*Appeal No. 25-3098*

---

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

IN RE:  TELESCOPES
ANTITRUST LITIGATION

---

ZHEN, et al.,

*Objectors-Appellants,*

vs.

INDIRECT PURCHASER PLAINTIFFS

*Plaintiffs-Appellees,*

vs.

SYNTA TECHNOLOGY CORP., ET AL,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of California, San Jose Division
Hon. Edward J. Davila
D.C. No. 5:20-cv-03639 –EJD

---

**DECLARATION OF LIN Y. CHAN IN SUPPORT OF INDIRECT
PURCHASER PLAINTIFFS-APPELLEES'
MOTION TO DISMISS FOR LACK OF STANDING**

---

1

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

Kalpana Srinivasan (SBN 237460)
**SUSMAN GODFREY LLP**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE &
McCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

*Settlement Class Counsel for Indirect Purchaser Plaintiffs-Appellees*

I, Lin Y. Chan, declare:

1.     I am Co-Lead Counsel for Plaintiffs-Appellees and the Class in the above captioned matter.  I make this Declaration in support of Indirect Purchaser Plaintiffs-Appellees' Motion to Dismiss for Lack of Standing.

2.     Attached as **Exhibit 1** is a true and correct copy of the Settlement Agreement in the Originating District Court Case *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Sept. 16, 2025), ECF No. 390-1.

3.     Attached as **Exhibit 2** is a true and correct copy of the Stipulation & Order Regarding Consolidation & Case Management, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Aug. 17, 2020), ECF No. 56.

4.     Attached as **Exhibit 3** is a true and correct copy of the Fourth Amended Consolidated Class Action Complaint, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Dec. 5, 2022), ECF No. 300.

5.     Attached as **Exhibit 4** is a true and correct copy of the Order Granting Motion for Final Approval; Granting Motion for Attorneys' Fees, Expenses & Service Awards, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Apr. 11, 2025), ECF No. 419.

6.     Attached as **Exhibit 5** is a true and correct copy of the Order Preliminarily Approving Class Action Settlement and Issuing Notice, *In re*

*Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Nov. 4, 2024), ECF No. 397.

7.      Attached as **Exhibit 6** is a true and correct copy of Jason Steele and Pioneer Cycling & Fitness LLP's Conditional Objection to Class Action Settlement, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Feb. 13, 2025), ECF No. 400.

8.      Attached as **Exhibit 7** is a true and correct copy of Pat Zhen's Notice of Appeal, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. May 5, 2025), ECF No. 421.

9.      Attached as **Exhibit 8** is a true and correct copy of Pat Zhen's Objections to the Settlement, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Feb. 19, 2025), ECF No. 402.

10.      Attached as **Exhibit 9** is a true and correct copy of the Judgment, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Apr. 11, 2025), ECF No. 420.

11.      Attached as **Exhibit 10** is a true and correct copy of the Amended Judgment, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. June 23, 2025), ECF No. 426.

12.     Attached as **Exhibit 11** is a true and correct copy of Elman Barnes'
Objections to the Settlement, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-
0369-EJD (N.D. Cal. Feb. 12, 2025), ECF No. 399.

13.     Attached as **Exhibit 12** is a true and correct copy of National
Woodlands Preservation, Inc.'s Objections to the Settlement, *In re Telescopes
Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Feb. 14, 2025), ECF No.
401.

14.     Attached as **Exhibit 13** is a true and correct copy of Mike Sussman's
Objections to the Settlement, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-
0369-EJD (N.D. Cal. Feb. 26, 2025), ECF No. 403.

15.     Attached as **Exhibit 14** is a true and correct copy of Pat Zhen's Reply
in Support of Objections, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-
EJD (N.D. Cal. Mar. 26, 2025), ECF No. 408.

16.     Attached as **Exhibit 15** is a true and correct copy of Pat Zhen's
receipt for appeal fee, *In re Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD
(N.D. Cal. May 30, 2025), ECF No. 424.

17.     Attached as **Exhibit 16** is a true and correct copy of Indirect
Purchaser Plaintiffs' Motion for Appeal Bond, *In re Telescopes Antitrust
Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. July 14, 2025), ECF No. 429.

18.     Attached as **Exhibit 17** is a true and correct copy of Indirect

Purchaser Plaintiffs' Reply in Support of Motion for Appeal Bond, *In re*

*Telescopes Antitrust Litigation*, No. 5:20-cv-0369-EJD (N.D. Cal. Aug. 4, 2025),

ECF No. 443.

19.     I declare under penalty of perjury under the laws of the United States

that the foregoing is true and correct.

Executed this 3rd day of September, 2025 at San Francisco, CA.

Dated:  September 3, 2025          By:   */s/ Lin Y. Chan*

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

*Settlement Class Counsel for Indirect*
*Purchaser Plaintiffs-Appellees*

# EXHIBIT 1

EXHIBIT A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| **IN RE TELESCOPES ANTITRUST LITIGATION** | Case No. 5:20-cv-03639-EJD |
| **This Document Relates to:** | **SETTLEMENT AGREEMENT** |
| **Indirect Purchaser Actions** | |

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**

2987155.2

This Settlement Agreement (defined below) is made and entered into this **31st** day of August, 2024 (the "Execution Date"), by and among the Synta Defendants and the Indirect Purchaser Plaintiffs, both individually and on behalf of the proposed Settlement Class (defined below) in the above-captioned action ("Action"). This Settlement Agreement is intended by the Synta Defendants and the Indirect Purchaser Plaintiffs ("the Settling Parties" as further defined below) to fully, finally, and forever resolve, discharge and settle the Released Claims (defined below), upon and subject to the terms and conditions hereof.

<u>**RECITALS**</u>

WHEREAS, Indirect Purchaser Plaintiffs are prosecuting the Action on their own behalf and on behalf of the proposed Settlement Class against the Synta Defendants and other Defendants and alleged co-conspirators;

WHEREAS, Indirect Purchaser Plaintiffs allege, among other things, that the Synta Defendants violated the antitrust and consumer protection laws by conspiring amongst themselves and with the other Defendants and alleged co-conspirators to fix, raise, maintain, or stabilize the prices of Telescopes, and these acts caused the Class to incur damages;

WHEREAS, the Synta Defendants have denied and continue to deny each and all of Indirect Purchaser Plaintiffs' claims and allegations of wrongdoing; have not conceded or admitted any liability, or that they violated or breached any law, regulation, or duty owed to the Indirect Purchaser Plaintiffs; have denied and continue to deny all charges of wrongdoing or liability against it arising out of any of the conduct, statements, acts or omissions alleged in the Action; and further deny the allegations that the Indirect Purchaser Plaintiffs or any member of the Class were harmed by any conduct by the Synta Defendants alleged in the Action or otherwise;

WHEREAS, Indirect Purchaser Plaintiffs and the Synta Defendants have engaged in extensive discovery regarding the facts pertaining to Indirect Purchaser Plaintiffs' claims and the Synta Defendants' defenses;

WHEREAS, Indirect Purchaser Plaintiffs and the Synta Defendants agree that neither this Settlement Agreement nor any statement made in the negotiation thereof shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by the Synta Defendants or of the truth of any of the claims or allegations alleged in the Action;

WHEREAS, Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs ("Co-Lead Counsel") have concluded, after due investigation and after carefully considering the relevant circumstances, including, without limitation, the claims asserted in the Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Complaint, the legal and factual defenses thereto, and the applicable law, that it is in the best interests of the Indirect Purchaser Plaintiffs and the proposed Settlement Class to enter into this Settlement Agreement to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the Indirect Purchaser Plaintiffs and the Class, and, further, that Co-Lead Counsel consider the Settlement set forth herein to be fair, reasonable and adequate and in the best interests of the Indirect Purchaser Plaintiffs and the Class;

WHEREAS, the Synta Defendants have concluded, despite their belief that they are not liable for the claims asserted against them in the Action and that they have good defenses thereto, that they will enter into this Settlement Agreement in order to avoid the further expense, inconvenience, and distraction of burdensome and protracted litigation, and thereby put to rest this controversy with respect to the Indirect Purchaser Plaintiffs and the Class and avoid the risks inherent in complex litigation; and

WHEREAS, arm's length settlement negotiations have taken place between counsel for Indirect Purchaser Plaintiffs and the Synta Defendants over many months, including in multiple mediations before Judge Suzanne Segal (Ret.), and this Settlement Agreement, which embodies all of the terms and conditions of the Settlement between the Settling Parties, both individually and on behalf of the Class, has been reached as a result of the Settling Parties' negotiations

1  (subject to the approval of the Court) as provided herein and is intended to supersede any prior

2  agreements or understandings between the Settling Parties.

3  ## AGREEMENT

4     NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among

5  the Settling Parties, by and through their undersigned attorneys of record, in consideration of the

6  covenants, agreements, and releases set forth herein and for other good and valuable

7  consideration, that the Action and the Released Claims as against the Synta Defendants shall be

8  finally and fully settled, compromised and dismissed on the merits and with prejudice, without

9  costs as to Indirect Purchaser Plaintiffs, the Class, or the Synta Defendants, upon and subject to

10  the approval of the Court, following notice to the Class, on the following terms and conditions:

11  ## DEFINITIONS

12     1.     As used in this Settlement Agreement, the following terms shall have the meanings

13  specified below:

14        (a)     "Action" means *In re Telescopes Antitrust Litigation* – All Indirect

15  Purchaser Actions, Case No. 5:20-cv-03639-EJD, and each of the cases brought on behalf of

16  indirect purchasers previously consolidated and/or included as part of Docket No. 5:20-cv-

17  03639-EJD.

18        (b)     "Affiliates" means entities controlling, controlled by or under common

19  control with a Releasee or Releasor.

20        (c)     "Authorized Claimant" means any Indirect Plaintiff Purchaser who, in

21  accordance with the terms of this Settlement Agreement, is entitled to a distribution consistent

22  with any Distribution Plan or order of the Court ordering distribution to the Class.

23        (d)     "Claims Administrator" means the claims administrator(s) to be selected

24  by Co-Lead Counsel.

25        (e)     The "Class" or "Settlement Class" is defined as all persons and entities in

26  the Indirect Purchaser States (as defined herein) who, during the period from January 1, 2005 to

27  September 6, 2023, purchased one or more Telescopes from a distributor (or from an entity other

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**          3
2987155.2

than a Defendant) that a Defendant or alleged co-conspirator manufactured. Excluded from the Class are Defendants; their parent companies, subsidiaries and Affiliates; any co-conspirators; Defendants' attorneys in this Action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this Action; all jurors in this Action; and all Persons who directly purchased Telescopes from Defendants but only for those direct purchases of Telescopes.

(f)    "Class Member" or "Settlement Class Member" means a Person who falls within the definition of the Settlement Class and who does not timely and validly elect to be excluded from the Class in accordance with the procedure to be established by the Court.

(g)    "Co-Lead Counsel" means the law firms of Cotchett, Pitre & McCarthy, LLP; Lieff Cabraser Heimann & Bernstein LLP; and Susman Godfrey LLP.

(h)    "Court" means the United States District Court for the Northern District of California.

(i)    "Distribution Plan" means any plan or formula of allocation, to be approved by the Court, whereby the Net Settlement Fund shall in the future be distributed to Authorized Claimants.

(j)    "Document" is synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a), including, without limitation, electronic or computerized data compilations. A draft of non-identical copy is a separate document within the meaning of this term.

(k)    "Effective Date" means the first date by which all of the following events and conditions have been met or have occurred:

(1)    All parties have executed this Settlement Agreement;

(2)    The Court has preliminarily approved the Settlement Agreement, certified the Settlement Class for purposes of effectuating this Settlement, and approved the Settlement after providing notice to the Settlement Class as defined herein;

(3)    The Court has entered a Final Judgment; and

(4)     The Final Judgment (as more fully described in ¶ 7 of this Settlement Agreement) has become final, with the occurrence of the following: (A) the entry by the Court of a final order approving the Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure together with entry of a final judgment dismissing the Action and all claims therein by the Class against the Synta Defendants with prejudice as to all Class Members (the "Final Judgment"), and (B) the expiration of the time for appeal or to seek permission to appeal from the Court's approval of the Settlement Agreement and entry of the Final Judgment or, if an appeal from an approval and Final Judgment is taken, the affirmance of such Final Judgment in its entirety, without modification, by the court of last resort to which an appeal of such Final Judgment may be taken, provided, however, a modification or reversal on appeal of any amount of Co-Lead Counsel's fees and expenses awarded by the Court from the Settlement Fund or any plan of allocation or distribution of the Settlement Fund shall not be deemed a modification of all or part of the terms of this Settlement Agreement or the Final Judgment. It is agreed that neither the provisions of Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. § 1651, shall be taken into account in determining the above-stated times.

(l)     "Escrow Agent" means the agent jointly designated by Co-Lead Counsel and the Synta Defendants, and any successor agent.

(m)     "Execution Date" means the first date set forth above in this Settlement Agreement, which is August 31 , 2024.

(n)     "Final" means, with respect to any order of court, including, without limitation, the Judgment, that such order represents a final and binding determination of all issues within its scope and is not subject to further review on appeal or otherwise. Without limitation, an order becomes "Final" when: (a) no appeal has been filed and the prescribed time for commencing any appeal has expired; or (b) an appeal has been filed and either (i) the appeal has been dismissed and the prescribed time, if any, for commencing any further appeal has expired, or (ii) the order has been affirmed in its entirety and the prescribed time, if any, for commencing

1 any further appeal has expired. For purposes of this Settlement Agreement, an "appeal" includes
2 appeals as of right, discretionary appeals, interlocutory appeals, proceedings involving writs of
3 certiorari or mandamus, and any other proceedings of like kind. Any appeal or other proceeding
4 pertaining solely to any order adopting or approving a Distribution Plan, and/or to any order
5 issued in respect of an application for attorneys' fees and expenses consistent with this
6 Settlement Agreement, shall not in any way delay or preclude the Judgment from becoming
7 Final.

8 (o) "Gross Settlement Fund" or "Settlement Fund" means the Settlement
9 Amount plus any interest that may accrue.

10 (p) "Indirect Purchaser Plaintiffs" means John Goerger, Scott Plummer,
11 Donnie Houston, Ronald Troillet, Sigurd Murphy, Thien Ngo, Arthur Sines, Jesse Smith, Greg
12 Kendall, Austin Griffith, Keith Uehara, Madeline Bekielewski,[1] Michael Price, Brian Murphy,
13 Timothy McQuaid, Sara Day Brewer, Robert Welsh, Bentaro Huset, Jason Glydewell, Deborah
14 Lemar, James Riley, David Dick, Leon Greenberg, Anthony Di Mambro, Steven Zellers,
15 Michael Liskow, Philip Moore, Doug Lundy, John Maurice, David Kerber, Thomas Berta, Greg
16 Ross, Vincent Catanzaro, David Quaglietta, and Herbert Nelson, as well as any other Person
17 added as an Indirect Purchaser Plaintiff in the Action.

18 (q) "Indirect Purchaser States" means Arizona, Arkansas, California,
19 Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine,
20 Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New
21 Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island,
22 South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

23 (r) "Judgment" means the order of judgment and dismissal of the Action with
24 prejudice.

25 (s) "Net Settlement Fund" means the Gross Settlement Fund, less the

27 [1] Richard Bekielewski was an original class representative, but he passed away during the pendency of the litigation. His wife, Madeline Bekielewski, has taken over his estate and claims.

payments set forth in ¶ 17.

(t)    "Notice, Administrative and Claims Administration Costs" means the reasonable sum of nonrefundable settlement money to be paid out of the Gross Settlement Fund to pay for notice to the Class and related administrative and claims administration costs.

(u)    "Person(s)" means an individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and any spouses, heirs, predecessors, successors, representatives or assignees of any of the foregoing.

(v)    "Proof of Claim and Release" means the form to be sent to the Class, upon further order(s) of the Court, by which any member of the Class may make claims against the Gross Settlement Fund.

(w)    "Released Claims" means any and all manner of claims, demands, rights, actions, suits, causes of action, whether class, individual or otherwise in nature, fees, costs, penalties, injuries, damages whenever incurred, liabilities of any nature whatsoever, known or unknown (including, but not limited to, "Unknown Claims"), foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, contingent or non-contingent, in law or in equity, under the laws of any jurisdiction, which Releasors or any of them, whether directly, representatively, derivatively, or in any other capacity, ever had, now have or hereafter can, shall or may have, relating in any way to any conduct on or before the Effective Date and arising out of or related in any way in whole or in part to any facts, circumstances, acts, or omissions by Releasees which were alleged or which could have been alleged in the Action, including but not limited to any conduct by Releasees regardless of where it occurred at any time on or before the Effective Date concerning, arising out of or related to (1) the purchase, pricing, selling, discounting, marketing, manufacturing and/or distributing of Telescopes; (2) any agreement, combination or conspiracy to raise, fix, maintain or stabilize the prices of Telescopes or restrict, reduce, alter or allocate the supply, quantity or quality of Telescopes or concerning the development, manufacture, supply,

distribution, transfer, marketing, sale or pricing of Telescopes, or any other restraint of competition alleged in the Action or that could have been or hereafter could be alleged against the Releasees relating to Telescopes, or (3) any other restraint of competition relating to Telescopes that could have been or hereafter could be alleged against the Releasees as a violation of the Sherman Act or any other antitrust, unjust enrichment, unfair competition, unfair practices, trade practices, price discrimination, unitary pricing, racketeering, civil conspiracy or consumer protection law, whether under federal, state, local or foreign law provided however, that nothing herein shall release: (i) claims involving any negligence, personal injury, breach of contract, bailment, failure to deliver lost goods, damaged or delayed goods, product defect, securities or similar claim relating to any Telescopes; and (ii) claims for damages under the state or local laws of any jurisdiction other than an Indirect Purchaser State, as defined herein in this Settlement Agreement. For the avoidance of doubt, this Settlement Agreement does not release any claims for direct purchases of Telescopes.

(x)   "Releasees" refers jointly and severally, individually and collectively to the Synta Defendants (as defined in ¶ 1(ee) below) and each of their respective past and/or present direct and indirect parents, members, subsidiaries, Affiliates, predecessors, joint ventures, heirs, executors, administrators, successors and assigns, and their respective past, present and/or future officers, directors, employees, agents, attorneys and legal representatives, servants, and representatives, and the predecessors, successors, heirs, executors, administrators and assigns of each of the foregoing.  For the avoidance of doubt, "Releasees" does not refer to, or mean, alleged co-conspirator and named Defendant Ningbo Sunny or any of its officers, affiliates or related entities in their capacity on behalf of Ningbo Sunny.

(y)   "Releasors" refers jointly and severally, individually and collectively to the Indirect Purchaser Plaintiffs and each and every member of the Class on their own behalf and on behalf of their respective past, present, and/or future direct and indirect parents, members, subsidiaries and Affiliates, and their past, present and/or future officers, directors, employees, agents, attorneys and legal representatives, servants, and representatives, and the predecessors,

successors, heirs, executors, administrators and assigns of each of the foregoing.

(z)     "Settlement" means the settlement of the Released Claims set forth herein.

(aa)    "Settlement Agreement" means this settlement agreement dated ~~June~~ August 31 , 2024.

(bb)    "Settlement Amount" means Thirty-Two Million U.S. Dollars ($32,000,000.00).

(cc)    "Settling Parties" means, collectively, the Indirect Purchaser Plaintiffs (on behalf of themselves and the Class) and the Synta Defendants.

(dd)    "Synta Co-Conspirators" means Jean Shen, Sylvia Shen, Jack Chen, Laurence Huen, and Corey Lee.

(ee)    "Synta Defendants" means Synta Technology Corp. of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd.; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon, USA LLC; Dar Tson ("David") Shen; Joseph Lupica; and Dave Anderson.

(ff)    "Telescopes" refers to optical instruments that magnify and enhance the view of faraway objects, as further described in paragraphs 96 through 99 of the Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Complaint, and does not include other optical instruments not marketed as telescopes, such as binoculars, siting scopes, microscopes, etc.

(gg)    "Unknown Claims" means any Released Claim that an Indirect Purchaser Plaintiff and/or Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Releasees that if known by him, her or it, might have affected his, her or its settlement with and release of the Releasees, or might have affected his, her or its decision not to object to this Settlement. Such Unknown Claims include claims that are the subject of California Civil Code § 1542 and equivalent, similar or comparable laws or principles of law. California Civil Code § 1542 provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

**Preliminary Approval Order, Notice Order and Settlement Hearing**

2.     ***Reasonable Best Efforts to Effectuate this Settlement.*** The Settling Parties: (a) acknowledge that it is their intent to consummate this Settlement Agreement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement the terms and conditions of this Settlement Agreement and to exercise their reasonable best efforts to accomplish the terms and conditions of this Settlement Agreement. The Synta Defendants agree to provide data reasonably necessary and available to them for Plaintiffs to effectuate Class Notice, allocation, and payments to the Settlement Class.

3.     ***Motion for Preliminary Approval.*** At a time to be determined by Co-Lead Counsel, Co-Lead Counsel shall submit this Settlement Agreement to the Court and shall apply for entry of a Preliminary Approval Order, requesting, *inter alia,* preliminary approval of the Settlement. The motion shall include (a) the proposed Preliminary Approval Order, and (b) a request for certification of the Class for settlement purposes pursuant to Federal Rule of Civil Procedure 23.

4.     ***Proposed Notice.*** At a time to be determined in their sole discretion, Co-Lead Counsel shall submit to the Court for approval a proposed form of, method for and schedule for dissemination of notice to the Class. This motion shall recite and ask the Court to find that the proposed form of and method for dissemination of the notice to the Class constitutes valid, due and sufficient notice to the Class, constitutes the best notice practicable under the circumstances, and complies fully with the requirements of Federal Rule of Civil Procedure 23.

5.     ***Claims Administrator.*** Indirect Purchaser Plaintiffs shall retain a Claims

Administrator, which shall be responsible for the claims administration process including distribution to Class Members pursuant to a court-approved plan of distribution. The fees and expenses of the Claims Administrator shall be paid exclusively out of the Settlement Fund. In no event shall the Synta Defendants be separately responsible for any fees or expenses of the Claims Administrator.

6.   ***Requests for Exclusion (Opt Outs).*** Any Class Member that wishes to seek exclusion from the Settlement Class by "opting out" must timely submit a written request for exclusion to the Claims Administrator (a "Request for Exclusion"). To be effective, each such Request for Exclusion must state: the Settlement Class Member's full legal name, address and telephone number; that the Class Member purchased one or more Telescopes from a Distributor (or from an entity other than a defendant) who in turn purchased from one of the Defendants during the Class Period; and that the Class Member (1) wants to be excluded from the *In re Telescopes Antitrust Litigation* – Indirect Purchaser Actions class action settlement with the Synta Defendants and (2) understands that by so doing, the Class Member will not be able to get any money or benefits from the Settlement with the Synta Defendants under the Settlement Agreement. All Requests for Exclusion must be signed and dated by the Class Member or its officer or legal representative, and be (1) mailed to the Claims Administrator via First Class United States Mail (or United States Mail for overnight delivery) and postmarked by a date certain to be specified on the Notice, or (2) received by the Claims Administrator by that date, Persons who opt out are not entitled to any monetary award from the Settlement Fund.

7.   ***Motion for Final Approval and Entry of Final Judgment.*** Prior to the date set by the Court to consider whether this Settlement should be finally approved, Co-Lead Counsel shall submit a motion for final approval of the Settlement by the Court. The Settling Parties shall jointly seek entry of the Final Approval Order and Judgment:

(a)   certifying the Settlement Class, as defined in this Settlement Agreement, pursuant to Federal Rule of Civil Procedure 23, solely for purposes of this Settlement;

(b)   fully and finally approving the Settlement contemplated by this Settlement

Agreement and its terms as being fair, reasonable and adequate within the meaning of Federal Rule of Civil Procedure 23 and directing its consummation pursuant to its terms and conditions.

(c)    finding that the notice given to the Class Members constituted the best notice practicable under the circumstances and complies in all respects with the requirements of Federal Rule of Civil Procedure 23 and due process;

(d)    directing that the Action be dismissed with prejudice as to the Synta Defendants and, except as provided for herein, without costs;

(e)    discharging and releasing the Releasees from all Released Claims;

(f)    permanently barring and enjoining the institution and prosecution, by Indirect Purchaser Plaintiffs and Class Members, of any other action against the Releasees in any court asserting any claims related in any way to the Released Claims;

(g)    reserving continuing and exclusive jurisdiction over the Settlement, including all future proceedings concerning the administration, consummation and enforcement of this Settlement Agreement;

(h)    determining pursuant to Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of a final judgment as to the Synta Defendants; and

(i)    containing such other and further provisions consistent with the terms of this Settlement Agreement to which the parties expressly consent in writing.

8.    ***Stay Order.*** Upon the Execution Date, the Action shall be stayed, and any existing stay shall remain in place, as against the Synta Defendants only. Should the Action be tried against any Defendants other than the Synta Defendants, the parties specifically agree that any findings therein shall not be binding on or admissible in evidence against the Synta Defendants or prejudice the Synta Defendants in any way in any future proceeding involving the Synta Defendants.

9.    Upon the date that the Court enters an order preliminarily approving the Settlement, Indirect Purchaser Plaintiffs and members of the Class shall be barred and enjoined from commencing, instituting or continuing to prosecute any action or any proceeding in any

court of law or equity, arbitration tribunal, administrative forum or other forum of any kind worldwide based on the Released Claims.

### Releases

10.     ***Released Claims.*** Upon the Effective Date, the Releasors (regardless of whether any such Releasor ever seeks or obtains any recovery by any means, including, without limitation, by submitting a Proof of Claim and Release, any distribution from the Gross Settlement Fund) by virtue of this Settlement Agreement shall be deemed to have, and by operation of the Judgment shall have fully, finally and forever released, relinquished and discharged all Released Claims against the Releasees.

11.     ***No Future Actions Following Release.*** The Releasors shall not, after the Effective Date, seek (directly or indirectly) to commence, institute, maintain or prosecute any suit, action or complaint or collect from or proceed against the Synta Defendants or any other Releasee (including pursuant to the Action) based on the Released Claims in any forum worldwide, whether on his, her, or its own behalf or as part of any putative, purported or certified class of purchasers or consumers.

12.     ***Covenant Not to Sue.*** Releasors hereby covenant not to sue the Releasees with respect to any such Released Claims. Releasors shall be permanently barred and enjoined from instituting, commencing or prosecuting against the Releasees any claims based in whole or in part on the Released Claims. The Settling Parties contemplate and agree that this Settlement Agreement may be pleaded as a bar to a lawsuit, and an injunction may be obtained, preventing any action from being initiated or maintained in any case sought to be prosecuted by or on behalf of Indirect Purchaser Plaintiffs or Class Members with respect to the Released Claims.

13.     ***Waiver of California Civil Code § 1542 and Similar Laws.*** The Releasors acknowledge that, by virtue of the execution of this Settlement Agreement, and for the consideration received hereunder, it is their intention to release, and they are releasing, all Released Claims, even Unknown Claims. In furtherance of this intention, the Releasors expressly waive and relinquish, to the fullest extent permitted by law, any rights or benefits conferred by

the provisions of California Civil Code § 1542, as set forth in ¶ 1(gg), or equivalent, similar or comparable laws or principles of law. The Releasors acknowledge that they have been advised by Co-Lead Counsel of the contents and effects of California Civil Code § 1542, and hereby expressly waive and release with respect to the Released Claims any and all provisions, rights and benefits conferred by California Civil Code § 1542 or by any equivalent, similar or comparable law or principle of law in any jurisdiction. The Releasors may hereafter discover facts other than or different from those which they know or believe to be true with respect to the subject matter of the Released Claims, but the Releasors hereby expressly waive and fully, finally and forever settle and release any known or unknown, suspected or unsuspected, foreseen or unforeseen, asserted or unasserted, contingent or non-contingent, and accrued or unaccrued claim, loss or damage with respect to the Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such additional or different facts. The release of unknown, unanticipated, unsuspected, unforeseen, and unaccrued losses or claims in this paragraph is not a mere recital.

14. **Claims Excluded from Release.** Notwithstanding the foregoing, the releases provided herein shall not release claims against the Synta Defendants for product liability, breach of contract, breach of warranty or personal injury, claims for direct purchases of Telescopes or any other claim unrelated to the allegations in the Action of restraint of competition or unfair competition with respect to Telescopes. Additionally, the releases provided herein shall not release any claims to enforce the terms of this Settlement Agreement.

**Settlement Consideration and Settlement Fund**

15. **Settlement Payments.** The Synta Defendants shall pay by wire transfer the Settlement Amount ($32,000,000) to the Escrow Agent pursuant to escrow instructions as follows: (i) a $1 million non-reimbursable amount within 10 days of preliminary approval; (ii) a further $1 million within 12 months of preliminary approval, which latter amount shall be refunded to the Synta Defendants if the Settlement is not approved; and (iii) the entire remaining portion of the Settlement Amount according to the terms of the parties' Confidential Supplemental Agreement

1   but not to exceed 18 months from preliminary approval. This Settlement Amount constitutes the

2   total amount of payment that the Synta Defendants are required to make in connection with

3   this Settlement Agreement. This amount shall not be subject to reduction, and upon the

4   occurrence of the Effective Date, no funds shall revert to the Synta Defendants except as

5   provided herein. The Escrow Agent shall only act in accordance with the mutually agreed escrow

6   instructions.

7       16.   ***Stipulated Judgment.*** Synta Technology Corp. of Taiwan; Suzhou Synta Optical

8   Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd.; Synta Canada

9   International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW

10  Technology Corporation; Celestron Acquisition, LLC;   Olivon, USA LLC; and Dar Tson

11  ("David") Shen will execute a stipulated judgment for $32 million (less any amounts paid toward

12  the Settlement Fund) concurrently with the execution of the Settlement Agreement. The

13  stipulated judgment will be held in escrow, and not filed or entered, unless there is an uncured

14  default of the Settlement Agreement following 30 days' written notice to the defaulting party or

15  parties.

16      17.   ***Disbursements Prior to Effective Date.*** No amount may be disbursed from the

17  Gross Settlement Fund unless and until the Effective Date, except that: (a) Notice,

18  Administrative and Claims Administration Costs may be paid from the Gross Settlement Fund

19  as they become due; (b) Taxes and Tax Expenses (as defined in ¶ 21(b) below) may be paid from

20  the Gross Settlement Fund as they become due; and (c) attorneys' fees and reimbursement of

21  litigation costs may be paid as ordered by the Court, which may be disbursed during the pendency

22  of any appeals, which may be taken from the judgment to be entered by the Court finally

23  approving this Settlement.

24      18.   ***Refund by Escrow Agent.*** If the Settlement as described herein is not finally

25  approved by any court, or it is terminated as provided herein, or the Judgment as described herein

26  is not approved or entered or is overturned on appeal or by writ, the Gross Settlement Fund,

27  including the Settlement Amount and all interest earned on the Settlement Amount while held in

28

escrow, excluding only Notice, Administrative and Claims Administration Costs and Taxes and/or Tax Expenses, shall be refunded, reimbursed and repaid by the Escrow Agent to the Synta Defendants within five (5) business days after receiving notice pursuant to ¶ 38 below.

19. **Refund by Co-Lead Counsel.** If the Settlement as described herein is not finally approved by any court, or it is terminated as provided herein, or the Judgment as described herein is not approved or entered or is overturned on appeal or by writ, any attorneys' fees and costs previously paid pursuant to this Settlement Agreement (as well as interest on such amounts) shall be refunded, reimbursed and repaid by Co-Lead Counsel within thirty (30) business days after receiving notice pursuant to ¶ 38 below.

20. **No Additional Payments by the Synta Defendants.** Under no circumstances will the Synta Defendants be required to pay more or less than the Settlement Amount pursuant to this Settlement Agreement and the Settlement set forth herein. For purposes of clarification, the payment of any Fee and Expense Award (as defined in ¶ 30 below), the Notice, Administrative and Claims Administrative Costs, and any other costs associated with the implementation of this Settlement Agreement shall be exclusively paid from the Settlement Amount.

21. **Taxes.** The Settling Parties and the Escrow Agent agree to treat the Gross Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1. The Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this paragraph, including the "relation-back election" (as defined in Treas. Reg. § 1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agent to prepare and deliver timely and properly the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

(a) For the purpose of § 1.468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent. The Escrow Agent shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2

1   by, e.g., (i) obtaining a taxpayer identification number, (ii) satisfying any information reporting

2   or withholding requirements imposed on distributions from the Gross Settlement Fund, and

3   (iii) timely and properly filing applicable federal, state and local tax returns necessary or

4   advisable with respect to the Gross Settlement Fund (including, without limitation, the returns

5   described in Treas. Reg. § 1.468B-2(k)) and paying any taxes reported thereon. Such returns (as

6   well as the election described in this paragraph) shall be consistent with the provisions of this

7   paragraph and in all events shall reflect that all Taxes as defined in ¶ 21(b) below on the income

8   earned by the Gross Settlement Fund shall be paid out of the Gross Settlement Fund as provided

9   in ¶ 21(b) hereof;

10          (b)    The following shall be paid out of the Gross Settlement Fund: (i) all taxes

11   (including any estimated taxes, interest or penalties) arising with respect to the income earned

12   by the Gross Settlement Fund, including, without limitation, any taxes or tax detriments that may

13   be imposed upon the Synta Defendants or their counsel with respect to any income earned by the

14   Gross Settlement Fund for any period during which the Gross Settlement Fund does not qualify

15   as a "qualified settlement fund" for federal or state income tax purposes (collectively, "Taxes");

16   and (ii) all expenses and costs incurred in connection with the operation and implementation of

17   this paragraph, including, without limitation, expenses of tax attorneys and/or accountants and

18   mailing and distribution costs and expenses relating to filing (or failing to file) the returns

19   described in this paragraph (collectively, "Tax Expenses"). In all events neither any of the Synta

20   Defendants nor their counsel shall have any liability or responsibility for the Taxes or the Tax

21   Expenses. With funds from the Gross Settlement Fund, the Escrow Agent shall indemnify and

22   hold harmless the Synta Defendants and their counsel for Taxes and Tax Expenses (including,

23   without limitation, Taxes payable by reason of any such indemnification). Further, Taxes and

24   Tax Expenses shall be treated as, and considered to be, a cost of administration of the Gross

25   Settlement Fund and shall timely be paid by the Escrow Agent out of the Gross Settlement Fund

26   without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding

27   anything herein to the contrary) to withhold from distribution to Authorized Claimants any funds

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                                      17
2987155.2

1 necessary to pay such amounts, including the establishment of adequate reserves for any Taxes

2 and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg.

3 §1.468B-2(1)(2)); neither any of the Synta Defendants nor their counsel is responsible therefor,

4 nor shall they have any liability therefor. The Settling Parties agree to cooperate with the Escrow

5 Agent, each other, their tax attorneys and their accountants to the extent reasonably necessary to

6 carry out the provisions of this paragraph.

7 **Administration and Distribution of Gross Settlement Fund**

8       22.    ***Time to Appeal.*** The time to appeal from an approval of the Settlement shall

9 commence upon the Court's entry of the Judgment regardless of whether or not either the

10 Distribution Plan or an application for attorneys' fees and expenses has been submitted to the

11 Court or resolved.

12       23.    ***Distribution of Gross Settlement Fund.*** Upon further orders of the Court, the

13 Claims Administrator, subject to such supervision and direction of the Court and/or Co-Lead

14 Counsel as may be necessary or as circumstances may require, shall administer the claims

15 submitted by members of the Class and shall oversee distribution of the Gross Settlement Fund

16 to Authorized Claimants pursuant to the Distribution Plan. Subject to the terms of this Settlement

17 Agreement and any order(s) of the Court, the Gross Settlement Fund shall be applied as follows:

18       (a)    To pay all costs and expenses reasonably and actually incurred in providing

19 notice to the Class in connection with administering and distributing the Net Settlement Fund to

20 Authorized Claimants, and in connection with paying escrow fees and costs, if any;

21       (b)    To pay all costs and expenses, if any, reasonably and actually incurred in

22 claims administration and assisting with the filing and processing of such claims;

23       (c)    To pay the Taxes and Tax Expenses as defined herein;

24       (d)    To pay any Fee and Expense Award along with proportional interest earned

25 on the Settlement Fund that is allowed by the Court, subject to and in accordance with the

26 Agreement; and

27       (e)    To distribute the balance of the "Net Settlement Fund" to Authorized

28

1   Claimants as allowed by the Agreement, any Distribution Plan or order of the Court along with

2   proportional interest earned on the Settlement Fund.

3        24.    ***Distribution of Net Settlement Fund.*** The Net Settlement Fund shall be distributed

4   in accordance with the Distribution Plan that is approved by the Court.

5        25.    All Persons who fall within the definition of the Class who do not timely and

6   validly request to be excluded from the Class shall be subject to and bound by the provisions of

7   this Settlement Agreement, the releases contained herein, and the Judgment with respect to all

8   Released Claims, regardless of whether such Persons seek or obtain by any means, including,

9   without limitation, by submitting a Proof of Claim and Release or any similar document, any

10   distribution from the Gross Settlement Fund or the Net Settlement Fund.

11        26.    ***No Liability for Distribution of Settlement Funds.*** Neither the Releasees nor their

12   counsel shall have any responsibility for, interest in or liability whatsoever with respect to the

13   distribution of the Gross Settlement Fund; the Distribution Plan; the determination,

14   administration, or calculation of claims; the Settlement Fund's qualification as a "qualified

15   settlement fund"; the payment or withholding of Taxes or Tax Expenses; the distribution of the

16   Net Settlement Fund; or any losses incurred in connection with any such matters. The Releasors

17   hereby fully, finally and forever release, relinquish and discharge the Releasees and their counsel

18   from any and all such liability. No Person shall have any claim against Co-Lead Counsel or the

19   Claims Administrator based on the distributions made substantially in accordance with the

20   Agreement and the Settlement contained herein, the Distribution Plan or further orders of the

21   Court.

22        27.    ***Balance Remaining in Net Settlement Fund.*** If there is any balance remaining in

23   the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), Co-

24   Lead Counsel may reallocate such balance among Authorized Claimants in an equitable and

25   economic fashion, distribute the remaining funds through *cy pres*, or allow the money to escheat

26   to federal or state governments, subject to Court approval. In no event shall the Net Settlement

27   Fund revert to the Synta Defendants.

28

28.    ***Distribution Plan Not Part of Settlement.*** It is understood and agreed by the Settling Parties that any Distribution Plan, including any adjustments to any Authorized Claimant's claim, is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Settlement Agreement, and any order or proceedings relating to the Distribution Plan shall not operate to terminate or cancel this Settlement Agreement or affect the finality of the Judgment, the Final Approval Order, or any other orders entered pursuant to this Settlement Agreement. The time to appeal from an approval of the Settlement shall commence upon the Court's entry of the Judgment regardless of whether either the Distribution Plan or an application for attorneys' fees and expenses has been submitted to the Court or approved.

**Attorneys' Fees and Reimbursement of Expenses**

29.    ***Fee and Expense Application.*** Co-Lead Counsel may submit an application or applications (the "Fee and Expense Application") for distributions from the Gross Settlement Fund, for: (a) an award of attorneys' fees; plus (b) reimbursement of expenses incurred in connection with prosecuting the Action; plus (c) any interest on such attorneys' fees and expenses (until paid) at the same rate and for the same periods as earned by the Settlement Fund, as appropriate, and as may be awarded by the Court.

30.    ***Payment of Fee and Expense Award.*** Any amounts that are awarded by the Court pursuant to the above paragraph (the "Fee and Expense Award") shall be paid from the Gross Settlement Fund consistent with the provisions of this Settlement Agreement.

31. ***Award of Fees and Expenses Not Part of Settlement.*** The procedure for, and the allowance or disallowance by the Court of, the Fee and Expense Application are not part of the Settlement set forth in this Settlement Agreement, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Settlement Agreement. Any order or proceeding relating to the Fee and Expense Application, or any appeal from any Fee and Expense Award or any other order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel this

1   Settlement Agreement, or affect or delay the finality of the Judgment and the Settlement of the

2   Action as set forth herein. No order of the Court or modification or reversal on appeal of any

3   order of the Court concerning any Fee and Expense Award or Distribution Plan shall constitute

4   grounds for cancellation or termination of this Settlement Agreement.

5         32.     ***No Liability for Fees and Expenses of Co-Lead Counsel.*** The Synta Defendants

6   shall have no responsibility for, and no liability whatsoever with respect to, any payment(s) to

7   Co-Lead Counsel pursuant to this Settlement Agreement and/or to any other Person who may

8   assert some claim thereto or any Fee and Expense Award that the Court may make in the Action,

9   other than as set forth in this Settlement Agreement.

10  **Conditions of Settlement, Effect of Disapproval, Cancellation or Termination**

11        33.     ***Occurrence of Effective Date.*** Upon the occurrence of all of the events required

12  in order to trigger the Effective Date as defined in ¶ 1(k), any and all remaining interest or right

13  of the Synta Defendants in or to the Gross Settlement Fund, if any, shall be absolutely and forever

14  extinguished, and the Gross Settlement Fund (less any Notice and Administrative Costs, Taxes

15  or Tax Expenses or any Fee and Expense Award paid) shall be transferred from the Escrow

16  Agent to the Claims Administrator as successor Escrow Agent within ten (10) days after the

17  Effective Date.

18        34.     ***Failure of Effective Date to Occur.*** If, for whatever reason, the Effective Date

19  does not occur or is not met, then this Settlement Agreement shall be cancelled and terminated,

20  subject to and in accordance with ¶¶ 37-38, below, unless the Settling Parties mutually agree in

21  writing to proceed with this Settlement Agreement.

22        35.     ***Exclusions.*** Co-Lead Counsel shall cause copies of requests for exclusion from the

23  Class to be provided to counsel for the Synta Defendants. No later than 14 days after the final

24  date for mailing requests for exclusion, Co-Lead Counsel shall provide counsel for the Synta

25  Defendants with a complete and final list of Requests for Exclusion from the Class. With the

26  motion for final approval of the Settlement, Co-Lead Counsel will file with the Court a complete

27  list of Requests for Exclusion from the Class, including only the name, city and state of the

28

person or entity requesting exclusion.

36. **Objections.** Settlement Class members who wish to object to any aspect of the Settlement must file with the Court a written statement containing their objection by the end of the period to object to the Settlement. Any award or payment of attorneys' fees made to counsel to an objector to the Settlement shall only be made by order of the Court order pursuant to the provisions of Federal Rule of Civil Procedure 23(e)(5)(B).

37. **Failure to Enter Proposed Preliminary Approval Order, Final Approval Order or Judgment.** If the Court does not enter the Preliminary Approval Order, the Final Approval Order or the Judgment, or if the Court enters the Final Approval Order and the Judgment and appellate review is sought and, on such review, the Final Approval Order or the Judgment is finally vacated, modified or reversed, then this Settlement Agreement and the Settlement incorporated therein shall be cancelled and terminated; provided, however, the Settling Parties agree to act in good faith to secure Final Approval of this Settlement and to attempt to address in good faith concerns regarding the Settlement identified by the Court and any court of appeal. No Settling Party shall have any obligation whatsoever to proceed under any terms other than substantially in the form provided and agreed to herein; provided, however, that no order of the Court concerning any Fee and Expense Application or Distribution Plan, or any modification or reversal on appeal of such order, shall constitute grounds for cancellation or termination of this Settlement Agreement by any Settling Party. Without limiting the foregoing, the Synta Defendants shall have, in their sole and absolute discretion, the option to terminate the Settlement in its entirety in the event that the Judgment, upon becoming Final, does not provide for the dismissal with prejudice of the Action against all of them.

38. **Termination.** Unless otherwise ordered by the Court, in the event that the Effective Date does not occur or this Settlement Agreement should terminate, or be cancelled or otherwise fail to become effective for any reason or the Settlement as described herein is not finally approved by the Court, or the Judgment is reversed or vacated following any appeal taken therefrom, then:

     (a)   within five (5) business days after written notification of such event is sent by counsel for the Synta Defendants to the Escrow Agent, the Gross Settlement Fund, including the Settlement Amount and all interest earned on the Settlement Fund while held in escrow excluding only Notice Administrative and Claims Administration Costs that have either been properly disbursed or are due and owing, Taxes and Tax Expenses that have been paid or that have accrued and will be payable at some later date, and attorneys' fees and costs that have been disbursed pursuant to Court order will be refunded, reimbursed and repaid by the Escrow Agent to the Synta Defendants; if said amount or any portion thereof is not returned within such five (5) business day period, then interest shall accrue thereon at the rate of ten percent (10%) per annum until the date that said amount is returned;

     (b)   within thirty (30) business days after written notification of such event is sent by Counsel for the Synta Defendants to Co-Lead Counsel, all attorneys' fees and costs which have been disbursed to Co-Lead Counsel pursuant to Court order shall be refunded, reimbursed and repaid by Co-Lead Counsel to the Synta Defendants;

     (c)   the Escrow Agent or its designee shall apply for any tax refund owed to the Gross Settlement Fund and pay the proceeds to the Synta Defendants, after deduction of any fees or expenses reasonably incurred in connection with such application(s) for refund, pursuant to such written request;

     (d)   the Settling Parties shall be restored to their respective positions in the Action as of the Execution Date, with all of their respective claims and defenses, preserved as they existed on that date;

     (e)   the terms and provisions of this Settlement Agreement, with the exception of ¶¶ 39-44 (which shall continue in full force and effect), shall be null and void and shall have no further force or effect with respect to the Settling Parties, and neither the existence nor the terms of this Settlement Agreement (nor any negotiations preceding this Settlement Agreement nor any acts performed pursuant to, or in furtherance of, this Settlement Agreement) shall be used in the Action or in any other action or proceeding for any purpose (other than to enforce

the terms remaining in effect); and

(f)    any judgment or order entered by the Court in accordance with the terms of this Settlement Agreement shall be treated as vacated, nunc pro tunc.

**No Admission of Liability**

39.    ***Final and Complete Resolution.*** The Settling Parties intend the Settlement as described herein to be a final and complete resolution of all disputes between them with respect to the Action and Released Claims and to compromise claims that are contested, and it shall not be deemed an admission by any Settling Party as to the merits of any claim or defense or any allegation made in the Action.

40.    ***Federal Rule of Evidence 408.*** The Settling Parties agree that this Settlement Agreement, its terms and the negotiations surrounding this Settlement Agreement shall be governed by Federal Rule of Evidence 408 and shall not be admissible or offered or received into evidence in any suit, action or other proceeding, except upon the written agreement of the Settling Parties hereto, pursuant to an order of a court of competent jurisdiction, or as shall be necessary to give effect to, declare or enforce the rights of the Settling Parties with respect to any provision of this Settlement Agreement.

41.    ***Use of Agreement as Evidence.*** Neither this Settlement Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Settlement Agreement or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claims, of any allegation made in the Action, or of any wrongdoing or liability of any of the Synta Defendants; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any liability, fault or omission of the Releasees in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. Neither this Settlement Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Settlement Agreement or the Settlement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that the Releasees may file this Settlement Agreement and/or the

Judgment in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim. The limitations described in this paragraph apply whether or not the Court enters the Preliminary Approval Order, the Final Approval Order, or the Judgment, or if the Settlement Agreement is terminated or rescinded.

**Miscellaneous Provisions**

42.   ***Voluntary Settlement.*** The Settling Parties agree that the Settlement Amount and the other terms of the Settlement as described herein were negotiated in good faith by the Settling Parties, and reflect a settlement that was reached voluntarily and after consultation with competent legal counsel.

43.   ***Consent to Jurisdiction.*** All of the Synta Defendants and each Class Member hereby irrevocably submit to the exclusive jurisdiction of the Court only for the specific purpose of any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement. Solely for purposes of such suit, action, or proceeding, to the fullest extent that they may effectively do so under applicable law, the Synta Defendants and the Class Members irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the Court or that the Court is in any way an improper venue or an inconvenient forum. Nothing herein shall be construed as a submission to jurisdiction for any purpose other than any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement.

44.   ***Resolution of Disputes; Retention of Exclusive Jurisdiction.*** Any disputes between or among the Synta Defendants and any Class Members concerning matters contained in this Settlement Agreement shall, if they cannot be resolved by negotiation and agreement, be submitted to the Court. The Court shall retain exclusive jurisdiction over the implementation and enforcement of this Settlement Agreement.

45. **_Binding Effect._** This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto. Without limiting the generality of the foregoing, each and every covenant and agreement herein by Indirect Purchaser Plaintiffs and Co-Lead Counsel shall be binding upon all Class Members.

46. **_Authorization to Enter Settlement Agreement._** The undersigned representatives of the Synta Defendants represent that they are fully authorized to enter into and to execute this Settlement Agreement on behalf of all of the Synta Defendants. Co-Lead Counsel, on behalf of Indirect Purchaser Plaintiffs and the Class, represent that they are, subject to Court approval, expressly authorized to take all action required or permitted to be taken by or on behalf of the Indirect Purchaser Plaintiffs and the Class pursuant to this Settlement Agreement to effectuate its terms and to enter into and execute this Settlement Agreement and any modifications or amendments to the Settlement Agreement on behalf of the Class that they deem appropriate.

47. **_Notices._** All notices under this Settlement Agreement shall be in writing. Each such notice shall be given either by (a) email; (b) hand delivery; (c) registered or certified mail, return receipt requested, postage pre-paid; (d) Federal Express or similar overnight courier; or (e) facsimile and first class mail, postage pre-paid and, if directed to any Class Member, shall be addressed to Co-Lead Counsel at their addresses set forth below, and if directed to the Synta Defendants, shall be addressed to their attorneys at the addresses set forth below or such other addresses as Co-Lead Counsel or counsel for the Synta Defendants may designate, from time to time, by giving notice to all parties hereto in the manner described in this paragraph.

If directed to the Indirect Purchaser Plaintiffs, address notice to:

> COTCHETT, PITRE & MCCARTHY, LLP
> Adam J. Zapala (azapala@cpmlegal.com)
> San Francisco Airport Office Center
> 840 Malcolm Road, Suite 200
> Burlingame, CA 94010
> Telephone: (650) 697-6000
> Facsimile: (650) 697-0577
>
> LIEFF CABRASER HEIMANN & BERNSTEIN LLP
> Lin Chan (lchan@lchb.com)
> 275 Battery Street, 29th Floor
> San Francisco, CA 94111

Telephone: (415) 956-1000
Facsimile: (415) 956-1008

SUSMAN GODFREY LLP
Kalpana Srinivasan (ksrinivasan@susmangodfrey.com)
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

If directed to the Synta Defendants, address notice to:

FROST LLP
Christopher Frost (chris@frostllp.com)
10960 Wilshire Blvd., Suite 1260
Los Angeles, CA 90024
Telephone: (424) 254-0441

48.    ***Confidentiality of Settlement Negotiations.*** Co-Lead Counsel shall keep strictly confidential and not disclose to any third party, including specifically any counsel representing any other current or former party to the Action, any non-public information regarding the Settling Parties' negotiation of this Settlement and/or the Settlement Agreement. For the sake of clarity, information contained within this Settlement Agreement shall be considered public, and the Synta Defendants may issue a press release regarding execution of the Settlement Agreement and the amount paid in connection with the Settlement Agreement.

49.    ***Headings.*** The headings used in this Settlement Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

50.    ***No Party Deemed to Be the Drafter.*** None of the parties hereto shall be deemed to be the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

51.    ***Choice of Law.*** This Settlement Agreement shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of California, and the rights and obligations of the parties to this Settlement Agreement shall be construed and enforced in accordance with, and governed by, the substantive laws of the State of California without giving effect to that State's choice of law principles.

52. **Amendment; Waiver.** This Settlement Agreement shall not be modified in any respect except by a writing executed by all the parties hereto, and the waiver of any rights conferred hereunder shall be effective only if made by written instrument of the waiving party. The waiver by any party of any breach of this Settlement Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous, of this Settlement Agreement.

53. **Execution in Counterparts.** This Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. Counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts and a complete set of executed counterparts shall be filed with the Court.

54. **Notification of State Officials.** The Synta Defendants shall be responsible for providing all notices required by the Class Action Fairness Act, 28 U.S.C. § 1715, to be provided to state attorneys general or to the Attorney General of the United States.

55. **Integrated Agreement.** This Settlement Agreement, along with the Confidential Supplemental Agreement, constitutes the entire agreement between the Settling Parties and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement other than the representations, warranties and covenants contained and memorialized herein and in the Confidential Supplemental Agreement. It is understood by the Settling Parties that, except for the matters expressly represented herein and in the Confidential Supplemental Agreement, the facts or law with respect to which this Settlement Agreement is entered into may turn out to be other than or different from the facts now known to each party or believed by such party to be true; each party therefore expressly assumes the risk of the facts or law turning out to be so different, and agrees that this Settlement Agreement shall be in all respects effective and not subject to termination by reason of any such different facts or law. Except as otherwise provided herein, each party shall bear its own costs and attorneys' fees.

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

IN WITNESS WHEREOF, the parties hereto, through their fully authorized

representatives, have executed this Settlement Agreement as of the Execution Date.

INTERIM CO-LEAD COUNSEL FOR THE INDIRECT PURCHASER PLAINTIFFS,
on behalf of Indirect Purchaser Plaintiffs individually and on behalf of the Settlement
Class.

By:

    Adam J. Zapala
    COTCHETT, PITRE & MCCARTHY
    San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
    Burlingame, CA 94010
    Telephone: 650-697-6000
    Fax: 650-697-0577
    azapala@cpmlegal.com

    Lin Chan
    LIEFF CABRASER HEIMANN & BERNSTEIN LLP
    275 Battery Street, 29th Floor
    San Francisco, CA 94111
    Telephone: (415) 956-1000
    Facsimile: (415) 956-1008
    lchan@lchb.com

    Kalpana Srinivasan
    SUSMAN GODFREY LLP
    1900 Avenue of the Stars, Ste. 1400
    Los Angeles, CA 90067
    Telephone: (310) 789-3100
    ksrinivasan@susmangodfrey.com

SYNTA DEFENDANTS' COUNSEL, on behalf of Synta Technology Corp. Of Taiwan;
Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology
Co. Ltd.; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon
Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon,
Usa LLC; Dar Tson ("David") Shen; Joseph Lupica; and Dave Anderson.

By:

    Christopher Frost
    10960 Wilshire Blvd., Suite 1260
    Los Angeles, CA 90024
    Telephone: (424) 254-0441
    chris@frostllp.com

Synta Technology Corp. of Taiwan

By:

1    Ta Kung Shen

2

3

4

5    / / /

6    Suzhou Synta Optical Technology Co. Ltd.

7    By:_____

8    David Shen

9

10   Synta Canada International Enterprises Ltd.;

11   By:_____

12   Sylvia Shen

13

14   Pacific Telescope Corp.

15   By:_____

16   Sylvia Shen

17

18   Olivon Manufacturing Co. Ltd.

19   By:_____

20   Jean Shen

21

22   SW Technology Corporation;

23   By:_____

24   Sylvia Shen

25

26   Celestron Acquisition, LLC

27   By:_____

28   Corey Lee

Olivon, USA LLC

By: _____

    Jean Shen

Nantong Schmidt Opto-Electrical Technology Co. Ltd.

By: _____

    Sheng Rong Zhu


David Shen

By: _____

    David Shen


Joseph Lupica

By: _____

    Joseph Lupica


Dave Anderson

By: _____

    Dave Anderson

# EXHIBIT 2

1    **[Counsel Listed on Signature Page]**

2

3

4

5

6

7

8

9

10

11

12              **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14

15   DANIEL HIGHTOWER, on behalf of                Case No. 5:20-cv-03639-EJD
     himself and all others similarly situated,    Case No. 5:20-cv-04049-EJD
16                                                  Case No. 5:20-cv-04823-EJD
             Plaintiffs,                            Case No. 5:20-cv-04860-EJD
17                                                  Case No. 5:20-cv-05285-EJD
             v.                                     Case No. 5:20-cv-05400-EJD
18
     CELESTRON ACQUISITION, LLC, *et al.*
19                                                  **STIPULATION AND [PROPOSED]**
             Defendants.                            **ORDER REGARDING**
20                                                  **CONSOLIDATION AND CASE**
                                                    **MANAGEMENT**
21   **This Document Relates to the Following
     Actions:**
22
     SIGURD MURPHY and KEITH UEHARA,
23   on behalf of themselves and all others
     similarly situated,
24
             Plaintiffs,
25
             v.
26
     CELESTRON ACQUISITION, LLC, *et al.*
27
             Defendants.
28

---

**Stipulation and [Proposed] Order Regarding Consolidation and Case Management; Case Nos. 5:20-cv-04049-
EJD; 5:20-cv-04823-EJD; 5:20-cv-04860-EJD; 5:20-cv-05285-EJD; 5:20-cv-05400-EJD**

SARA DAY BREWER and THIEN NGO, on
behalf of themselves and all others similarly
situated,

        Plaintiffs,

               v.

CELESTRON ACQUISITION, LLC, *et al.*

        Defendants.

---

NORMAN GOLDBLATT, individually and
on behalf of all others similarly situated,

        Plaintiff

               v.

DAR TSON "DAVID" SHEN, *et al.*

        Defendants.

---

JAMES KAUFMAN, on behalf of himself
and all others similarly situated,

        Plaintiff,

               v.

CELESTRON ACQUISITION, LLC, *et al.*

        Defendants.

---

AUSTIN GRIFFITH and TIMOTHY
McQUAID, on behalf of themselves and all
others similarly situated,

        Plaintiffs,

               v.

DAR TSON "DAVID" SHEN, *et al.*

        Defendants.

---

1    Plaintiffs in the *Murphy*, *Brewer*, *Goldblatt*, *Kaufman*, and *Griffith* actions (collectively,

2    "Indirect Purchaser Plaintiffs" or "IPPs") and Defendants Celestron Acquisition, LLC, SW

3    Technology Corp., Corey Lee, Dave Anderson, and Joseph Lupica (collectively, "Defendants")

4    hereby stipulate as follows:

5    WHEREAS, IPPs have brought six proposed class actions[1] against Defendants and others

6    arising out of alleged violations of antitrust and consumer protection laws in the telescopes

7    market;

8    WHEREAS, the *Murphy*, *Brewer*, *Goldblatt*, *Kaufman*, and *Griffith* Actions are currently

9    before this Court and are related to the first-filed indirect purchaser action, the *Hightower* Action;

10   WHEREAS, on June 30, 2020, in the *Hightower* Action, Defendants filed a Motion to

11   Transfer Case Pursuant to 28 U.S.C. § 1404(a) to the Central District of California ("Motion to

12   Transfer Venue") (ECF No. 16)[2] and a Motion to Dismiss Lawsuit Pursuant to Fed. R. Civ. P.

13   12(b)(6) ("Motion to Dismiss") (ECF No. 15);

14   WHEREAS, on July 14, 2020, IPPs in the *Murphy* Action filed a Motion to Intervene and

15   filed Oppositions to the Motion to Transfer Venue and Motion to Dismiss (ECF No. 22).

16   Defendants filed a limited opposition to the Motion to Intervene (ECF No. 33);

17   WHEREAS, on July 21, 2020, IPPs in the *Murphy* Action filed a Motion to Consolidate

18   Actions Pursuant to Federal Rule of Civil Procedure 42(a) and Motion to Coordinate relating to

19   the related actions alleging anticompetitive conduct in the telescopes industry. Defendants did

---

[1] As of the date of this stipulation, the following IPP class actions are pending:
1. *Hightower v. Celestron Acquisition, LLC et al.*, No. 5:20-cv-03639-EJD (N.D. Cal.) ("*Hightower* Action");
2. *Murphy, et al. v. Celestron Acquisition, LLC, et al.*, No. 5:20-cv-04049-EJD (N.D. Cal. June 17, 2020) ("*Murphy* Action");
3. *Brewer, et al. v. Celestron Acquisition, LLC, et al.*, No. 5:20-cv-04823-EJD (N.D. Cal. July 17, 2020) ("*Brewer* Action");
4. *Goldblatt v. Shen, et al.*, No. 5:20-cv-04860-EJD (N.D. Cal. July 20, 2020) ("*Goldblatt* Action");
5. *Kaufman v. Celestron Acquisition, LLC, et al.*, No. 5:20-cv-05285-EJD (N.D. Cal. July 31, 2020) ("*Kaufman* Action"); and
6. *Griffith, et al. v. Shen, et al.*, No. 5:20-cv-05400-EJD (N.D. Cal. Aug. 4, 2020) ("*Griffith* Action") ("IPP Actions").

[2] All ECF references are to the *Hightower* Action unless otherwise noted.

---

**Stipulation and [Proposed] Order Regarding Consolidation and Case Management; Case Nos. 5:20-cv-04049-EJD; 5:20-cv-04823-EJD; 5:20-cv-04860-EJD; 5:20-cv-05285-EJD; 5:20-cv-05400-EJD**                     1

1   not oppose this motion (ECF No. 40). The hearing on this motion is scheduled for October 15,

2   2020 at 9:00 a.m. (ECF No. 29);

3       WHEREAS, on July 31, 2020, IPPs in the *Murphy*, *Brewer*, and *Goldblatt* Actions filed

4   an Amended Motion to Appoint Cotchett, Pitre & McCarthy, LLP, Susman Godfrey LLP, and

5   Lieff Cabraser Heimann & Bernstein, LLP Interim Co-Lead Counsel for the Indirect Purchaser

6   Plaintiffs (ECF No. 38). The hearing on this motion is scheduled for October 15, 2020 at 9:00

7   a.m. (ECF No. 30);

8       WHEREAS, on August 12, 2020, IPP James Kaufman filed a Motion To Appoint Robins

9   Kaplan LLP As Interim Lead Or Co-Lead Counsel For Indirect Purchaser Plaintiffs; Opposition

10  To Amended Motion To Appoint Cotchett, Pitre & McCarthy, LLP, Susman Godfrey LLP, and

11  Lieff Cabraser Heimann & Bernstein, LLP, which is scheduled to be heard on October 15, 2020

12  at 9:00 a.m. (ECF No. 51);

13      WHEREAS, Defendants Celestron Acquisition, LLC and SW Technology Corp. are

14  required to file and serve an answer or motion under Federal Rule of Civil Procedure ("Rule")

15  12 to the complaint in the *Murphy* Action on or by August 17, 2020 pursuant to the Waiver of

16  the Service of Summons (*see Murphy* Action (ECF No. 11));

17      WHEREAS, Defendants Celestron Acquisition, LLC and SW Technology Corp. are

18  required to file and serve an answer or motion under Rule 12 to the complaint in the *Kaufman*

19  Action on or by October 2, 2020 pursuant to the Waiver of the Service of Summons (*see Kaufman*

20  Action (ECF Nos. 8-9));

21      WHEREAS Defendants will also be required to file and serve an answer or motion under

22  Rule 12 to the complaints in the *Brewer*, *Goldblatt*, and *Griffith* Actions after IPPs in those

23  actions serve them with said complaints;

24      WHEREAS, the Court has scheduled Initial Case Management Conferences on

25  September 3, 2020 at 10:00 a.m. in the *Hightower*, *Kaufman*, and *Griffith* Actions (ECF No. 9)

26  but has not yet scheduled them in the *Murphy*, *Brewer*, or *Goldblatt* Actions;

27      WHEREAS, IPPs and Defendants, by and through their respective counsel, have

28  conferred and agree that consolidation of the IPP Actions is appropriate pursuant to Rule 42(a)

1    because they involve common questions of law or fact, including that they all name substantially

2    similar Defendants; arise from the same alleged conduct; and assert overlapping claims;

3         WHEREAS, IPPs and Defendants agree that neither this stipulation nor any resulting

4    consolidation of the IPP Actions will waive or prejudice in any respect their legal claims,

5    defenses, or rights, including the right to challenge personal jurisdiction over any of the

6    Defendants; and

7         WHEREAS, Plaintiffs and Defendants agree that it is in the best interests of the Court

8    and the parties to conserve judicial and party resources, to collectively address case management

9    matters for all IPP Actions, to eliminate seriatim answers and/or Rule 12 motions to complaints,

10   and to facilitate the expeditious, economic, and just resolution of this litigation.

11        NOW, THEREFORE, the undersigned parties hereby stipulate as follows:

12        1.    IPPs and Defendants, by and through their respective counsel, stipulate that

13   consolidation of the IPP Actions is appropriate pursuant to Rule 42(a);

14        2.    No. 5:20-cv-03639-EJD will constitute the master docket for the IPP Actions and

15   all future related indirect purchaser class actions;

16        3.    A master complaint shall be filed in No. 5:20-cv-03639-EJD at the earlier of either

17   (a) 30 days of the Court's entry of an order appointing Interim Lead or Co-Lead Counsel, or (b)

18   October 29, 2020 if the Court has not appointed Interim Lead or Co-Lead Counsel by that date.

19        4.    Defendants shall respond to the master complaint within 30 days of its filing.

20   **IT IS SO STIPULATED.**    5.  The parties will abide by the further instructions in the Court's
     Order Granting Motion to Consolidate and Coordinate (Dkt. No.

21   Dated: August 14, 2020    55).    Respectfully submitted,

22                                    /s/ *Adam J. Zapala*
23                                    Adam J. Zapala
                                      Elizabeth T. Castillo
24                                    Tamarah P. Prevost
                                      Reid W. Gaa
25                                    **COTCHETT PITRE & McCARTHY, LLP**
26                                    840 Malcolm Road, Suite 200
                                      Burlingame, CA 94010
27                                    Tel: (650) 697-6000
                                      Fax: (650) 697-0577
28                                    azapala@cpmlegal.com

---

Stipulation and [Proposed] Order Regarding Consolidation and Case Management; Case Nos. 5:20-cv-04049-
EJD; 5:20-cv-04823-EJD; 5:20-cv-04860-EJD; 5:20-cv-05285-EJD; 5:20-cv-05400-EJD          3

1  ecastillo@cpmlegal.com
   tprevost@cpmlegal.com
2  rgaa@cpmlegal.com

3  *Attorneys for Plaintiffs Sigurd Murphy and Keith Uehara*

4
   */s/ Kalpana Srinivasan*
5  Kalpana Srinivasan (Bar No. 237460)
   Marc M. Seltzer (Bar No. 54534)
6  Steven Sklaver (Bar No.237612)
   Michael Gervais (Bar No. 330731)
7  **SUSMAN GODFREY L.L.P.**
8  1900 Avenue of the Stars, Ste. 1400
   Los Angeles, CA 90067
9  Phone: 310-789-3100
   ksrinivasan@susmangodfrey.com
10 mseltzer@susmangodfrey.com
   ssklaver@susmangodfrey.com
11 mgervais@susmangodfrey.com

12
   *Attorneys for Plaintiffs Sara Day Brewer*
13 *and Thien Ngo*

14
   */s/ Lin Y. Chan*
15 Eric B. Fastiff (SBN 182260)
   efastiff@lchb.com
16 Lin Y. Chan (SBN 255027)
   lchan@lchb.com
17 Jallé H. Dafa (SBN 290637)
   jdafa@lchb.com
18 **LIEFF CABRASER HEIMANN &**
19 **BERNSTEIN LLP**
   275 Battery Street, 29th Floor
20 San Francisco, California 94111
   Telephone: (415) 956-1000
21 Facsimile: (415) 956-1008

22
   *Attorney for Plaintiffs Norman Goldblatt, Austin Griffith,*
23 *and Timothy McQuaid*

24

25
   */s/ Aaron M. Sheanin*
26 Aaron M. Sheanin (SBN 214472)
   asheanin@robinskaplan.com
27 **ROBINS KAPLAN LLP**
28 2440 West El Camino Real, Suite 100

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041

Hollis Salzman
Kellie Lerner
Adam C. Mendel
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
KLerner@RobinsKaplan.com
AMendel@RobinsKaplan.com

*Attorney for Plaintiff James Kaufman*

*/s/ Christopher Frost*
Christopher Frost (SBN 200336)
cfrost@eisnerlaw.com
Amber Henry (SBN 247624)
ahenry@eisnerlaw.com
Ashlee N. Lin (SBN 275267)
alin@eisnerlaw.com
Rosie Cole (SBN 322185)
rcole@eisnerlaw.com
EISNER, LLP
9601 Wilshire Blvd., 7th Floor
Beverly Hills, California 90210
Telephone: (310) 855-3200
Facsimile: (310) 855-3201

*Attorneys for Defendants Celestron Acquisition, LLC, SW Technology Corp., Corey Lee, David Anderson, and Joseph Lupica*

1

**ATTESTATION**

2          I, Adam J. Zapala, am the ECF User whose ID and password are being used to file this

3   document. In compliance with Civil L.R. 5-1(i)(3), I hereby attest that all counsel have concurred

4   in this filing.

5                                                    */s/ Adam J. Zapala*

6

7                              [PROPOSED] ORDER

8   PURSUANT TO STIPULATION, IT IS SO ORDERED.

9

10

11   Date: _____August 17___, 2020          By: _____

12                                                    Edward J. Davila
                                                      United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3

1
2
3
4

Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

5
6
7

Kalpana Srinivasan (Bar No. 237460)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

8
9
10
11

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

12

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

13

[Additional Counsel Listed on Signature Page]

14

## UNITED STATES DISTRICT COURT

15

## NORTHERN DISTRICT OF CALIFORNIA

16

## SAN JOSE DIVISION

17
18
19
20
21
22
23
24
25
26
27

| | |
|---|---|
| **IN RE TELESCOPES ANTITRUST LITIGATION** | Case No. 5:20-cv-03639-EJD |
| | **FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** |
| **THIS DOCUMENT RELATES TO:** | |
| **Indirect Purchaser Actions** | 1. **SHERMAN ACT §§ 1, 2;** |
| | 2. **CLAYTON ACT § 7;** |
| | 3. **STATE ANTITRUST LAWS; and** |
| | 4. **STATE CONSUMER PROTECTION LAWS; and for** |
| | 5. **UNJUST ENRICHMENT** |
| | **JURY TRIAL DEMANDED** |

28

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ......................................................................................................1

II. JURISDICTION AND VENUE .............................................................................3

III. PARTIES ................................................................................................................5

    A.  Plaintiffs.......................................................................................................5

    B.  Defendants ....................................................................................................8

        1.  Synta Defendants ...............................................................................8

            a.  Corporate Defendants ..........................................................8

            b.  Individual Defendants........................................................10

        2.  The Ningbo Sunny Defendant .........................................................11

    C.  Agents and Co-Conspirators......................................................................12

        1.  Defendants' Corporate Families Acted as Single Enterprises, and
           Defendant Parent Companies Exercised Substantial Control over Their
           U.S. Affiliates .................................................................................14

        2.  Defendants' High-Level Employees Organized the Conspiracy, and Their
           Subordinate Employees—Including Those of Their U.S. Subsidiaries—
           Executed the Conspiracy...................................................................15

        3.  Defendants and Co-Conspirators Who Engaged in Collusive Conduct
           Participated in Discussions on Behalf of Entire Corporate Families and
           Failed to Distinguish Between Corporate Entities in the Same Corporate
           Family ..............................................................................................16

        4.  The Nature of the Telescope Industry Required Foreign Companies Named
           As Defendants and Co-Conspirators Herein to Use Their United States
           Subsidiaries and Affiliates As Distribution and Sales Arms .....................18

IV. FACTUAL ALLEGATIONS ................................................................................18

    A.  Telescopes...................................................................................................18

    B.  Relevant Market: The Market for Telescopes in the United States ........................19

    C.  Defendants Are Liable for the Anticompetitive Conduct Alleged Herein .............20

    D.  The Federal Trade Commission's Actions in the Telescope Market.....................22

    E.  Defendant Dar Tson ("David") Shen Orchestrated and Participated in the Creation
        of Ningbo Sunny as a Sham Competitor for Synta, and Managed Ningbo Sunny to
        Promote Synta's Anticompetitive Ends...............................................................23

    F.  Defendants and Co-Conspirators Agreed to Sell Different Telescopes in the
        Telescope Market.....................................................................................27

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                  i

G.    Defendants and Co-Conspirators Colluded on Ningbo Sunny's Acquisition of Meade ...............................................................................................29

H.    Defendants and Co-Conspirators Conspired to Interfere with Orion's Acquisition of the Hayneedle Assets ...........................................................................31

I.    Illustrative Examples of Defendants' Anticompetitive Conduct and Conspiracy to Fix Prices, Rig Bids, and Allocate the Market............................................31

J.    The Structure and Characteristics of the Telescope Market Renders the Conspiracy More Plausible .................................................................................39

    1.    The Telescope Market Was Subject to Market Allocation ........................40

    2.    The Telescope Market Has High Barriers to Entry ...................................40

    3.    The Telescope Market Is Highly Concentrated .........................................41

    4.    There Is Inelasticity of Demand for Telescopes .......................................42

V.    CLASS ACTION ALLEGATIONS .................................................................43

A.    California Law Should Be Applied to the Indirect Purchaser States' Damages Class..................................................................................................44

    1.    The Conspiracy's Contacts with California: Location of Defendants and Co-Conspirators ........................................................................................44

    2.    The Conspiracy's Contacts with California: Location of Individuals ........45

    3.    Specific Targets of the Conspiracy Were from California ........................45

    4.    The Conspiracy's Contacts with California: Facilitation of the Conspiracy in California ..............................................................................................45

    5.    Defendants and Co-Conspirators Targeted California..............................46

B.    Alternatively, Plaintiffs Seek to Certify State Damages Classes............................46

VI.    PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY .....................54

VII.    THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS...........57

A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims .........................................................57

B.    Fraudulent Concealment Tolled the Statute of Limitations.....................................58

VIII.    CAUSES OF ACTION .................................................................................62

First Cause of Action
Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) Restraint of Trade (on behalf of Plaintiffs and the Nationwide Injunctive Class)...............................62

Second Cause of Action
Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) Monopolization (on behalf of Plaintiffs and the Nationwide Injunctive Class)...............................64

Third Cause of Action
Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) Attempted
    Monopolization (on behalf of Plaintiffs and the Nationwide Injunctive Class) .....65

Fourth Cause of Action
Violation of Section 7 of the Clayton Act (15 U.S.C. § 18) (on behalf of Plaintiffs
    and the Nationwide Injunctive Class) ....................................................................67

Fifth Cause of Action
Violation of the State Antitrust Laws (on behalf of Plaintiffs and the Damages
    Class or, Alternatively, the State Damages Classes) .............................................68

Sixth Cause of Action
Violation of State Consumer Protection Laws (on behalf of Plaintiffs and the
    Damages Class or, Alternatively, the State Damages Classes) .............................93

Seventh Cause of Action
Unjust Enrichment (on behalf of Plaintiffs and the Damages Class or, Alternatively,
    the State Damages Classes) ..................................................................................112

IX.    PRAYER FOR RELIEF ....................................................................................112

X.    JURY DEMAND ...............................................................................................114

Indirect Purchaser Plaintiffs ("Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against Defendants (1) Synta Technology Corp. of Taiwan (a/k/a Synta Technology Corp. and Good Advance Industries Ltd.), (2) Suzhou Synta Optical Technology Co., Ltd., (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd., (4) Synta Canada International Enterprises Ltd., (5) Pacific Telescope Corp., (6) Olivon Manufacturing Co. Ltd., (7) SW Technology Corp., (8) Celestron Acquisition, LLC, (9) Olivon USA LLC, (10) Dar Tson "David" Shen, (11) Joseph Lupica, (12) David Anderson (together, "Synta" or "Synta Defendants"), and (13) Ningbo Sunny Electronic Co. Ltd. ("Ningbo Sunny" or "Ningbo Sunny Defendant") (collectively, "Defendants"). The following co-conspirator entities and individuals were engaged in and facilitated the conspiracy and conduct alleged herein: (1) Jean Shen, (2) Sylvia Shen, (3) Jack Chen, (4) Lauren Huen, (5) Corey Lee, (6) Sunny Optical Technology Co., Ltd., (7) Meade Instruments Corp., (8) Sunny Optics Inc., (9) Wenjun "Peter" Ni, and (10) Wenjian Wang ("Co-Conspirators"). Plaintiffs name the foregoing entities and individuals as Defendants or Co-Conspirators for engaging in a conspiracy to unlawfully fix or stabilize prices, rig bids, and allocate the market for telescopes and customers as well as for unlawful monopolistic conduct, including attempted monopolization and conspiracy to monopolize, in the United States. Plaintiffs hereby allege, on information and behalf, except as to those allegations that pertain to themselves, as follows:



*Source:* https://www.shutterstock.com/video/search/astronomer-looking-through-telescope

## I. INTRODUCTION

1. Astronomy is among the oldest hobbies of mankind. Even the occasional backyard

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD** 1

1  sky watching by the unaided eye or a small telescope can be a marvelous experience. Astronomy
2  has inspired thousands of Americans to buy telescopes and learn about the starry names and
3  patterns overhead. These amateur astronomers have experienced joys from intellectual discovery
4  and knowledge of the night sky. Unfortunately, Americans have collectively paid hundreds of
5  millions of dollars in illegal overcharges for telescopes since 2005 as a result of a long-running
6  conspiracy to unlawfully fix or stabilize prices, rig bids, and allocate the market and customers,
7  and gain an unlawful monopoly in the United States in the market for telescopes, causing the
8  prices of telescopes to be raised above competitive levels.

9       2.    In November 2016, a California-based distributor and seller of telescopes,
10  binoculars, and accessories, Orion Technologies, Inc. ("Orion"), filed a lawsuit in this District
11  against Ningbo Sunny and its affiliates—identifying their primary competitor, Synta Technology
12  Corp. of Taiwan and its affiliates, including the defendants named herein—for conspiring to
13  "divide the market, fix prices, [and] throttle competition" in violation of the Sherman, Clayton,
14  and California Cartwright Acts, as well as California's unfair competition law. *See Optronic*
15  *Techs., Inc. v. Ningbo Sunny Electronic Co., Ltd. et al.*, No. 5:16-cv-06370-EJD-VKD (N.D. Cal.)
16  ("*Orion* Action"). Specifically, Orion alleged the defendants conspired to: (1) fix the prices and
17  credit terms of telescopes purchased in the United States; (2) facilitate Ningbo Sunny's purchase
18  of Meade Instruments Corp.; and (3) divide the telescope market by product type and by customer.
19  Additionally, Orion accused the defendants of forming, or attempting to form, a monopoly and
20  pushing Orion out of the United States telescope market by refusing to deal with Orion and
21  unlawfully concentrating the market for telescope manufacturing services.

22       3.    Following a six-week trial and two days of deliberation, the jury delivered a verdict
23  in favor of Orion on December 5, 2019, awarding Orion $16.8 million in damages after finding
24  that the defendants had violated the Sherman Act and the Clayton Act by engaging in
25  anticompetitive conduct in the domestic telescope market. United States District Judge Edward J.
26  Davila delivered a partial final judgment in the amount of $50.4 million by trebling the jury's
27  award and granting post-judgment interest.

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**        2

4.    As alleged herein, as a result of Defendants' conduct, Plaintiffs and the Classes (defined *infra*) paid artificially inflated prices for telescopes during the period from and including January 1, 2005 through the present ("Class Period") and have thereby suffered harm.

## II.    JURISDICTION AND VENUE

5.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable, including injunctive, relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

6.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 16), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337 (28 U.S.C. §§ 1331, 1337). This Court has subject-matter jurisdiction over state law claims pursuant to Title 28, United States Code, Sections 1332(d) and 1367 (28 U.S.C. §§ 1332(d) and 1367) because: (1) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the Classes are citizens of a state different from those of Defendants; and (2) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

7.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and Title 28, United States Code, Sections 1391(b) through (d) (28 U.S.C. §§ 1391 (b), (c), and (d)) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants variously reside, are licensed to do business in, are doing business in, have agents in, and are found in or transact business in this District.

8.    This Court has *in personam* jurisdiction over Defendants because Defendants either

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                        3

directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of telescopes throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) were engaged in an illegal conspiracy to fix or stabilize prices, rig bids, and allocate the market of telescopes, and to monopolize, that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States. Furthermore, Defendants SW Technology Corp. and Celestron Acquisition, LLC are headquartered in California, and Co-Conspirator Meade Instruments Corp. is headquartered in California.

9. Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects on interstate commerce within the United States.

10. The activities of Defendants and Co-Conspirators directly targeted the United States telescope market and were within the flow of, were intended to have and did have a substantial effect on the interstate commerce of the United States. Defendants' telescopes are sold in the flow of United States interstate commerce.

11. Telescopes manufactured abroad by Defendants and Co-Conspirators and sold in the United States are goods brought into the United States for sale and therefore constitute import commerce. To the extent any telescopes are purchased in the United States and such telescopes do not constitute import commerce, Defendants' and Co-Conspirators' activities with respect thereto, as more fully alleged herein during the Class Period, had and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, caused antitrust injury to Plaintiffs and members of the Classes in the United States.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD** 4

12. By reason of the unlawful activities alleged herein, Defendants' and Co-Conspirators' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants and Co-Conspirators, directly and through their agents, engaged in activities affecting all states to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for telescopes, as well as to monopolize those markets. The conspiracy unreasonably restrained trade and adversely affected the market for telescopes in the United States.

13. Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased telescopes.

14. Intra-District Assignment: Assignment to the San Jose division of the Court is proper pursuant to Northern District of California Local Rule 3-2(c) because a substantial part of the events giving rise to the claims arose in this district. Some Plaintiffs made purchases in Santa Clara County. Defendants' illegal conspiracy included acts occurring in or directed at Santa Clara County, and Defendants marketed and/or sold telescopes throughout the district during the Class Period. Orion, a target of Defendants' conduct, is headquartered in Santa Cruz County.

## III.   PARTIES

### A.   Plaintiffs

15. Plaintiff **John Goerger** purchased at least one telescope in Arizona indirectly from Defendants or Co-Conspirators during the Class Period.

16. Plaintiff **Scott Plummer** purchased at least one telescope in Arizona indirectly from Defendants or Co-Conspirators during the Class Period.

17. Plaintiff **Donnie Houston** purchased at least one telescope in Arkansas indirectly from Defendants or Co-Conspirators during the Class Period.

18. Plaintiff **Ronald Troillett** purchased at least one telescope in Arkansas indirectly from Defendants or Co-Conspirators during the Class Period.

19. Plaintiff **Sigurd Murphy** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

20.     Plaintiff **Thien Ngo** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

21.     Plaintiff **Arthur Sines** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

22.     Plaintiff **Jesse Smith** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

23.     Plaintiff **Greg Kendall** purchased at least one telescope in the District of Columbia from Defendants or Co-Conspirators during the Class Period.

24.     Plaintiff **Austin Griffith** purchased at least one telescope in Florida indirectly from Defendants or Co-Conspirators during the Class Period.

25.     Plaintiff **Keith Uehara** purchased at least one telescope in Hawaii indirectly from Defendants or Co-Conspirators during the Class Period.

26.     Plaintiff **Richard Bekielewski** purchased at least one telescope in Illinois indirectly from Defendants or Co-Conspirators during the Class Period.

27.     Plaintiff **Michael Price** purchased at least one telescope in Iowa indirectly from Defendants or Co-Conspirators during the Class Period.

28.     Plaintiff **Brian Murphy** purchased at least one telescope in Maine indirectly from Defendants or Co-Conspirators during the Class Period.

29.     Plaintiff **Timothy McQuaid** purchased at least one telescope in Massachusetts indirectly from Defendants or Co-Conspirators during the Class Period.

30.     Plaintiff **Sara Day Brewer** purchased at least one telescope in Michigan indirectly from Defendants or Co-Conspirators during the Class Period. She is currently a Utah resident.

31.     Plaintiff **Robert Welsh** purchased at least one telescope in Michigan indirectly from Defendants or Co-Conspirators during the Class Period. He is currently a Utah resident.

32.     Plaintiff **Bentaro Huset** purchased at least one telescope in Minnesota indirectly from Defendants or Co-Conspirators during the Class Period.

33.     Plaintiff **Jason Glydewell** purchased at least one telescope in Mississippi indirectly

from Defendants or Co-Conspirators during the Class Period.

34.     Plaintiff **Deborah Lemar** purchased at least one telescope in Missouri indirectly from Defendants or Co-Conspirators during the Class Period.

35.     Plaintiff **James Riley** purchased at least one telescope in Missouri indirectly from Defendants or Co-Conspirators during the Class Period.

36.     Plaintiff **David Dick** purchased at least one telescope in Montana indirectly from Defendants or Co-Conspirators during the Class Period. He is currently a Utah resident.

37.     Plaintiff **Leon Greenberg** purchased at least one telescope in Nevada indirectly from Defendants or Co-Conspirators during the Class Period.

38.     Plaintiff **Anthony Di Mambro** purchased at least one telescope in New Hampshire indirectly from Defendants or Co-Conspirators during the Class Period.

39.     Plaintiff **Steven Zellers** purchased at least one telescope in New Mexico indirectly from Defendants or Co-Conspirators during the Class Period.

40.     Plaintiff **Michael Liskow** purchased at least one telescope in New York indirectly from Defendants or Co-Conspirators during the Class Period.

41.     Plaintiff **Philip Moore** purchased at least one telescope in North Carolina indirectly from Defendants or Co-Conspirators during the Class Period.

42.     Plaintiff **Doug Lundy** purchased at least one telescope in Oregon indirectly from Defendants or Co-Conspirators during the Class Period.

43.     Plaintiff **John Maurice** purchased at least one telescope in Oregon indirectly from Defendants or Co-Conspirators during the Class Period.

44.     Plaintiff **David Kerber** purchased at least one telescope in Rhode Island indirectly from Defendants or Co-Conspirators during the Class Period.

45.     Plaintiff **Thomas Berta** purchased at least one telescope in South Carolina indirectly from Defendants or Co-Conspirators during the Class Period.

46.     Plaintiff **Greg Ross** purchased at least one telescope in Tennessee indirectly from Defendants or Co-Conspirators during the Class Period.

47. Plaintiff **Vincent Catanzaro** purchased at least one telescope in Utah indirectly from Defendants or Co-Conspirators during the Class Period.

48. Plaintiff **David Quaglietta** purchased at least one telescope in Vermont indirectly from Defendants or Co-Conspirators during the Class Period.

49. Plaintiff **Herbert Nelson** purchased at least one telescope in Wisconsin indirectly from Defendants or Co-Conspirators during the Class Period.

**B.**     **Defendants**

    **1.**     **Synta Defendants**

        **a.**     **Corporate Defendants**

50. The Synta Defendants that are entities are the parents, subsidiaries, affiliates, predecessors, and/or successors of each other (collectively, "Synta Corporate Defendants").

51. Defendant **Synta Technology Corp. of Taiwan** ("Synta Technology") is a Taiwanese company with its principal place of business at No. 89 Lane 4 Chia-An W. Road, Lung-Tan, Taoyuan, 32546 Taiwan, China. Synta Technology is also known as **Synta Technology Corp.** and **Good Advance Industries Ltd.** ("Good Advance"). During the Class Period, Synta Technology—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and/or controls Synta Technology. Synta Technology was listed as a "Celestron Party" in Celestron Acquisition, LLC's settlement agreement with Orion. *Orion* Action, ECF No. 301-30 ("Settlement Agreement"). David Shen signed the settlement agreement with Orion on behalf of Good Advance. *Id.*

52. Defendant **Suzhou Synta Optical Technology Co., Ltd**. ("Suzhou Synta") is a Chinese company with its principal place of business at No. 65 Yushan Road, New District, Suzhou, China 215011. During the Class Period, Suzhou Synta—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and controls Suzhou Synta. Suzhou Synta is Synta Technology's primary

manufacturing subsidiary. Synta Canada (*see supra*) owns 20 percent of Suzhou Synta. David Shen signed the settlement agreement with Orion on behalf of Suzhou Synta. Settlement Agreement, *Orion* Action.

53. Defendant **Nantong Schmidt Opto-Electrical Technology Co. Ltd.** ("Nantong Synta") is a Chinese company with its principal place of business at No. 399 West Zhongshan Road, Rugao City, Jiangsu, China. During the Class Period, Nantong Synta—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and controls Nantong Synta. David Shen signed the settlement agreement with Orion on behalf of Nantong Synta. Settlement Agreement, *Orion* Action.

54. Defendant **Synta Canada International Enterprises Ltd.** ("Synta Canada") is a Canadian company with its principal place of business at 7531 Lucas Road, Richmond, BC V6Y1G1, Canada. During the Class Period, Synta Canada—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Synta Canada owns 20 percent of Suzhou Synta. David Shen and/or his family own and control Synta Canada.

55. Defendant **Pacific Telescope Corp.** ("Pacific Telescope") is a Canadian company with its principal place of business at 11880 Hammersmith Way, Richmond, British Columbia V7A 5C8, Canada. During the Class Period, Pacific Telescope—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Pacific Telescope was established in 1997 to sell Synta's Sky-Watcher brand of telescopes in Canada. David Shen is a co-owner of Pacific Telescope.

56. Defendant **Olivon Manufacturing Co. Ltd.** ("Olivon Canada") is a Canadian company with its principal place of business at 11880 Hammersmith Way, Richmond, BC V7A 5C8, Canada. During the Class Period, Olivon Canada—directly and/or through its subsidiaries,

which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen controls Olivon Canada and Olivon USA LLC .

57.    Defendant **SW Technology Corporation** ("SW Technology") is a Delaware corporation with its principal place of business at 2835 Columbia Street, Torrance, California 90503. SW Technology is a subsidiary and wholly owned and/or controlled by its parent, Synta Technology. During the Class Period, SW Technology—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. In 2005, David Shen established SW Technology to acquire Celestron Acquisition, LLP as a wholly owned subsidiary. He continues to operate SW Technology.

58.    Defendant **Celestron Acquisition, LLC** ("Celestron") is a Delaware limited liability company with its principal place of business at 2835 Columbia Street, Torrance, California 90503. Celestron is a subsidiary of and is wholly owned and/or controlled by its parent, SW Technology. During the Class Period, Celestron—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Synta Technology was listed as a "Celestron Party" in Celestron's settlement agreement with Orion, rendering Synta Technology an affiliate of Celestron. Settlement Agreement*, Orion* Action.

59.    Defendant **Olivon USA, LLC** ("Olivon USA") is a Nevada corporation with its principal place of business at 5525 Coley Avenue, Las Vegas, Nevada 89146. During the Class Period, Olivon USA, LLC—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen controls Olivon USA and Olivon Canada.

### b.    Individual Defendants

60.    Defendant **Dar Tson ("David") Shen** is the founder, owner, and chairman of the

aforementioned Synta Corporate Defendants, unless otherwise noted. Mr. Shen personally participated in the conspiracy alleged herein. He owns and/or controls the Synta Corporate Defendants during the Class Period, unless otherwise noted. Mr. Shen is a member of Celestron's board, the Executive Management Group. He signed the settlement agreement with Orion on behalf of Synta Technology. Although Mr. Shen founded and oversees the Synta Corporate Defendants, he was concurrently an officer of Ningbo Sunny, a direct horizontal competitor, from 2001 to 2005. In fact, Mr. Shen held a 26 percent ownership interest in Ningbo Sunny until 2005, when Synta Technology acquired Celestron through SW Technology. Mr. Shen regularly comes to this District to meet with distributors of Synta telescopes.

61.     Defendant **Joseph Lupica** is Celestron's former CEO. Through the collusive arrangements of Defendants and Co-Conspirators, he became CEO of Meade Instrument Corp. ("Meade")—Celestron's main competitor. Mr. Lupica resides in Palm Springs, California. He personally participated in the conspiracy alleged herein. He began replacing Meade's management with Celestron's officers, directors, employees, and/or agents, including Celestron's Vice President of Sales, Victor Aniceto, who was hired as Meade's Vice President of Sales. Later, when Mr. Lupica retired, Mr. Aniceto was promoted to Meade's President. Mr. Lupica has admitted that Ningbo Sunny could not have acquired Meade but for the collusive assistance it received from Synta Corporate Defendants.

62.     Defendant **Dave Anderson** is Celestron's former CEO. He resides in or near Minneapolis, Minnesota. Mr. Anderson personally participated in the conspiracy alleged herein.

### 2.     The Ningbo Sunny Defendant

63.     Defendant **Ningbo Sunny Electronic Co. Ltd.** is a Chinese company with its principal place of business at 199 An Shan Lu, Yuyao, Ningbo, Zhejiang, China 315400. During the Class Period, Ningbo Sunny—directly and/or through its subsidiaries, which it wholly owned and/or controlled, and through Defendant Celestron (*see supra*) and other distributors— manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District.

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
Case No. 5:20-cv-03639-EJD                                                                11

## C. Agents and Co-Conspirators

64. Co-Conspirator **Jean Shen** owns and controls Olivon Canada and Olivon USA and is Mr. Shen's sister. She represented to telescope distributors that the Synta Corporate Defendants' competitor, Ningbo Sunny, was one of "my family's companies[.]" Mr. Shen also exercises control over Olivon Canada and Olivon USA through her.

65. Co-Conspirator **Sylvia Shen** is the co-owner of Pacific Telescope along with Mr. Shen and Mr. Chen (*see infra*), a member of Celestron's Executive Management Group, SW Technology's CEO, CFO, and Secretary, Mr. Shen's sister, and Mr. Chen's wife. Mr. Shen also exercises control over Pacific Telescopes through her. She signed the settlement agreement with Orion on behalf of SW Technology.

66. Co-Conspirator **Jack Chen** is the co-owner of Pacific Telescope along with Mr. Shen and Ms. Sylvia Shen, a member of Celestron's Executive Management Group, and Ms. Sylvia Shen's husband. Mr. Shen also exercises control over Pacific Telescopes through Mr. Chen.

67. Co-Conspirator **Laurence Huen** is a member of Celestron's Executive Management Group and Mr. Shen's close advisor and confidante. He resides in British Columbia, Canada. Mr. Huen assisted Joseph Lupica (*see infra*) and acted as a conduit of information between Synta Defendants and Ningbo Sunny Defendant.

68. Co-Conspirator **Corey Lee** is Celestron's CEO. He resides in California.

69. Co-Conspirator **Sunny Optical Technology Co., Ltd.** ("Sunny Optical") is a Chinese company with its principal place of business at 27-29 Shunke Road, Yuyao, Zhejiang, China. Sunny Optical is Ningbo Sunny's affiliate. Sunny Optical manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District, during the Class Period. On information and belief, Sunny Optical's activities in the United States were under the control and direction of Ningbo Sunny at all times during the Class Period.

70. Co-Conspirator **Sunny Optics Inc.** ("Sunny Optics") is a Delaware corporation formed for the purpose of Ningbo Sunny's acquisition of Meade. Upon information and belief,

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
Case No. 5:20-cv-03639-EJD                                                                                    12

1     Sunny Optics is Ningbo Sunny's subsidiary.

2          71.     Co-Conspirator **Meade Instruments Corp.** is a Delaware corporation with its

3     principal place of business at 27 Hubble, Irvine, California 92618. Meade is a subsidiary and

4     wholly-owned and/or controlled by its parent, Ningbo Sunny. Meade manufactured, marketed,

5     and/or sold telescopes that were sold and purchased throughout the United States, including in

6     this District, during the Class Period. On information and belief, Meade's activities in the United

7     States were under the control and direction of Ningbo Sunny at all times during the Class Period.

8     Meade has filed for bankruptcy (*see* Case No. 8:19-bk-14714-CB (C.D. Cal.)), is subject to the

9     bankruptcy stay, and is not named as a defendant.

10         72.     Co-Conspirator **Wenjun ("Peter") Ni** is the founder, owner, and CEO of Ningbo

11    Sunny and Meade. On information and belief, Mr. Ni controlled Sunny Optical, Meade, and

12    Sunny Optics during the Class Period.

13         73.     Co-Conspirator **Wang Wenjian** is Sunny Optical's director and controlling

14    shareholder and Mr. Ni's uncle.

15         74.     As indicated above, Defendants and Co-Conspirators shared certain executives that

16    facilitated the conspiracy. For example, although Mr. Shen founded Synta Technology in 1980,

17    he also served as an officer and vice chairman of its direct competitor, Ningbo Sunny, from

18    November 2001 to July 2005. Mr. Shen also owned 26 percent of Ningbo Sunny until 2005, at

19    which time he transferred his shares to his sister-in-law, Dong Yun Xue, who continues to hold

20    that interest. As another example, Joe Lupica was the CEO of both Celestron and Meade, and his

21    transition from Celestron's CEO to Meade's CEO is part of the conspiracy alleged herein.

22         75.     Defendants acted as the principals of or agents for the unnamed co-conspirators with

23    respect to the acts, violations, and common course of conduct alleged herein.

24         76.     Various persons, partnerships, sole proprietors, firms, corporations, companies, and

25    individuals not named as defendants in this lawsuit, and individuals, the identities of which are

26    presently unknown have participated as co-conspirators with Defendants in the offenses alleged

27    in this Complaint and have performed acts and made statements in furtherance of the conspiracy

28

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                          13

or the anticompetitive conduct. The co-conspirators committed overt acts and communicated with others in the conspiracy to restrain, restrict, exclude, and foreclose competition in the telescope market (*see infra*) in every state and territory of the United States. Celestron and Meade are headquartered in California. Ningbo Sunny's and Synta's conduct in California, and related conduct occurring in every other state and territory, substantially affected and continues to affect a substantial amount of trade and commerce and has injured consumers in every state and territory of the United States.

77.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, limited liability entity, or company, the allegation means that the corporation, limited liability entity, or company engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the business or affairs of the corporation, limited liability entity, or company.

### 1.     Defendants' Corporate Families Acted as Single Enterprises, and Defendant Parent Companies Exercised Substantial Control over Their U.S. Affiliates

78.     When Defendants reached agreement on fixing or stabilizing prices, rigging bids, or allocating the market of telescopes—whether as a result of formal or informal meetings or discussions arranged to implement or enforce cartel purposes and agreements—Defendants and Co-Conspirators meant for their collusive agreements to impact the pricing for all telescopes subject to the cartel's anticompetitive efforts regardless of where they were sold.

79.     As part of a single, integrated, global enterprise, Defendants and Co-Conspirators manufacture, market, and/or sell telescopes. They sell their telescopes around the world, including in the United States. Accordingly, to achieve the cartel's anticompetitive aims, Defendants and Co-Conspirators effectuated the cartel by establishing pricing and allocating the market in which they compete.

80.     Foreign-based Defendants and Co-Conspirators established United States (and other North American) subsidiaries not only to market and sell their telescopes in the United States

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                14

but also to effectuate and achieve the cartel's aims and purposes. Without doing so, these corporate entities would have had to perform such functions themselves. These corporate entities chose not to do so and instead established corporate subsidiaries and affiliates that perform functions at the direction of and are controlled by their officers in China.

81. These United States (and other North American) subsidiaries have no authority to set prices below the prices for telescopes agreed to among the cartel's members. For these subsidiaries, pricing authority largely was held by their Chinese corporate parent or affiliate.

82. Because their foreign-based corporate parent or affiliate had significant control over all aspects of their business (*e.g.*, type of telescopes, prices, supply, business strategy, customer development and relations, sales, personnel decisions), the United States (and other North American) subsidiaries operated as little more than distribution and sales units of their foreign-based corporate parents or affiliates. Indeed, the foreign-based corporate parent and affiliates named their own family members as employees and officers of their United States subsidiaries. As a result, the United States (and other North American) subsidiaries were—as intended—able to advance the cartel aims in the United States.

### 2. Defendants' High-Level Employees Organized the Conspiracy, and Their Subordinate Employees—Including Those of Their U.S. Subsidiaries—Executed the Conspiracy

83. Defendants and Co-Conspirators organized the telescope conspiracy at a high-level within their respective corporate families. Both executives and subordinate employees carried out the conspiracy. Additionally, given the nature of the industry, the subsidiaries and affiliates implemented the conspiratorial agreements within their respective corporate families.

84. Each of the corporate families alleged herein (*i.e.*, Synta and Ningbo Sunny) operates not as separate corporate entities but as a single enterprise. Each corporate family holds itself out to the public as a single, integrated enterprise. Each of the parent and/or foreign entities named in this case operate a hierarchical corporate structure wherein it treats subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent.

85. Each corporate parent alleged herein also coordinates and manages the finances and

1  meetings among officers from each of the different subsidiaries to facilitate an integrated
2  enterprise to link the various supply chains to the corporate families' clients. The parent
3  defendants dominate and control the finances, policies, and business practices of their various
4  subsidiaries, including the United States subsidiaries.

5       86.    In light of the fact that the United States subsidiaries named in this Complaint were
6  treated as mere distribution and sales units of the Chinese parent or foreign affiliate, they were
7  generally kept informed about the competitor meetings and discussions occurring abroad and were
8  not permitted to undercut the pricing and market allocation agreements reached during those
9  meetings and discussions.

10      87.    By virtue of their integrated enterprises, and by virtue of the other allegations in this
11 complaint, each Defendant and Co-Conspirator entered into the conspiracy alleged herein on
12 behalf of, and reported these meetings and discussions to, its respective corporate family and
13 United States subsidiaries. In fact, Chinese-based parents and affiliates often provided pricing
14 instructions to their United States subsidiaries, which acted as their distribution and sales arms in
15 the United States.

16           **3.    Defendants and Co-Conspirators Who Engaged in Collusive Conduct
17                   Participated in Discussions on Behalf of Entire Corporate Families
                     and Failed to Distinguish Between Corporate Entities in the Same
18                   Corporate Family**

19      88.    In meetings and discussions between Defendants and Co-Conspirators in
20 furtherance of the telescope conspiracy (*see infra*), Plaintiffs allege generally which corporate
21 family was represented in a particular meeting or communications. The individual participants in
22 the conspiratorial meetings and discussions did not distinguish among entities within a particular
23 corporate family, referring to themselves or others, for example, merely as "Synta," "Celestron,"
24 "Sunny," or "Meade." Indeed, the officers from Defendants appear to have attended the
25 conspiratorial meetings on behalf of their entire corporate families, including their respective
26 United States' subsidiaries. Further, because of their generic uses of Defendants and Co-
27 Conspirators' names, individual participants in the conspiratorial meetings and discussions did
28 not always know the specific corporate affiliation of their counterparts nor did they distinguish

1  among entities within the respective corporate families. Participants in the conspiratorial meetings

2  entered into agreements on behalf of, and reported these meetings and discussions to their

3  respective corporate families and United States affiliates. As a result, the entire corporate family

4  was represented in meetings and discussions by its agents and was party to the agreements reached

5  in those meetings.

6        89.    For example, in an email from Peter Ni to Celestron's former CEO, Dave Anderson,

7  and Celestron's board members, Laurence Huen, Mr. Chen and Ms. Sylvia Shen, Mr. Ni wrote

8  "But the premise of this case is CELESTRON/SYNTA should be provided the financial support

9  to SUNNY" and "[a]t present, Meade has already started to borrow money from East West Bank

10  by offering guarantees from sunny." *See infra*.

11        90.    Similarly, Meade's then Vice-President of Sales Victor Aniceto wrote to then-

12  Meade CEO Joe Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business. However, this promo

13  will not be disruptive to Celestron business." *See infra.*

14        91.    Additionally, former CEO of Celestron and Meade, Joe Lupica, wrote in an email

15  to Sunny Optics and Meade, "On the other hand if we take advantage of the strong relationships

16  among Ningbo Sunny, Synta, Celestron and Meade (under Peter's ownership) ***we can quickly***

17  ***turn the company around and the four companies can dominate the telescope industry***"

18  (emphasis added). Further revealing the interrelatedness of Ningbo Sunny and its affiliates is the

19  manner in which invoices were paid. For example, Sunny Optical's financial statements reflect

20  Meade paying invoices issued by the law firm which represented Ningbo Sunny in the acquisition

21  of Meade.

22        92.    Further, Defendants and Co-Conspirators knew the individuals at the conspiratorial

23  meetings represented their entire respective corporate family; otherwise, Defendants and Co-

24  Conspirators would not have entered into the agreements if affiliates could simply undercut the

25  agreements reached.

26  / / /

27

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    17

**4.    The Nature of the Telescope Industry Required Foreign Companies Named As Defendants and Co-Conspirators Herein to Use Their United States Subsidiaries and Affiliates As Distribution and Sales Arms**

93.    Defendants and Co-Conspirators' United States subsidiaries are wholly-owned and/or controlled by their foreign parents or affiliates. As part of each Defendant's global enterprise, its United States subsidiary or affiliate assists the foreign parent or affiliate with the distribution and/or sale of telescopes to consumers in the United States. In most cases, the United States subsidiaries carry out the distribution and/or sales of telescopes to customers in the United States after obtaining telescopes manufactured at the foreign parent or affiliate's factories located abroad. Generally, United States' subsidiaries facilitate direct purchaser orders for telescopes with parents or affiliates overseas. That is, the foreign parent or affiliate manufactures telescopes abroad and sends the telescopes directly to the United States, often through its United States (or other North American) subsidiaries or affiliates. Indeed, the foreign parents and affiliates make millions—if not, billions—of dollars of "sales" annually to their United States' (and other North American) subsidiaries and affiliates as part of their global business.

94.    In sum, the foreign-based Defendants and Co-Conspirators sell directly to the United States and operates their telescope business as a single global enterprise with their subsidiaries and affiliates in the United States and North America generally.

## IV.    FACTUAL ALLEGATIONS

### A.    Telescopes



*Source:* https://particle.scitech.org.au/space/best-telescope-buy/

95.     Humans have looked up at the heavens and wondered what is out there for millennia. Thousands of amateur astronomers grab their telescope and aim it towards the open sky each day. There is never a shortage of interesting sights in the vast universe. For example, despite the fact that it is only a mere blip on the cosmic scale, the Milky Way galaxy contains over 100 billion stars, and one can uncover the tiny details and see what the naked eye cannot with the help of a telescope.

96.     A telescope is an optical instrument that magnifies and enhances the view of faraway objects. Most telescopes available for purchase to consumers fall into one of two main categories, refractor or reflector, though a combination of the two, Schmidt-Cassegrain telescopes, are also available.

97.     A refractor telescope contains convex (bending outwards) lenses to collect, focus, and magnify light. Rays of light travel through the objective (main) lens where they are focused at the focal length of the eyepiece.

98.     A reflector telescope, contains concave (bending inwards like a cave) mirrors. Light travels down the tube where it is reflected (hence the name reflector) up to a secondary mirror near the top of the tube, which directs the light into the eyepiece. This exact system is known as a Newtonian reflector.

99.     The Schmidt-Cassegrain telescope has gained immense popularity over the last 30 years. This type of telescope uses both lenses and mirrors in a compound system.

**B.     Relevant Market: The Market for Telescopes in the United States**

100.    The relevant market is the market for telescopes in the United States. The telescopes at issue in this case are those used by amateur astronomers rather than those found at observatories and universities. This market is $250 million to $500 million annually. The Synta and Ningbo Sunny Defendants control the market for telescopes in the United States.

101.    Ningbo Sunny and Synta together control 80 percent of the market for telescopes in the United States. Together, they have engaged in exclusionary conduct that has harmed competition and caused purchasers of telescopes to pay supra competitive prices.

102.    For example, as described elsewhere in this complaint, although Ningbo Sunny and Synta are each capable of manufacturing all types of telescopes, Ningbo Sunny and Synta have an illegal agreement or understanding that Synta manufactures and sells higher-end telescopes, while Ningbo Sunny manufactures and sells lower-end telescopes. Both higher-end telescopes and lower-end telescopes are part of the same overall market for telescopes in the United States.

103.    Pursuant to that unlawful agreement or understanding, Synta will not manufacture, sell, or respond to a request for quotation ("RFQ") for telescopes offered by Ningbo Sunny, and *vice versa*. As a result of their understanding, Ningbo Sunny and Synta can and do fix and stabilize prices thereby charge supracompetitive prices, rig bids, restrict supply, and engage in other anticompetitive conduct that artificially increases the prices of telescopes purchased by American consumers from Defendants and Co-Conspirators.

104.    Ningbo Sunny and Synta have faced limited competition in the market for telescopes in the United States because of their unlawful agreements and their conspiracies to monopolize.

105.    Moreover, as described further in this complaint, in 2005 Synta acquired Celestron as a wholly-owned subsidiary. Celestron became the dominant higher-end telescope distributor in the United States though Defendants and Co-Conspirators' efforts. Subsequently, Ningbo Sunny acquired Meade with Synta's help and assistance and became the dominant lower-end telescope distributor in the United States.

C.    **Defendants Are Liable for the Anticompetitive Conduct Alleged Herein**

106.    Orion's claims withstood motions to dismiss and summary judgment before proceeding to trial in November 2019. As mentioned, *supra*, Orion won a $16.8 million jury verdict against Ningbo Sunny and its subsidiaries, which was statutorily trebled under 15 U.S.C. § 15(a) to $50.4 million.

107.    In the *Orion* Action, the jury unanimously found, *inter alia*:

a.    Ningbo Sunny agreed with its competitors to fix or stabilize the prices and credit terms for telescopes and accessories in violation of Section 1 of the

Sherman Act;

b.    Ningbo Sunny agreed with a third party, other than a competitor, to fix the price or credit terms for telescopes and accessories in a manner that unreasonably restrained trade, such that the anticompetitive effects outweighed any procompetitive effects, in violation of Section 1 of the Sherman Act;

c.    Ningbo Sunny agreed with a competitor or potential competitor either (a) not to compete with each other in the market for telescopes and accessories, or (b) to divide customers or potential customers between them, in violation of Section 1 of the Sherman Act;

d.    Ningbo Sunny agreed with a third party, other than a competitor or potential competitor, either (a) not to complete with each other in the market for telescopes and accessories, or (b) to divide customers or potential customers between them in a manner that unreasonably restrained trade, such that the anticompetitive effects outweighed any procompetitive effects, in violation of Section 1 of the Sherman Act;

e.    Ningbo Sunny engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act;

f.    Ningbo Sunny had a specific intent to achieve monopoly power in the telescope market in violation of Section 2 of the Sherman Act;

g.    There is or was a dangerous probability that Ningbo Sunny could achieve monopoly power in violation of Section 2 of the Sherman Act;

h.    Ningbo Sunny knowingly entered into an agreement with another person or entity to obtain or maintain monopoly power in the telescope market in violation of Section 2 of the Sherman Act;

i.    Ningbo Sunny specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in the telescope market in

1    violation of Section 2 of the Sherman Act;

2    j.    Ningbo Sunny committed an overt act in furtherance of the conspiracy in

3          violation of Section 2 of the Sherman Act; and

4    k.    Ningbo Sunny and Sunny Optical's acquisition of Co-Conspirator Meade

5          created a reasonable likelihood of substantially lessening competition or

6          creating a monopoly in the telescope market in violation of Section 7 of the

7          Clayton Act.

8    *See* Verdict Form*, Orion* Action (Nov. 26, 2019), ECF No. 501.

9          **D.    The Federal Trade Commission's Actions in the Telescope Market**

10   108.   Antitrust concerns in the telescope market are not new; indeed, they arose in 2005,

11   when Synta acquired Celestron, the largest distributor of telescopes in the United States at the

12   time and a rival of Meade, another telescope distributor. In May 2002, Meade had itself attempted

13   to acquire Celestron. The parties abandoned the deal, however, after the Federal Trade

14   Commission ("FTC") authorized staff to seek a temporary restraining order and a preliminary

15   injunction in federal district court to stop any attempt by Meade to purchase all, or certain assets,

16   of Tasco Holdings, Inc.'s Celestron International, the number two performance telescope provider

17   in the United States and the only other supplier of Schmidt-Cassegrain telescopes. According to

18   the FTC's complaint, Meade's acquisition of Celestron assets would adversely impact the

19   telescope market by eliminating substantial actual competition between the two companies and

20   by creating a monopoly in the market for telescopes.[1]

21   109.   Similarly, in 1991, the FTC gave final approval to a consent agreement settling

22   charges that a proposed joint venture between Meade and Celestron would have created a virtual

23   monopoly in the manufacture and sale of certain telescopes. The agreement placed a 10-year

24   requirement on Harbour Group Investments, L.P. and Diethelm Holding Ltd. (the former parents

25

26   ---
     [1] FTC Authorizes Injunction to Pre-empt Meade Instruments' Purchase of All, or Certain Assets,
     of Tasco Holdings, Inc.'s Celestron International, Fed. Trade Comm'n (May 29, 2002), *available*
27   *at* https://www.ftc.gov/news-events/press-releases/2002/05/ftc-authorizes-injunction-pre-empt-
     meade-instruments-purchase-all.

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                              22

1   of Meade and Celestron, respectively) to obtain FTC approval before acquiring any company that

2   manufactures or sells certain telescopes in the United States. This consent agreement followed a

3   decision by the United States District Court for the District of Columbia granting the FTC's

4   motion for a preliminary injunction barring the acquisition of any assets or other interest in

5   Celestron International by Harbour Group (Meade's parent) and further barring Diethelm

6   (Celestron's parent) from acquiring any assets or other interest in Meade.[2]

7   **E.    Defendant Dar Tson ("David") Shen Orchestrated and Participated in the
8         Creation of Ningbo Sunny as a Sham Competitor for Synta, and Managed
        Ningbo Sunny to Promote Synta's Anticompetitive Ends**

9       110.    Ningbo Sunny was not formed as a new business venture by independent investors,

10  but rather was created to serve as a sham competitor to Synta at the direction of Defendant Dar

11  Tson ("David") Shen. Mr. Shen had earlier been acquainted with Co-Conspirator Wenjun

12  ("Peter") Ni, and in or around 2001 provided Mr. Ni with a large share of the seed capital

13  necessary for Ningbo Sunny's formation. At the time, Mr. Ni did not have significant available

14  financial resources or the ability to adequately capitalize Ningbo Sunny. In exchange for this

15  infusion of funds, Mr. Shen was granted a 26 percent ownership stake in the new company, an

16  arrangement that gave him significant influence over Ningbo Sunny's affairs and the ability to

17  control and direct the manner in which it pretended to compete with its nominal rival, the by-then

18  well-established, Synta. The creation of Ningbo Sunny gave Mr. Shen the ability to coordinate

19  the activities of a much larger share of the industry's sales than would have been achievable

20  otherwise.

21      111.    At all times relevant here, and beginning at least as early as 2001 and extending to

22  the present, Ningbo Sunny and Synta coordinated their actions in the consumer telescope market,

23  instead of acting as true competitors.  Indeed, Mr. Shen and Mr. Ni have been close personal

24  friends who met and spoke regularly with each other.

25      112.    In 2004, Mr. Shen and Mr. Ni deepened their ties by collaborating to form a new

26

27  ────────────────
    [2] *FTC v. Harbour Grp. Invs.*, Civil Action No. 90-2525, 1990 US Dist. LEXIS 15542 (D.D.C.
    Nov. 19, 1990).

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                     23

1    entity they named Sky-Rainbow, which would later serve as a conduit used by the Defendants to

2    transfer funds between Celestron and Ningbo Sunny to acquire Meade.

3         113.   Synta's 2005 acquisition of Celestron marked a major step in Synta and Ningbo

4    Sunny's coordinated effort to dominate and exert control over the U.S. telescopes market. In

5    preparation for this step, Mr. Shen resigned from his position as Vice Chairman of Ningbo Sunny.

6    As Laurence Huen explained in an August 2013 email: "David resigned this position on July 2005,

7    in order to avoid any concern of conflict of interest after he acquired Celestron on April 2005."

8    Mr. Shen also nominally divested himself of his interest in Ningbo Sunny by transferring his 26

9    percent ownership interest to his brother and sister-in-law. This resignation and transfer was, in

10    fact, a sham and Mr. Shen thereafter continued to exert his influence over the management of

11    Ningbo Sunny.

12         114.   In May 2005, one month after the acquisition, Sylvia Shen of Synta informed Joe

13    Lupica of Celestron and later Meade that it was David Shen's decision to allocate higher-end and

14    lower-end telescopes: "David decided to move all the production for 114mm or smaller items to

15    Sunny" and "Synta will concentrate on bigger and higher end products[.]"

16
17
18
19
20
21

-----Original Message-----
From: sylvia
To: JOE LUPICA
Cc: Sylvia Chen
Sent: Tuesday, May 24, 2005 12:14 PM
Subject: Re: Telephone Conversation with Joe Messner

Dear Joe,
Thank you for your message.
David thinks that you have a very good understanding about his thoughts. He would like you to keep in touch with Joe Messner from time to time to maintain a
friendly relationship. To keep the business from Bushnell is one concern, but David is more concern about the potential lawsuit in patent conflict.
I think it is also important to have face-to-face communications with Joe Messner, I'll check with David to see his opinions and availability.
David decided to move all the production for 114mm or smaller items to Sunny, except Bushnell's. It's a sensative moment, we would keep Bushnell's as is.
Sytna will concentrate on bigger and higher end products, thus we can support Celestron better.
We appreciate your understanding and efforts.
Thank you and best regards,
Sylvia
-----Original Message-----

22         115.   In February 2007, Laurence Huen of Celestron wrote: "The facts supporting the

23    movement were well received by David … knowing that he has got certain 'strategic alignment'

24    with Sunny. So shifting to Sunny, if suggested by him, will never be a problem."

25         116.   In November 2008, Joe Lupica emailed David Shen, Sylvia Shen, and Laurance

26    Huen:

27              Dear David, Sylvia and Laurence:

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 24

I have reviewed the nondisclosure agreement sent by Baird to Sunny regarding the Meade transaction. … David, are you and Mr. Ni interested in buying Meade jointly?

I would recommend David or Mr. Ni sign this agreement and have them send the financial packet to Laurence. Laurence can make copies and send one copy to David, Mr. Ni and myself. We can then evaluate the possibility of acquiring Meade.

117. In October 2010, Joe Lupica emailed Laurence Huen:

We may have to do this through Sunny because of legal issues associated with Celestron and Meade. …

If David and his family are looking out five to seven years this would be a very advantageous acquisition. Over the first two years we would probably make less than Celestron as a stand-alone company. The other thing for David and his family to consider is that this transaction would complicate our business beyond its current level of complexity. Would the family feel comfortable adding more complexity to the operation beyond what we current have? I don't know the answer to this but they would have to place more faith and trust into others outside the family for the overall success of their business empire. Only the family can answer if this is the approach they want to take.

118. In October 2010, Corey Lee of Celestron emailed Victor Aniceto of Celestron and later Meade: "I think Sunny will *only* do something like that if it was a deal brokered by David."

119. In August 2011, Joe Lupica emailed Dave Anderson of Celestron, Corey Lee, Victor Aniceto:

The visit to Sunny was beneficial in understanding Sunny and Synta's relationship. … I was told that David visits at least 1x a month. … I asked Junwen about the pricing they charge these smaller brands and he thinks that they pay 10 – 15% higher but these are all quoted by Synta. It looks like Synta is Sunny's sales arm.

120. Moreover, in November 2005, the shareholder equity interest of Mr. Shen's brother, Dagong Shen, grew from 10% to 26%. That 26% equity interest remains in the Shen family today, now under the name of David Shen's sister-in-law and Dagong Shen's wife, Yongxue Dong.

121. The interconnections between Mr. Shen and Mr. Ni only deepened when Synta acquired Celestron in 2005.

122. Following Synta's acquisition of Celestron, Synta personnel conducted regular

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
25

weekly calls with Celestron personnel in the United States in order to manage Celestron's affairs. In addition, starting at least as early as 2008, employees and managers within the Quality Assurance department at Celestron traveled at regular intervals several times a year to China to inspect operations at the manufacturing facilities operated at the direction of Synta (until recently at Suzhou, later at Rugao) and Ningbo Sunny (at Ningbo), Celestron's two most significant suppliers of telescopes. These facilities were located within a few hours' drive of each other, within Jiangsu Province in cities surrounding greater Shanghai. It was the customary practice of Celestron personnel to conduct their inspection activities first at Synta and then on subsequent days at Ningbo Sunny, or vice versa, but always with visits to both suppliers scheduled as part of the same trip from California to China.

123.   On these occasions, Celestron's hosts at Synta or Ningbo Sunny would entertain their guests in the evening. If the event took place in Suzhou or Rugao, senior Ningbo Sunny executives (including Mr. Ni) would travel from Ningbo to Suzhou or Rugao to meet with attendees from Celestron ***and*** Synta; if at Ningbo, senior Synta executives (including Mr. Shen) would travel from Suzhou or Rugao to Ningbo to meet with their counterparts at Celestron ***and*** Ningbo Sunny. At Celestron-Synta-Ningbo Sunny dinners, and at continuation sessions later at nightclubs, Mr. Shen and Mr. Ni generally sat at the same table, and had face-to-face discussion providing them ample opportunities to confirm their ongoing loyalty and discuss the coordinated management of their telescopes businesses.

124.   Upon information and belief, at all times relevant and beginning at least as early as 2008, and extending to at least the period when Orion initiated suit in 2016, Messrs. Shen and Ni met together and traveled together elsewhere as well. Mr. Ni would often accompany Mr. Shen on trips to Taiwan, where Mr. Shen operated another telescopes company, so that the pair could meet for several rounds of golf. These trips provided Synta and Ningbo Sunny further opportunities to coordinate the conduct of Synta and Ningbo Sunny and collude with each other.

125.   In November 2013, Ningbo Sunny executives inspected Meade's facilities and operations in Southern California and Mexico as part of their research related to Ningbo Sunny's

planned acquisition of Meade. A delegation of seven executives, including Mr. Shen and Mr. Ni, traveled from China to North America for the inspections. The group first flew to Los Angeles, then visited Meade headquarters in Irvine, California, and continued on to Meade's facilities in Tijuana, Mexico. From there, Mr. Shen and Mr. Ni split off from the group and traveled together to play golf in San Diego, traveled together to Tucson, Arizona, and finally returned to Los Angeles before their return flight to China. Their joint traveling together provided further opportunities for them to collude over the marketing and sales of telescopes in the United States.

126.    The foregoing conduct including their shared travel strongly supports the allegations that strong bonds existed between Mr. Shen and Mr. Ni long before 2013, when Ningbo Sunny made its collusive acquisition of Meade.

127.    The Synta assistance to and coordination with Ningbo Sunny in connection with its acquisition of Meade was not an isolated event; it was merely in furtherance of longstanding cooperation between the entities. Indeed, Mr. Shen's coordination of business activities with Ningbo Sunny, including the formation of Ningbo Sunny, began long before the acquisition of Meade. This conduct is part and parcel of related and similar efforts to set up additional telescopes manufacturers who were made to appear to the outside world as rival competitors, but which were, in fact, influenced by Mr. Shen. These manufacturers included Sky-Watcher, a company so closely affiliated with Celestron that its offices were located within Celestron's offices, and Viewway, another manufacturer Mr. Shen formed in Guangzhou, China.

F.    **Defendants and Co-Conspirators Agreed to Sell Different Telescopes in the Telescope Market**

128.    Through their unlawful agreements with horizontal competitors, Synta and Ningbo Sunny effectively divided the telescope market. As alleged above, Synta and Ningbo Sunny agreed that Synta would manufacture and supply higher-end telescopes and Ningbo Sunny would manufacture and supply lower-end telescopes and that they would not compete.

129.    They also agreed that Synta would not manufacture or respond to RFQs for telescopes manufactured by Ningbo Sunny and *vice versa*. Both adhered to their agreements. As

a result of their respective market shares, agreements not to compete, and significant barriers to entry (*see infra*), Synta and Ningbo Sunny both have engaged in conduct to control the respective telescopes that each sell. Ningbo Sunny and Synta therefore can and do limit supply, fix or stabilize prices, rig bids, and charge supracompetitive prices, and engage in other anticompetitive conduct that artificially increases the prices of telescopes.

130. In the years following Ningbo Sunny's formation, Synta and Ningbo Sunny manufactured telescopes for distributors like Meade and Orion. During this period, while both Synta and Ningbo enjoyed some success, Defendants were unable to obtain a dominant market share as a number of unaffiliated telescope manufacturing competitors remained.

131. In 2005, Defendants identified an opportunity to avoid this competition. Celestron, a major telescope distributor, was looking to be acquired by a purchaser that could provide additional capital. If Defendants purchased Celestron, they could then just direct all Celestron manufacturing to Synta and Ningbo Sunny rather than having to compete with other manufacturers for Celestron's business. This would effectively preclude any other telescope manufacturer from being able to compete for Celestron's business.

132. Accordingly in April 2005, it was announced that Synta would acquire Celestron. And in May 2005, Celestron's manufacturing of higher-end telescopes was allocated to Synta and Celestron's manufacturing lower-end telescopes was allocated to Ningbo Sunny.

133. In 2004, Synta Technology began marketing and selling Ningbo Sunny telescopes to U.S.-based purchasers including Orion, an arrangement that was a product of the close coordination between Synta and Ningbo Sunny.

134. Contemporaneously with Synta's 2005 acquisition of Celestron, Synta announced to U.S.-based purchasers, including Orion, that it would no longer manufacture certain telescopes that it had manufactured and supplied to these customers in the past. Synta recommended that these U.S. purchasers acquire the models that Synta had previously supplied from Ningbo Sunny instead. Synta's withdrawal from the market with respect to these product lines and urging purchasers to acquire these products to Ningbo Sunny was made pursuant to a market allocation

1  agreement that was part and parcel of their overarching agreement to suppress competition by

2  dividing up the markets between them.

3      135.   In a December 7, 2007 SEC Form S-1 filing, Meade reported that it "has begun to

4  see increased pricing pressure from Celestron as a result of this change in ownership and a

5  substantial capital infusion by Synta." Meade added: "We have experienced, and continue to

6  experience, difficulties with these manufacturers, including reductions in the availability of

7  production capacity, failure to meet our quality control standards, failure to meet production

8  deadlines and increased manufacturing costs."

9      136.   By 2009, Synta Technology employee Joyce Huang had abandoned pretense of

10  working only for Synta-affiliated companies, and began issuing invoices to telescope purchasers

11  on behalf of Ningbo Sunny.

12      137.   In 2010, Synta informed U.S. retailer customers, including Orion, that some of its

13  low-end telescope products would thenceforth be produced by Ningbo Sunny.

14      138.   As of 2012, Synta employee Ms. Huang was coordinating meetings between Mr.

15  Shen of Synta, Mr. Ni of Ningbo Sunny, and at least one U.S. customer, Peter Moreo of Orion.

16  **G.**    **Defendants and Co-Conspirators Colluded on Ningbo Sunny's Acquisition of**

17      **Meade**

18      139.   Meade was a leading American telescope manufacturer and supplier for many

19  years. It owned critical patents, had a manufacturing facility in Mexico, and manufactured high-

20  and low-end telescopes. One of the patents was for GoTo technology, a highly valued type of

21  telescope mount and related software that can automatically point a telescope at astronomical

22  objects that the user selects. GoTo technology was also the subject of extensive litigation between

23  Meade and Celestron.

24      140.   When Meade was offered for sale in 2013, Jinghua Optical Co. Ltd. ("Jinghua"),

25  a smaller manufacturer of telescopes and competitor of Ningbo Sunny and Synta, made a bid to

26  purchase it. If Jinghua had been able to purchase Meade, it would have gained critical knowledge

27  about the manufacture of telescopes and accessories as well as Meade's patent portfolio,

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                      29

1    permitting it to better compete with Ningbo Sunny and Synta in the telescope market.

2         141.    Ningbo Sunny and Synta colluded to prevent Jinghua's acquisition of Meade,

3    which would have diversified manufacturing, preserved an independent distributor, and increased

4    competition in the telescope industry. Ningbo Sunny and Synta were motivated to scupper the

5    Jinghua deal and to conspire because the FTC had blocked Meade and Celestron's merger in 1991

6    and 2002. Additionally, Synta could not acquire Meade due to its ownership of Celestron. As a

7    result, Ningbo Sunny's Mr. Ni and Synta's Mr. Chen agreed that if Ningbo Sunny moved to

8    acquire Meade, Celestron and Synta would provide financial and other assistance to complete the

9    acquisition. This is not the kind of arrangement into which true competitors enter.

10        142.    Synta/Celestron made substantial payments and loans to Ningbo Sunny to facilitate

11   the Meade acquisition. These payments were documented, for example, in an accounting provided

12   by Celestron's CFO, Paul Roth. As part of this unlawful agreement, Celestron took equity in

13   Meade, which is memorialized in shadow books kept by Defendants and Co-Conspirators.

14        143.    On information and belief, in exchange for this support, Ningbo Sunny concealed

15   Synta's and Celestron's involvement or assistance in its acquisition of Meade from the FTC;

16   Ningbo Sunny offered Celestron equity in Meade; Ningbo Sunny provided Celestron and Synta

17   with access to Meade's intellectual property rights, thereby ensuring that Celestron no longer

18   needed to compete with Meade (previously an independent company); and Ningbo Sunny shared

19   its customers' data—including pricing data—with Celestron and Synta, thus enabling them to

20   coordinate their prices and strategies. This cooperation reinforced Synta and Ningbo Sunny's

21   control in the United States for their telescopes, further enabling the price fixing in which they

22   engaged.

23        144.    Synta and Ningbo Sunny's combination and conspiracy eliminated competitors and

24   increased market concentration. Specifically, the effect of Ningbo Sunny's acquisition of Meade

25   lessened competition, raised the already-high barriers to entry (*see infra*), and tended to allow

26   Synta and Ningbo Sunny to obtain control over the telescope market in the United States. All of

27   this conduct facilitated and made possible the circumstances for the price-fixing in which they

28

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                      30

1    engaged.

2        145.   After the Meade acquisition, Messrs. Shen and Huen continued to provide advice

3    and assistance to horizontal competitors Ningbo Sunny and Meade, met with Mr. Ni about these

4    issues, and toured Meade's facilities. Mr. Huen also instructed Ningbo Sunny to remove Meade's

5    CEO and to replace him with Celestron's former CEO, Mr. Lupica. Again, these are not the

6    actions in which true competitors would engage. These are, instead, the actions of two corporate

7    families that have decided to collaborate instead of compete.

8        **H.    Defendants and Co-Conspirators Conspired to Interfere with Orion's
            Acquisition of the Hayneedle Assets**
9

10        146.   Synta and Ningbo Sunny also colluded to prevent a competitor, Orion, from

11   acquiring various valuable assets. In 2014, Orion attempted to acquire certain assets, including

12   web domains like telescopes.com, from online retailer, Hayneedle ("Hayneedle Assets").

13   Defendants and Co-Conspirators used their market power to fix credit terms to prevent Orion from

14   acquiring the Hayneedle Assets. Specifically, they coordinated timing to cut off Orion's credit

15   with the respective businesses when they learned that Orion sought to acquire these assets.

16        147.   On May 12, 2014, Orion sent a letter of intent to Hayneedle indicating that Orion

17   sought to purchase the Hayneedle Assets. On June 14, 2014, Synta sent Orion's CEO, Peter

18   Moreo, an email that threatened to terminate Orion's credit, stating, "if Orion really buys

19   Hayneedle, this will be the beginning of hazard, we could not trust Orion's credit any more."

20   Synta then forwarded this email to Ningbo Sunny and requested that Ningbo Sunny also withdraw

21   Orion's line of credit. Ningbo Sunny then sent Orion an email nearly identical to Synta's email to

22   Orion. With its supplier credit cut off, Orion could not move forward with the asset acquisition.

23   Synta and Ningbo Sunny therefore sabotaged Orion's purchase of the Hayneedle Assets that

24   would have allowed it to better compete with them in supplying telescopes.

25        **I.    Illustrative Examples of Defendants' Anticompetitive Conduct and
            Conspiracy to Fix Prices, Rig Bids, and Allocate the Market**
26

27        148.   In the *Orion* Action, evidence demonstrated defendants' anticompetitive conduct

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                              31

which includes, without limitation:

     a.    Fixing or stabilizing the prices of telescopes;

     b.    Rigging bids for telescopes;

     c.    Allocating the market for telescopes;

     d.    Jointly working together to aid and abet Ningbo Sunny's acquisition of Celestron's horizontal competitor, Meade;

     e.    Exchanging non-public, material information with each other, including Meade's intellectual property, business plans, and telescope pricing strategies;

     f.    Exchanging non-public, material information about competitors' businesses, including intellectual property, business plans, and telescope pricing strategies; and

     g.    Aiding and abetting each other's consolidation and maintenance of monopoly power.

149.    Through these activities, the Ningbo Sunny and Synta corporate families illegally combined and conspired with each other instead of competing against one another. Celestron has amassed at least 70 percent of the telescope market in the United States as a result of Defendants' and Co-Conspirators' anticompetitive conduct.

150.    Illustrative examples of Defendants' and Co-Conspirators' conspiratorial conduct in the telescope market that, among other things, facilitated and made possible the circumstances for the market allocation and price fixing in which they engaged, includes, but are not limited to:

151.    Regarding the horizontal competitors' conspiracy to acquire Meade for Ningbo Sunny, Ningbo Sunny's Mr. Ni confirmed to Celestron's then-CEO Mr. David Anderson and directors, Mr. Shen, Mr. Huen, Mr. Chen, and Ms. Sylvia Shen, that Ningbo Sunny would purchase Meade to prevent JOC (Jinghua) from doing so per the parties' discussion and indicated that Celestron and Synta should provide the financial support to Ningbo Sunny.

| From: | nbsunny <nbsunny@vip.sina.com> |
|---|---|
| Sent: | Friday, December 13, 2013 12:43 AM |
| To: | DAVE ANDERSON |
| Cc: | david shen; Laurence Huen; Jack chen; shentakuo1 |
| Subject: | Fw: Fw: Celestron Payments星特朗付款 |

Dear Dave,

Thanks for your email and supports!

At the end of June or beginning of July, I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON / SYNTA should be provided the financial support to SUNNY.

At present, Sunny has already paid more than $10 millions to MEADE. According to your email, you said you will not provide the financial support to sunny in 2014. It will not maintain MEADE' s operation, if only support them by sunny. We had borrowed a lot of money from bank for MEADE. Moreover, Meade still needs to addition $3.5 millions working capital to support their normal operation work at the first of 2014.

As your mention, the $10 millions that you support us is included the payment of goods that the terms of payment is 100days. But so far, CELESTRON is total paid $4.5 millions  if we calculated based on the term of payment is 100 days.

In 2014, we hope the term of payment that CELESTRON pay to sunny will less than 50 days form shipping. And maybe you can pay the SYNTA later; I think Mr. Shen will agree it. At present, Meade has already started to borrow money from East West Bank by offering guarantees from sunny. I think it will help to cushion MEADE if Meade get this money from bank.

Best regards,

Ni Wen Jun

152.   In the *Orion* Action, the jury found that Ningbo Sunny and Synta conspired to acquire Meade. Synta made substantial payments and loans to Ningbo Sunny to facilitate the Meade acquisition. Celestron took equity in its competitor, Meade, as part of this unlawful arrangement between Ningbo Sunny and Synta.

153.   Additionally, a California law firm represented Ningbo Sunny in the acquisition of Meade. According to its engagement letter, however, the law firm was required to take instructions from Synta's Mr. Shen and his executives, including Celestron's Joe Lupica and Dave Anderson. Messrs. Lupica and Anderson helped Sheppard Mullin negotiate and structure the transaction and instructed it to keep Messrs. Shen and Ni updated. This is not the kind of arrangement that would occur amongst normal horizontal competitors.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                    33

1.   Scope of Representation.  Except as we may agree otherwise in writing, we will be representing only the Client and will not be representing any parent, subsidiary or other affiliated entity nor any shareholder, partner, member, director, officer, employee, agent or insurer of the Client.  Except as we may otherwise agree, the terms of this letter apply to other

engagements for the Client that we may undertake.  You have advised us that you will obtain tax advice regarding the Matter from a third party; accordingly, our firm will not be providing any tax advice in connection with the Matter, including, without limitation, tax structuring or tax consequences arising out of the Matter.  You have instructed us to take direction from and communicate directly with your advisors, Dave Anderson (President of Celestron), Laurence Huen, David Shen (head of Synta) and Joe Lupica.

154.   Ningbo Sunny's Mr. Ni and Synta's Mr. Shen also agreed that Celestron's then-CEO, Joe Lupica, would be transferred to Ningbo Sunny, and after Ningbo Sunny's acquisition of Meade, Joe Lupica would become Meade's CEO. He and others acted as a conduit of information between Ningbo Sunny and Synta.

155.   When the FTC inquired into whether Synta's Mr. Shen was involved in any way in Ningbo Sunny's Meade acquisition, but the FTC was advised by the law firm that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade" on August 22, 2013. This statement was false given that Ningbo Sunny's Mr. Ni and Synta's Mr. Shen had agreed before this that Mr. Shen and his companies would provide financial support to Ningbo Sunny in connection with the Meade acquisition.

156.   The FTC was also concerned that Synta's Mr. Shen was previously a Ningbo Sunny shareholder. To allay the FTC's concerns, Ningbo Sunny's Mr. Ni formed Sunny Optics, Inc., the entity used to acquire Meade and became its sole shareholder. Ningbo Sunny represented to the FTC that it had nothing to do with the Meade acquisition. Then, after the acquisition closed, Mr. Ni transferred his interest in Sunny Optics to Ningbo Sunny for the nominal amount of $1.

157.   After Ningbo Sunny acquired Meade, Ningbo Sunny and Synta agreed not to compete with each other, which noncompetition was the entire purpose of this charade from the beginning. For example, a December 12, 2013 email thread between the entities reflects a request from Synta's Mr. Shen to Ningbo Sunny's Mr. Ni to reach an understanding with Celestron's then-CEO about not competing against Celestron for sales:

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                34

- Bidding with Costco between May and June (compete with Celestron for the price). This is a very important issue. This needs Director Ni to communicate face-to-face with DAVE when he goes to the United States. Don't bid. If you let the thing go by doing this, how would you deal with everything in the future? All products are produced by sunny. Following a conflict, celestron would not trust sunny any longer.
- Going back to the risk arising out of forwarding SYNTA's order to Boguan Jinghua 8 years ago, it maybe not happen. But they would think that there is no value to fight for the Company. Most of CELESTRONs senior executives left because they are Americans who live for their dreams.
- we recommend that Director Ni personally take the two actions concurrently, by selling the products to outside China and the United States, or meet with CELESTRON DAVE to resolve difficulties and make every effort to get order from COSTCO.
- it is worth it to affect the whole thing and personal communication is more important.

158.    In a June 13, 2014 email, Synta's Mr. Shen informed Ningbo Sunny's Mr. Ni and Celestron's David Anderson, "The best way in the future is to divide the products and sell them into different markets to reduce conflicts":

-------- 转发邮件信息 --------    Forwarded email

发件人 : "david shen" <syntadavid@163.com>

发送日期 : 2014-06-13 07:04:18

收件人 : "Laurence Huen" <vancouver_blue_junior@yahoo.com>,DAVE <danderson@celestron.com>,sylvia <shentakuo@gmail.com>

主题 : Re:Laurence 回 复關於David 電話 re:Hayneedle    Re: Laurence's reply about David's phone

Laurence & Dave

感 谢您 的 回 复，由 於 收到 您 的 信 晚 了，再加上 没 有 Dave指導性 内容,我 也 無 法 向 peter致 信

Thank you for your reply. Since it was late when i received your letter, and I was not given with Dave's guiding information, i was therefore unable to write to Peter. Letters communicated to and from me and Peter should be brief and to the point, so I need to wait for Dave's comments for reference before sending it out.

The materials provided by Dave today are extremely important for reference. Meanwhile, my worries concerning the issue have been also reduced greatly. Since most of Telescope's business comes from Celestron, Celestron deems purchase of Hayneedle by Orion is positive at some points (the positive is more than the negative). But rising of the sales website may harm the business of the other traditional fields. The best way in the future is to divide the products and sell them into different markets to reduce conflicts.

Following purchase of Hayneedle by Orion, what makes it more concerned about is its ability to pay products payable. I suggest that Dave may propose to Orion that if business is continued, we need to know the financial condition of investors behind imaginova. If the fund is the cash increased by the company, then it would be safe. If the fund is borrowed, causing worse situation considering the current heavy debt, we need to deal with it carefully.

Viewing its current suppliers, JOC/GSO/BOSMA/IOPTRON.... no company can replace CELESTRON....SKYWATCHER...MEADE...

If we don't supply products, Hayneedle invested by Orion with $4.5 million would immediately value at less than $2 million. This is my opinion.

159.    Defendants and Co-Conspirators' conduct was in furtherance of their efforts to eliminate competition and fix prices. Ningbo Sunny (and, as a consequence, Meade) agreed not to compete against Celestron. As Meade's then-Vice President of Sales, Victor Aniceto, explained the strategy to Meade's then-CEO Joe Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business."

**From:** "Victor Aniceto" <victor.aniceto@meade.com>
**Date:** November 12, 2013 at 4:54:52 PM PST
**To:** "Joe Lupica" <joe.lupica@meade.com>
**Subject:** proposed promo

Joe,
We met earlier today to discuss promotional activities to generate revenue and kick start our holiday activities.

Attached is a P & L with background on YTD sales on products we currently have instock.

For the LX850, we discussed $1000 off on the mount only. This will result in a retail price of $4999. Comparably, CGE Pro mounts have a special price of $3999 ($1,000 off). We will still be higher by $1,000 but we have Starlock. This is designed to get interest going on this mount as well as take advantage of the great review in S & T.

For the PST, we will offer $100 off which will be competitive against the Lunt offers.
The SMT90-15 needs a boost as we have only sold 3 all year that is why we are aggressive but we will still have good margins.

Lastly, the XWA eyepieces are really under performing and we just need to move the inventory out.

Mr Ni discussed with me earlier that he wants us to remain profitable and he doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business.

We plan to launch this at ASAE and sent to the dealers by Saturday, 11/16/13.

Please provide your approval.

Thanks.

**Victor Aniceto**
Vice President of Sales
Meade Instruments Corp.
victor.aniceto@meade.com
Tel - 949.451.1450, ext. 6364
Fax - 949.451.1460  www.meade.com

160.    Moreover, Celestron's current CEO, Corey Lee, conspired with Synta and Ningbo Sunny to steal competitors' key business information. Ningbo Sunny sells telescopes to Celestron's competitors. Ningbo Sunny provides Celestron with material business information on such customers, including its pricing of telescopes, credit arrangements, and order forecasts. For instance, Ningbo Sunny's James Chiu provided detailed data for several recent years of Orion orders to Celestron's CEO, Corey Lee:

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                            36

1

2

3

4

5

6

7

8

9

10

11

12

13

14

> **From:** nbsunny [mailto:nbsunny@vip.sina.com]
> **Sent:** Friday, May 22, 2015 4:58 PM
> **To:** COREY LEE
> **Subject:** 回复: RE: orion 订单统计    Re: Order statistics
>
> Dear Corey,
>
> This is for 2014. I will send for 2013 on Monday.
>
> Junwen
>
> 发件人: COREY LEE
> 发送时间: 2015-05-23 06:31
> 收件人: nbsunny
> 主题: RE: Re: orion 订单统计    Subject: Re: Order statistics
>
> Junwen,
>
> Thank you. I assume this information is for Orion orders in 2015? Can you supply sales figures for both 2014 and 2013?
>
> Thank you.
>
> Corey

15    161. Ningbo Sunny and Synta also exchanged and fixed prices. They discussed and

16  agreed on the amount to charge distributors. For example, Ningbo Sunny's James Chiu and

17  Synta's Joyce Huang discussed Ningbo Sunny's prices and determined they should be higher.

18  Similarly, Ms. Huang informed Mr. Chiu that Ningbo Sunny's "payment terms should be the same

19  with Suzhou [Synta.]"

20    162. In addition to the foregoing, Defendants' internal records reveal their agreement to

21  cooperate with horizontal competitors. In a November 2005 email to Peter Ni, Joe Lupica, Sylvia

22  Shen, Anne Barton, and others, Joe Lupica wrote:

23

24

> I think Sunny, Synta and Celestron have a very good opportunity to increase our sales of telescopes, spotting scopes and binoculars over the next few years.

25

26

27

28

> We have very good distribution channels to sell Sunny and Synta products. The quality of the products manufactured at Sunny and Synta will enable Celestron to separate ourselves from all other competitors. I am very excited about our future and I look forward to working together for the benefit of all three companies.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                37

I believe it will be very important over the next two or three years for Sunny, Synta and Celestron to make sure we understand how we plan to distribute the products manufactured by Sunny and Synta to make sure we have the best opportunity to grow. …

Mr. Ni, I truly appreciate your consideration of this very important issue. I think it is important for the three of our companies to look to the world as one strong group of companies. This will better help us compete against all the other Chinese manufacturers.

163. Peter Ni of Ningbo responded:

Sunny will try its best to work with Celestron and Synta to turn these 3 companies into the best and strongest Telescope & sport optics manufacturing and marketing group in the world. I believe we will share the great success out of joint efforts. … Dear Joe, I appreciate your confidence about our future through cooperation. And I am expecting greater success to be made by our common efforts.

164. In December 2011, Celestron's Monthly Management Presentation similarly stated: "The relationship between Celestron, Synta and Sunny has never been stronger. … It is also well understood that each is dependent upon the other for continued growth."

165. Defendants and Co-Conspirators' emails further reveal their agreement to allocate the market and restrict supply. In May 2005, Sylvia Shen emailed Rob Shishino and Joe Lupica: "[T]he production for these models *will be transferred* to Sunny. … we don't want to order from Bosma any more, unless otherwise you have urgent demand in the near future before Sunny can catch up the production."

166. In November 2005, Peter Ni of Ningbo conveyed to Joe Lupica Sylvia Shen, Anne Barton, and others of Synta: "Please be sure that Sunny *will never directly work with or supply* to any of Celestron's dealers and distributors. … And we assure you that we will *never sell* any big diameter telescopes to any third parties."

167. In December 2005, Sylvia Shen emailed Joe Lupica, David Shen's interpreter Nancy Liu, and others: "I reminded him not to order from Bosma, Jinghua for the orders Synta/Sunny can build for you. That is for transition period, now you know clearly whom to buy products from."

168.   In January 2006, Lupica emailed Shen and Liu: "David, Mr. Ni and I discussed the Powerseekers and Firstscope lines since we intend to discontinue both lines this year[.]"

169.   In a February 2007 "Risk Assessment Memo," Lupica wrote:

> Take Sales from Suppliers that Compete with Synta and Sunny**:** The additional 40,000 to 50,000 telescopes purchased from Synta/Sunny will not only provide additional work for these two factories but it will also *take business away* from the competitors of Synta/Sunny such as Jinghua and others.

170.   As Ningbo Sunny's Vice Chairman, Mr. Chiu, wrote to Ms. Sylvia Shen to discuss "how to avoid conflict with Celestron products" and state that "[i]f the customer visits our factory and confirms their intention to cooperate with us, we will consider the strategy of separation from Celestron products or adopt different product prices to protect Celestron."

171.   Ningbo Sunny's Mr. Chiu also explained to Synta's Ms. Sylvia Shen that Ningbo Sunny "will take prompt action to avoid conflict in the astronomical market," including "abandoning the small OEM customers so as to protect big customers."

172.   In sum, as Synta's Mr. Shen explained in an email to Ningbo Sunny: "Director Ni will not be a competitor and is trustworthy when it comes to business."

173.   Defendants and Co-Conspirators were able to coordinate and raise telescopes prices as a result of their *per se* illegal agreements and understandings. They sought to avoid competition with each other's telescopes and developed strategies to protect each other from further competition. Mr. Lupica wrote, they did this to collectively "dominate the telescope industry."

174.   As Synta's Mr. Shen explained in an email to senior Celestron executives that he then forwarded to Ningbo Sunny, "we do not need to wage a price war with Orion head-on," because Synta and its co-conspirators could instead simply "replace them" in the marketplace.

J.     **The Structure and Characteristics of the Telescope Market Renders the Conspiracy More Plausible**

175.   The telescope market is conducive to a price-fixing agreement because of its structure and other characteristics, which have made collusion particularly attractive. Specifically, this market: (1) was the subject of market allocation; (2) has high barriers to entry; (3) is highly

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                        39

concentrated; and (4) has inelastic demand.

176.    Likewise, the telescope market is protected from outside competition because telescopes require heavy financial investments and intellectual property licensing. They also require scale to achieve cost efficiencies.

### 1.    The Telescope Market Was Subject to Market Allocation

177.    Through illegal allocation of the telescope market in the United States, Ningbo Sunny and Synta together have 80 percent of that market.

178.    Although Ningbo Sunny and Synta are each capable of manufacturing all types of telescopes, Ningbo Sunny and Synta have an illegal agreement or understanding that Synta manufactures higher-end telescopes, while Ningbo Sunny manufactures lower-end telescopes. Pursuant to that unlawful agreement or understanding, Synta will not compete on telescopes offered by Ningbo Sunny, and *vice versa*.

179.    This allocation of the market further enabled the price-fixing conduct described here.

### 2.    The Telescope Market Has High Barriers to Entry

180.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

181.    There are substantial barriers that preclude, reduce, or make more difficult entry into the telescope market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million-dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, intellectual property rights, and long-standing customer relationships.

182.    The high barriers to entry allow Defendants and Co-Conspirators to control prices and output for several reasons. First, manufacturing telescopes requires high capital investments,

and Ningbo Sunny and Synta are vertically integrated with the largest distributors. There is an insufficient number of independent distributors to render independent manufacturing profitable. Second, manufacturing telescopes requires key intellectual property rights, such as patents on software to automatically detect celestial objects demanded by amateur astronomers. Meade invented this software and initially owned the patents. Defendants and Co-Conspirators colluded, however, so that Ningbo Sunny could acquire Meade, thereby blocking independent manufacturers that might have been able to successfully compete with Ningbo Sunny or Synta with this game-changing intellectual property.

183.   As evidence of the high barriers to entry, no new, significant telescope manufacturers have entered the market in at least a decade. Furthermore, in light of Ningbo Sunny's acquisition of Meade, which also had manufacturing capabilities, in 2013, the number of suppliers has essentially dwindled to Ningbo Sunny and Synta.

184.   Furthermore, Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities, and the failure of any replacement suppliers to emerge, demonstrate that the barriers to entry into the telescope market, combined with Defendants' anticompetitive conduct, have effectively foreclosed competition.

### 3.   The Telescope Market Is Highly Concentrated

185.   A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

186.   Defendants and Co-Conspirators control the telescope market in the United States.

187.   Through increasing consolidation, the telescope market in the United States has become increasingly concentrated. In 2005, Synta acquired Celestron as a wholly-owned subsidiary. Celestron became the dominant higher-end telescope distributor in the United States through Defendants and Co-Conspirators' efforts. Subsequently, Ningbo Sunny acquired Meade with Synta's help and became the dominant lower-end telescope distributor in the United States.

188.   Synta and Ningbo Sunny manufacture, market, and/or sell their telescopes to distributors, including their respective wholly-owned subsidiaries Celestron and Meade, which

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 41

1   then sell the telescopes online, in stores, and through dealers to astronomy enthusiasts in the

2   United States. Celestron and Meade collectively account for the vast majority of telescopes sold

3   in the United States.

4       189. Synta and Ningbo Sunny have faced limited competition in the telescope market as

5   a result of their acquisition of competitors and agreements with each other. Their anticompetitive

6   conduct, including controlling the supply of telescopes in the United States, further facilitated and

7   made possible the circumstances for the price fixing and market allocation in which they engaged.

8       190. The telescope market was not always highly concentrated. Ningbo Sunny and Synta

9   transformed this market, however, by colluding to prevent competitors from entering the market

10  and thereby making sure they are the only viable sources of telescopes.

11      191. As of 2012, Synta and Ningbo Sunny together controlled 80% of the global

12  telescope manufacturing market. The associated Herfindahl-Hirschman Index ("HHI") for the

13  industry—a key market concentration metric often considered by antitrust economists—registered

14  at 3,200 points, well above the 2,500-point threshold generally regarded as evidencing high

15  concentration. Moreover, industry HHI levels remained above 2,500 from 2012 through 2018, the

16  most recent year for which Plaintiffs have collected information to date.

17      192. Additionally, when Ningbo Sunny acquired Meade with the help of Synta,

18  Defendants and Co-Conspirators removed a competitor and independent supplier from the

19  telescope market—Meade. Neither Celestron nor Meade have seriously competed since Ningbo

20  Sunny's acquisition of Meade or exercised their manufacturing capabilities to diversify the supply

21  of telescopes.

22      193. Furthermore, Ningbo Sunny and Synta consolidated control of the telescope market

23  by fixing prices and engaging in anticompetitive conduct.

24          **4.    There Is Inelasticity of Demand for Telescopes**

25      194. "Elasticity" is a term used to describe the sensitivity of supply and demand to

26  changes in one or the other. For example, demand is said to be "inelastic" if an increase in the

27  price of a product results in only a small decline in the quantity sold of that product, if any.

28

---

1   Inelasticity tends to exist when customers have nowhere to turn for alternative, cheaper products

2   of similar quality, and so continue to purchase despite a price increase.

3        195.   For a cartel to profit from raising prices above competitive levels, demand must be

4   relatively inelastic at competitive prices. Otherwise, increased prices would result in declining

5   sales and profits, as customers purchased substitute products or declined to buy altogether.

6   Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise

7   their prices without triggering customer substitution and lost sales.

8        196.   Demand for telescopes is highly inelastic because there are no close substitutes for

9   these products.

10   **V.    CLASS ACTION ALLEGATIONS**

11        197.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to

12   Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking equitable and injunctive

13   relief on behalf of the following classes ("Nationwide Injunctive Class") under Sections 1 and 2

14   of the Sherman Act (15 U.S.C. §§ 1, 2):

15        All persons and entities who indirectly purchased a telescope for their own use and
16        not for resale during the period from and including January 1, 2005 through the
         present that was manufactured or sold by Defendants or Co-Conspirators, or any
17        current or former affiliate thereof.

18        198.   Plaintiffs also bring this action on behalf of themselves and as a class of Indirect

19   Purchaser States under Rule 23(a) and (b)(2), seeking damages pursuant to California state

20   antitrust and consumer protection laws as well as common law unjust enrichment on behalf of the

21   following class ("Damages Class"):

22        All persons and entities who indirectly purchased a telescope for their own use and
         not for resale in one of the Indirect Purchaser States during the period from and
23        including January 1, 2005 through the present that was manufactured or sold by
         Defendants or Co-Conspirators, or any current or former affiliate thereof.
24

25        199.   The "Indirect Purchaser States," for purposes of this complaint, are:  Arizona,

26   Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas,

27   Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada,

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                  43

New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

**A.    California Law Should Be Applied to the Indirect Purchaser States' Damages Class**

200.    It is appropriate to apply California law to a class of indirect purchaser plaintiffs from the Indirect Purchaser States because many of Defendants and Co-Conspirators and their respective subsidiaries and affiliates can be found in California and have their principal place of business in California; many of the key witnesses reside in California; Defendants and Co-Conspirators carried out their conspiracy in California, *inter alia*, by coordinating it through the California offices of Ningbo Sunny's legal counsel; and much of Defendants and Co-Conspirators' sales occurred in California. California law should be applied to the Damages Class for the following reasons:

**1.    The Conspiracy's Contacts with California: Location of Defendants and Co-Conspirators**

201.    Aside from the foreign entities, the most critical corporate entities furthering the conspiracy alleged herein were incorporated in or carried out their principal place of business in California.

202.    Defendant Celestron—a major participant in the conspiracy—is headquartered and has its principal place of business in Torrance, California. Acts in furtherance of the conspiracy by Celestron were carried out in California.

203.    Co-Conspirator Meade—a major participant in the conspiracy, which would have been named as a Defendant but for its bankruptcy petition—is headquartered in Irvine, California. Acts in furtherance of the conspiracy by Meade were carried out in California.

204.    According to an April 11, 2014 email from Mr. Lupica, when Ningbo Sunny acquired Meade in 2013, Meade had over 10 legal entities formed in California that were paying state taxes each year, including Meade Instruments Holding Corp., Meade Coronado Holding Corp., MTSC Holding Corp., MC Holding Corp., Meade Instruments Europe Corp., Meade.com,

and Coronado Instruments Inc., among others.

**2.    The Conspiracy's Contacts with California: Location of Individuals**

205.    David Shen regularly comes to this District to meet with distributors of Synta telescopes. Acts in furtherance of the conspiracy by Mr. Shen were carried out in California.

206.    Joe Lupica, Celestron's former CEO and then Meade's former CEO, resides in California. Acts in furtherance of the conspiracy by Mr. Lupica were carried out in California.

207.    Corey Lee, Celestron's CEO, resides in California. Acts in furtherance of the conspiracy by Mr. Lee were carried out in California.

**3.    Specific Targets of the Conspiracy Were from California**

208.    A unanimous jury has already found that Orion, an American retail company that sells telescopes, was harmed by the conspiracy alleged herein.

209.    Orion, which competes with Synta and Ningbo Sunny both in the supply of telescopes and filed a complaint against them in the *Orion* Action, has corporate offices in Watsonville, California and a retail store in Cupertino, California.

**4.    The Conspiracy's Contacts with California: Facilitation of the Conspiracy in California**

210.    The law firm that assisted Ningbo Sunny in its acquisition of Meade helped facilitate the conspiracy in California. For example, a June 6, 2013 engagement letter with Ningbo Sunny in connection with Ningbo Sunny's acquisition of Meade specifies that "this agreement will be governed by the laws of California without regard to its conflict rules."

211.    The attorney who wrote the aforementioned engagement letter, is based in California. On information and belief, he accepted instruction from both Ningbo Sunny and Synta on structuring and negotiating Ningbo Sunny's acquisition of Meade and handled the acquisition from California

212.    Another attorney, who worked on the deal process, is also based in California. On information and belief, he accepted instruction from both Ningbo Sunny and Synta on structuring and negotiating Ningbo Sunny's acquisition of Meade and handled the acquisition from the San

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                45

Francisco Bay Area. Indeed, a July 16, 2013 email from him to Celestron's then-CEO Mr. Lupica and Celestron's board member, Mr. Huen, regarding next steps in Ningbo Sunny's acquisition of Meade confirms as much.

### 5. Defendants and Co-Conspirators Targeted California

213. Defendants and Co-Conspirators directed their conduct at persons and activities within California. For example, Synta manufactures a large proportion of telescopes for California-based Orion under the Orion brand name.

214. There are at least 73 amateur astronomy clubs in California that feature meetings, viewing nights, star parties, and stargazing programs which, on information and belief, is more than any other state.

215. Defendants have violated California antitrust and consumer protection laws, and California has an interest in not only protecting its own consumers but in punishing businesses like Defendants that operate within its borders.

### B. Alternatively, Plaintiffs Seek to Certify State Damages Classes

216. As an alternative to the Damages Class, in the event California law is not applied to class members' claims residing in states that recognize a form of indirect purchaser cause of action, Plaintiffs seek certification of classes asserting claims for damages under the antitrust statutes and/or consumer protection statutes of the following Indirect Purchaser States (collectively, the "State Damages Classes"):

**Arizona:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Arizona during the period from and including January 1, 2005 through present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Arkansas:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Arkansas during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**California:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in California during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Connecticut:** All persons and entities who indirectly purchased a telescope for their

own use and not for resale in Connecticut during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**District of Columbia:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in the District of Columbia during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Florida:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Florida during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Hawaii:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Hawaii during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Illinois:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Illinois during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Iowa:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Iowa during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Kansas:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Kansas during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Maine:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Maine during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Massachusetts:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Massachusetts during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Michigan:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Michigan during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Minnesota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Minnesota during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD** 47

**Mississippi:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Mississippi during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Missouri:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Missouri during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Montana:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Montana during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Nebraska:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Nebraska during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Nevada:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Nevada during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New Hampshire:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New Hampshire during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New Mexico:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New Mexico during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New York:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New York during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**North Carolina:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in North Carolina during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**North Dakota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in North Dakota during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Oregon:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Oregon during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Rhode Island:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Rhode Island during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**South Carolina:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in South Carolina during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**South Dakota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in South Dakota during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Tennessee:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Tennessee during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Utah:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Utah during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Vermont:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Vermont during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**West Virginia:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in West Virginia during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Wisconsin:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Wisconsin during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

217.   The Nationwide Injunctive Class, Damages Class, and the State Damages Classes are referred to herein as the "Classes" unless otherwise indicated. Excluded from the Classes are Defendants and Co-Conspirators, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased telescopes directly. Plaintiffs reserve the right to amend the aforementioned definitions if discovery and further investigation reveal that they should be expanded or otherwise modified.

218. Plaintiffs properly bring this action as a class action under Rule 23(a) for the following reasons:

a.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The Classes are so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable. While Plaintiffs does not know the exact number and identity of all Class Members, Plaintiffs are informed and believe that there are tens of thousands of members in each Class. The precise number of Class Members can be ascertained through discovery;

b.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):** There are questions of law and fact common to the Classes which predominate over any questions that may affect particular Class Members. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

i.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of telescopes sold in the United States;

ii.   The identity of the participants of the alleged conspiracy;

iii.  The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

iv.   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Cause of Action;

v.    Whether the market for telescopes in the United States is the relevant market;

vi.   Whether the United States constitutes the relevant geographic

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                            50

market;

    vii.    Whether Defendants possess market or monopoly power in the telescope market;

    viii.    Whether Defendants and their alleged horizontal competitors agreed or combined to restrain competition and exclude competitors from the telescope market;

    ix.    Whether Defendants entered into concerted refusals to deal to foreclose competition and exclude competitors from the telescope market;

    x.    Whether the alleged monopoly and/or attempt to monopolize violated the Sherman Act;

    xi.    Whether the alleged conspiracy, monopoly, and/or attempt to monopolize violated state antitrust and/or consumer protection laws;

    xii.    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Damages Class, thereby entitling Plaintiffs and the members of the Damages Class to disgorgement of all benefits derived by Defendants;

    xiii.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the property of Plaintiffs and the members of the Classes;

    xiv.    The effect of the alleged conspiracy on the prices of telescopes sold in the United States during the Class Period;

    xv.    Whether Plaintiffs and members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

    xvi.    Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the

Classes;

xvii.  The appropriate injunctive and related equitable relief for the Nationwide Class; and

xviii.  The appropriate class-wide measure of damages for the Damages Class.

c.  **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of Class Members. Plaintiffs and the Classes have been injured by the same wrongful practices of Defendants. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of the Classes and are based on the same legal theories;

d.  **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of the Classes in that he has no interests antagonistic to those of the other Class Members, and Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation as counsel;

219.  This action is properly brought as a class action under Rule 23(b) for the following reasons:

a.  **Class Action Status (Fed. R. Civ. P. 23(b)(1)):** Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by Class Members would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by Class Members would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

b.  **Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)):** Certification

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 52

under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the  Classes as a whole.

c.     **Superiority (Fed. R. Civ. P. 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because  questions of law or fact common to Class Members predominate over any questions affecting only individual members, and class action treatment is superior to the other available  methods for the fair and efficient adjudication of this controversy.

d.     The Classes are ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member were infringed or violated in the same fashion;

220.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.     Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b.     This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured;

c.     Without a class action, Class Members will continue to suffer damages, and Defendant's violations of law will proceed without remedy while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

d.     Plaintiffs know of no difficulty that will be encountered in the management

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                53

of this litigation which would preclude its maintenance as a class action.

## VI.   PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

221.   Ningbo Sunny and Synta's anticompetitive practices have excluded competitors, suppressed innovation, and increased telescope prices.

222.   In the telescope market, price competition has been restrained or eliminated because Ningbo Sunny and Synta engaged in price-fixing, agreed to allocate the market among themselves, and limit supply, thereby raising telescope prices.

223.   By exercising their respective control in the telescope market, Synta and Ningbo Sunny have reduced competitors' sales and margins and diminished competitors' ability and incentive to invest and innovate. Several former competitors of Synta and Ningbo Sunny have sold off or shut down their telescope businesses, unable to achieve sales volumes and margins needed to sustain a viable business.

224.   Consumer choice has also been restrained due to Ningbo Sunny's acquisition of Meade. Since Ningbo Sunny acquired Meade, Meade has not significantly competed with Celestron. Moreover, the acquisition of Meade prevented companies that are trying to compete against Defendants, such as Jinghua, from obtaining a potential manufacturing facility and important intellectual property that would have increased competition.

225.   In the telescope market, price competition has also been restrained or eliminated because Ningbo Sunny and Synta allocated the market among themselves. Additionally, by fixing prices and credit terms so that unaffiliated distributors pay more than affiliated distributors, and by sharing independent distributors' confidential business information with each other, Ningbo Sunny and Synta have prevented independent distributors from fairly competing against their own affiliates and putting downward pressure on prices.

226.   Defendants' conspiracy had the following effects, among others:

  a.   The number of manufacturers and products for telescopes and accessories have been reduced as a result of Synta's acquisition of Celestron and Ningbo Sunny's acquisition of Meade;

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 54

b. There have been no new entrants into the telescope market for a decade and many independent manufacturers and distributors have gone out of business as a result of Synta and Ningbo Sunny's collusion;

c. The concentration of vital intellectual property assets within the nucleus of companies controlled by Synta and Ningbo Sunny working together has reinforced their respective control and erected additional barriers to new entrants;

d. Price competition has been restrained or eliminated with respect to telescopes;

e. Celestron, empowered and emboldened by its supracompetitive overcharges, now exercises control in the telescope market, including supply to major retailers such as Wal-Mart, Menards, and Costco;

f. The prices of telescopes have been fixed, raised, maintained, or stabilized at artificially inflated levels;

g. Indirect purchasers of telescopes have been deprived of free and open competition; and

h. Indirect purchasers of telescopes paid artificially inflated prices.

227. These antitrust injuries are of the type that the antitrust laws were meant to punish and prevent.

228. On information and belief, Ningbo Sunny and Synta have collectively controlled at least 65 percent of the global telescope market since 2012. This figure increased to over 90 percent at certain points during the Class Period.

229. During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for telescopes. Telescope distributors and retailers passed on inflated prices to Plaintiffs and the members of the Classes. Those overcharges have unjustly enriched Defendants. Telescopes follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and any cost changes attributable to telescopes can be traced through the

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD** 55

1  chain of distribution to Plaintiffs and the members of the Classes.

2      230.  Just as telescopes can be physically traced through the supply chain, so can their

3  prices be traced to show that changes in the prices paid by direct purchasers affect prices paid by

4  indirect purchasers. Here, the inflated prices of telescopes resulting from Defendants' price-fixing

5  conspiracy have been passed on to Plaintiffs and the other members of the Classes by distributors

6  and retailers.

7      231.  The economic and legal literature has recognized that unlawful overcharges in a

8  multiple-level distribution chain normally result in higher prices for those at the bottom of the

9  distribution chain. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and

10 former Chair of the Business and Public Policy Group at the Haas School of Business at the

11 University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law

12 Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have

13 observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not

14 the exception: it is the rule."[3]

15     232.  As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information

16 and Computer Science and Professor of Economics and Public Policy at the University of

17 Michigan), an expert who presented evidence in a number of the indirect purchaser cases

18 involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case

19 granting class certification):

20      As is well known in economic theory and practice, at least some of the overcharge
21      will be passed on by distributors to end consumers. When the distribution markets
        are highly competitive, as they are here, all or nearly the entire overcharge will be
22      passed on through to ultimate consumers…Both of Microsoft's experts also agree
        upon the economic phenomenon of cost pass through, and how it works in
23      competitive markets. This general phenomenon of cost pass through is well
        established in antitrust laws and economics as well.[4]

24      233.  The purpose of the conspiratorial conduct of Defendants and their co-conspirators

25 ────────────────

26 [3]  Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

27 [4] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

28

────────────────

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                    56

1    was to raise, fix, rig or stabilize the price of telescopes. Economists have developed techniques to

2    isolate and understand the relationship between one "explanatory" variable and a "dependent"

3    variable in those cases when changes in the dependent variable are explained by changes in a

4    multitude of variables, even when all such variables may be changing simultaneously. That

5    analysis – called regression analysis – is commonly used in the real world and in litigation to

6    determine the impact of a price increase on one cost in a product (or service) that is an assemblage

7    of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of

8    telescopes to distributors and retailers on the price of telescopes to consumers while controlling

9    for the impact of other price-determining factors.

10    234.   The precise amount of the overcharge impacting the prices of telescopes can be

11    measured and quantified. Commonly used and well-accepted economic models can be used to

12    measure both the extent and the amount of the supra-competitive charge passed through the chain

13    of distribution. Thus, the economic harm to Plaintiffs and members of the Classes can be

14    quantified.

15    235.   By reason of the violations of the antitrust, consumer protection, and unjust

16    enrichment laws alleged herein, Plaintiffs and the members of the Classes have sustained injury

17    to their property, having paid higher prices for telescopes than they would have paid in the absence

18    of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered

19    damages in an amount presently undetermined. This is an antitrust injury of the type that the

20    antitrust laws were meant to punish and prevent.

21    **VII.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS**

22    **A.     The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not
              and Could Not Discover Their Claims**

23

24    236.   Plaintiffs repeat and re-allege the allegations set forth above. Plaintiffs and the

25    members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of

26    facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest)

27    September 2019, when evidence of Defendants' conspiracy was first made public in the *Orion*

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                          57

Action.

237.   Plaintiffs and members of the Classes are consumers that purchased telescopes not for resale. They had no direct contact or interaction with Defendants and had no means from which they could have discovered the telescopes combination and conspiracy described in this Complaint before September 2019.

238.   No information in the public domain was available to Plaintiffs and members of the Classes concerning the combination or conspiracy alleged herein prior to September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion* Action. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants or their co-conspirators' dealings with competitors or direct purchasers, much less the fact that Defendants and their co-conspirators had engaged in the combination and conspiracy alleged herein.

239.   For these reasons, the statute of limitations as to Plaintiff's and the Classes' claims did not begin to run until, at the earliest, September 2019.

**B.     Fraudulent Concealment Tolled the Statute of Limitations**

240.   In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion* Action.

241.   Before that time, Plaintiffs and the members of the Classes were unaware of Defendants' unlawful conduct and did not know before then that they were paying supra-competitive prices for telescopes throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

242.   The affirmative acts of Defendants alleged herein, including acts in furtherance of

1    the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

2    The following are illustrative examples of Defendants' fraudulent concealment:

3    243.    Beginning with the 2005 acquisition of Celestron, Synta and Ningbo Sunny

4    attempted to conceal that Mr. Shen would remain in control of Ningbo Sunny after the acquisition.

5    Among other things, as discussed above, Defendants represented that Mr. Shen had resigned from

6    his position as Vice Chairman of Ningbo Sunny following the acquisition and held no other

7    position in Ningbo Sunny since the acquisition.  However, as Defendants' internal correspondence

8    clearly demonstrate (*see infra*), Mr. Shen's remained firmly in control of Ningbo Sunny after the

9    Celestron acquisition.

10   244.    Following the Celestron acquisition, Defendants also attempted to conceal their

11   broader agreement to cooperate as horizontal competitors.  Among other misrepresentations, in

12   an April 2005 press release about the acquisition, Joseph Lupica publicly stated: "This acquisition

13   is in the best interest of Celestron dealers, employees, consumers and the telescope industry as a

14   whole. Synta and Celestron will form a strong team to provide competitive products of the highest

15   quality for consumers."  The release also avoided making any explicit reference to Ningbo Sunny,

16   stating instead that Synta had "related companies" and Synta's "related companies will continue

17   to manufacture and supply other telescopes and related products for Celestron."

18   245.    In the April 2005 press release, Defendants further stated: "Celestron will be in a

19   position . . . to lead the product engineering, development and manufacturing processes from the

20   Torrance, California headquarters. . . . Celestron's operations will remain in Torrance, the

21   management team will stay intact[.]" ECF No. 117-5.  This was another misrepresentation as

22   Synta had already communicated to Celestron that members of the Shen family, including David

23   Shen and Sylvia Shen, would oversee Celestron.

24   246.    In August 2006, Joe Lupica was admonished for representing Synta and Ningbo

25   Sunny as "sister companies" and instructed "not refer to Sunny as an affiliated company again."

26   Accordingly, in subsequent communications with competitors and customers, Mr. Lupica

27   concealed the fact that, Synta and Ningbo Sunny were "sister companies."  However, those

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    59

1  specific representations were false.  As a 2010 internal Celestron presentation acknowledged,

2  Synta and Ningbo Sunny were and would remain "sister companies."



8     247.  Shortly after the Celestron acquisition, Defendants further concealed their intent to

9  expand into the lower-end telescope market through their acquisition of Celestron. In an April

10  2005 email to Bushnell Telescopes, for example, David Shen stated:

> Thank you for your long term trust and support.  After Celestron
> acquisition I believe we have more areas that we can provide services
> to you. There are a lot of rumors spreaded around by competitors,
> saying Synta is going to build volume low end traditional products to
> compete Bushnell,.. etc.  It must cause your great concern.  It is not
> true, on the contrary, we are not interested in big volume chain store
> orders. …
>
> I have no interest to compete the volume low price products with
> Bushnell,  Meade or others. Celestron has good reputation in high
> end high price products, I'll exert all my effort in this area to maintain
> and strengthen its reputation. Once again, I would like to address, I
> have no intention to compete with you. We are looking forward to
> exploring more opportunies to serve you."

   248.  Synta and Ningbo Sunny also attempted to conceal the existence of their

transactions in connection with Ningbo Sunny's acquisition of Meade. David Anderson revealed

in an email recently disclosed in pending litigation that "Since July Celestron has made $10

million in anticipated payments to Ningbo Sunny. This represents a majority of the monies that

will be paid to Ningbo Sunny this year. If Celestron continues with this payment pattern it will

need to disclose this arrangement to its auditors and its bank. Though we see this as temporary an

outside group (such as the bank or auditing firm) will interpret it as a significant change due to

the fact that the majority of payments for the last 7 months were made in anticipation with no

discernable benefit to Celestron."

249.   Additionally, as stated, *supra*, when the FTC inquired into whether Synta's Mr. Shen was involved in Ningbo Sunny's Meade acquisition, it represented to the FTC that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade[.]" This statement was false in light of the fact that Ningbo Sunny's Mr. Ni and Synta's Mr. Shen agreed before this that Mr. Shen and his companies would provide financial support to Ningbo Sunny in connection with the Meade acquisition.

250.   Furthermore, as part of Synta and Ningbo Sunny's collusion regarding Meade, Celestron took equity in Meade, which is memorialized in Defendants and Co-Conspirators' shadow books.

251.   Additionally, Defendants and Co-Conspirators also intentionally and fraudulently concealed their conspiracy from the public by filing disclosures with the SEC relating to the Meade transaction that failed to disclose Mr. Shen, Synta, and Celestron's involvement and role in the Meade acquisition.

252.   In addition to the foregoing acts of fraudulent concealment, by their very nature, Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing. Telescopes are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the telescopes industry to be a competitive industry. On information and belief, Defendants met and communicated in secret and agreed to keep the facts about its collusive conduct from being discovered by any member of the public or by distributors, retailers, and other direct purchasers with whom they did business. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' telescope prices before September 2019, at the earliest.

253.   Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                          61

254.   Because the alleged conspiracy was self-concealing and affirmatively concealed by Defendants and its co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until, at the earliest, September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion* Action.

255.   For these reasons, the statute of limitations applicable to Plaintiffs and the Classes' claims was tolled and did not begin to run until September 2019.

## VIII.  CAUSES OF ACTION

### First Cause of Action
### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### Restraint of Trade
### (on behalf of Plaintiffs and the Nationwide Injunctive Class)

256.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

257.   Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

258.   The acts done by Defendants as part of, and in furtherance of, its and its co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

259.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, rig bids for, or control prices for telescopes, thereby creating anticompetitive effects.

260.   The anticompetitive acts were intentionally directed at the United States market for telescopes and had a substantial and foreseeable effect on interstate commerce by stabilizing, raising, or fixing prices for telescopes throughout the United States.

261.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for telescopes.

262.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Injunctive Class who purchased telescopes have been harmed by being forced to pay inflated, supra-competitive prices for telescopes.

263.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

264.   Defendants and their co-conspirators' conspiracy had the following effects, among others:

   a.   Price competition in the market for telescopes has been restrained, suppressed, and/or eliminated in the United States;

   b.   Prices for telescopes sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

   c.   Plaintiffs and members of the Nationwide Injunctive Class who purchased telescopes indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

265.   Plaintiffs and members of the Nationwide Injunctive Class have been injured and will continue to be injured in their business and property by paying more for telescopes purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

266.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

267.   Plaintiffs and members of the Nationwide Injunctive Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**Second Cause of Action**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Monopolization**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

268.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

269.   The relevant market is the market for telescopes in the United States. Plaintiffs reserve the right to redefine the relevant market following further discovery.

270.   Defendants and Co-Conspirators have monopoly power in the market for telescopes in the United States.

271.   Defendants and Co-Conspirators have acquired and maintained their respective monopolies in the telescope market through:

    a.    Synta's acquisition of Celestron in 2005;

    b.    Synta facilitating Ningbo Sunny's acquisition of Meade in 2013, thereby eliminating Meade as a competitor manufacturer and distributor and increasing market concentration;

    c.    Synta and Ningbo Sunny agreeing to allocate the telescope market;

    d.    Synta and Ningbo Sunny agreeing not to bid on RFQs for each other's telescope offerings;

    e.    Synta and Ningbo Sunny exchanging their intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies; and

    f.    Synta and Ningbo Sunny exchanging their competitors' (*e.g.*, Orion's) intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies.

272.   Defendants and Co-Conspirators have acquired and maintained their respective monopolies through the aforementioned conduct plus:

    a.    Colluding to prevent Jinghua from acquiring Meade;

    b.    Making false representations to the FTC regarding Synta's involvement in Ningbo Sunny's acquisition of Meade; and

c.     Colluding to sabotage Orion's acquisition of the Hayneedle Assets.

273.   Defendants' acquisition or maintenance of their monopolies is not a result of growth or development as a consequence of a superior product, business acumen, or historic accident, but is the result of the unlawful conduct alleged herein.

274.   There is no procompetitive justification for Defendants' anticompetitive conduct that outweighs its anticompetitive effects; namely, the foreclosure of competition in the telescope market. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

275.   Defendants' willful acquisition or maintenance of their respective monopolies in the telescope market injured, and continues to injure, Plaintiffs and members of the Nationwide Class in their property by:

a.     Restricting output and limiting consumer choice in the telescope market; and

b.     Forcing Plaintiffs and members of the Nationwide Class to pay artificially high, supracompetitive prices for telescopes.

276.   The injury to Plaintiffs and members of the Nationwide Class was a foreseeable consequence of Defendants' willful acquisition or maintenance of its monopoly in the telescope market.

277.   Plaintiffs and members of the Nationwide Class have suffered irreparable harm and do not have an adequate remedy at law. Accordingly, Plaintiffs and members of the Nationwide Class seek injunctive and equitable relief.

### Third Cause of Action
### Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)
### Attempted Monopolization
### (on behalf of Plaintiffs and the Nationwide Injunctive Class)

278.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

279.   The relevant market is the market for telescopes in the United States. Plaintiffs reserve the right to redefine the relevant market following further discovery.

280.   Defendants and Co-Conspirators have monopoly power in the market for telescopes

1    in the United States.

2        281.    Defendants and Co-Conspirators have acquired and maintained their respective

3    monopolies in the market for telescopes in the United States through:

4            a.    Synta's acquisition of Celestron in 2005;

5            b.    Synta facilitating Ningbo Sunny's acquisition of Meade in 2013, thereby

6                  eliminating Meade as a competitor manufacturer and distributor and

7                  increasing market concentration;

8            c.    Synta and Ningbo Sunny agreeing to allocating the telescope market such

9                  that Synta manufacturers higher-end telescopes and Ningbo Sunny

10                 manufacturers lower-end telescopes;

11           d.    Synta and Ningbo Sunny agreeing to not to bid on RFQs for each other's

12                 telescope offerings;

13           e.    Synta and Ningbo Sunny exchanging their intellectual property and

14                 material, non-public information with each other, thereby enabling them to

15                 coordinate prices and strategies; and

16           f.     Synta and Ningbo Sunny exchanging their competitors' (*e.g.*, Orion's)

17                 intellectual property and material, non-public information with each other,

18                 thereby enabling them to coordinate prices and strategies.

19       282.    Defendants and Co-Conspirators have acquired and maintained their respective

20   monopoly through the aforementioned conduct plus:

21           a.    Colluding to prevent Jinghua from acquiring Meade;

22           b.    Making false representations to the FTC regarding Synta's involvement in

23                 Ningbo Sunny's acquisition of Meade; and

24           c.    Colluding to sabotage Orion's acquisition of the Hayneedle Assets.

25       283.    The anticompetitive conduct described herein undertaken by Defendants create a

26   dangerous probability that Defendants will achieve monopoly power in the telescope market. Any

27   possible procompetitive benefits for such conduct could have been obtained by less restrictive

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
Case No. 5:20-cv-03639-EJD                                                          66

1    alternatives.

2        284.   Defendants' predatory and anticompetitive conduct described herein, which was

3    done with the intent of monopolizing the telescope market, injured, and continues to injure,

4    Plaintiffs and members of the Class in their property by:

5            a.    Restricting output and limiting consumer choice in the telescope market; and

6            b.    Forcing Plaintiffs and members of the Class to pay artificially high,

7                supracompetitive prices for telescopes.

8        285.   The injury to Plaintiffs and members of the Class was a foreseeable consequence of

9    Defendants' predatory and unlawful conduct, described herein, which was done with the intent of

10   monopolizing the telescope market.

11       286.   Plaintiffs and members of the Class have suffered irreparable harm and do not have

12   an adequate remedy at law. Accordingly, Plaintiffs and members of the Class seek injunctive and

13   equitable relief.

14                        **Fourth Cause of Action**
                **Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)**
15              **(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

16       287.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

17       288.   As a result of Ningbo Sunny's acquisition of Meade and Synta's facilitation thereof,

18   Synta and Ningbo Sunny has been able to exercise market power in the market for telescopes in

19   the United States. The acquisition created the largest syndicates of telescope manufacturers and

20   telescope distributors in the United States. This market is highly concentrated and the acquisition

21   further significantly increased market concentration.

22       289.   It is unlikely that entry into the market would remedy, in a timely manner, the

23   anticompetitive effects from Ningbo Sunny's acquisition of Meade in 2013. Entry is difficult and

24   likely to take years because of the intellectual property needed to manufacture telescopes, the time

25   required to plan for and to complete manufacturing facilities, and the time required to plan for and

26   establish the distribution channels.

27       290.   The effect of the mergers substantially lessens competition in the provision of in

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                        67

violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, in the following ways:

    a.     Eliminating actual, direct, and substantial competition between Synta and Ningbo Sunny in the market for telescopes in the United States;

    b.     Increasing the ability of the merged entities to unilaterally raise prices of telescopes;

    c.     Eliminating Meade as a substantial and independent competitor in the market;

    d.     Eliminating the diversity of telescope offerings by Defendants;

    e.     Increasing the prices of telescopes to consumers; and

    f.     Reducing incentives to improve telescope quality in the relevant market.

291.   Ningbo Sunny's acquisition of Meade has substantially lessened competition in the market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18 as well as decreased telescope options and increased telescope prices to consumers.

### Fifth Cause of Action
### Violation of the State Antitrust Laws
### (on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)

292.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

293.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the market for telescopes in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

294.   The contract, combination, or conspiracy consisted of an agreement among Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for telescopes and to allocate products and customers in the United States.

295.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                 68

a.  participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price telescopes at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to telescopes sold in the United States;

b.  allocating products and customers in the United States in furtherance of their agreements; and

c.  participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

296.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products and customers.

297.  Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

298.  Defendants have entered into an unlawful agreement in restraint of or to monopolize trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

a.  Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Arizona; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

b.  In violation of Arizona Revised Statutes § 44-1403, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 69

occurred within Arizona, for the purpose of excluding competition or
controlling, fixing, or maintaining prices in the telescope market.

c.      During the Class Period, Defendants' illegal conduct substantially affected
Arizona commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs
and members of the Damages Class have been injured in their business and
property and are threatened with further injury.

e.      By reason of the foregoing, Defendants entered into agreements in restraint
of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly,
Plaintiffs and members of the Damages Class seek all forms of relief
available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

299.   Defendants have entered into an unlawful agreement in restraint of trade in violation
of the California Business and Professions Code, §§ 16700, *et seq.*

a.      During the Class Period, Defendants and their co-conspirators entered into
and engaged in a continuing unlawful trust in restraint of the trade and
commerce described above in violation of Section 16720, California
Business and Professions Code. Defendants have acted in violation of
Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate
markets for, telescopes at supra-competitive levels; to prevent competition
in the market for telescopes; and to pool, combine, and directly and
indirectly unite their interests connected with the sale of telescopes to
elevate the price at which telescopes are sold.

b.      The aforesaid violations of Section 16720, California Business and
Professions Code, consisted, without limitation, of a continuing unlawful
trust and concert of action among Defendants and their co-conspirators, the
substantial terms of which were to fix, raise, maintain, and stabilize the
prices of, and to allocate markets for, telescopes.

c.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of telescopes; and (2) Allocating among themselves the production of telescopes.

d.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) Price competition in the market for telescopes has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for telescopes sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased telescopes directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

*e.*    By virtue of the conduct alleged herein, Defendants have entered into contracts, in concerted action with others, where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in California in violation of Section 16720, *et seq.*

f.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for telescopes than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions

Code.

300.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut General Statutes §§ 35-26 *et seq.*

    a.    Connecticut's legislature conferred broad standing under the Connecticut Antitrust Act based on an important principle of protecting the public from anticompetitive behavior and of promoting competition in the marketplace.

    b.    Under the Connecticut Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. Conn. Gen. Stat. § 35-46a.

    c.    Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful. Conn. Gen. Stat. § 35-26.

    d.    Every contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful. Conn. Gen. Stat. § 35-27.

    e.    Every contract, combination, or conspiracy that has the purpose of effect of fixing, controlling, or maintaining prices in any part of trade or commerce; or of fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of any part of trade or commerce, is also unlawful. Conn. Gen. Stat. § 35-28.

    f.    Defendants made contracts or engaged in a combination or conspiracy with each other by maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of telescopes for the purpose of, and which had the desired effect of, fixing, controlling, or maintaining prices for telescopes within the intrastate commerce of Connecticut, and to monopolize and attempt to monopolize said commerce.

    g.    Plaintiffs purchased telescopes within the State of Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of

1    telescopes would have been lower, in an amount to be determined at trial.

2    h.    Plaintiffs and members of the Class were injured with respect to purchases

3          of telescopes in Connecticut and are entitled to all forms of relief, including

4          actual damages, treble damages, reasonable attorneys' fees and costs, and

5          injunctive relief.

6    i.    Sec. 35-44b. Judicial construction of Connecticut Antitrust Act. It is the

7          intent of the General Assembly that in construing sections 35-24 to 35-46,

8          inclusive, the courts of this state shall be guided by interpretations given by

9          the federal courts to federal antitrust statutes.

10   301.  Defendants have entered into an unlawful agreement in restraint of trade in violation

11   of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

12   a.    Defendants' combination or conspiracy had the following effects: (1)

13         telescope price competition was restrained, suppressed, and eliminated

14         throughout the District of Columbia; (2) telescope prices were raised, fixed,

15         maintained and stabilized at artificially high levels throughout the District

16         of Columbia; (3) Plaintiffs and members of the Damages Class were

17         deprived of free and open competition; and (4) Plaintiffs and members of

18         the Damages Class paid supra-competitive, artificially inflated prices for

19         telescopes.

20   b.    In violation of District of Columbia Code Annotated § 28-4503, Defendants

21         monopolized, attempted to monopolize, and combined and conspired

22         together to monopolize trade or commerce in the telescope market, a

23         substantial part of which occurred within District of Columbia, for the

24         purpose of excluding competition or controlling, fixing, or maintaining

25         prices in the telescope market.

26   c.    During the Class Period, Defendants' illegal conduct substantially affected

27         District of Columbia commerce.

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    73

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

302.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 ILCS10/1, *et seq.*

a.    The Illinois Antitrust Act, 740 ILCS10/1, *et seq.*, aims to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILCS 10/2.

b.    Plaintiffs purchased telescopes within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price for telescopes would have been lower, in an amount to be determined at trial.

c.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

d.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling, or maintaining prices for telescopes sold, and/or for allocating products and customers within the intrastate commerce of Illinois.

e.    Defendants further unreasonably restrained trade or commerce and established, maintained, used, and attempted to acquire monopoly power over the market for telescopes in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/3 § 3(3).

303.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Iowa; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.    In violation of Iowa Code § 553.5, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Iowa, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

304.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

    a.    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Kansas Statutes Annotated, § 50-101. Defendants have acted in violation of § 50-101 to fix, raise, stabilize, and maintain prices of, and allocate markets for, telescopes at supra-competitive levels; to prevent competition in the market for telescopes; and to pool, combine, and directly unite their interests in connection with the sale of telescopes to elevate the price at which telescopes are sold.

    b.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Kansas; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    c.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

305.   Defendants have entered into an unlawful agreement in restraint of trade in violation

of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

    a.    Defendants entered into a combination in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101.

    b.    Defendants further monopolized, attempted to monopolized, and combined and conspired together to monopolize trade in telescopes including with the State of Maine in violation of Maine Rev. Stat. Ann. 10, § 1102.

    c.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Maine; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    d.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

    e.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    f.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

306.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

    a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Michigan; (2) telescope prices were raised, fixed, maintained

and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b. In violation of Michigan Compiled Laws Annotated, § 445.773, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Michigan, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

307. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a. Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                 78

supracompetitive, artificially inflated prices for telescopes.

b.   In violation of Minnesota Statutes 325D.52, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Minnesota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

308.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

b.   In violation of Mississippi Code Annotated § 75-21-3, Defendants monopolized and attempted to monopolize the market for telescopes, a substantial part of which occurred within Mississippi, for the purpose of

excluding competition or controlling, fixing, or maintaining prices in the telescope market.

    c.    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

309.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

    a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    In violation of Nebraska Revised Statute § 59-802, Defendants monopolized, attempted to monopolize, and combined or conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Nebraska, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

    c.    During the Class Period, Defendants' illegal conduct substantially affected

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**          80

Nebraska commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

310.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Nevada; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.    In violation of Nevada Revised Statutes Annotated § 598.60(1)(e), Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 81

1    property and are threatened with further injury.

2    e.    By reason of the foregoing, Defendants have entered into agreements in

3    restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

4    Accordingly, Plaintiffs and members of the Damages Class seek all relief

5    available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

6    311.   Defendants have entered into an unlawful agreement in restraint of trade in violation

7    of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

8    a.    Defendants' combination or conspiracy had the following effects: (1)

9    telescope price competition was restrained, suppressed, and eliminated

10    throughout New Hampshire; (2) telescope prices were raised, fixed,

11    maintained and stabilized at artificially high levels throughout New

12    Hampshire; (3) Plaintiffs and members of the Damages Class were deprived

13    of free and open competition; and (4) Plaintiffs and members of the

14    Damages Class paid supra-competitive, artificially inflated prices for

15    telescopes.

16    b.    In violation of New Hampshire Revised Statutes § 356:3, Defendants

17    established, maintained, or used a monopoly, or attempted to establish a

18    monopoly, of trade or commerce in the telescope market, a substantial part

19    of which occurred within New Hampshire, for the purpose of excluding

20    competition or controlling, fixing, or maintaining prices in the telescope

21    market.

22    c.    During the Class Period, Defendants' illegal conduct substantially affected

23    New Hampshire commerce.

24    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

25    and members of the Damages Class have been injured in their business and

26    property and are threatened with further injury.

27    e.    By reason of the foregoing, Defendants have entered into agreements in

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                      82

restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1,
*et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all
relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

312.  Defendants have entered into an unlawful agreement in restraint of trade in violation
of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

    a.    Defendants' combination or conspiracy had the following effects: (1)
telescope price competition was restrained, suppressed, and eliminated
throughout New Mexico; (2) telescope prices were raised, fixed, maintained
and stabilized at artificially high levels throughout New Mexico; (3)
Plaintiffs and members of the Damages Class were deprived of free and open
competition; and (4) Plaintiffs and members of the Damages Class paid
supra-competitive, artificially inflated prices for telescopes.

    b.    In violation of New Mexico Statutes § 57-1-2, Defendants monopolized,
attempted to monopolize, and conspired and combined to monopolize trade
or commerce in the telescope market, a substantial part of which occurred
within New Mexico, for the purpose of excluding competition or controlling,
fixing, or maintaining prices in the telescope market.

    c.    During the Class Period, Defendants' illegal conduct substantially affected
New Mexico commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs
and members of the Damages Class have been injured in their business and
property and are threatened with further injury.

    e.    By reason of the foregoing, Defendants have entered into agreements in
restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*.
Accordingly, Plaintiffs and members of the Damages Class seek all relief
available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

313.  Defendants have entered into an unlawful agreement in restraint of trade in violation

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 83

1  of the New York General Business Laws §§ 340, *et seq*.

2      a.    Defendants' combination or conspiracy had the following effects: (1)

3      telescope price competition was restrained, suppressed, and eliminated

4      throughout New York; (2) telescope prices were raised, fixed, maintained

5      and stabilized at artificially high levels throughout New York; (3) Plaintiffs

6      and members of the Damages Class were deprived of free and open

7      competition; and (4) Plaintiffs and members of the Damages Class paid

8      supra-competitive, artificially inflated prices for telescopes when they

9      purchased telescopes, or purchased telescopes that were otherwise of lower

10     quality than they would have been absent Defendants' and their co-

11     conspirators' illegal acts, or were unable to purchase telescopes that they

12     otherwise would have purchased absent the illegal conduct.

13     b.    Defendants entered into a contract, agreement, arrangement, or combination

14     with at least one other person whereby:

15         i.    A monopoly in the telescope market, substantially affecting

16         commerce in New York, was established or maintained; (b)

17         Competition or the free exercise of conduct in the telescope market,

18         substantially affecting commerce in New York, was restrained; or

19         (c) Competition was restrained for the purpose of establishing or

20         maintaining a monopoly or unlawfully interfering with the free

21         exercise of conduct in the telescope market.

22     c.    During the Class Period, Defendants' illegal conduct substantially affected

23     New York commerce.

24     d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

25     and members of the Damages Class have been injured in their business and

26     property and are threatened with further injury.

27     e.    By reason of the foregoing, Defendants have entered into agreements in

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**    84

1    restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.
2    The conduct set forth above is a *per se* violation of the Act. Accordingly,
3    Plaintiffs and members of the Damages Class seek all relief available under
4    New York Gen. Bus. Law §§ 340, *et seq*.

5    314.   Defendants have entered into an unlawful agreement in restraint of trade in violation
6    of the North Carolina General Statutes §§ 75-1, *et seq*.

7    a.    Defendants' combination or conspiracy had the following effects: (1)
8    telescope price competition was restrained, suppressed, and eliminated
9    throughout North Carolina; (2) telescope prices were raised, fixed,
10    maintained and stabilized at artificially high levels throughout North
11    Carolina; (3) Plaintiffs and members of the Damages Class were deprived
12    of free and open competition; and (4) Plaintiffs and members of the
13    Damages Class paid supra-competitive, artificially inflated prices for
14    telescopes.

15    b.    In violation of North Carolina General Statutes § 75-2.1, Defendants
16    monopolized, attempted to monopolize, and combined and conspired
17    together to monopolize trade or commerce in the telescope market, a
18    substantial part of which occurred within North Carolina, for the purpose of
19    excluding competition or controlling, fixing, or maintaining prices in the
20    telescope market.

21    c.    During the Class Period, Defendants' illegal conduct substantially affected
22    North Carolina commerce.

23    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs
24    and members of the Damages Class have been injured in their business and
25    property and are threatened with further injury.

26    e.    By reason of the foregoing, Defendants have entered into agreements in
27    restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.
28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                              85

1          Accordingly, Plaintiffs and members of the Damages Class seek all relief

2          available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

3      315.   Defendants have entered into an unlawful agreement in restraint of trade in violation

4  of the North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

5          a.   Defendants' combination or conspiracy had the following effects: (1)

6          telescope price competition was restrained, suppressed, and eliminated

7          throughout North Dakota; (2) telescope prices were raised, fixed, maintained

8          and stabilized at artificially high levels throughout North Dakota; (3)

9          Plaintiffs and members of the Damages Class were deprived of free and open

10         competition; and (4) Plaintiffs and members of the Damages Class paid

11         supra-competitive, artificially inflated prices for telescopes.

12         b.   In violation of North Dakota Code § 51-08.1-03, Defendants established,

13         maintained, or used a monopoly, or attempted to establish a monopoly, of

14         trade or commerce in the telescope market, a substantial part of which

15         occurred within North Dakota, for the purpose of excluding competition or

16         controlling, fixing, or maintaining prices in the telescope market.

17         c.   During the Class Period, Defendants' illegal conduct had a substantial effect

18         on North Dakota commerce.

19         d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

20         and members of the Damages Class have been injured in their business and

21         property and are threatened with further injury.

22         e.   By reason of the foregoing, Defendants have entered into agreements in

23         restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et*

24         *seq.* Accordingly, Plaintiffs and members of the Damages Class seek all

25         relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

26     316.   Defendants have entered into an unlawful agreement in restraint of trade in violation

27  of the Oregon Revised Statutes §§ 646.705, *et seq.*

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                86

a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Oregon; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.    In violation of Oregon Revised Statutes § 646.730, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Oregon, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

317.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) telescope prices were raised, fixed, maintained

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
Case No. 5:20-cv-03639-EJD                                                    87

and stabilized at artificially high levels throughout South Dakota; (3)
Plaintiffs and members of the Damages Class were deprived of free and open
competition; and (4) Plaintiffs and members of the Damages Class paid
supra-competitive, artificially inflated prices for telescopes.

b.   In violation of South Dakota Codified Laws § 37-1-3.2, Defendants
monopolized, attempted to monopolize, and combined and conspired
together to monopolize trade or commerce in the telescope market, a
substantial part of which occurred within South Dakota, for the purpose of
excluding competition or controlling, fixing, or maintaining prices in the
telescope market.

c.   During the Class Period, Defendants' illegal conduct had a substantial effect
on South Dakota commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs
and members of the Damages Class have been injured in their business and
property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in
restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1,
*et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all
relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

318.   Defendants have entered into an unlawful agreement in restraint of trade in violation
of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

a.   Defendants' combination or conspiracy had the following effects: (1)
telescope price competition was restrained, suppressed, and eliminated
throughout Tennessee; (2) telescope prices were raised, fixed, maintained
and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs
and members of the Damages Class were deprived of free and open
competition; and (4) Plaintiffs and members of the Damages Class paid

1   supra-competitive, artificially inflated prices for telescopes.

2   b.   Defendants established, maintained, or used a monopoly, or attempted to

3        establish a monopoly, of trade or commerce in the telescope market, a

4        substantial part of which occurred within Tennessee, for the purpose of

5        excluding competition or controlling, fixing, or maintaining prices in the

6        telescope market, such that in place of a free, open and competitive market,

7        a monopoly in the Tennessee market has been maintained.

8   c.   During the Class Period, Defendants' illegal conduct had a substantial effect

9        on Tennessee commerce.

10  d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

11       and members of the Damages Class have been injured in their business and

12       property and are threatened with further injury.

13  e.   By reason of the foregoing, Defendants have entered into agreements in

14       restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*

15       Accordingly, Plaintiffs and members of the Damages Class seek all relief

16       available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

17       319.  Defendants have entered into an unlawful agreement in restraint of trade in violation

18  of the Utah Code Annotated §§ 76-10-3101, *et seq.*

19  a.   Defendants' combination or conspiracy had the following effects: (1)

20       telescope price competition was restrained, suppressed, and eliminated

21       throughout Utah; (2) telescope prices were raised, fixed, maintained and

22       stabilized at artificially high levels throughout Utah; (3) Plaintiffs and

23       members of the Damages Class were deprived of free and open competition;

24       and (4) Plaintiffs and members of the Damages Class paid supra-

25       competitive, artificially inflated prices for telescopes.

26  b.   In violation of Utah Code Annotated § 76-10-3104, Defendants

27       monopolized, attempted to monopolize, and combined and conspired

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    89

together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants' have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

320.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*.

a. Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Vermont; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                              90

1        d.    By reason of the foregoing, Defendants have entered into agreements in

2    restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*

3    Accordingly, Plaintiffs and members of the Damages Class seek all relief

4    available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

5        321.   Defendants have entered into an unlawful agreement in restraint of trade in violation

6    of the West Virginia Code §§ 47-18-1, *et seq.*

7        a.    Defendants' combination or conspiracy had the following effects: (1)

8    telescope price competition was restrained, suppressed, and eliminated

9    throughout West Virginia; (2) telescope prices were raised, fixed,

10   maintained and stabilized at artificially high levels throughout West

11   Virginia; (3) Plaintiffs and members of the Damages Class were deprived of

12   free and open competition; and (4) Plaintiffs and members of the Damages

13   Class paid supra-competitive, artificially inflated prices for telescopes.

14       b.    In violation of West Virginia Code § 47-18-4, Defendants established,

15   maintained, or used a monopoly, or attempted to establish a monopoly, of

16   trade or commerce in the telescope market, a substantial part of which

17   occurred within West Virginia, for the purpose of excluding competition or

18   controlling, fixing, or maintaining prices in the telescope market.

19       c.    During the Class Period, Defendants' illegal conduct had a substantial effect

20   on West Virginia commerce.

21       d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

22   and members of the Damages Class have been injured in their business and

23   property and are threatened with further injury.

24       e.    By reason of the foregoing, Defendants have entered into agreements in

25   restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*

26   Accordingly, Plaintiffs and members of the Damages Class seek all relief

27   available under West Virginia Code §§ 47-18-1, *et seq.*

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**    91

322.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*.

    a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    In violation of Wisconsin Statutes § 133.03, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Wisconsin, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

    c.    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

323.   Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for telescopes than they otherwise would have paid in the absence of Defendants' unlawful conduct.

1    This injury is of the type the antitrust laws of the above states were designed to prevent and flows

2    from that which makes Defendants' conduct unlawful.

3        324.    In addition, Defendants have profited significantly from the aforesaid conspiracy.

4    Defendants' profits derived from its anticompetitive conduct come at the expense and detriment

5    of the Plaintiffs and the members of the Damages Class.

6        325.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above

7    jurisdictions seek damages (including statutory damages where applicable), to be trebled or

8    otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

9    including reasonable attorneys' fees, to the extent permitted by the above state laws.

### Sixth Cause of Action
**Violation of State Consumer Protection Laws**
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)**

13       326.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

14       327.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

15   fraudulent acts or practices in violation of the state consumer protection statutes listed below.

16       328.    Defendants have knowingly entered into an unlawful agreement in restraint of trade

17   in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

18           a.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or

19               commerce by affecting, fixing, controlling, and/or maintaining at non-

20               competitive and artificially inflated levels, the prices at which telescopes

21               were sold, distributed, or obtained in Arkansas and took efforts to conceal

22               its agreements from Plaintiffs and members of the Damages Class.

23           b.    The aforementioned conduct on the part of Defendants constituted

24               "unconscionable" and "deceptive" acts or practices in violation of Arkansas

25               Code Annotated, § 4-88-107(a)(10).

26           c.    Defendants' unlawful conduct had the following effects: (1) telescope price

27               competition was restrained, suppressed, and eliminated throughout

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                      93

Arkansas; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    d.    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

    e.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

    f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

329.  Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

    a.    During the Class Period, Defendants marketed, sold, or distributed telescopes in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

    b.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

c.   This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

d.   Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

e.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

f.   Defendants' acts or practices are unfair to purchasers of telescopes in the State of California within the meaning of Section 17200, California Business and Professions Code;

g.   Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

h.   Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                            95

business acts or practices.

i.      The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j.      The unlawful and unfair business practices of Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for telescopes. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

k.      The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

l.      As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

330.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which telescopes were sold, distributed or obtained in the District of Columbia.

b.      The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being

1   unfairly and illegally overcharged. There was a gross disparity of bargaining

2   power between the parties with respect to the price charged by Defendants

3   for telescopes. Defendants had the sole power to set that price and Plaintiffs

4   had no power to negotiate a lower price. Moreover, Plaintiffs lacked any

5   meaningful choice in purchasing telescopes because they were unaware of

6   the unlawful overcharge and there was no alternative source of supply

7   through which Plaintiffs could avoid the overcharges. Defendants' conduct

8   with regard to telescopes, including its illegal conspiracy to secretly fix the

9   price of telescopes at supra-competitive levels and overcharge consumers,

10  was substantively unconscionable because it was one-sided and unfairly

11  benefited Defendants at the expense of Plaintiffs and the public. Defendants

12  took grossly unfair advantage of Plaintiffs. The suppression of competition

13  that has resulted from Defendants' conspiracy has ultimately resulted in

14  unconscionably higher prices for consumers so that there was a gross

15  disparity between the price paid and the value received for telescopes.

16  c.   Defendants' unlawful conduct had the following effects: (1) telescope price

17  competition was restrained, suppressed, and eliminated throughout the

18  District of Columbia; (2) telescope prices were raised, fixed, maintained,

19  and stabilized at artificially high levels throughout the District of Columbia;

20  (3) Plaintiffs and the Damages Class were deprived of free and open

21  competition; and (4) Plaintiffs and the Damages Class paid supra-

22  competitive, artificially inflated prices for telescope.

23  d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

24  and members of the Damages Class have been injured and are threatened

25  with further injury. Defendants have engaged in unfair competition or unfair

26  or deceptive acts or practices in violation of District of Columbia Code § 28-

27  3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages

28

Class seek all relief available under that statute.

331. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

      a.    Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Florida; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

      b.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

      c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

      d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

332. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

      a.    Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4)

1          Plaintiffs and members of the Damages Class paid supra-competitive,

2          artificially inflated prices for telescopes.

3      b.      In violation of Hawaii Revised Statutes § 480-9, Defendants monopolized,

4          attempted to monopolize, and combined and conspired together to

5          monopolize trade or commerce in the telescope market, a substantial part of

6          which occurred within Hawaii, for the purpose of excluding competition or

7          controlling, fixing, or maintaining prices in the telescope market.

8      c.      During the Class Period, Defendants' illegal conduct substantially affected

9          Hawaii commerce and consumers.

10     d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

11         and members of the Damages Class have been injured and are threatened

12         with further injury.

13     e.      Defendants have engaged in unfair competition or unfair or deceptive acts

14         or practices in violation of Hawaii Revised Statutes §§ 480-1, *et seq.*, and,

15         accordingly, Plaintiffs and members of the Damages Class seek all relief

16         available under that statute.

17    333.  Defendants have engaged in unfair competition or unfair, unconscionable, or

18 deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

19     a.      Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

20     b.      Defendants agreed to, and did in fact, act in restraint of trade or commerce

21         in a market which includes Massachusetts, by affecting, fixing, controlling

22         and/or maintaining at artificial and non-competitive levels, the prices at

23         which telescopes were sold, distributed, or obtained in Massachusetts and

24         took efforts to conceal its agreements from Plaintiffs and members of the

25         Damages Class.

26     c.      Defendants' unlawful conduct had the following effects: (1) telescopes price

27         competition was restrained, suppressed, and eliminated throughout

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                     99

Massachusetts; (2) telescopes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

e.      Defendants have been or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to Defendants not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

f.      By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

334.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

a.      Plaintiffs and the Damages Class purchased telescopes for personal, family, or household purposes.

b.      Defendants engaged in the conduct described herein in connection with telescopes in trade or commerce in a market that includes Missouri.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 100

1       c.   Defendants agreed to, and did in fact, affect, fix, control, and/or maintain, at

2   artificial and non-competitive levels, the prices at which telescopes were

3   sold, distributed, or obtained in Missouri, which conduct constituted unfair

4   practices in that it was unlawful under federal and state law, violated public

5   policy, was unethical, oppressive and unscrupulous, and caused substantial

6   injury to Plaintiffs and members of the Damages Class.

7       d.   Defendants concealed, suppressed, and omitted to disclose material facts to

8   Plaintiffs and members of the Damages Class concerning its unlawful

9   activities and artificially inflated prices for telescopes. It concealed,

10  suppressed, and omitted facts that would have been important to Plaintiffs

11  and members of the Damages Class as they related to the cost of telescopes

12  they purchased.

13      e.   Defendants misrepresented the real cause of price increases and/or the

14  absence of price reductions in telescopes by making public statements that

15  were not in accord with the facts.

16      f.   Defendants' statements and conduct concerning the price of telescopes were

17  deceptive as they had the tendency or capacity to mislead Plaintiffs and

18  members of the Damages Class to believe that they were purchasing

19  telescopes at prices established by a free and fair market.

20      g.   Defendants' unlawful conduct had the following effects: (1) telescope price

21  competition was restrained, suppressed, and eliminated throughout

22  Missouri; (2) telescope prices were raised, fixed, maintained, and stabilized

23  at artificially high levels throughout Missouri; (3) Plaintiffs and members of

24  the Damages Class were deprived of free and open competition; and (4)

25  Plaintiffs and members of the Damages Class paid supra-competitive,

26  artificially inflated prices for telescopes.

27      h.   The foregoing acts and practices constituted unlawful practices in violation

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                              101

1    of the Missouri Merchandising Practices Act.

2    i.      As a direct and proximate result of the above-described unlawful practices,

3            Plaintiffs and members of the Damages Class suffered ascertainable loss of

4            money or property.

5    j.      Accordingly, Plaintiffs and members of the Damages Class seek all relief

6            available under Missouri's Merchandising Practices Act, specifically Mo.

7            Rev. Stat. § 407.020, which prohibits "the act, use or employment by any

8            person of any deception, fraud, false pretense, false promise,

9            misrepresentation, unfair practice or the concealment, suppression, or

10           omission of any material fact in connection with the sale or advertisement

11           of any merchandise in trade or commerce…," as further interpreted by the

12           Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-

13           8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025,

14           which provides for the relief sought in this count.

15   335.    Defendants have engaged in unfair competition or unfair, unconscionable, or

16   deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont.

17   Code, §§ 30-14-101, *et seq*.

18   a.      Defendants' unlawful conduct had the following effects: (1) telescope price

19           competition was restrained, suppressed, and eliminated throughout

20           Montana; (2) telescope prices were raised, fixed, maintained, and stabilized

21           at artificially high levels throughout Montana; (3) Plaintiffs and members of

22           the Damages Class were deprived of free and open competition; and (4)

23           Plaintiffs and members of the Damages Class paid supra-competitive,

24           artificially inflated prices for telescopes.

25   b.      During the Class Period, Defendants' illegal conduct substantially affected

26           Montana commerce and consumers.

27   c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    102

1    and members of the Damages Class have been injured and are threatened

2    with further injury.

3    d.    Defendants have engaged in unfair competition or unfair or deceptive acts

4          or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and,

5          accordingly, Plaintiffs and members of the Damages Class seek all relief

6          available under that statute.

7    336.   Defendants have engaged in unfair competition or unfair, unconscionable, or

8    deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

9    a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce

10         by affecting, fixing, controlling and/or maintaining at non-competitive and

11         artificially inflated levels, the prices at which telescopes were sold,

12         distributed or obtained in New Mexico and took efforts to conceal its

13         agreements from Plaintiffs and members of the Damages Class.

14   b.    The aforementioned conduct on the part of Defendants constituted

15         "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3,

16         in that such conduct, *inter alia*, resulted in a gross disparity between the

17         value received by Plaintiffs and the members of the Damages Class and the

18         prices paid by them for telescopes as set forth in N.M.S.A., § 57-12-2E.

19         Plaintiffs were not aware of Defendants' price-fixing conspiracy and were

20         therefore unaware that they were being unfairly and illegally overcharged.

21         There was a gross disparity of bargaining power between the parties with

22         respect to the price charged by Defendants for telescopes. Defendants had

23         the sole power to set that price and Plaintiffs had no power to negotiate a

24         lower price. Moreover, Plaintiffs lacked any meaningful choice in

25         purchasing telescopes because they were unaware of the unlawful

26         overcharge and there was no alternative source of supply through which

27         Plaintiffs' could avoid the overcharges. Defendants' conduct with regard to

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                         103

telescopes, including its illegal conspiracy to secretly fix the price of telescopes at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for telescopes.

c. Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

337. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 104

1  by affecting, fixing, controlling and/or maintaining, at artificial and non-

2  competitive levels, the prices at which telescopes were sold, distributed or

3  obtained in New York and took efforts to conceal its agreements from

4  Plaintiffs and members of the Damages Class.

5  b.  Defendants and their co-conspirators made public statements about the

6  prices of telescopes that Defendants knew would be seen by New York

7  consumers; such statements either omitted material information that

8  rendered the statements that they made materially misleading or

9  affirmatively misrepresented the real cause of price increases for telescopes;

10  and Defendants alone possessed material information that was relevant to

11  consumers, but failed to provide the information.

12  c.  Because of Defendants' unlawful trade practices in the State of New York,

13  New York consumer class members who indirectly purchased telescopes

14  were misled to believe that they were paying a fair price for telescopes or

15  the price increases for telescopes were for valid business reasons; and

16  similarly situated consumers were potentially affected by Defendants'

17  conspiracy.

18  d.  Defendants knew that its unlawful trade practices with respect to pricing

19  telescopes would have an impact on New York consumers and not just

20  Defendants' direct customers.

21  e.  Defendants knew that their unlawful trade practices with respect to pricing

22  telescopes would have a broad impact, causing consumer class members

23  who indirectly purchased telescopes to be injured by paying more for

24  telescopes than they would have paid in the absence of Defendants' unlawful

25  trade acts and practices.

26  f.  The conduct of Defendants described herein constitutes consumer-oriented

27  deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349,

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 105

1    which resulted in consumer injury and broad adverse impact on the public

2    at large, and harmed the public interest of New York State in an honest

3    marketplace in which economic activity is conducted in a competitive

4    manner.

5    g.    Defendants' unlawful conduct had the following effects: (1) telescope price

6    competition was restrained, suppressed, and eliminated throughout New

7    York; (2) telescope prices were raised, fixed, maintained, and stabilized at

8    artificially high levels throughout New York; (3) Plaintiffs and members of

9    the Damages Class were deprived of free and open competition; and (4)

10   Plaintiffs and members of the Damages Class paid supra-competitive,

11   artificially inflated prices for telescopes.

12   h.    During the Class Period, Defendants marketed, sold, or distributed

13   telescopes in New York, and Defendants' illegal conduct substantially

14   affected New York commerce and consumers.

15   i.    During the Class Period, each Defendant named herein, directly, or

16   indirectly and through affiliates they dominated and controlled,

17   manufactured, sold and/or distributed telescopes in New York.

18   j.    Plaintiffs and members of the Damages Class seek all relief available

19   pursuant to N.Y. Gen. Bus. Law § 349 (h).

20   338.   Defendants have engaged in unfair competition or unfair, unconscionable, or

21   deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

22   a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce

23   by affecting, fixing, controlling and/or maintaining, at artificial and non-

24   competitive levels, the prices at which telescopes were sold, distributed or

25   obtained in North Carolina and took efforts to conceal its agreements from

26   Plaintiffs and members of the Damages Class.

27   b.    Defendants' price-fixing conspiracy could not have succeeded absent

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                    106

deceptive conduct by Defendants to cover up its illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of telescopes created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed its unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

c.  The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d.  Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

e.  During the Class Period, Defendants marketed, sold, or distributed telescopes in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

f.  During the Class Period, Defendants, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed telescopes in North Carolina.

g.  Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

339.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

a.  Members of this Damages Class purchased telescopes for personal, family, or household purposes.

b.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Rhode Island.

c.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for telescopes. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, it breached that duty by its silence. Defendants misrepresented to all consumers during the Class Period that its telescope

1    prices were competitive and fair.

2    d.    Defendants' unlawful conduct had the following effects: (1) telescope price

3          competition was restrained, suppressed, and eliminated throughout Rhode

4          Island; (2) telescope prices were raised, fixed, maintained, and stabilized at

5          artificially high levels throughout Rhode Island; (3) Plaintiffs and members

6          of the Damages Class were deprived of free and open competition; and (4)

7          Plaintiffs and members of the Damages Class paid supra-competitive,

8          artificially inflated prices for telescopes.

9    e.    As a direct and proximate result of Defendants' violations of law, Plaintiffs

10         and members of the Damages Class suffered an ascertainable loss of money

11         or property as a result of Defendants' use or employment of unconscionable

12         and deceptive commercial practices as set forth above. That loss was caused

13         by Defendants' willful and deceptive conduct, as described herein.

14   f.    Defendants' deception, including its affirmative misrepresentations and

15         omissions concerning the price of telescopes, likely misled all consumers

16         acting reasonably under the circumstances to believe that they were

17         purchasing telescopes at prices set by a free and fair market. Defendants'

18         affirmative misrepresentations and omissions constitute information

19         important to Plaintiffs and members of the Damages Class as they related to

20         the cost of telescopes they purchased. Defendants have engaged in unfair

21         competition or unfair or deceptive acts or practices in violation of Rhode

22         Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and

23         members of the Damages Class seek all relief available under that statute.

24   340.   Defendants have engaged in unfair competition or unfair, unconscionable, or

25   deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code

26   Ann. §§ 39-5-10, *et seq.*

27   a.    Defendants' combination or conspiracy had the following effects: (1)

28

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                      109

telescopes price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) telescopes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

341.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Vermont.

b.    By virtue of the conduct alleged herein, Defendants and those acting in concert with them entered into contracts where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in Vermont in violation of Section 2453, *et seq.*, of Vermont Title 9.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

110

c.   Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for telescopes. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by its silence. Defendants misrepresented to all consumers during the Class Period that its telescope prices were competitive and fair.

d.   Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Vermont; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

e.   As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f.   Defendants' deception, including its affirmative misrepresentations and omissions concerning the prices of telescopes, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing telescopes at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                              111

### Seventh Cause of Action
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)

342.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

343.   Plaintiffs bring this claim under the laws of each of the Indirect Purchaser States.

344.   As a result of its unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on telescopes.

345.   Defendants have benefited from its unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the members of the Damages Class for telescopes.

346.   Plaintiffs and the members of the Damages Class are entitled to Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a *pro rata* basis.

347.   Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased telescopes subject to Defendants' conspiracy would have been futile.

## IX.   PRAYER FOR RELIEF

348.   Accordingly, Plaintiffs respectfully request that:

349.   The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) and direct that reasonable notice of this action be given to each and every member of the Class as provided by Rule 23(c)(2).

350.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

a.      An unreasonable restraint of trade or commerce in violation of Section 1 of

the Sherman Act;

b.      A *per se* violation of Section 1 of the Sherman Act;

c.      An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and consumer protection laws as set forth herein; and

d.      Acts of unjust enrichment by Defendants as set forth herein.

351.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

352.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

353.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

354.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of its acts of unfair competition and acts of unjust enrichment;

355.      Plaintiffs and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

356.      Plaintiffs and the members of the Classes recover their costs of suit, including

reasonable attorneys' fees, as provided by law; and

357.   Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## X.    JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.

Dated: December 5, 2022

Respectfully Submitted,

 /s/ Kalpana Srinivasan
Kalpana Srinivasan (Bar No. 237460)
Marc M. Seltzer (Bar No. 54534)
Steven Sklaver (Bar No.237612)
Michael Gervais (Bar No. 330731)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Phone: 310-789-3100
ksrinivasan@susmangodfrey.com
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com

Alejandra C. Salinas (*pro hac vice*)
Texas SBN 24102452
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
asalinas@susmangodfrey.com

/s/ *Lin Y. Chan*
Lin Y. Chan (SBN 255027)
Eric B. Fastiff (SBN 182260)
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
lchan@lchb.com
efastiff@lchb.com

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

115

*/s/ Adam J. Zapala*
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
James G. Dallal (SBN 277826)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

*Interim Co-Lead Counsel for the Indirect
Purchaser Plaintiffs*

# EXHIBIT 4

1

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5                          SAN JOSE DIVISION

6

7   IN RE TELESCOPES ANTITRUST          Case No.   5:20-cv-03639-EJD
    LITIGATION
8                                        **ORDER GRANTING MOTION FOR
                                         FINAL APPROVAL; GRANTING
9                                        MOTION FOR ATTORNEYS' FEES,
                                         EXPENSES, AND SERVICE AWARDS**
10

11                                       Re: Dkt. Nos. 398, 404

12          Before the Court is Indirect Purchaser Plaintiffs' ("IPPs") Motion for Final Approval of

13   Class Action Settlement and Motion for Attorney Fees, Expenses, and Service Awards.  ECF Nos.

14   398, 404.  Four *pro se* objectors and two represented by counsel for the Direct Purchaser Plaintiff

15   class ("DPPs") in a separate case before this Court oppose approval of the Settlement Agreement.

16   ECF Nos. 399, 400, 401, 402, 403.  The Court held a Fairness Hearing on April 3, 2025, where all

17   parties and DPP objectors were heard.

18          Having considered the motion briefing, the terms of the Settlement Agreement, the

19   objections and response thereto, the arguments of counsel, and the other matters on file in this

20   action, the Court **GRANTS** the Motion for Final Settlement Approval.  The Court finds the

21   Settlement Agreement to be fair, adequate, and reasonable.  The provisional appointments of the

22   Class Representatives and Class Counsel are confirmed.  The Court also **GRANTS** Class

23   Counsel's Motion for Attorney Fees, Expenses, and Service Awards.

24   **I.      BACKGROUND**

25          IPPs allege that Defendants and related individuals conspired to unlawfully fix or stabilize

26   prices for consumer telescopes, resulting in IPPs paying more than they would have in the absence

27

28   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
     EXPENSES, AND SERVICE AWARDS
                                          1

United States District Court
Northern District of California

<div style="float:left">United States District Court<br>Northern District of California</div>

1  of Defendants' alleged conduct.  Defendants in this Settlement Agreement are the following

2  entities: Synta Technology Corp. of Taiwan; Suzhou Synta Optical Technology Co., Ltd.; Nantong

3  Schmidt Opto-Electrical Technology Co. Ltd.; Synta Canada International Enterprises Ltd.;

4  Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron

5  Acquisition, LLC and Olivon USA, LLC.

6      The parties reached settlement on September 7, 2023, after two full-day mediation sessions

7  with an experienced mediator, the Honorable Suzanne Segal, a former Magistrate Judge of the

8  Central District of California.  ECF No. 398-1, ¶ 53.  The parties ultimately accepted Judge

9  Segal's mediator's proposal.  *Id*.  On November 4, 2024, the Court granted preliminary approval

10  of the Settlement Agreement and approved the proposed Notice Plan.  ECF No. 397.  The Court

11  appointed thirty-five individual IPPs as representatives for the Class, and appointed Cotchett, Pitre

12  & McCarthy, LLP; Lieff Cabraser Heimann & Bernstein, LLP; and Susman Godfrey L.L.P., as

13  counsel of the Settlement Class ("Class Counsel").  *Id*.

14      **A.**      **Terms of the Settlement Agreement**

15          **1.**      **Class Definition**

16      Under the Settlement Agreement, the Settlement Class is defined as:

17          all persons and entities in the Indirect Purchaser States (as defined
          herein) who, during the period from January 1, 2005 to September 6,
18          2023, purchased one or more Telescopes from a distributor (or from
          an entity other than a Defendant) that a Defendant or alleged co-
19          conspirator manufactured. Excluded from the Class are Defendants;
          their parent companies, subsidiaries and Affiliates; any co-
20          conspirators; Defendants' attorneys in this Action; federal
          government entities and instrumentalities, states and their
21          subdivisions; all judges assigned to this Action; all jurors in this
          Action; and all Persons who directly purchased Telescopes from
22          Defendants but only for those direct purchases of Telescopes.

23  Settlement Agreement ¶ 1(e), ECF No. 390-1.[1]

24

25  ─────────────────
  [1] Indirect Purchaser States are defined in the Settlement Agreement as Arizona, Arkansas,
26  California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine,
  Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New
27  Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South
  Case No.: 5:20-cv-03639-EJD
28  ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
  EXPENSES, AND SERVICE AWARDS
          2

United States District Court
Northern District of California

### 2.    Class Relief

Defendants agrees to a non-reversionary $32,000,000 common settlement fund to cover all costs associated with the Notice Plan, monetary benefits to Settlement Class Members, incentive awards for the Class Representatives, and Class Counsel's attorneys' fees and expenses. *Id.* ¶ 15. Should a balance remain after distribution to the Settlement Class, Class Counsel may redistribute such settlement funds to Settlement Class Members that cashed their checks. If unused settlement funds are not economically feasible to redistribute, Class Counsel may donate the funds to Stellar Dreams, a program directed by Science Haven, a 501(c)(3) non-profit, subject to the Court's approval.

### 3.    Releases and Dismissal of Action

In consideration of the Class Relief, the Settlement Class releases all claims against Defendants arising from the facts of this case and dismisses with prejudice the present action. *Id.* ¶¶ 1(w), 10, 13. Claims excluded from the release are claims against Defendants for "product liability, breach of contract, breach of warranty or personal injury, claims for direct purchases of Telescopes, [] any other claim unrelated to the allegations in the Action of restraint of competition or unfair competition with respect to Telescopes[, and] . . . claims to enforce the terms of this Settlement Agreement." *Id.* ¶ 14.

### 4.    Attorneys' Fees and Expenses

The Settlement Agreement provides that Class Counsel may submit an application for fees and expenses to the Court for approval, and the amount awarded will be paid from the gross settlement fund. *Id.* ¶¶ 29–32.

### B.    Class Notice and Claims Administration

The Settlement Agreement is being administered by Verita. Following the Court's Preliminary Approval Order, Verita implemented the Court-approved Notice Plan. The Notice Plan included email and postcard notice, media notice, an internet digital notice campaign, a

---

Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. Settlement Agreement ¶ 1(q).

1    settlement website, a toll-free telephone number, and a postal mailing address.  The Notice Plan

2    reached over 80% of the estimated 4 million Settlement Class Members.  Verita received over one

3    million claims and thoroughly vetted these claims for fraud and misuse.  The Court-ordered

4    deadline to opt out or object expired on February 13, 2025, but the claims deadline does not run

5    until May 20, 2025.  The claims submitted thus far represent approximately 2% of the estimated 4

6    million Settlement Class Members with 12 opt-outs.

7         **C.**    **Objections**

8         The Court received five written objections to the Settlement Agreement filed on behalf of

9    six objectors.  There are no objections to the request for fees, expenses, and service awards.  The

10    Court will discuss the substance of these objections in its analysis below.

11    **II.**    **FINAL APPROVAL OF SETTLEMENT**

12        **A.**    **Legal Standard**

13         At final approval, the Court must first conduct a "rigorous" analysis to confirm that the

14    requirements for class certification under Rule 23(a) and 23(b)(3) are met.  *Amchem Prods., Inc. v.*

15    *Windsor*, 521 U.S. 591, 619–22 (1997); *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539,

16    556 (9th Cir. 2019) (citations omitted).  A court may then approve a proposed class action

17    settlement only "after a hearing and only on finding that it is fair, reasonable, and adequate."  Fed.

18    R. Civ. P. 23(e)(2).  In making this determination, courts generally must consider the following

19    factors:

20            (1) the strength of the plaintiff's case; (2) the risk, expense,
        complexity, and likely duration of further litigation; (3) the risk of

21            maintaining class action status throughout the trial; (4) the amount
        offered in settlement; (5) the extent of discovery completed and the

22            stage of the proceedings; (6) the experience and views of counsel; (7)
        the presence of a governmental participant; and (8) the reaction of the

23            class members to the proposed settlement.

24    *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).  "This list is not exclusive

25    and different factors may predominate in different factual contexts."  *Torrisi v. Tucson Elec. Power*

26    *Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).

27    Case No.: 5:20-cv-03639-EJD

28    ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
EXPENSES, AND SERVICE AWARDS

United States District Court
Northern District of California

1    Furthermore, class settlements reached prior to formal class certification require a

2    "heightened fairness inquiry." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir.

3    2019).  When reviewing such a pre-certification settlement, the district court must not only explore

4    the *Churchill* factors but also "look[ ] for and scrutinize[ ] any subtle signs that class counsel have

5    allowed pursuit of their own self-interests . . . to infect the negotiations." *Id*. at 1043 (internal

6    quotation marks omitted).

7    **B.    Discussion**

8    **1.    Class Certification**

9    This analysis begins with an examination of whether class treatment remains appropriate

10    under Rule 23(a) and Rule 23(b)(3).

11    First, the Court finds that Rule 23(a)'s requirements of numerosity, commonality,

12    typicality, and adequacy remain satisfied.  The Settlement Class includes millions of IPPs, making

13    it so numerous that joinder of all members is impracticable.  The focus of this action—Defendants'

14    alleged conspiracy to raise, fix, maintain or stabilize the prices of telescopes, as well as their

15    unlawful monopolistic conduct—is common to all Class Members.  The Class Representatives are

16    typical of the Settlement Class they seek to represent because they purchased consumer telescopes

17    and paid supracompetitive prices caused by Defendants' alleged conspiracy.  Class

18    Representatives and Class Counsel have fairly and adequately represented the interests of the

19    Class.  No conflicts of interest appear as between Class Representatives and the Settlement Class

20    Members, nor is there any evidence that Class Counsel have any conflicts of interests with

21    Settlement Class Members.

22    Second, as to Rule 23(b)(3), common questions of law and fact predominate over any

23    questions affecting individuals here because every Settlement Class Member has been subjected to

24    the same alleged conduct which caused the same type of harm.  The class action mechanism is also

25    superior here given the small amount in dispute for individual class members in comparison to the

26    cost of individual litigation.  *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1123 (9th Cir. 2017).

27

28

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
EXPENSES, AND SERVICE AWARDS

United States District Court
Northern District of California

United States District Court
Northern District of California

1  The alternatives to class certification—approximately 4 million separate, individual, and time-

2  consuming proceedings, or a complete abandonment of claims by a majority of class members—

3  are not preferable.

4          Therefore, the Court finds all factors have been met and the Class shall remain certified for

5  the purposes of the Settlement Agreement.  The Court also reaffirms the appointment of Class

6  Counsel and Class Representatives pursuant to Rule 23(g) for all the reasons identified in its

7  Preliminary Approval Order.

8                    **2.      Adequacy of Notice**

9          A court must "direct notice [of a proposed class settlement] in a reasonable manner to all

10  class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  "[T]he class must

11  be notified of a proposed settlement in a manner that does not systematically leave any group

12  without notice." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982).

13  Adequate notice requires the best notice practicable, whereby the notice must be reasonably

14  calculated to apprise the Settlement Class members of the proposed settlement and of their right to

15  object or to exclude themselves; must constitute due, adequate, and sufficient notice to all persons

16  entitled to receive notice; and must meet all applicable requirements of due process and any other

17  applicable requirements under federal law. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812

18  (1985).  Due process requires "notice reasonably calculated, under all the circumstances, to apprise

19  interested parties of the pendency of the action and afford them an opportunity to present their

20  objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

21          The Court finds that the Notice Plan provided the best notice practicable.  Pursuant to the

22  procedures approved by the Court in its Preliminary Approval Order, Verita carried out the Notice

23  Plan and reached 80% of potential Settlement Class Members.  The Notice Plan employed

24  methods including email, direct mail, publication notices, a settlement website, a toll-free

25  telephone number, and a postal mailing address.  The settlement website address was prominently

26  displayed in all notice documents.  The settlement website contained relevant documents and

27  Case No.: 5:20-cv-03639-EJD

28  ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
EXPENSES, AND SERVICE AWARDS

6

*United States District Court*
*Northern District of California*

1   information including the Class Notice, Complaint, Settlement Agreement, the Preliminary

2   Approval Order, and the Motion for Attorneys' Fees, Expenses, and Service Awards.  The

3   settlement website also included answers to frequently asked questions, instructions for how

4   Settlement Class Members could opt out or object, instructions for how to obtain other case-

5   related information, and contact information for the Settlement Administrator.  Given the great

6   lengths that Verita took to notify the Settlement Class and the resulting expansive reach of the

7   Class Notice, the Court finds that the Court-approved Notice Plan has been fully and properly

8   implemented and the Settlement Class has been provided adequate notice of the pendency of this

9   action and the opportunity to opt out or present their objections.

### 3.   Settlement is Fair, Adequate, and Reasonable

11       The Court finds that the Settlement Agreement is fair, adequate, and reasonable under the

12  *Churchill* factors and Rule 23(e)(2).  The Court will analyze each relevant factor in turn.

### a.   Strength of the Case

14       To assess strength of the case, "the district court's determination is nothing more than an

15  amalgam of delicate balancing, gross approximations and rough justice."  *Officers for Justice*, 688

16  F.2d at 625 (internal quotations omitted).  There is no "particular formula by which that outcome

17  must be tested," *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009), and the

18  district court is not required to render specific findings on the strength of all claims.  *Lane*, 696

19  F.3d at 823.

20       The Court finds that the Settlement Agreement adequately reflects the strength of IPPs'

21  case, as well as Defendants' position.  The strengths of this case include the large number of

22  potential class members and a body of uncontested facts concerning Defendants' conduct.

23  However, this litigation presents significant hurdles that could weaken Plaintiffs' case, including

24  potential challenges to class certification and the inherent intricacies of class actions of this

25  magnitude.  The Court finds that the judicial policy favoring compromise and settlement of class

26  action suits is applicable here.  *See In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir.

27

28  Case No.: 5:20-cv-03639-EJD
    ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
    EXPENSES, AND SERVICE AWARDS

7

1    2008).

2            **b.**      **Risk, Expense, Complexity, and Likely Duration of Further**
                **Litigation**

3           The Settlement Agreement reflects a fair result considering the potential trial recovery,

4    numerous dispositive risks, costs of continuing litigation, and delay in payment to the class.  The

5    parties reached this Settlement Agreement while Defendants' renewed motion to dismiss was still

6    pending and IPPs were preparing expert reports.  Continued litigation posed particular risks and

7    challenges given the pending motion, anticipated challenges to expert reports, and complex and

8    international nature of IPPs' claims.  Even if IPPs were successful at each stage of litigation, relief

9    for the class could have been further delayed by appeals.  Given the procedural posture of the

10   litigation, many risks remained that could have resulted in no or significantly less relief for the

11   Settlement Class.

12           **c.**      **Amount Offered**

13          The Settlement Agreement provides substantial monetary relief—a $32 million non-

14   reversionary fund.  The $32 million settlement fund lies within the IPPs' expert's damages

15   estimate and represents between approximately 19% to 110% of the preliminary total estimate of

16   damages at trial.  "[I]t is well-settled law that a proposed settlement may be acceptable even

17   though it amounts to only a fraction of the potential recovery that might be available to the class

18   members at trial."  *In re MacBook Keyboard Litig.*, No. 5:18-cv-02813, 2023 WL 3688452, at *9

19   (N.D. Cal. May 25, 2023).  IPPs' recovery potentially exceeds recoveries approved in this district.

20   *See MacBook Keyboard*, 2023 WL 3688452, at *9 (finding that a settlement amount was

21   satisfactory because it represented "approximately 9% to 28% of the total estimated damages *at*

22   *trial*"); *Fleming v. Impax Lab'ys Inc.*, No. 16-CV-06557, 2021 WL 5447008, at *10 (N.D. Cal.

23   Nov. 22, 2021) (settlement recovery representing 12.5% of total recoverable damages is "in a

24   range consistent with the median settlement recovery in class actions"); *Deaver v. Compass Bank*,

25   No. 13-cv-00222, 2015 WL 8526982, at *7 (N.D. Cal. Dec. 11, 2015) (finding a settlement that

26   equaled "10.7 percent of the total potential liability exposure, before any deductions for fees, costs,

27   Case No.: 5:20-cv-03639-EJD
ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,

28   EXPENSES, AND SERVICE AWARDS

United States District Court
Northern District of California

1   or incentive awards" was "fair and reasonable").

2       The Court also notes that there is no reversion of unused funds to Defendants.  Should a

3   balance remain after distribution to the Settlement Class, and unused settlement funds are not

4   economically feasible to redistribute, Class Counsel may donate the funds to Stellar Dreams, a

5   non-profit program that seeks "to close the equity gap in science, particularly astronomy, by giving

6   100 telescopes, astronomy education, and citizen science opportunities to students in grades 5-12,

7   who come from underrepresented backgrounds in science and astronomy." *See*

8   https://www.thesciencehaven.org/stellardreams.  The Court finds a *cy pres* distribution of

9   remaining funds, if any, to Stellar Dreams is appropriate for this case.

10   <div align="center">**d.**    **Extent of Discovery**</div>

11       Prior to reaching the Settlement Agreement, the parties engaged in years of particularly

12   contentious discovery, requiring participation in regular discovery motion practice and

13   conferences with Magistrate Judge DeMarchi.  The Court finds that the amount of investigation,

14   discovery, and litigation reflects that the parties had thuroughly developed a perspective on the

15   strengths and weaknesses of their respective cases to "make an informed decision about

16   settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (quoting *Linney*

17   *v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)).

18   <div align="center">**e.**    **Reaction of Class Members**</div>

19       "[T]he absence of a large number of objections to a proposed class action settlement raises

20   a strong presumption that the terms of a proposed class settlement action are favorable to the class

21   members." *In re Omnivision Techs., Inc.,* 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008) (citation

22   omitted); *see also Churchill*, 361 F.3d at 577 (holding that approval of a settlement that received

23   45 objections (0.05%) and 500 opt-outs (0.56%) out of 90,000 settlement class members was

24   proper).  Here, the *de minimis* number of opt-outs and objections further support approval of the

25   Settlement Agreement.  Only twelve Class Members elected to opt out and the Court received only

26   five written objections on behalf of six Settlement Class Members.  Such a result weighs in favor

27

28

United States District Court
Northern District of California

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
EXPENSES, AND SERVICE AWARDS

of approval.  *See Cmty. Res. for Indep. Living v. Mobility Works of California*, *LLC*, 533 F. Supp.

3d 881, 889 (N.D. Cal. 2020) ("The absence of a negative reaction weighs in favor of approval.")

(quotation omitted); *In re Nexus 6P Prod. Liab. Litig.*, No. 17-cv-02185, 2019 WL 6622842 at *10

(N.D. Cal. Nov. 12, 2019) (granting approval and holding that zero objections and 31 opt-outs in a

class of approximately 511,000 "confirms that the settlement is fair and reasonable."); *In re

Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) ("A low number of opt-outs

and objections in comparison to class size is typically a factor that supports settlement approval.").

### f.      Equitable Plan of Allocation

The Court also approves the plan to distribute the proceeds of the settlement fund on a *pro

rata* basis to Settlement Class Members in the enumerated Indirect Purchaser States.  A *pro rata*

allocation treats all Settlement Class Members fairly because their recovery is tied to the volume

and cost of their purchases, the number of other qualified Settlement Class Members making

claims against the settlement fund, and the size of the overall fund.  *Pro rata* distribution is

generally a reasonable and fair way to compensate classes, especially in antitrust class actions such

as this.  *See Lithium Ion Batteries,* 2020 WL 7264559, at *7 (approving *pro rata* plan of

distribution); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-cv-2058, 2017 WL 2481782,

at *5 (N.D. Cal. June 8, 2017) (approving settlement distribution plan that "fairly treats class

members by awarding a pro rata share to the class members based on the extent of their injuries.")

(quotation omitted); *In re High-Tech Employee Antitrust Litig.*, No. 11–cv–02509, 2015 WL

5159441, at *8 (N.D. Cal. Sept. 2, 2015) (approving pro rata distribution); *Four in One Co. v. S.K.

Foods, L.P.*, No. 08–cv–3017, 2014 WL 4078232, at *15 (E.D. Cal. Aug. 14, 2014) (approving

"plan of allocation providing for a pro rata distribution of the net settlement fund based on verified

claimants' volume of qualifying purchases" as "fair, adequate, and reasonable").  The Court finds

the plan of allocation is fair to Settlement Class Members and supports a finding that the

Settlement Agreement is fair, adequate, and reasonable.

United States District Court
Northern District of California

### 4. Collusion

The Ninth Circuit has articulated the following "subtle signs" of collusion of which a court should be "particularly vigilant" when scrutinizing settlements achieved prior to class certification: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) "clear sailing" arrangements; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal quotations and citations omitted).

The Court finds that there is no evidence of conflicts of interest nor are there "subtle signs" of collusion here. After years of litigation and extensive discovery, counsel for all parties finally reached an agreement to resolve this matter after two full-day mediations with an experienced and well-respected mediator. The parties agreed to settle only after both sides accepted Judge Segal's mediator's proposal following protracted negotiations. Judge Segal's involvement and oversight are favorable factors to finding fairness and a lack of collusion between the parties. *See Bluetooth*, 654 F.3d at 948 (participation of mediator is not dispositive but is "a factor weighing in favor of a finding of non-collusiveness.").

### 5. Objections

The Court received five written objections from the following objectors: DPPs, National Woodlands Preservation, Inc. ("Woodlands"), Elman Barnes, Pat Zhen, and Mike Sussman.

#### a. DPPs

Counsel for two of the DPPs in *Spectrum Scientifics, LLC et al v. Celestron Acquisition, LLC et al*, No. 20-cv-03642-EJD, oppose approval of the Settlement Agreement. ECF No. 400. DPPs argue that the approval of this Settlement Agreement may impact Defendants' ability to pay any potential judgment in the DPPs' case. They cite to *True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010), and *Ferrington v. McAfee, Inc.*, 2012 WL 1156399, *8 (N.D. Cal. 2012), for the proposition that a settlement that injures one class at the expense of another is improper.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    For the reasons explained on the record, the Court overrules DPPs' objection.  The Court's

2  fiduciary duty today is to the IPP Settlement Class, and the Court is tasked with conducting a

3  rigorous review of the Settlement Agreement to determine whether it is fair, adequate, and

4  reasonable to *this* class.  DPPs do not object to the Settlement Agreement as unfair, inadequate, or

5  unreasonable to the Settlement Class Members. [2]  Instead, DPPs ask the Court "not approve the

6  proposed settlement unless and until Defendants disclose information sufficient to prove that they

7  have and will maintain sufficient assets in the United States to both pay the proposed settlement

8  amount to the IPPs and to satisfy an eventual judgment or settlement with the DPPs."  This

9  objection seeks to protect the interests of a different class in a separate case, at the expense of the

10  IPP Settlement Class here.  Denying final approval of the Settlement Agreement because of its

11  potential financial impact on a different and separate entity would be unprecedented and a breach

12  of the Court's fiduciary duty to protect the interest of the IPP Settlement Class.  The Court also

13  notes that the cases cited by DPPs all involve inequities within subclasses, not between class

14  members in a separate case.  DPPs have not presented the Court with any case law where a court

15  denied final approval to protect the interests of a potential creditor or a class in a different action.

16    However, the Court appreciates that DPPs' counsel raised these concerns with the Court at

17  the Fairness Hearing to protect the interests of the DPP class.  The Court is now aware of concerns

18  regarding Defendants' financial stability and will be cognizant of this issue moving forward,

19  particularly if DPPs secure a judgment in their case.

20    **b.    Woodlands**

21    Woodlands objects to the Settlement Agreement as defective with respect to non-individual

22  entities because the claim form did not have a field to enter a business name.  ECF No. 401, at 2.

23

---

24  [2] The parties also dispute whether the two DPP objectors have standing.  Regardless, even where
there is no standing, the Court may still examine arguments as helpful for the Court to satisfy its
25  fiduciary duties.  *See, e.g., In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 3648478, at
*23 (N.D. Cal. July 7, 2016) ("Even if a Court finds that a putative objector lacks standing to
26  object, it may still consider that putative objector's objections to a class settlement, which may
help the Court satisfy its fiduciary duties.") (citing *Stetson v. Grissom*, 2016 WL 2731587, at *2
27  (9th Cir. May 11, 2016)).

Case No.: 5:20-cv-03639-EJD
28  ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
EXPENSES, AND SERVICE AWARDS

12

(184 of 346), Page 184 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 184 of 346
Case 5:20-cv-03639-EJD    Document 419    Filed 04/11/25    Page 13 of 20

The Court overrules this objection. The class definition, published on the settlement website, in the Settlement Agreement, in the Preliminary Approval Order, and in all settlement notice materials issued to potential Settlement Class Members made clear that "all persons and entities in the Indirect Purchaser States (as defined herein) who, during the period from January 1, 2005 to September 6, 2023 purchased one or more Telescopes from a distributor (or from an entity other than a Defendant) that a Defendant or alleged co-conspirator manufactured" may submit claims. ECF Nos. 390-1, 391-1, 391-3. Entities were able to file a claim by putting their names into the "Name" field on the claim form; but regardless, since receiving this objection, Verita updated the Claim Form to include an additional row for "Name of Entity." The claim period is still ongoing through May 20, 2025, giving entities sufficient time to file claims with this new form. This renders Woodland's objection moot.

### c.    Elman Barnes

Barnes objects on the grounds that: (1) the claims process requires that class members without claim numbers must print and mail claim forms rather than submit them online; (2) Verita and Class Counsel were not diligent enough in providing claim numbers; and (3) the Settlement Agreement improperly includes a California Civil Code § 1542 waiver. ECF No. 399. His fourth objection regarding state of residence was withdrawn.

The Court overrules Barnes's objections. First, the fact that Barnes or any other claimant may have had to fill out and mail a standard claim form and receive payment by check does not in itself prejudice these Settlement Class Members or treat them unfairly. Courts routinely approve and order claims administration protocols that utilize physical claims and checks. *See, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 941 (9th Cir. 2015).

Second, Verita's system to provide claim numbers has been an effective and necessary tool to prevent fraud. Verita provided claim numbers to Settlement Class Members who called the general inquiries phone number and asked for one; however, after receiving this objection, Verita created a new dedicated toll-free hotline specific to claim number requests. Language directing

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES, EXPENSES, AND SERVICE AWARDS
13

1    claimants to the hotline is now featured prominently on the settlement website.  As the Court

2    discussed during the Fairness Hearing, the presence of fraudulent class action settlement claims is

3    a growing and serious concern that could jeopardies the integrity of class action settlements.  The

4    requirement for Settlement Class Members without a claim number to personally call Verita could

5    be an effective and appropriate way to minimize this risk.  *See, e.g., In re Anthem, Inc. Data*

6    *Breach Litig.*, 327 F.R.D. at 329–30 (approving settlement and overruling objections based on

7    difficulties communicating with the settlement administrator and utilizing the claims website).

8          Third, California Civil Code § 1542 waivers are commonplace in class action settlements.

9    Such waivers are uncontroversial in the class action context because, like all class settlements, the

10   extent of any release is constrained by the identical factual predicate doctrine.  *See, e.g., Reyn's*

11   *Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) (applying the identical

12   factual predicate doctrine to a class action settlement release); *Gallucci v. Boiron, Inc.*, No. 11-cv-

13   2039, 2012 WL 5359485, at *11 (S.D. Cal. Oct.31, 2012) (finding "[a] majority of circuits,

14   including the Ninth Circuit, uphold the release of claims that are based on the same factual

15   predicate as the claims asserted in the complaint") (citations omitted); *Miller v. Wellpoint*

16   *Companies, Inc.*, No. 09-cv-5666, 2010 WL 11520703, at *3 (C.D. Cal. May 17, 2010) ("The

17   release is not so broad as to extend beyond the "identical factual predicate" of this case, which the

18   Ninth Circuit has held to be the appropriate outer scope of a class action release.") (citing *Reyn's*

19   *Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) (applying the identical

20   facture predicate doctrine to a settlement's release; *see also Estorga v. Santa Clara Valley*

21   *Transportation Auth.*, No. 16-cv-02668, 2020 WL 7319356, at *5 (N.D. Cal. Dec. 11, 2020)

22   (approving settlement and holding that "waiving rights under Section 1542 of the California Civil

23   Code is a common and accepted practice in this District").

24                          **d.    Pat Zhen**

25          Zen objects to the Settlement Agreement on the grounds that it does not provide payment

26   for purchases made in Puerto Rico, and therefore those who made purchases in Puerto Rico are

27

28   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
     EXPENSES, AND SERVICE AWARDS
                                         14

United States District Court
Northern District of California

1    forced to waive their rights without any consideration.  ECF No. 402.

2       The Court overrules this objection.  The definition of "Indirect Purchaser States" in the

3    Settlement Agreement does not include Puerto Rico, or several other states within the United

4    States.  Further, the release of claims is limited to class members who made purchases in Indirect

5    Purchaser States only, so there is no possibility of harm to those who indirectly purchased subject

6    telescopes in Puerto Rico.  Those indirect purchasers are still free to bring their own claims.

7                  **e.**      **Mike Sussman**

8       Sussman objects for similar reasons to Barnes regarding having to file a paper claim, and

9    these objections are overruled for the reasons detailed above.  ECF No. 403.

10       Sussman also objects because he believes that the notices did not provide adequate

11    information regarding how and where to object.  The Court overrules this objection.  All the

12    information he seeks is found in the settlement website's FAQs, which provides detailed

13    instructions on how and when to file and objection to the Settlement Agreement.  The long form

14    notice also provides sufficient instructions regarding how to object.

15 **III.**     **ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**

16       The Court now turns to Class Counsel's requests for attorneys' fees, expenses, and service

17    awards.

18         **A.**      **Attorneys' Fees**

19       Attorneys' fees may be awarded in a certified class action under Federal Rule of Civil

20    Procedure 23(h).  Such fees must be found "fair, reasonable, and adequate" in order to be

21    approved.  Fed. R. Civ. P. 23(e); *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  To

22    "avoid abdicating its responsibility to review the agreement for the protection of the class, a

23    district court must carefully assess the reasonableness of a fee amount spelled out in a class action

24    settlement agreement." *Id.* at 963.  "[T]he members of the class retain an interest in assuring that

25    the fees to be paid class counsel are not unreasonably high," since unreasonably high fees are a

26    likely indicator that the class has obtained less monetary or injunctive relief than they might

27

28    Case No.: 5:20-cv-03639-EJD
ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
EXPENSES, AND SERVICE AWARDS

United States District Court
Northern District of California

1    otherwise.  *Id.* at 964.

2         The Court analyzes attorneys' fee requests based on either the "lodestar" method or a

3    percentage of the total settlement fund made available to the class, including costs, fees, and

4    injunctive relief.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  The Ninth

5    Circuit encourages courts to use the lodestar method as a cross-check in order to avoid a

6    "mechanical or formulaic approach that results in an unreasonable reward."  *In re Bluetooth*, 654

7    F.3d at 944–45 (citing *Vizcaino*, 290 F.3d at 1050–51).

8         Here, Class Counsel seek an award of attorneys' fees in the amount of $10,666,667 plus

9    proportional interest, which is approximately 33.33% of the $32,000,000 common settlement

10   fund.  Class Counsel also request reimbursement of $771,461 in litigation costs, and service

11   awards of $3,000 for each of the thirty-five Class Representatives.

12        For the reasons explained below, the Court finds this request fair, adequate, and

13   reasonable.

14              1.      **Percentage of the Fund**

15        When using the percentage of the fund method, courts consider a number of factors,

16   including the results achieved, the risk, counsel's performance, the burdens of litigation, and

17   whether the case was handled on a contingency basis.  *In re Online DVD-Rental Antitrust Litig.*,

18   779 F.3d 934, 954–55 (9th Cir. 2015) (quoting *Vizcaino*, 290 F.3d at 1047–50).  "[T]he most

19   critical factor [in determining appropriate attorney's fee awards] is the degree of success

20   obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  Under the percentage of the fund

21   method, courts in the Ninth Circuit "typically calculate 25% of the fund as the 'benchmark' for a

22   reasonable fee award, providing adequate explanation in the record of any 'special circumstances'

23   justifying a departure."  *In re Bluetooth*, 654 F.3d at 942 (citing *Six (6) Mexican Workers*, 904

24   F.2d at 1311.  The benchmark should be adjusted when the percentage recovery would be "either

25   too small or too large in light of the hours devoted to the case or other relevant factors."  *Six (6)

26   Mexican Workers*, 904 F.2d at 1311.

27

28   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
     EXPENSES, AND SERVICE AWARDS

United States District Court
Northern District of California

16

1       Here, the Court finds that the $32 million common fund is an excellent result warranting

2   an upward adjustment.  The $32 million settlement fund provides direct cash relief and represents

3   between 19% to 110% of IPPs' possible recoverable damages—the high end of which would be a

4   rare and exceptional percentage of recovery.  *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*,

5   No. 13-md-02420, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020), *aff'd,* 2022 WL

6   16959377 (9th Cir. Nov. 16, 2022) (granting final approval of the settlement representing 11.7%

7   of damages and describing the result for the class as "excellent"); *In re Nat'l Collegiate Athletic*

8   *Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 14-md-2541, 2017 WL 6040065, at *7 (N.D.

9   Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019) (approving a settlement and stating

10  that 50% of damages is "a result almost never achieved in large, complex antitrust cases).  The

11  Court also notes that Class Counsel took on substantial risk in litigating this case on a contingency

12  basis, and this case required a high level of skill to achieve a successful result.  *See Durham v.*

13  *Sachs Elec. Co.*, No. 18-cv-04506, 2022 WL 2307202, at *8 (N.D. Cal. June 27, 2022) (approving

14  upward adjustment based on factors including the risk and difficulty of the case).  The Settlement

15  Agreement was reached after more than four years of complex and hard-fought litigation.

16  Defendants vigorously defended their position throughout, filing multiple motions to dismiss and

17  strike and zealously participating in over a dozen contested discovery motions.  Under these

18  circumstances, an award of 33.33% is consistent with Ninth Circuit precedent.  *See, e.g., In re*

19  *Pac. Enters. Secs. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (awarding 33% of $12 million common

20  settlement fund); *Nelson v. Avon Prods.*, No. 13-cv-02276, 2017 WL 733145, at *6 (N.D. Cal.

21  Feb. 24, 2017) (awarding 33.3% and collecting cases awarding 30% or more).

22              **2.    Lodestar**

23      Under the lodestar approach, a court multiplies the number of hours reasonably expended

24  by the reasonable hourly rate.  *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016).  A

25  reasonable hourly rate is typically the prevailing market rate in the relevant community.  *Id.*  Since

26  a 25% benchmark award might be reasonable in some cases but arbitrary in cases involving an

27  Case No.: 5:20-cv-03639-EJD

28  ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
    EXPENSES, AND SERVICE AWARDS

17

*United States District Court*
*Northern District of California*

1    extremely large settlement fund, the purpose of the comparison with the lodestar is to ensure

2    counsel is not overcompensated. *In re Coordinated Pretrial Proceedings in Petroleum Prods.*

3    *Antitrust Litig.*, 103 F.3d 602, 607 (9th Cir. 1997).

4      Here, Class Counsel calculate a lodestar figure $14,550,720 for 20,536 hours across three

5    law firms, to which they apply a 0.73 multiplier for a total of $10,666,667.  Among the

6    participating law firms, the blended average hourly rate for counsel and staff is $709.

7      The Court finds that the number of hours attributed to this case are reasonable considering

8    the efforts required to engage in the settlement process here.  The reasonableness is further

9    supported by an examination of the hours not included in this lodestar calculation.  For example,

10   Class Counsel's lodestar calculation excludes all billers that billed less than twenty hours in this

11   case and includes only work done prior to November 30, 2024, which would not include the

12   substantial work done since then, including briefing and litigating the present Motion for Final

13   Approval, and the substantial work to follow in ensuring compliance with the Settlement

14   Agreement.  The Court also finds that the blended rate of $709 is within the acceptable range of

15   attorneys' fees in this district.  *See, e.g., In re MacBook Keyboard Litig.*, No. 18-cv-02813, 2023

16   WL 3688452, at *15 (N.D. Cal. May 25, 2023) (approving a $863 blended rate).

17     Considering the negative multiplier here, the Court finds that the lodestar cross-check

18   confirms the reasonableness of the percentage-based calculation.

19     **B.**  **Expenses**

20     Class Counsel also seek compensation for total expenses of  $771,461.  Class Counsel is

21   entitled to reimbursement of reasonable out-of-pocket expenses.  Fed. R. Civ. P. 23(h); *see Harris*

22   *v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (holding that attorneys may recover reasonable

23   expenses that would typically be billed to paying clients in non-contingency matters).  Costs

24   compensable under Rule 23(h) include "nontaxable expenses that are authorized by law or by the

25   parties' agreement." Fed. R. Civ. P. 23(h).  Here, Class Counsel seek reimbursement for litigation

26   expenses and provide records documenting those expenses in the amount of $771,461. The Court

27   Case No.: 5:20-cv-03639-EJD

28   ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
     EXPENSES, AND SERVICE AWARDS

United States District Court
Northern District of California

finds their request is supported by the record and the amount is fair, adequate, and reasonable.

### C.    Service Awards

Service awards are "intended to compensate class representatives for work undertaken on behalf of a class" and "are fairly typical in class action cases." *DVD-Rental*, 779 F.3d at 943 (internal quotation marks and citation omitted). The district court must evaluate named plaintiff's requested award using relevant factors including "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing the litigation." *Staton*, 327 F.3d at 977. "Such awards are discretionary and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59 (internal citation omitted). The Ninth Circuit has emphasized that district courts must "scrutiniz[e] all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1163 (9th Cir. 2013).

Here, the thirty-five Class Representatives request a service award of $3,000 each. The Court finds that the requested service awards are reasonable considering Class Representatives' efforts in this case, including sitting for depositions and participating in discovery. The requested service awards are also below the presumptively reasonable amount of $5,000 and are consistent with Ninth Circuit precedent. *See, e.g., Allagas v. BP Solar Int'l*, 2016 WL 9114162, at *4 (N.D. Cal. Dec. 22, 2016) (awarding $7,500 to named plaintiffs who were deposed and $3,500 to one named plaintiff who was not deposed).

## IV.    CONCLUSION

Based on the preceding discussion, the Court finds that the terms of the Settlement Agreement are fair, adequate, and reasonable; that Federal Rule of Civil Procedure 23(e) and the fairness and adequacy factors are satisfied; and that the Settlement Agreement should be approved

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES, EXPENSES, AND SERVICE AWARDS
19

United States District Court
Northern District of California

Case 5:20-cv-03639-EJD    Document 419    Filed 04/11/25    Page 20 of 20

1    and implemented.  The Motion for Final Approval is accordingly **GRANTED**.

2         Class Counsel's Motion for Attorneys' Fees, Expenses, and Service Awards is also

3    **GRANTED**.  Class Counsel is awarded $10,666,667 in attorneys' fees and $771,461 in litigation

4    expenses.  Class Representatives are granted a service award of $3,000 each.

5         Without affecting the finality of this Order in any way, the Court retains jurisdiction of all

6    matters relating to the interpretation, administration, implementation, effectuation, and

7    enforcement of this Order and the Settlement Agreement.

8         The parties shall file a post-distribution accounting in accordance with this District's

9    Procedural Guidance for Class Action Settlements no later than **January 12, 2026**.  The parties'

10   statement shall include information regarding the number of claims Verita found fraudulent as of

11   that date.

12        The Court sets a compliance deadline on **January 22, 2026**, on the Court's 9:00 a.m.

13   calendar to verify timely filing of the post-distribution accounting.

14        **IT IS SO ORDERED.**

15   Dated: April 11, 2025

16

17   _____

18   EDWARD J. DAVILA
    United States District Judge

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING MOT. FOR FINAL APPROVAL; GRANTING MOT. FOR FEES,
EXPENSES, AND SERVICE AWARDS

# EXHIBIT 5

1    UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    SAN JOSE DIVISION

4

5    **IN RE TELESCOPES ANTITRUST**          **Case No. 5:20-cv-03639-EJD**
     **LITIGATION**
6
                                             **[PROPOSED]** **ORDER**
7    _____           **PRELIMINARILY APPROVING CLASS**
                                             **ACTION SETTLEMENT AND ISSUING**
     **This Document Relates to:**            **NOTICE**
8
     **Indirect Purchaser Actions**
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   **[PROPOSED]** **ORDER PRELIMINARILY APPROVING CLASS ACTION**
     **SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**
     3046536.4

WHEREAS, Interim Co-Lead Counsel and Plaintiffs Madeline Bekielewski,[1] Thomas Berta, Carey Briggs, Vincent Catanzaro, David Dick, Austin Griffith, Donnie Houston, Bentaro Huset, Greg Kendall, David Kerber, Deborah Lemar, Doug Lundy, John Maurice, Timothy McQuaid, Philip Moore, Brian Murphy, Herbert Nelson, Scott Plummer, Michael Price, David Quaglietta, Greg Ross, Ronald Troillett, Robert Welsh, Tony DiMambro, Jason Glydewell, Leon Greenberg, Michael Liskow, Sigurd Murphy, Jim Riley, Keith Uehara, Steven Zellers, Sarah Day Brewer, Thien Ngo, Jesse Smith, and Arthur Sines ("Plaintiffs") have applied for an order preliminarily approving the terms and conditions of the Settlement as set forth in the Settlement Agreement, which is attached as Exhibit A to the Declaration of Alejandra C. Salinas ("Salinas Declaration");

WHEREAS, the Settlement requires, among other things, that all Released Claims against Released Parties be settled and compromised;

WHEREAS, this Court has considered the Settlement Agreement, the Motion for Preliminary Approval of Class Action Settlement and Issuance of Notice, and all papers filed in support of the Motion and the entire docket in this matter; and

WHEREAS, this Court preliminarily finds, for the purpose of settlement only, that the Settlement Class meets all the prerequisites of Federal Rule of Civil Procedure 23 for class certification, including numerosity, commonality, typicality, predominance of common issues, superiority, and that the Plaintiffs and Lead Counsel are adequate representatives of the Settlement Class;

NOW THEREFORE, good cause appearing and pursuant to Federal Rule of Civil Procedure 23, it is hereby ORDERED that:

---

[1] Richard Bekielewski was an original class representative, but he passed away during the pendency of the litigation. His wife, Madeline Bekielewski, has taken over his estate and claims.

**[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**    2

3046536.4

1.    The capitalized terms used herein shall have the meanings set forth in the Settlement Agreement.

### Preliminary Certification of Settlement Class for Purpose of Settlement Only

2.    The Settlement is hereby preliminarily approved as fair, reasonable, and adequate such that notice thereof should be given to members of the Settlement Class. Under Federal Rule of Civil Procedure 23(b)(3), the Settlement Class, as set forth in the Settlement Agreement and defined as follows, is preliminarily certified for the purpose of settlement only:

> all persons and entities in the Indirect Purchaser States[2] who, during the period from January 1, 2005 to September 6, 2023, purchased one or more Telescopes from a distributor (or from an entity other than a Defendant) that a Defendant or alleged co-conspirator manufactured.

3.    Excluded from the Class are Defendants; their parent companies, subsidiaries and Affiliates; any co-conspirators; Defendants' attorneys in this Action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this Action; all jurors in this Action; and all directly purchased Telescopes from Defendants. The Settlement Class also excludes members who timely exercised their right to exclude themselves pursuant to the procedures described in the Notice.

4.    Specifically, the Court preliminary approves the Settlement as set forth in the Settlement Agreement, including the releases contained therein, and the proposed plan of allocation and distribution described in Exhibit A to the Salinas Declaration, because the Court

---

[2] "Indirect Purchaser States" means Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

will likely be able to find that the Settlement is fair, reasonable and adequate after considering the Rule 23(e)(2)(A)–(D) factors and governing case law.

5.     If the Settlement Agreement is not finally approved by this Court, or if such final approval is reversed or materially modified on appeal by any court, this Order (including but not limited to the certification of the class) shall be vacated, null and void, and of no force or effect, and Defendants and Plaintiffs shall be entitled to make any arguments for or against certification for litigation purposes.

6.     Interim Co-Lead Counsel, Cotchett, Pitre & McCarthy, LLP; Lieff Cabraser Heimann & Bernstein, LLP; and Susman Godfrey L.L.P., and the Plaintiffs are appointed as representatives and counsel of the Settlement Class.

### Notice to the Settlement Class

7.     Interim Co-Lead Counsel has provided the Court with information sufficient to enable it to determine whether to give notice of the proposed settlement to the Class pursuant to Rule 23(e)(1)(A). The Court approves the Notice Plan and attendant documents and forms, which are attached to the Verita Declaration as Exhibits A-E, and finds that their dissemination substantially in the manner and form set forth in the Motion meets the requirements of Federal Rule of Civil Procedure 23 and due process, constitutes the best notice practicable under the circumstances, and is reasonably calculated, under the circumstances, to apprise members of the Settlement Class of the pendency of the Actions, the effect of the proposed Settlement (including the releases contained therein), the anticipated Motion for a Fee and Expense Award and for Service Awards, and their rights to participate in, opt out of, or object to any aspect of the proposed Settlement.

8.     By November 11, 2024 [no later than ten (10) days after the issuance of this Order], Defendants shall cause to be paid into the Escrow Account $1,000,000 to cover the administrative costs associated with Notice.

---

[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION
SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD                4
3046536.4

9. By November 1, 2025 [no later than twelve (12) months after the issuance of this Order], Defendants shall cause to be paid into the Escrow Account another $1,000,000 (for a total of $2,000,000).

10. By May 1, 2026 [no later than eighteen (18) months after the issuance of this Order] and as detailed in Paragraph 15 of the Settlement Agreement, Defendants shall pay the entire remaining Settlement funds into the Escrow Account.

11. Verita shall provide Notice consistent with the Notice Plan outlined in the Motion and Verita Declaration, and Notice shall be disseminated to Settlement Class Members by the Notice Date of December 13, 2024 [42 days after the issuance of this Order]. Verita is authorized to utilize funds from the Settlement Fund for these purposes.

## Settlement Administration

12. The Court appoints Verita Global, LLC as the notice and claims administrator. Verita shall supervise and administer the notice procedures, establish and operate the settlement website, administer the claims processes, distribute payments according to the processes and criteria set forth in the Settlement Agreement, and perform any other duties that are reasonably necessary and/or provided for in the Settlement Agreement. Funds required to pay Verita may be paid from the Settlement Fund as they become due as set forth in the Settlement Agreement.

13. Counsel may pay Verita up to $450,500 from the Settlement Fund to effectuate the notice plan and claims administration. Any notice and claims costs above $450,500 may only be paid from the Settlement Fund subject to further application and Court approval.

14. The Settlement Administrator shall act in compliance with the Amended Stipulated Protective Order, ECF No. 158, including, but not limited to, making all necessary efforts and precautions to ensure the security and privacy of Settlement Class Member information and protect it from loss, misuse, unauthorized access and disclosure, and to protect against any reasonably anticipated threats or hazards to the security of Settlement Class Member information; not using the information provided by Defendants or Settlement Class Counsel in

connection with the Settlement or this Notice Plan for any purposes other than providing notice or conducting claims administration; and not sharing Settlement Class Member information with any third parties without advance consent from the parties.

15.     Settlement Class Members who wish to make a Claim must do so by submitting a Claim Form starting on December 13, 2024 [Notice Date] and no later than May 20, 2025 [200 days from the Preliminary Approval Order and 158 days after the Notice Date]. The Settlement Administrator shall determine the eligibility of Claims submitted and allocate the Settlement Funds in accordance with the Settlement Agreement, subject to review and insight from Interim Co-Lead Counsel.

16.     Settlement Class Members who wish to object to the Settlement must object in writing and: (1) clearly identify the case name and number; (2) your full name, current address, email address, and telephone number; (3) proof of membership in the settlement class; (4) the reasons why you object to the settlement, including any documents supporting your objection; (5) if you have retained an attorney, (a) the full name, current address, telephone number, and email address of your attorney; (b) the state bar(s) to which your attorney is admitted; and (c) a list of all other class actions you or your attorney has been involved in making objections over the last 10 years (whether or not you or your attorney appeared in the matter); (6) a statement indicating whether you or your attorney intend to appear at the fairness hearing; and (7) your signature or the signature of your attorney.

17.     Objections must be filed with the Court or post-marked by February 13, 2025 [no later than 104 days from the Preliminary Approval Order and 62 days from the Notice Date], to the Court at the following address: Clerk of the Court, United States District Court for the Northern District of California, 280 South 1st Street, Room 2112, San Jose, California 95113.

18.     Any Settlement Class Member who seeks to be excluded from the Settlement Class must submit a request for exclusion, sending written request, which must be postmarked by February 13, 2025 [no later than 104 days from the Preliminary Approval Order and 62 days

from the Notice Date]. A request to opt-out must be timely sent by U.S. mail to the Settlement Administrator, requesting exclusion, providing their name, address, a signature, the name and number of the Action, and a clear and explicit statement that they wish to be excluded from the Settlement. The date of the postmark on the envelope containing the written request to opt-out shall be the exclusive means used to determine whether a request to opt-out has been timely submitted. In the event a postmark is illegible, the date of mailing shall be deemed to be three (3) days prior to the date that the Settlement Administrator received a copy of the request to opt-out of the Settlement. The Settlement Class Member must pay for postage. Any member of the Settlement Class who does not file a valid and timely request for exclusion shall be bound by the final judgment dismissing the Actions on the merits with prejudice.

<p align="center"><strong><u>Fairness Hearing</u></strong></p>

19.    The Fairness Hearing shall be held by the Court on Thursday, April 3, 2025 [no later than 154 days from preliminary approval], to determine whether the requirements for certification of the Settlement Class have been met; whether the proposed settlement of the Actions on the terms set forth in the Settlement should be approved as fair, reasonable, adequate, and in the best interests of the Settlement Class Members; whether Interim Co-Lead Counsel's motion or application for Fees and Expense Award and application for the Service Awards should be approved; and whether final judgment approving the Settlement and dismissing the Actions on the merits with prejudice against the Named Plaintiffs and all other Settlement Class Members should be entered. The date and time of the Fairness Hearing may, without further direct notice to the Settlement Class Members (except those who have filed timely and valid objections and requested to speak at the Final Fairness Hearing), be changed, continued or adjourned by order of the Court.

20. The Fairness Hearing will take place at:

**U. S. District Court of the Northern District of California**
**Robert F. Peckham Federal Building & Courthouse**
**Courtroom 4, 280 South 1st Street**
**San Jose, California 95113**

21. Any Objector who timely submits an Objection has the option to appear and request to be heard at the Fairness Hearing, either in person or through the Objector's counsel. Any Objector wishing to appear and be heard at the Final Fairness Hearing must include a Notice of Intention to Appear in the body of the Objector's Objection. Objectors who fail to submit or include such timely Notice of Intention to Appear may not speak at the Final Fairness Hearing without permission of the Court.

22. By January 9, 2025 [no later than 69 days after the Preliminary Approval Order and 35 days before the objection and opt-out deadline], Interim Co-Lead Counsel shall file all papers in support of any Motion for a Fee and Expense Award and/or for Service Awards, and shall serve copies of such papers upon Defense Counsel and upon any objectors who have validly complied this Order.

23. By February 28, 2025 [no later than 119 days after the Preliminary Approval Order and fifteen (15) days after the objection and opt-out deadline], Interim Co-Lead Counsel and Plaintiffs shall file all papers in support of the application for the Final Approval of Settlement and Final Judgment.

24. Interim Co-Lead Counsel's Motion or Application for a Fee and Expense Award and for Service Awards will be considered separately from the fairness, reasonableness, and adequacy of the Settlement. Any appeal from any order relating solely to Settlement Class Counsel's Motion for a Fee and Expense Award, and/or for Service Awards, or any reversal or modification of any such order, shall not operate to terminate, vacate, or cancel the Settlement.

**<u>Miscellaneous</u>**

25.     No later than ten (10) days after the Motion for Preliminary Approval of the Settlement has been filed with the Court, Defendants will serve the Class Action Fairness Act ("CAFA") Notice on the Attorney General of the United States and the state attorneys general as required by 28 U.S.C. § 1715(b). Thereafter, Defendants will serve any supplemental CAFA Notice as appropriate.

26.     Defense Counsel and Interim Co-Lead Counsel are hereby authorized to utilize all reasonable procedures in connection with the administration of the Settlement which are not materially inconsistent with either this Order or the Settlement Agreement.

27.     This Order may be modified by the Court upon motion by either or both parties, for good cause shown.

**IT IS SO ORDERED, ADJUDGED AND DECREED.**


Dated: _November 4_____, 2024.

_____
Hon. Edward J. Davila
UNITED STATES DISTRICT JUDGE

---

[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION
SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD                    9
3046536.4

# EXHIBIT 6

(203 of 346), Page 203 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 203 of 346
Case 5:20-cv-03639-EJD    Document 400    Filed 02/13/25    Page 1 of 14

J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
    borden@braunhagey.com
Andrew Levine, Esq. (SBN: 278246)
    levine@braunhagey.com
Yekaterina Kushnir, Esq. (SBN: 350843)
    kushnir@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Garrett Biedermann, Esq. *(pro hac vice)*
    biedermann@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

ATTORNEYS FOR OBJECTORS
JASON STEELE,
PIONEER CYCLING & FITNESS LLP

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03639-EJD |
| This Document Relates to: | Case No. 5:20-cv-03642-EJD |
| All Indirect Purchaser Actions | **CONDITIONAL OBJECTION TO CLASS ACTION SETTLEMENT** |
| | **Compl. Filed:** June 1, 2020 |
| | **Fourth Am. Compl. Filed:** September 1, 2023 |
| | **Trial Date:** None Set |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to the Order Preliminarily Approving Class Action Settlement, dated November 4, 2024 (Dkt. 397), Jason Steele and Pioneer Cycling & Fitness LLP respectfully submit this conditional objection to the class action settlement.

Dated: February 13, 2025

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:  ___/s/ Matthew Borden_____
         Matthew Borden

*Attorneys for Objectors Jason Steele and*
*Pioneer Cycling & Fitness LLP*

(205 of 346), Page 205 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 205 of 346
Case 5:20-cv-03639-EJD    Document 400    Filed 02/13/25    Page 3 of 14

Conditional Objectors Jason Steele and Pioneer Cycling & Fitness LLP (together, the "Conditional Objectors") respectfully submit this conditional objection to the proposed settlement in this action.

## **CONDITIONAL OBJECTION**

Conditional Objectors object to the proposed settlement to the extent that it would injure direct purchasers of telescopes, who have been harmed by the same illegal conduct by Defendants that the proposed settlement seeks to address. This is a protective and conditional objection because Defendants have refused to provide assurances and information that they have sufficient resources to satisfy both the proposed settlement and a judgment in the parallel litigation filed by Direct Purchaser Plaintiffs ("DPPs"), No. 20-cv-3642-EJD ("DPP Action"). They have also concealed financial terms of the proposed settlement here in a secret side deal that they have not disclosed to either the DPP or the IPP Class. The settlement thus poses a risk that the DPP Class members will be deprived of their ability to obtain relief as the result of an agreement that they cannot opt out of, which resulted from a settlement process where their interests were not represented.

Given Defendants' fraudulent organizational structure, history of improper money transfers, ability to remove assets from the jurisdiction and claims that they have no money, despite receiving over two billion dollars during the Class Period, there is a substantial risk that absent judicial intervention, the DPP Class will not be able to secure sufficient recovery if the proposed settlement with the IPP Class is approved. DPPs have filed a motion seeking to require Defendants to identify their assets and provide assurances that they will not remove assets from the United States outside the ordinary course of business (DPP Action, Dkts. 656, 697-1), which is currently pending. Until such time as Defendants show that they are capable of satisfying a collectible judgment in the DPP Action, the Conditional Objectors—who otherwise support payment to the IPP Class— conditionally object to the proposed settlement because it is impossible to evaluate whether the settlement will effectively wipe out the claims of the DPP Class. Such a settlement would not be fair and reasonable under Rule 23(e).

The instant objection is based on the Court's duty to ensure the fairness of the proposed settlement to all telescope purchasers. IPPs' theory of their case is that Defendants sold telescopes

CONDITIONAL OBJECTION TO CLASS ACTION SETTLEMENT

1    at artificially inflated prices to the DPP Class, which then re-sold the telescopes to the IPP Class,

2    passing along part of the overcharge. (*E.g.*, No. 20-cv-3639-EJD ("IPP Action"), Dkt. 113 ¶ 193

3    ("Telescope distributors and retailers passed on inflated prices to Plaintiffs and the members of the

4    Classes."), *id.* ¶ 194 ("Just as telescopes can be physically traced through the supply chain, so can

5    their prices be traced to show that changes in the prices paid by direct purchasers affect prices paid

6    by indirect purchasers. Here, the inflated prices of telescopes resulting from Defendants' price-

7    fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by

8    distributors and retailers.").) Absent Defendants overcharging the DPP Class, IPPs would have no

9    claim. Thus, a settlement that compensates the IPP Class at the expense of the DPP Class's ability

10   to recover would be inequitable.

11                                   **BACKGROUND**

12        **A.    The Indirect Purchaser and Direct Purchaser Class Actions**

13         Both the IPP and DPP actions were filed on June 1, 2020. On July 21, 2020, IPPs filed a

14   motion to consolidate multiple related IPP cases and to coordinate the IPP cases with the DPP

15   Action. (IPP Action, Dkt. 29.) In support, IPPs argued that "the pleading in the [DPP] Action is

16   virtually identical to that in the Proposed Indirect Purchaser Actions [citations omitted] . . . Indeed,

17   these actions name similar Defendants and co-conspirators, include substantially similar

18   allegations, and assert the same causes of action. [citations omitted]." (*Id.* at 11-12.) Additionally,

19   IPPs noted that "[c]oordination of direct purchaser and indirect purchaser action is the norm in this

20   District, and throughout the country." (*Id.* at 11 (citing cases).) In response, Defendants filed a

21   statement of non-opposition and stated that they "do not oppose Plaintiffs' request to consolidate

22   the Indirect Purchaser Actions nor Plaintiffs' request to *coordinate* the Indirect Purchaser Actions

23   with the Direct Purchaser Action." (IPP Action, Dkt. 40 at 3 (emphasis in original).) The Court

24   granted consolidation of the IPP cases on August 17, 2020. (*Id.*, Dkt. 42.) After considering DPPs'

25   motion to appoint interim lead counsel and to coordinate the DPP Action with the IPP case (DPP

26   Action, Dkt. 41), the Court ordered DPPs' counsel to "coordinate [the DPP] action with the Indirect

27   Purchaser Actions, consolidated as *In Re: Telescopes Antitrust Litigation*, No. 20-cv-3639, for

28   pretrial and discovery purposes." (DPP Action, Dkt. 49.)

(207 of 346), Page 207 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 207 of 346
Case 5:20-cv-03639-EJD    Document 400    Filed 02/13/25    Page 5 of 14

In September 2023, IPPs and Defendants apparently executed an agreement in principle to settle the IPP Class claims. (IPP Action, Dkt. 390 ¶ 4.) Defendants have refused to resolve the claims of the DPP Class, despite all parties' acknowledgment that IPPs' claims are predicated on and their damages are derivative of harm caused by Defendants to DPPs in the first instance.

**B.    The Conditional Objectors**

Conditional Objector Jason Steele is both a direct and indirect purchaser of telescopes from Defendant Celestron Acquisition, LLC ("Celestron"). In March 2009, Mr. Steele purchased a Celestron telescope called the Nexstar 114GT, Reflector 114mm and an adapter accessory from the website of Celestron's distributor, Edmund Scientific. In April 2009, Mr. Steele purchased a Celestron accessory kit and power tank from Amazon. In April 2009, Mr. Steele also purchased a car battery adapter for his Nexstar telescope directly from Celestron's website. In May 2009, Mr. Steele ordered another accessory for his Nexstar telescope from Amazon. In August 2012, Mr. Steele purchased a telescope called the SkyProdigy 130 Computerized Telescope directly from Celestron's website, along with a telescope accessory. In November 2012, Mr. Steele purchased another Celestron telescope accessory from Amazon.

Conditional Objector Pioneer Cycling & Fitness LLP ("Pioneer") is a direct purchaser of telescopes from Defendant Celestron. Pioneer is a small family business located in Blaine, Minnesota that began selling telescopes in 2018. Between 2019 and 2022, Pioneer purchased approximately $15,000 worth of telescopes and telescope accessories directly from Celestron.

**C.    The Dangers that Defendants Will Frustrate Recovery by the DPP Class**

As detailed in the fully briefed motion on DPPs' motion for financial assurances and asset information (DPP Action, Dkts. 656, 697-1, 661, 698-1, 668, 672, 696, 702), which are attached as Exhibits 1, 56, and 92-98 to the Declaration of Matthew Borden ("Borden Decl."), and fully incorporated by reference herein, there is significant risk that Defendants have and/or will remove assets from the United States to prevent the DPP Class from recovering if they prevail. These dangers include, without limitation:

1.    Defendants have engaged in decades of criminal activities.

2.       Defendants set up a fraudulent corporate structure designed to hide money, where on paper, Synta's founder and mastermind, David Shen, owns almost nothing of the enterprise that he created, financed, and runs and has instead reposed ownership in various family members.

3.       Defendants have transferred millions of dollars between their various entities.

4.       Defendants hold assets in jurisdictions that prevent asset collection.

5.       Defendants have an ever-present ability to transfer funds to China outside the Court's reach, as they already have done.

6.       Over the course of the class period, Defendants obtained over $2 billion in revenue, but in seeking approval of the settlement reference "difficulties regarding collection" and "potential collection and ability to pay problems with foreign defendants, as evidenced in the Orion litigation." (IPP Action, Dkt. 389 at 1, 7.)

7.       Defendant Celestron helped Defendant Ningbo Sunny commit a fraud on the Court by transferring $4.2 million to China to frustrate judgment collection in the Orion litigation.

8.       Defendants use the Synta entities—especially Good Advance—as a slush fund to finance their illicit activities and transfer tens of millions of dollars to themselves. At the same time, Defendants admitted, in interrogatory responses, that they destroyed documents from Good Advance and offered inaccurate and evasive testimony about their various Good Advance entities, which are not listed on their corporate structure chart.

9.       The claims at issue in this settlement involve improper transfers of money between Defendants. (IPP Action, Dkt. 300, Compl. ¶¶ 89, 91, 112, 116, 141, 151, 155, 249-50; *see also* Borden Decl., Ex. 1 at 2-5.)

10.      Defendants have refused to provide asset information or assurances that they will not fraudulently transfer assets out of the jurisdiction again.

## **ARGUMENT**

"To ensure the interests of the absent class members are properly safeguarded", in determining whether to grant final approval of a class action settlement, the Court "must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." *Lusk v. Five Guys Enterprises LLC*, 2022

WL 209560, \*2 (E.D. Cal. Jan. 24, 2022) (internal citation omitted). The Court's final approval

procedures "safeguard class members' due process rights and enable the Court to fulfill its role as

the guardian of class interests." *In re Packaged Seafood Prods. Antitrust Litig.*, 2022 WL 2803110,

\*3 (S.D. Cal. July 15, 2022). Among other things, Courts may only approve a proposed settlement

if "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).

The Conditional Objectors respectfully submit that the Court should not approve the proposed

settlement unless and until Defendants disclose information sufficient to prove that they have and

will maintain sufficient assets in the United States to both pay the proposed settlement amount to

the IPPs and to satisfy an eventual judgment or settlement with the DPPs. Absent such relief, it is

impossible to determine whether the settlement is fair and reasonable to the DPP Class.

# I.    A SETTLEMENT THAT INJURES ONE CLASS AT THE EXPENSE OF ANOTHER CLASS IS IMPROPER

As detailed in Section C above and Section II below, the proposed settlement has the

potential to eliminate the DPP Class's remedy in the DPP Action and will therefore inflict formal

legal prejudice on the DPP class.[1] Courts refuse to certify classes under similar circumstances. *See*

*True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010) (rejecting

settlement and noting that courts "generally are wary of settlement agreements where some class

members are treated differently than others.").

For example, in *Ferrington v. McAfee, Inc.*, Judge Koh rejected a proposed settlement that

purported to release a subclass's claims for no consideration. The Court explained that "Settlements

in which the class or a significant subclass will receive no benefit have been rejected by courts

because such agreements are not fair, adequate, and reasonable for all class members." 2012 WL

---

[1] Mr. Steele can make this objection because he is an IPP. Pioneer can make this objection because
a party that is not a member of a proposed settlement class may nevertheless challenge a proposed
settlement when it "demonstrates that it will sustain some formal legal prejudice as a result of the
settlement." *Sweet v. Cardona*, 121 F.4th 32, 44 (9th Cir. 2024) (citation omitted). Here,
Conditional Objectors will suffer such prejudice if a settlement of the IPP Class's claims wipes out
the DPPs' Class claims. Moreover, "[e]ven if a Court finds that a putative objector lacks standing
to object, it may still consider that putative objector's objections to a class settlement, which may
help the Court satisfy its fiduciary duties." *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL
3648478, at \*23 (N.D. Cal. July 7, 2016) (citing *Stetson v. Grissom*, 2016 WL 2731587, at \*2 (9th
Cir. May 11, 2016)).

(210 of 346), Page 210 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 210 of 346
Case 5:20-cv-03639-EJD    Document 400    Filed 02/13/25    Page 8 of 14

1   1156399, *8 (N.D. Cal. 2012). In *Ferrington*, Melissa Ferrington alleged that McAfee had

2   provided her billing information to Arpu, which then sent her a pop-up stating "try it now." She

3   clicked on the link thinking it came from McAfee and was then charged $4.95/month after an

4   initial free month of Arpu's services. Her class included people who clicked on the try-it-now link

5   and were billed by Arpu. A separate class action was filed by Ken Pochis on behalf of all people

6   who did not provide their billing information to Arpu, but whose billing information was obtained

7   by Arpu. *Id*. Ms. Ferrington settled, but Mr. Pochis did not and objected to the settlement.

8       The Court rejected Ms. Ferrington's proposed class settlement because it released the

9   claims of many class members, including those in the Pochis class, without compensation. The

10  Court explained that while the settlement broadly released claims of everyone whose information

11  was given to Arpu, "only the subclass who did not download the Arpu software will receive some

12  form of compensation." *Id*. at *8. The Court further rejected the idea that the claims of people who

13  merely downloaded the Arpu software were weaker than those who were compensated, reasoning,

14  "the claims of the downloader subclass are not so meritless that releasing the claims for no

15  consideration is fair and reasonable." *Id*. at *10.

16      Here, as in *Ferrington*, a class settlement that could wipe out the claims of other class

17  members for no consideration is not fair and reasonable. Like *Ferrington*, here, there are two

18  classes whose injuries arise from the same course of conduct. Like *Ferrington*, Defendants are

19  potentially extinguishing the DPP Class's claims without any protections for the unnamed class

20  members. This case presents an even more compelling situation than *Ferrington* because here,

21  unlike in that case, DPP Class members cannot opt out of the settlement. Moreover, unlike in

22  *Ferrington*, here the claims of the settling IPP Class are entirely derivative of the claims of the DPP

23  Class that Defendants are trying to eliminate. Moreover, unlike in *Ferrington*, while the liability

24  case for DPPs is the same as the liability case for IPPs, the damages that the DPP Class has

25  incurred are far greater than those of the IPP Class. Absent asset information and assurances that

26  Defendants will not move their assets out of the country, it is impossible to evaluate whether the

27  settlement at issue is fair and reasonable for all class members.

28

Many other cases have similarly held that a settlement that benefits one class at the expense of another is improper. In *Mirfashi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004), the Court rejected a settlement where the defendant mortgage company released customer information to telemarketers. The settlement released the claims of anyone whose information was shared, but only compensated a subclass of people who transacted with the telemarketing company, leaving nothing for the people whose information was illegally shared. In reversing approval of the settlement, the Court of Appeals noted that "the information class did not have separate counsel" to protect it in the settlement negotiations. *Id.* at 786. The same is true here, as Defendants did not include the DPP Class in their settlement negotiations and effectively prevented DPP Class members from protecting their interests. The Court further held that it "staggers the imagination" to think it fair that the information class would "surrender a claim worth $35 million in exchange for the satisfaction of knowing that his wrongdoer had been forced to pay $243,000 to members of another class." *Id.* at 783. As in *Mirfashi*, a settlement that would benefit the IPP Class at the expense of the DPP Class is not fair and reasonable.

In *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007), the Court rejected a class settlement that attempted to exclude a subset of the class from recovering. Two plaintiffs brought class actions against credit reporting agencies Trans Union and Equifax, alleging that their practice of relying on creditors "to voluntarily update the status of discharged debts" from bankruptcy proceedings was unreasonable and led to individuals having materially negative marks on their credit reports. *Id.* at *380. Two plaintiffs mediated with the credit agencies and attempted to settle while excluding three other putative class representatives from the mediation, who then objected to the settlement. *Id.*

In the proposed settlement, the settling plaintiffs defined an overall settlement class of "all consumers . . . residing in the United States for whom Trans Union and/or Equifax maintain a File who, between April 1, 1996 and the date of entry of the Preliminary Approval Order, received a Chapter 7 bankruptcy discharge order." *Id.* at 381. They then defined two settlement classes:  (1) the "California Economic Relief Subclass", comprised of individuals "whose [bankruptcy] discharge orders were entered after May 12, 2001, and who reside in California," and (2) the "Non–

1    California Economic Relief Subclass", comprised of individuals "whose [bankruptcy] discharge

2    orders were entered after October 3, 2003, and who reside outside California." *Id.* at 381-82.

3          The Court rejected the settlement, finding that the class divisions were arbitrary because the

4    erroneous information reported on the classes' credit reports "is published and hence cannot be

5    circumscribed solely by the date on which a consumer obtains a bankruptcy discharge order." *Id.* at

6    *387. Additionally, only the economic relief subclasses would receive any recovery, which would

7    create a situation in which "two-thirds of the Settlement Class" were "completely ineligible for any

8    economic relief under the [s]ettlement." The Court noted that it was "aware of no case in which a

9    settlement was allowed that partitioned a class so as to provide relief to one segment and to deny it

10   completely to another." *Id.* at 388.

11         In *True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1068 (C.D. Cal. 2010), the

12   Court rejected a proposed settlement that "draws an arbitrary distinction among class members

13   with identical legal claims" and provided members disparate relief. The class consisted of members

14   who were exposed to false and misleading advertising regarding the fuel efficiency of the Honda

15   Civic Hybrid and relied on these misrepresentations to pay a hybrid premium. *Id.* at 1058. While all

16   class members suffered the same injury, the settlement created a special, favored subclass of

17   members—those with a record of their written complaint regarding the fuel economy of their car—

18   who received a cash payment, rebate and DVD. All other class members received only a rebate and

19   DVD. *Id.* at 1060. In rejecting the settlement, the Court noted that the plaintiffs did not suggest that

20   the favored "sub-group have any different legal claims than the other class members, or that they

21   suffered any greater damages." *Id.* at 1067. Citing *Acosta*, *supra*, with approval, the court found

22   this disparate treatment of similarly situated members "patently unfair." *Id.* at 1068. The same is

23   true here, where the claims of the DPP Class and the IPP class arise from the exact same antitrust

24   violation.

25         As in the cases cited above, a class settlement that could wipe out the claims of other class

26   members for no consideration is not fair and reasonable. The circumstances here are even more

27   potentially troubling because unlike in *Ferrington*, *Mirfashi*, *Acosta*, or *True*, here DPP Class

28   members cannot opt out of the settlement.

1   Moreover, unlike in *Ferrington*, *Mirfashi*, *Acosta*, or *True*, here the claims of the settling

2   IPP Class are entirely derivative of the claims of the DPP Class that Defendants are trying to

3   eliminate. IPPs allege that the harm redressed in the proposed settlement is harm that first passes

4   through DPPs: "the inflated prices of telescopes resulting from Defendants' price-fixing conspiracy

5   have been passed on to Plaintiffs and the other members of the Classes by distributors and retailers

6   [DPPs]". (IPP Action, Dkt. 113 ¶ 194.) The proposed settlement is intended to compensate the IPPs

7   for the portion of Defendants' overcharge that passed through from the DPPs.

8   Further, unlike in *Ferrington* or *Mirfashi*, where the class members injured by the

9   settlement had weaker claims, the damages that the DPP Class has incurred are far greater than

10   those of the IPP Class. IPPs reside only in the 33 states that permit indirect purchaser claims,

11   whereas the DPPs are nationwide. IPPs' damages expert calculated the damages for the IPP Class

12   of $29 million to $165 million, depending on the pass overcharge percentage and pass through rate.

13   (IPP Action, Dkt. 389 at 15.) DPPs' damages expert, Dr, Zona, calculated damages to the DPPs'

14   Class in the range of $142 million to $238 million before trebling. (DPP Action, Dkts, 599, 629-1

15   at 12.) Yet because Defendants have refused to provide assurances that they will maintain sufficient

16   assets in the United States to satisfy both the proposed settlement and a potential judgment or

17   settlement with DPPs, the proposed settlement could prevent DPPs from recovering anything at all.

18   Absent asset information and assurances that Defendants will not move their assets out of the

19   country, there is no way to evaluate whether the settlement at issue is fair and reasonable for all

20   class members.

21   **II.    ABSENT JUDICIAL RELIEF, THE PROPOSED SETTLEMENT IMPERILS THE RIGHTS OF THE DPP CLASS**

22   DPPs' concerns about Defendants' dissipation of assets are not speculative. IPPs have

23   represented to the Court that "difficulties regarding collection" and "potential collection and ability

24   to pay problems with foreign defendants, as evidenced in the Orion litigation" (Dkt. 389 at 1, 7)

25   were rationales that factored into their representation of the class. As explained in DPPs' Financial

26   Assurances Motion, Defendants have all the hallmarks that courts cite in imposing freeze orders.

27   They regularly transfer money from their U.S. entity, Celestron, out of the United States, and use a

28

1    byzantine corporate structure with numerous shell companies to transfer money to hard-to-reach

2    jurisdictions like China. (*See* Borden Decl., Ex. 1 at 2-6.) As the Ninth Circuit noted about the

3    claims that the proposed settlement resolves, "Celestron made $7.2 million in "prepayments" to

4    Sunny for unshipped telescopes, and gave Sunny $10 million in interest-free loans to fund Meade's

5    operations" in connection with Sunny's acquisition of Meade. *Optronic Techs., Inc. v. Ningbo*

6    *Sunny Elec. Co.*, 20 F.4th 466, 479 (9th Cir. 2021). And Defendant Celestron aided and abetted

7    Defendant Ningbo Sunny in avoiding the judgment in the *Orion* litigation by wiring $4.2 million to

8    Ningbo Sunny four days before the judgment stay expired in the *Orion* Litigation. (*See* Case No.

9    16-cv-6370-EJD, Dkts. 807, 823, 840.) The Court awarded sanctions of $4,184,057 against Ningbo

10   Sunny for fraudulently transferring funds out of the United States to evade judgment and held

11   Ningbo Sunny Chairman Peter Ni personally in contempt, awarding sanctions of $4,203,200

12   against him personally for related misconduct. (*See id.*, Dkts. 598, 701.)

13          Defendants' actions thus far raise serious concerns as to whether they will be able to satisfy

14   any judgment against the DPPs if the Court approves their settlement with the IPPs. Approving a

15   settlement with a derivative class while leaving no remedy for the primary class would result in

16   material legal prejudice to DPPs.

17   **III.    THE PROPOSED SETTLEMENT DOES NOT DISCLOSE THE TERMS OF THE
            CONFIDENTIAL SUPPLEMENTAL AGREEMENT**

18
19          The proposed settlement has also not been fully disclosed. It refers to and incorporates the

20   terms of a "Confidential Supplemental Agreement" between Defendants and IPPs that purportedly

21   "grants certain rights in favor of the [IPP] class[.]" (IPP Action, Dkt. 389 at 10.) Neither IPPs'

22   counsel nor Defendants have disclosed that agreement or its terms. The Proposed Settlement

23   Agreement's undisclosed terms govern how $30 million of the $32 million settlement payment will

24   be distributed. (*Id.*, Dkt. 390 ¶ 15.)

25          Courts regularly order production of confidential side agreements entered into in connection

26   with class action settlements. *See, e.g.*, *White v. Experian Information Solutions, Inc.*, 2010 WL

27   11526818, *3 (C.D. Cal. 2010) ("Generally courts are satisfied that the Rule 23(e)(3) requirement

28

(215 of 346), Page 215 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 215 of 346
Case 5:20-cv-03639-EJD    Document 400    Filed 02/13/25    Page 13 of 14

1   has been met through the identification *and submission* of all settlement agreements.") (emphasis

2   added).

3      Given the history of Defendants' misconduct, including their actions to transfer assets out

4   of the United States, there are justifiable concerns that whatever is in the Confidential

5   Supplemental Agreement may treat the IPP Class preferentially to and at the expense of the DPP

6   Class in violation of Rule 23(e)(2)(D) and the overriding principles of equity and fairness that

7   govern judicial review of proposed class settlements. The Conditional Objectors respectfully

8   submit that the Court should require the Confidential Supplemental Agreement to be disclosed to

9   ensure that any such terms come to light.

10  **IV.  THIS OBJECTION IS CONDITIONAL**

11     The Conditional Objectors have no objection to a settlement that fairly compensates the

12  IPPs for the harm caused by Defendants' decades-long antitrust misconduct. But a proposed class

13  settlement may not be approved if it disparately treats one class of purchasers preferentially and at

14  the expense of another. Nor should the Court evaluate the fairness of a proposed settlement without

15  requiring that all the material terms be disclosed—not just to the Court (as the parties in this case

16  proposed (IPP Action, Dkt. 390 at 10)), but to all interested parties, especially unnamed class

17  members.

18     Accordingly, the Conditional Objectors object only to the extent that Defendants have not

19  provided sufficient financial information and assurances to provide the Court and class members

20  confidence that the proposed settlement's payments to the IPP Class will not impair the DPP

21  Class's ability to obtain redress and remedy for Defendants' misconduct. Provided that they receive

22  the financial assurances and information they have requested, the Conditional Objectors do not

23  intend to stand in the way of the proposed settlement. The financial information Defendants

24  produced in this litigation shows that they received over $2 billion in revenue over the class period,

25  which means that, barring fraudulent transfers, Defendants should have sufficient assets to fulfill

26  their obligations under the proposed settlement and satisfy a judgment in favor of or a settlement

27  with the DPP Class. But given Defendants' financial chicanery, and strenuous efforts to avoid

28  disclosure and refusal to provide financial assurances, the Court and Conditional Objectors have no

(216 of 346), Page 216 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 216 of 346
Case 5:20-cv-03639-EJD    Document 400    Filed 02/13/25    Page 14 of 14

1  basis to evaluate the fairness of the Proposed settlement. This information deficit is further

2  heightened by the Defendants shrouding the terms of the Confidential Supplemental Agreement—

3  which govern distribution of the lions share of settlement funds—in secrecy.

4        Accordingly, the Court should delay approval of the proposed settlement until the issues

5  raised in DPPs' Financial Assurances Motion are resolved such that the DPP Class is protected, and

6  the terms of the Confidential Supplemental Agreement are disclosed. Any prejudice resulting from

7  this delay is the result of Defendants excluding the DPP Class from settlement discussions and

8  refusing to engage in settlement discussions with DPPs in good faith, and from their claim that they

9  no longer have the funds to compensate the victims of their decades-long illegal antitrust

10 conspiracy, which has netted them hundreds of millions of dollars.

11                          <u>**CONCLUSION**</u>

12        For the foregoing reasons, the Conditional Objectors respectfully request that the Court

13 delay approval of the proposed settlement until such time as the conditions above are satisfied.

14

15 Dated:  February 13, 2025                    Respectfully submitted,

16                                             BRAUNHAGEY & BORDEN LLP

17                                             By:   _/s/ Matthew Borden_____
                                                     Matthew Borden
18
                                               *Attorneys for Objectors Jason Steele and*
19                                             *Pioneer Cycling & Fitness LLP*

20

21

22

23

24

25

26

27

28

# EXHIBIT 7



FILED

MAY 05 2025

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

IN RE: TELESCOPES ANTITRUST     ) No. 5:20-cv-03639-EJD
LITIGATION                      )
                                )

## <u>NOTICE OF APPEAL</u>

The undersigned hereby appeal from the Order (Entry
419) and Judgment (Entry 420) entered on April 11, 2025, to
the United States Court of Appeals for the Ninth Circuit.


/// /// ///


/// /// ///


/// /// ///


Respectfully submitted,

--------------------

Pat Zhen
PO Box 366047
San Juan PR  00936
legal@patzhen.com
(787) 523-8040

April 17 2025

Karla Luna

% National Woodlands.

110 James Street

Hinton WV  25951

Elman Barnes
401 21st St STE R
Sacramento, CA 95811
elmanmethod@theachievementcoaches.com

Mike Sussman
23200 Camino del Mar #503
Boca Raton, FL  33433
mike.sussman@pm.me

4/19/25

# EXHIBIT 8

Pat Zhen
PO Box 366047
San Juan PR  00936
legal@patzhen.com
(787) 523-8040

Objector

# FILED

FEB 19 2025

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: TELESCOPES ANTITRUST
LITIGATION

No. 5:20-cv-03639-EJD

This Document Relates to:
Indirect Purchaser Actions

## OBJECTIONS TO THE SETTLEMENT

Objector Pat Zhen, a retail purchaser of a telescope covered by the class

action and a Citizen of Puerto Rico, objects to the settlement in that it

discriminates against indirect purchasers who made their purchases in Puerto

Rico by not providing a payment, but it appears to waive their rights (See

Settlement Agreement, definition of "class" not being limited to repealer states). [1]

---

[1] The "Class" or "Settlement Class" is defined as all persons and entities in the
Indirect Purchaser States (as defined herein) who, during the period from
January 1, 2005 to 27 September 6, 2023, purchased one or more Telescopes
from a distributor (or from an entity other than a Defendant) that a Defendant or
alleged co-conspirator manufactured. Excluded from the Class are Defendants;
their parent companies, subsidiaries and Affiliates; any co-conspirators;
Defendants' attorneys in this Action; federal government entities and
instrumentalities, states and their subdivisions; all judges assigned to this Action;
all jurors in this Action; and all Persons who directly purchased Telescopes from
Defendants but only for those direct purchases of Telescopes.

Puerto Rico is a repealer territory of the United States.[2] As the United States District Court for the District of Minnesota stated in *In re: Pork Antitrust Litigation,* 495 F.Supp.3d 753, 900-801 (D. Minn. 2020): "The Court agrees with the U.S. District Court for the District of Puerto Rico, which has twice concluded that the Supreme Court of Puerto Rico has rejected *Illinois Brick* and allows indirect purchasers to sue for damages under the PRAA. *Rivera-Muniz v. Horizon Lines*, *Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) (citing *Pressure Vessels of P.R.*, *Inc. v. Empire Gas de P.R.*, 137 D.P.R. 497, 509-18 (1994)); *Rivera-Muniz v. Horizon Lines*, *Inc.*, Civil No. 09-2081 (GAG), 2010 WL 3703737, at *2 (D.P.R. Sept. 13, 2010) (denying defendants' motion to certify a question to the Puerto Rico Supreme Court asking whether indirect purchasers may bring claims under the PRAA because, "[w]ithout citing *Illinois Brick* explicitly, the Puerto Rico Supreme Court rejected such limitations on standing for the purpose of private antitrust actions under PRAA").

The Northern District of California, in *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 886-887 (N.D. Cal. 2021), reached the same conclusion and found that the Puerto Rico Supreme Court rejected *Illinois Brick*. Therefore, the Court allowed claims of damages for indirect purchasers. *See also*, *In re Zetia (Ezetimibe) Antitrust Litig.,* 400 F. Supp. 3d 418, 433 (E.D. Va. 2019) (holding same); *Sergeants Benevolent Ass'n Health & Welfare Fund v.*

---

[2] Section 258 of the Puerto Rico Antitrust Act ("PRAA"), P.R. Laws. Ann. tit. 10 §§ 257–276, is equivalent to a § 1 claim under the Sherman Act. See *Shell Co. (Puerto Rico) Ltd. v. Los Frailes ServStation, Inc.*, 551 F. Supp. 2d 127, 135 (D.P.R. 2007), aff'd, 605 F.3d 10 (1st Cir. 2010) ("Puerto Rico courts generally follow federal antitrust law when interpreting local antitrust laws[.]").

*Actavis, plc,* No. 15-CV-06549-CM, 2018 WL 7197233, at *23 (S.D.N.Y. Dec. 26, 2018).

This Court should give deference to the decisions of the District of Puerto Rico in interpreting Puerto Rico law. *In re: Xyrem,* 555 F.Supp at 887.

The settlement, waiving the claims of Puerto Ricans but not providing them a payment is against public policy as it violates the anti-discrimination Order of the Puerto Rican Department of Commerce, No. 2011-006. In addition, it denies Puerto Ricans due process since it waives their damage claims and binds them to a settlement where they receive nothing despite being a repealer territory.

Failing to include payment to Puerto Rico claimants but waiving their rights also violates Fed. R. Civ. Proc. 23(e)(D) as it does not treat Puerto Rican purchasers equitably relative to purchasers in other repealer areas. Class Counsel is not fairly and adequately representing the interests of Puerto Rican purchasers despite including them in the settlement class. Fed. R. Civ. Proc. 23(g)(4).

If Class Counsel is unwilling to represent class members from the United States repealer territory of Puerto Rico, it should not enter any settlement as to purchasers in Puerto Rico. *See In re Cathode Ray Tube Antitrust Litig.,* No. 07-CV-5944-JST, 2018 WL 11292347 (N.D. Cal. Nov. 8, 2018)(court recognizing error in approving release of claims while not providing compensation for residents in certain repealer states).[3]

---

[3] The Court in the *CRT* case ultimately approved reducing the settlement by a certain percentage and dismissing the claims of the unrepresented repealer states so that residents of those states could file their own action. This reduced the prejudice caused by not providing compensation to members of those repealer states since they could sue. In this case, the Puerto Rico claims are

In the *In re: Cathode Ray Tube* case, the district court expressed concern about counsel's failure to advocate for the repealer states and held that it most probably was a conflict of interest. Eventually, the district court appointed new counsel for those omitted repealer states.

This Court must protect persons who purchased their telescopes in Puerto Rico or had them shipped using a retailer such as Amazon to Puerto Rico. Unless the parties agree to adopt the claims and provide payment to persons in the repealer Territory of Puerto Rico under the settlement, rejection of the settlement must occur. Alternatively, this Court must completely remove the prejudice to Puerto Rico purchasers and allow them to bring their own antitrust action by not waiving their antitrust claims or finding that they are bound by the settlement agreement.

Respectfully submitted,

Pat Zhen

---

being settled without compensation causing extreme prejudice to the Objector and those similarly situated.

# EXHIBIT 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03639-EJD |
|---|---|
| | **JUDGMENT** |

On April 11, 2025, the Court issued its Order Granting Motion for Final Settlement Approval and Order Granting Motion for Attorneys' Fees, Expenses, and Service Awards. Pursuant to Federal Rule of Civil Procedure 58, the Court hereby ENTERS judgment. The Clerk of Court shall close the file in this matter.

**IT IS SO ORDERED.**

Dated: April 11, 2025

_____
EDWARD J. DAVILA
United States District Judge

# EXHIBIT 10

(231 of 346), Page 231 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 231 of 346
Case 5:20-cv-03639-EJD    Document 426    Filed 06/23/25    Page 1 of 39

1    Lin Y. Chan (SBN 255027)
2    **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
     275 Battery Street, 29th Floor
3    San Francisco, CA 94111
     Telephone: (415) 956-1000
4    lchan@lchb.com

5    Adam J. Zapala (SBN 245748)
     **COTCHETT, PITRE & McCARTHY LLP**
6    840 Malcolm Road
     Burlingame, CA 94010
7    Telephone: (650) 697-6000
     azapala@cpmlegal.com

8    Kalpana Srinivasan (SBN 237460)
9    **SUSMAN GODFREY LLP**
     1900 Avenue of the Stars, Ste. 1400
10   Los Angeles, CA 90067
     Telephone: (310) 789-3100
11   ksrinivasan@susmangodfrey.com

12   *Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

13   [Additional Counsel Listed on Signature Page]

14                 **UNITED STATES DISTRICT COURT**
                   **NORTHERN DISTRICT OF CALIFORNIA**
15                        **SAN JOSE DIVISION**

16   IN RE TELESCOPES ANTITRUST          Case No. **5:20-cv-03639-EJD**
     LITIGATION
17                                        [PROPOSED] **AMENDED JUDGMENT**
                                          **OF DISMISSAL WITH PREJUDICE**
18   _____
                                          **Dept.: Courtroom 4**
19   THIS DOCUMENT RELATES TO:            **Judge: Hon. Edward J. Davila**

20   All Indirect Purchaser Actions

21

22

23

24

25

26

27

28

(232 of 346), Page 232 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 232 of 346
Case 5:20-cv-03639-EJD   Document 426   Filed 06/23/25   Page 2 of 39

1    Indirect Purchaser Plaintiffs ("IPPs") have presented this matter before the Court to

2    determine whether there is any cause why this Court should not enter an Amended Final

3    Judgment ("Final Judgment") as to Defendants Celestron Acquisition, LLC; Nantong Schmidt

4    Opto-Electrical Technology Co. Ltd; Olivon Manufacturing Co. Ltd.; Pacific Telescope Corp.;

5    Olivon USA, LLC; Suzhou Synta Optical Technology Co., Ltd.; SW Technology Corporation;

6    Synta Canada International Enterprises Ltd.; Synta Technology Corp. of Taiwan; Dave Anderson;

7    Joseph Lupica; and Dar Tson ("David") Shen; (collectively, "Defendants").

8    The Court, having carefully considered all papers filed and proceedings held herein,

9    including IPPs' Motions for Preliminary and Final Approval of Settlement; the objections filed by

10   DPP Conditional Objectors Pioneer Cycling & Fitness LLP and Jason Steele, Elman Barnes,

11   National Woodlands Preservation, Inc., Mike Sussman, and Pat Zhen; IPPs' responses to those

12   objections; and the statements of counsel and the parties, and otherwise being fully informed, has

13   already determined as follows: (a) IPPs' Motion for Final Approval of Settlement should be

14   granted; (b) IPPs' claims against Defendants should be dismissed with prejudice; and (c) IPPs'

15   plan of distribution should be approved. This Court further finds that that there is no just reason

16   for delaying the entry of Final Judgment.

17   Accordingly, the Court directs entry of Final Judgment, which shall constitute a final

18   adjudication of this case on the merits as to the parties to the Settlement.

19   Good cause appearing therefore, it is:

20   **ORDERED, ADJUDGED, AND DECREED THAT**:

21   1.    The Court has jurisdiction over the subject matter of this litigation, the Actions

22   within this litigation, and the parties to the Settlement, including all members of the Settlement

23   Class and Defendants.

24   2.    For purposes of this Judgment, except as otherwise set forth herein, the Court

25   adopts and incorporates the definitions contained in the Settlement, attached hereto as Exhibit 1.

26   3.    The Court has already granted IPPs' Motion for Final Approval of the Settlement,

27   and found that the Settlement is, in all respects, fair, reasonable, and adequate to the Settlement

28   Class pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").

2
[PROPOSED] AMENDED FINAL JUDGMENT

4.    The Settlement Class is defined as

all persons and entities in the Indirect Purchaser States (as defined herein) who, during the period from January 1, 2005 to September 6, 2023, purchased one or more Telescopes from a distributor (or from an entity other than a Defendant) that a Defendant or alleged co-conspirator manufactured. Excluded from the Class are Defendants; their parent companies, subsidiaries and Affiliates; any co-conspirators; Defendants' attorneys in this Action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this Action; all jurors in this Action; and all Persons who directly purchased Telescopes from Defendants but only for those direct purchases of Telescopes.

5.    Similarly, the Court has already found that IPPs' Motion for Attorneys' Fees and Costs is appropriate and fair and granted that motion. *See, e.g.*, ECF Nos. 398 (Motion); 419 (Order granting motion).

6.    The Court dismisses on the merits and with prejudice IPPs' claims against Defendants, with each party to bear their own costs and attorneys' fees, except as provided in the Settlement.

7.    The Court had similarly already approved IPPs' plan of distribution.

8.    All persons and entities who are Releasors under the terms of the Settlement are hereby barred and enjoined from commencing, prosecuting, or continuing, either directly or indirectly, any claim against the Releasees in this or any other jurisdiction arising out of, or related to, any of the Released Claims provided, however, nothing herein shall be deemed to release any of the executory obligations of the parties to the Settlement, nor release any and all rights of the IPPs, on behalf of themselves and the members of the Settlement Class, against the Defendants to enforce the terms and provisions of the Settlement, including, but not limited to having judgment entered on motion before the Court against the Defendants in the event that the full Settlement Amount is not timely paid. *See* Exhibit 1 at ¶ 1.(w), (x), and (y).

9.    The Releasees are hereby and forever released from all Released Claims as defined in the Settlement. *Id.*

10.    Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of, and compliance with, the Settlement

3
[PROPOSED] AMENDED FINAL JUDGMENT

and any distribution to the Settlement Class pursuant to further orders of this Court; (b) disposition of the Gross Settlement Fund; (c) hearing and determining applications by IPPs for attorneys' fees, costs, expenses, and interest; (d) the Actions, until the Final Judgment has become effective and each and every act agreed to be performed by the parties under the terms of the Settlement have been performed; (e) hearing and ruling on any matters relating to the plan of allocation of Settlement proceeds; and (f) the parties to the Settlement for the purpose of enforcing and administering the Settlement, and the mutual releases contemplated by, or executed in connection with, the Settlement.

11.     The persons and entities identified in <u>Exhibit 2</u> are validly excluded from the Class. Such persons and entities are not included in or bound by this Judgment. Such persons and entities are not entitled to any recovery of the Settlement proceeds obtained in connection with the Settlement Agreement.

12.     The Court finds, pursuant to FRCP Rules 54(a) and (b), that Final Judgment should be entered, and further finds that there is no just reason for delay in the entry of Final Judgment, as to the parties to the Settlement. Accordingly, the Clerk is hereby directed to enter Final Judgment forthwith.

Dated: _____ ___ ___, 2025
      June 23

Hon. Edward J. Davila
United States District Judge

# EXHIBIT 1

Docusign Envelope ID: 748DDB3A-F061-49F5-89BB-CB4E3A89560A

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **IN RE TELESCOPES ANTITRUST LITIGATION** | **Case No. 5:20-cv-03639-EJD** |
| **This Document Relates to:** | **SETTLEMENT AGREEMENT** |
| **Indirect Purchaser Actions** | |

1  This Settlement Agreement (defined below) is made and entered into this **31st** day of

2  August, 2024 (the "Execution Date"), by and among the Synta Defendants and the Indirect

3  Purchaser Plaintiffs, both individually and on behalf of the proposed Settlement Class (defined

4  below) in the above-captioned action ("Action"). This Settlement Agreement is intended by the

5  Synta Defendants and the Indirect Purchaser Plaintiffs ("the Settling Parties" as further defined

6  below) to fully, finally, and forever resolve, discharge and settle the Released Claims (defined

7  below), upon and subject to the terms and conditions hereof.

8  ## RECITALS

9  WHEREAS, Indirect Purchaser Plaintiffs are prosecuting the Action on their own behalf

10  and on behalf of the proposed Settlement Class against the Synta Defendants and other

11  Defendants and alleged co-conspirators;

12  WHEREAS, Indirect Purchaser Plaintiffs allege, among other things, that the Synta

13  Defendants violated the antitrust and consumer protection laws by conspiring amongst

14  themselves and with the other Defendants and alleged co-conspirators to fix, raise, maintain, or

15  stabilize the prices of Telescopes, and these acts caused the Class to incur damages;

16  WHEREAS, the Synta Defendants have denied and continue to deny each and all of

17  Indirect Purchaser Plaintiffs' claims and allegations of wrongdoing; have not conceded or

18  admitted any liability, or that they violated or breached any law, regulation, or duty owed to the

19  Indirect Purchaser Plaintiffs; have denied and continue to deny all charges of wrongdoing or

20  liability against it arising out of any of the conduct, statements, acts or omissions alleged in the

21  Action; and further deny the allegations that the Indirect Purchaser Plaintiffs or any member of

22  the Class were harmed by any conduct by the Synta Defendants alleged in the Action or

23  otherwise;

24  WHEREAS, Indirect Purchaser Plaintiffs and the Synta Defendants have engaged in

25  extensive discovery regarding the facts pertaining to Indirect Purchaser Plaintiffs' claims and the

26  Synta Defendants' defenses;

27

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                                    1
2987155.2

WHEREAS, Indirect Purchaser Plaintiffs and the Synta Defendants agree that neither this Settlement Agreement nor any statement made in the negotiation thereof shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by the Synta Defendants or of the truth of any of the claims or allegations alleged in the Action;

WHEREAS, Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs ("Co-Lead Counsel") have concluded, after due investigation and after carefully considering the relevant circumstances, including, without limitation, the claims asserted in the Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Complaint, the legal and factual defenses thereto, and the applicable law, that it is in the best interests of the Indirect Purchaser Plaintiffs and the proposed Settlement Class to enter into this Settlement Agreement to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the Indirect Purchaser Plaintiffs and the Class, and, further, that Co-Lead Counsel consider the Settlement set forth herein to be fair, reasonable and adequate and in the best interests of the Indirect Purchaser Plaintiffs and the Class;

WHEREAS, the Synta Defendants have concluded, despite their belief that they are not liable for the claims asserted against them in the Action and that they have good defenses thereto, that they will enter into this Settlement Agreement in order to avoid the further expense, inconvenience, and distraction of burdensome and protracted litigation, and thereby put to rest this controversy with respect to the Indirect Purchaser Plaintiffs and the Class and avoid the risks inherent in complex litigation; and

WHEREAS, arm's length settlement negotiations have taken place between counsel for Indirect Purchaser Plaintiffs and the Synta Defendants over many months, including in multiple mediations before Judge Suzanne Segal (Ret.), and this Settlement Agreement, which embodies all of the terms and conditions of the Settlement between the Settling Parties, both individually and on behalf of the Class, has been reached as a result of the Settling Parties' negotiations

1    (subject to the approval of the Court) as provided herein and is intended to supersede any prior

2    agreements or understandings between the Settling Parties.

3    **AGREEMENT**

4    NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among

5    the Settling Parties, by and through their undersigned attorneys of record, in consideration of the

6    covenants, agreements, and releases set forth herein and for other good and valuable

7    consideration, that the Action and the Released Claims as against the Synta Defendants shall be

8    finally and fully settled, compromised and dismissed on the merits and with prejudice, without

9    costs as to Indirect Purchaser Plaintiffs, the Class, or the Synta Defendants, upon and subject to

10   the approval of the Court, following notice to the Class, on the following terms and conditions:

11   **DEFINITIONS**

12   1.    As used in this Settlement Agreement, the following terms shall have the meanings

13   specified below:

14   (a)    "Action" means *In re Telescopes Antitrust Litigation* – All Indirect

15   Purchaser Actions, Case No. 5:20-cv-03639-EJD, and each of the cases brought on behalf of

16   indirect purchasers previously consolidated and/or included as part of Docket No. 5:20-cv-

17   03639-EJD.

18   (b)    "Affiliates" means entities controlling, controlled by or under common

19   control with a Releasee or Releasor.

20   (c)    "Authorized Claimant" means any Indirect Plaintiff Purchaser who, in

21   accordance with the terms of this Settlement Agreement, is entitled to a distribution consistent

22   with any Distribution Plan or order of the Court ordering distribution to the Class.

23   (d)    "Claims Administrator" means the claims administrator(s) to be selected

24   by Co-Lead Counsel.

25   (e)    The "Class" or "Settlement Class" is defined as all persons and entities in

26   the Indirect Purchaser States (as defined herein) who, during the period from January 1, 2005 to

27   September 6, 2023, purchased one or more Telescopes from a distributor (or from an entity other

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                                    3
2987155.2

than a Defendant) that a Defendant or alleged co-conspirator manufactured. Excluded from the Class are Defendants; their parent companies, subsidiaries and Affiliates; any co-conspirators; Defendants' attorneys in this Action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this Action; all jurors in this Action; and all Persons who directly purchased Telescopes from Defendants but only for those direct purchases of Telescopes.

(f)    "Class Member" or "Settlement Class Member" means a Person who falls within the definition of the Settlement Class and who does not timely and validly elect to be excluded from the Class in accordance with the procedure to be established by the Court.

(g)    "Co-Lead Counsel" means the law firms of Cotchett, Pitre & McCarthy, LLP; Lieff Cabraser Heimann & Bernstein LLP; and Susman Godfrey LLP.

(h)    "Court" means the United States District Court for the Northern District of California.

(i)    "Distribution Plan" means any plan or formula of allocation, to be approved by the Court, whereby the Net Settlement Fund shall in the future be distributed to Authorized Claimants.

(j)    "Document" is synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a), including, without limitation, electronic or computerized data compilations. A draft of non-identical copy is a separate document within the meaning of this term.

(k)    "Effective Date" means the first date by which all of the following events and conditions have been met or have occurred:

(1)    All parties have executed this Settlement Agreement;

(2)    The Court has preliminarily approved the Settlement Agreement, certified the Settlement Class for purposes of effectuating this Settlement, and approved the Settlement after providing notice to the Settlement Class as defined herein;

(3)    The Court has entered a Final Judgment; and

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP
2987155.2

(4)     The Final Judgment (as more fully described in ¶ 7 of this Settlement Agreement) has become final, with the occurrence of the following: (A) the entry by the Court of a final order approving the Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure together with entry of a final judgment dismissing the Action and all claims therein by the Class against the Synta Defendants with prejudice as to all Class Members (the "Final Judgment"), and (B) the expiration of the time for appeal or to seek permission to appeal from the Court's approval of the Settlement Agreement and entry of the Final Judgment or, if an appeal from an approval and Final Judgment is taken, the affirmance of such Final Judgment in its entirety, without modification, by the court of last resort to which an appeal of such Final Judgment may be taken, provided, however, a modification or reversal on appeal of any amount of Co-Lead Counsel's fees and expenses awarded by the Court from the Settlement Fund or any plan of allocation or distribution of the Settlement Fund shall not be deemed a modification of all or part of the terms of this Settlement Agreement or the Final Judgment. It is agreed that neither the provisions of Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. § 1651, shall be taken into account in determining the above-stated times.

(l)     "Escrow Agent" means the agent jointly designated by Co-Lead Counsel and the Synta Defendants, and any successor agent.

(m)     "Execution Date" means the first date set forth above in this Settlement Agreement, which is August _31_, 2024.

(n)     "Final" means, with respect to any order of court, including, without limitation, the Judgment, that such order represents a final and binding determination of all issues within its scope and is not subject to further review on appeal or otherwise. Without limitation, an order becomes "Final" when: (a) no appeal has been filed and the prescribed time for commencing any appeal has expired; or (b) an appeal has been filed and either (i) the appeal has been dismissed and the prescribed time, if any, for commencing any further appeal has expired, or (ii) the order has been affirmed in its entirety and the prescribed time, if any, for commencing

any further appeal has expired. For purposes of this Settlement Agreement, an "appeal" includes appeals as of right, discretionary appeals, interlocutory appeals, proceedings involving writs of certiorari or mandamus, and any other proceedings of like kind. Any appeal or other proceeding pertaining solely to any order adopting or approving a Distribution Plan, and/or to any order issued in respect of an application for attorneys' fees and expenses consistent with this Settlement Agreement, shall not in any way delay or preclude the Judgment from becoming Final.

(o)    "Gross Settlement Fund" or "Settlement Fund" means the Settlement Amount plus any interest that may accrue.

(p)    "Indirect Purchaser Plaintiffs" means John Goerger, Scott Plummer, Donnie Houston, Ronald Troillet, Sigurd Murphy, Thien Ngo, Arthur Sines, Jesse Smith, Greg Kendall, Austin Griffith, Keith Uehara, Madeline Bekielewski,[1] Michael Price, Brian Murphy, Timothy McQuaid, Sara Day Brewer, Robert Welsh, Bentaro Huset, Jason Glydewell, Deborah Lemar, James Riley, David Dick, Leon Greenberg, Anthony Di Mambro, Steven Zellers, Michael Liskow, Philip Moore, Doug Lundy, John Maurice, David Kerber, Thomas Berta, Greg Ross, Vincent Catanzaro, David Quaglietta, and Herbert Nelson, as well as any other Person added as an Indirect Purchaser Plaintiff in the Action.

(q)    "Indirect Purchaser States" means Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

(r)    "Judgment" means the order of judgment and dismissal of the Action with prejudice.

(s)    "Net Settlement Fund" means the Gross Settlement Fund, less the

[1] Richard Bekielewski was an original class representative, but he passed away during the pendency of the litigation. His wife, Madeline Bekielewski, has taken over his estate and claims.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1    payments set forth in ¶ 17.

2    (t)   "Notice, Administrative and Claims Administration Costs" means the
3    reasonable sum of nonrefundable settlement money to be paid out of the Gross Settlement Fund
4    to pay for notice to the Class and related administrative and claims administration costs.

5    (u)   "Person(s)" means an individual, corporation, limited liability corporation,
6    professional corporation, limited liability partnership, partnership, limited partnership,
7    association, joint stock company, estate, legal representative, trust, unincorporated association,
8    government or any political subdivision or agency thereof, and any business or legal entity and
9    any spouses, heirs, predecessors, successors, representatives or assignees of any of the foregoing.

10   (v)   "Proof of Claim and Release" means the form to be sent to the Class, upon
11   further order(s) of the Court, by which any member of the Class may make claims against the
12   Gross Settlement Fund.

13   (w)   "Released Claims" means any and all manner of claims, demands, rights,
14   actions, suits, causes of action, whether class, individual or otherwise in nature, fees, costs,
15   penalties, injuries, damages whenever incurred, liabilities of any nature whatsoever, known or
16   unknown (including, but not limited to, "Unknown Claims"), foreseen or unforeseen, suspected
17   or unsuspected, asserted or unasserted, contingent or non-contingent, in law or in equity, under
18   the laws of any jurisdiction, which Releasors or any of them, whether directly, representatively,
19   derivatively, or in any other capacity, ever had, now have or hereafter can, shall or may have,
20   relating in any way to any conduct on or before the Effective Date and arising out of or related
21   in any way in whole or in part to any facts, circumstances, acts, or omissions by Releasees which
22   were alleged or which could have been alleged in the Action, including but not limited to any
23   conduct by Releasees regardless of where it occurred at any time on or before the Effective Date
24   concerning, arising out of or related to (1) the purchase, pricing, selling, discounting, marketing,
25   manufacturing and/or distributing of Telescopes; (2) any agreement, combination or conspiracy
26   to raise, fix, maintain or stabilize the prices of Telescopes or restrict, reduce, alter or allocate the
27   supply, quantity or quality of Telescopes or concerning the development, manufacture, supply,

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**            7
2987155.2

distribution, transfer, marketing, sale or pricing of Telescopes, or any other restraint of competition alleged in the Action or that could have been or hereafter could be alleged against the Releasees relating to Telescopes, or (3) any other restraint of competition relating to Telescopes that could have been or hereafter could be alleged against the Releasees as a violation of the Sherman Act or any other antitrust, unjust enrichment, unfair competition, unfair practices, trade practices, price discrimination, unitary pricing, racketeering, civil conspiracy or consumer protection law, whether under federal, state, local or foreign law provided however, that nothing herein shall release: (i) claims involving any negligence, personal injury, breach of contract, bailment, failure to deliver lost goods, damaged or delayed goods, product defect, securities or similar claim relating to any Telescopes; and (ii) claims for damages under the state or local laws of any jurisdiction other than an Indirect Purchaser State, as defined herein in this Settlement Agreement. For the avoidance of doubt, this Settlement Agreement does not release any claims for direct purchases of Telescopes.

(x)    "Releasees" refers jointly and severally, individually and collectively to the Synta Defendants (as defined in ¶ 1(ee) below) and each of their respective past and/or present direct and indirect parents, members, subsidiaries, Affiliates, predecessors, joint ventures, heirs, executors, administrators, successors and assigns, and their respective past, present and/or future officers, directors, employees, agents, attorneys and legal representatives, servants, and representatives, and the predecessors, successors, heirs, executors, administrators and assigns of each of the foregoing.  For the avoidance of doubt, "Releasees" does not refer to, or mean, alleged co-conspirator and named Defendant Ningbo Sunny or any of its officers, affiliates or related entities in their capacity on behalf of Ningbo Sunny.

(y)    "Releasors" refers jointly and severally, individually and collectively to the Indirect Purchaser Plaintiffs and each and every member of the Class on their own behalf and on behalf of their respective past, present, and/or future direct and indirect parents, members, subsidiaries and Affiliates, and their past, present and/or future officers, directors, employees, agents, attorneys and legal representatives, servants, and representatives, and the predecessors,

DocuSign Envelope...

1  successors, heirs, executors, administrators and assigns of each of the foregoing.

2       (z)    "Settlement" means the settlement of the Released Claims set forth herein.

3       (aa)    "Settlement Agreement" means this settlement agreement dated ~~June~~ August 31 ,

4  2024.

5       (bb)    "Settlement Amount" means Thirty-Two Million U.S. Dollars

6  ($32,000,000.00).

7       (cc)    "Settling Parties" means, collectively, the Indirect Purchaser Plaintiffs (on

8  behalf of themselves and the Class) and the Synta Defendants.

9       (dd)    "Synta Co-Conspirators" means Jean Shen, Sylvia Shen, Jack Chen,

10  Laurence Huen, and Corey Lee.

11       (ee)    "Synta Defendants" means Synta Technology Corp. of Taiwan; Suzhou

12  Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd.;

13  Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co.

14  Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon, USA LLC; Dar Tson

15  ("David") Shen; Joseph Lupica; and Dave Anderson.

16       (ff)    "Telescopes" refers to optical instruments that magnify and enhance the

17  view of faraway objects, as further described in paragraphs 96 through 99 of the Indirect

18  Purchaser Plaintiffs' Fourth Amended Consolidated Complaint, and does not include other

19  optical instruments not marketed as telescopes, such as binoculars, siting scopes, microscopes,

20  etc.

21       (gg)    "Unknown Claims" means any Released Claim that an Indirect Purchaser

22  Plaintiff and/or Class Member does not know or suspect to exist in his, her or its favor at the

23  time of the release of the Releasees that if known by him, her or it, might have affected his, her

24  or its settlement with and release of the Releasees, or might have affected his, her or its decision

25  not to object to this Settlement. Such Unknown Claims include claims that are the subject of

26  California Civil Code § 1542 and equivalent, similar or comparable laws or principles of law.

27  California Civil Code § 1542 provides:

28

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

**Preliminary Approval Order, Notice Order and Settlement Hearing**

2. ***Reasonable Best Efforts to Effectuate this Settlement.*** The Settling Parties: (a) acknowledge that it is their intent to consummate this Settlement Agreement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement the terms and conditions of this Settlement Agreement and to exercise their reasonable best efforts to accomplish the terms and conditions of this Settlement Agreement. The Synta Defendants agree to provide data reasonably necessary and available to them for Plaintiffs to effectuate Class Notice, allocation, and payments to the Settlement Class.

3. ***Motion for Preliminary Approval.*** At a time to be determined by Co-Lead Counsel, Co-Lead Counsel shall submit this Settlement Agreement to the Court and shall apply for entry of a Preliminary Approval Order, requesting, *inter alia,* preliminary approval of the Settlement. The motion shall include (a) the proposed Preliminary Approval Order, and (b) a request for certification of the Class for settlement purposes pursuant to Federal Rule of Civil Procedure 23.

4. ***Proposed Notice.*** At a time to be determined in their sole discretion, Co-Lead Counsel shall submit to the Court for approval a proposed form of, method for and schedule for dissemination of notice to the Class. This motion shall recite and ask the Court to find that the proposed form of and method for dissemination of the notice to the Class constitutes valid, due and sufficient notice to the Class, constitutes the best notice practicable under the circumstances, and complies fully with the requirements of Federal Rule of Civil Procedure 23.

5. ***Claims Administrator.*** Indirect Purchaser Plaintiffs shall retain a Claims

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD** 10
2987155.2

DocuSign Envelope ID: ...

1   Administrator, which shall be responsible for the claims administration process including

2   distribution to Class Members pursuant to a court-approved plan of distribution. The fees and

3   expenses of the Claims Administrator shall be paid exclusively out of the Settlement Fund. In

4   no event shall the Synta Defendants be separately responsible for any fees or expenses of the

5   Claims Administrator.

6           6.      ***Requests for Exclusion (Opt Outs).*** Any Class Member that wishes to seek

7   exclusion from the Settlement Class by "opting out" must timely submit a written request for

8   exclusion to the Claims Administrator (a "Request for Exclusion"). To be effective, each such

9   Request for Exclusion must state: the Settlement Class Member's full legal name, address and

10  telephone number; that the Class Member purchased one or more Telescopes from a Distributor

11  (or from an entity other than a defendant) who in turn purchased from one of the Defendants

12  during the Class Period; and that the Class Member (1) wants to be excluded from the *In re*

13  *Telescopes Antitrust Litigation* – Indirect Purchaser Actions class action settlement with the

14  Synta Defendants and (2) understands that by so doing, the Class Member will not be able to get

15  any money or benefits from the Settlement with the Synta Defendants under the Settlement

16  Agreement. All Requests for Exclusion must be signed and dated by the Class Member or its

17  officer or legal representative, and be (1) mailed to the Claims Administrator via First Class

18  United States Mail (or United States Mail for overnight delivery) and postmarked by a date

19  certain to be specified on the Notice, or (2) received by the Claims Administrator by that date,

20  Persons who opt out are not entitled to any monetary award from the Settlement Fund.

21          7.      ***Motion for Final Approval and Entry of Final Judgment.*** Prior to the date set by

22  the Court to consider whether this Settlement should be finally approved, Co-Lead Counsel shall

23  submit a motion for final approval of the Settlement by the Court. The Settling Parties shall

24  jointly seek entry of the Final Approval Order and Judgment:

25          (a)     certifying the Settlement Class, as defined in this Settlement Agreement,

26  pursuant to Federal Rule of Civil Procedure 23, solely for purposes of this Settlement;

27          (b)     fully and finally approving the Settlement contemplated by this Settlement

28

1  Agreement and its terms as being fair, reasonable and adequate within the meaning of Federal

2  Rule of Civil Procedure 23 and directing its consummation pursuant to its terms and conditions.

3     (c) finding that the notice given to the Class Members constituted the best

4  notice practicable under the circumstances and complies in all respects with the requirements of

5  Federal Rule of Civil Procedure 23 and due process;

6     (d) directing that the Action be dismissed with prejudice as to the Synta

7  Defendants and, except as provided for herein, without costs;

8     (e) discharging and releasing the Releasees from all Released Claims;

9     (f) permanently barring and enjoining the institution and prosecution, by

10  Indirect Purchaser Plaintiffs and Class Members, of any other action against the Releasees in

11  any court asserting any claims related in any way to the Released Claims;

12     (g) reserving continuing and exclusive jurisdiction over the Settlement,

13  including all future proceedings concerning the administration, consummation and enforcement

14  of this Settlement Agreement;

15     (h) determining pursuant to Federal Rule of Civil Procedure 54(b) that there is

16  no just reason for delay and directing entry of a final judgment as to the Synta Defendants; and

17     (i) containing such other and further provisions consistent with the terms of

18  this Settlement Agreement to which the parties expressly consent in writing.

19    8. ***Stay Order.*** Upon the Execution Date, the Action shall be stayed, and any existing

20  stay shall remain in place, as against the Synta Defendants only. Should the Action be tried

21  against any Defendants other than the Synta Defendants, the parties specifically agree that any

22  findings therein shall not be binding on or admissible in evidence against the Synta Defendants or

23  prejudice the Synta Defendants in any way in any future proceeding involving the Synta

24  Defendants.

25    9. Upon the date that the Court enters an order preliminarily approving the

26  Settlement, Indirect Purchaser Plaintiffs and members of the Class shall be barred and enjoined

27  from commencing, instituting or continuing to prosecute any action or any proceeding in any

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**   12

2987155.2

1  court of law or equity, arbitration tribunal, administrative forum or other forum of any kind

2  worldwide based on the Released Claims.

3  **Releases**

4       10.    ***Released Claims.*** Upon the Effective Date, the Releasors (regardless of whether

5  any such Releasor ever seeks or obtains any recovery by any means, including, without

6  limitation, by submitting a Proof of Claim and Release, any distribution from the Gross

7  Settlement Fund) by virtue of this Settlement Agreement shall be deemed to have, and by

8  operation of the Judgment shall have fully, finally and forever released, relinquished and

9  discharged all Released Claims against the Releasees.

10       11.    ***No Future Actions Following Release.*** The Releasors shall not, after the Effective

11  Date, seek (directly or indirectly) to commence, institute, maintain or prosecute any suit, action

12  or complaint or collect from or proceed against the Synta Defendants or any other Releasee

13  (including pursuant to the Action) based on the Released Claims in any forum worldwide, whether

14  on his, her, or its own behalf or as part of any putative, purported or certified class of purchasers

15  or consumers.

16       12.    ***Covenant Not to Sue.*** Releasors hereby covenant not to sue the Releasees with

17  respect to any such Released Claims. Releasors shall be permanently barred and enjoined from

18  instituting, commencing or prosecuting against the Releasees any claims based in whole or in

19  part on the Released Claims. The Settling Parties contemplate and agree that this Settlement

20  Agreement may be pleaded as a bar to a lawsuit, and an injunction may be obtained, preventing

21  any action from being initiated or maintained in any case sought to be prosecuted by or on behalf

22  of Indirect Purchaser Plaintiffs or Class Members with respect to the Released Claims.

23       13.    ***Waiver of California Civil Code § 1542 and Similar Laws.*** The Releasors

24  acknowledge that, by virtue of the execution of this Settlement Agreement, and for the

25  consideration received hereunder, it is their intention to release, and they are releasing, all

26  Released Claims, even Unknown Claims. In furtherance of this intention, the Releasors expressly

27  waive and relinquish, to the fullest extent permitted by law, any rights or benefits conferred by

28

1    the provisions of California Civil Code § 1542, as set forth in ¶ 1(gg), or equivalent, similar or

2    comparable laws or principles of law. The Releasors acknowledge that they have been advised

3    by Co-Lead Counsel of the contents and effects of California Civil Code § 1542, and hereby

4    expressly waive and release with respect to the Released Claims any and all provisions, rights

5    and benefits conferred by California Civil Code § 1542 or by any equivalent, similar or

6    comparable law or principle of law in any jurisdiction. The Releasors may hereafter discover

7    facts other than or different from those which they know or believe to be true with respect to the

8    subject matter of the Released Claims, but the Releasors hereby expressly waive and fully, finally

9    and forever settle and release any known or unknown, suspected or unsuspected, foreseen or

10   unforeseen, asserted or unasserted, contingent or non-contingent, and accrued or unaccrued

11   claim, loss or damage with respect to the Released Claims, whether or not concealed or hidden,

12   without regard to the subsequent discovery or existence of such additional or different facts. The

13   release of unknown, unanticipated, unsuspected, unforeseen, and unaccrued losses or claims in

14   this paragraph is not a mere recital.

15       14.    ***Claims Excluded from Release.*** Notwithstanding the foregoing, the releases

16   provided herein shall not release claims against the Synta Defendants for product liability, breach

17   of contract, breach of warranty or personal injury, claims for direct purchases of Telescopes or

18   any other claim unrelated to the allegations in the Action of restraint of competition or unfair

19   competition with respect to Telescopes. Additionally, the releases provided herein shall not

20   release any claims to enforce the terms of this Settlement Agreement.

21   **Settlement Consideration and Settlement Fund**

22       15.    ***Settlement Payments.*** The Synta Defendants shall pay by wire transfer the Settlement

23   Amount ($32,000,000) to the Escrow Agent pursuant to escrow instructions as follows: (i) a $1

24   million non-reimbursable amount within 10 days of preliminary approval; (ii) a further $1

25   million within 12 months of preliminary approval, which latter amount shall be refunded to the

26   Synta Defendants if the Settlement is not approved; and (iii) the entire remaining portion of the

27   Settlement Amount according to the terms of the parties' Confidential Supplemental Agreement

28

but not to exceed 18 months from preliminary approval. This Settlement Amount constitutes the total amount of payment that the Synta Defendants are required to make in connection with this Settlement Agreement. This amount shall not be subject to reduction, and upon the occurrence of the Effective Date, no funds shall revert to the Synta Defendants except as provided herein. The Escrow Agent shall only act in accordance with the mutually agreed escrow instructions.

16. **_Stipulated Judgment._** Synta Technology Corp. of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd.; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC;  Olivon, USA LLC; and Dar Tson ("David") Shen will execute a stipulated judgment for $32 million (less any amounts paid toward the Settlement Fund) concurrently with the execution of the Settlement Agreement. The stipulated judgment will be held in escrow, and not filed or entered, unless there is an uncured default of the Settlement Agreement following 30 days' written notice to the defaulting party or parties.

17. **_Disbursements Prior to Effective Date._** No amount may be disbursed from the Gross Settlement Fund unless and until the Effective Date, except that: (a) Notice, Administrative and Claims Administration Costs may be paid from the Gross Settlement Fund as they become due; (b) Taxes and Tax Expenses (as defined in ¶ 21(b) below) may be paid from the Gross Settlement Fund as they become due; and (c) attorneys' fees and reimbursement of litigation costs may be paid as ordered by the Court, which may be disbursed during the pendency of any appeals, which may be taken from the judgment to be entered by the Court finally approving this Settlement.

18. **_Refund by Escrow Agent._** If the Settlement as described herein is not finally approved by any court, or it is terminated as provided herein, or the Judgment as described herein is not approved or entered or is overturned on appeal or by writ, the Gross Settlement Fund, including the Settlement Amount and all interest earned on the Settlement Amount while held in

1  escrow, excluding only Notice, Administrative and Claims Administration Costs and Taxes

2  and/or Tax Expenses, shall be refunded, reimbursed and repaid by the Escrow Agent to the Synta

3  Defendants within five (5) business days after receiving notice pursuant to ¶ 38 below.

4       19.    **Refund by Co-Lead Counsel.** If the Settlement as described herein is not finally

5  approved by any court, or it is terminated as provided herein, or the Judgment as described herein

6  is not approved or entered or is overturned on appeal or by writ, any attorneys' fees and costs

7  previously paid pursuant to this Settlement Agreement (as well as interest on such amounts) shall

8  be refunded, reimbursed and repaid by Co-Lead Counsel within thirty (30) business days after

9  receiving notice pursuant to ¶ 38 below.

10      20.    **No Additional Payments by the Synta Defendants.** Under no circumstances will

11 the Synta Defendants be required to pay more or less than the Settlement Amount pursuant to

12 this Settlement Agreement and the Settlement set forth herein. For purposes of clarification, the

13 payment of any Fee and Expense Award (as defined in ¶ 30 below), the Notice, Administrative

14 and Claims Administrative Costs, and any other costs associated with the implementation of this

15 Settlement Agreement shall be exclusively paid from the Settlement Amount.

16      21.    **Taxes.** The Settling Parties and the Escrow Agent agree to treat the Gross Settlement

17 Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg.

18 § 1.468B-1. The Escrow Agent shall timely make such elections as necessary or advisable to

19 carry out the provisions of this paragraph, including the "relation-back election" (as defined in

20 Treas. Reg. § 1.468B-1) back to the earliest permitted date. Such elections shall be made in

21 compliance with the procedures and requirements contained in such regulations. It shall be the

22 responsibility of the Escrow Agent to prepare and deliver timely and properly the necessary

23 documentation for signature by all necessary parties, and thereafter to cause the appropriate filing

24 to occur.

25      (a)    For the purpose of § 1.468B of the Internal Revenue Code of 1986, as amended,

26 and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent. The

27 Escrow Agent shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2

28

DocuSign Envelope ID: ...

by, e.g., (i) obtaining a taxpayer identification number, (ii) satisfying any information reporting or withholding requirements imposed on distributions from the Gross Settlement Fund, and (iii) timely and properly filing applicable federal, state and local tax returns necessary or advisable with respect to the Gross Settlement Fund (including, without limitation, the returns described in Treas. Reg. § 1.468B-2(k)) and paying any taxes reported thereon. Such returns (as well as the election described in this paragraph) shall be consistent with the provisions of this paragraph and in all events shall reflect that all Taxes as defined in ¶ 21(b) below on the income earned by the Gross Settlement Fund shall be paid out of the Gross Settlement Fund as provided in ¶ 21(b) hereof;

(b)    The following shall be paid out of the Gross Settlement Fund: (i) all taxes (including any estimated taxes, interest or penalties) arising with respect to the income earned by the Gross Settlement Fund, including, without limitation, any taxes or tax detriments that may be imposed upon the Synta Defendants or their counsel with respect to any income earned by the Gross Settlement Fund for any period during which the Gross Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes (collectively, "Taxes"); and (ii) all expenses and costs incurred in connection with the operation and implementation of this paragraph, including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this paragraph (collectively, "Tax Expenses"). In all events neither any of the Synta Defendants nor their counsel shall have any liability or responsibility for the Taxes or the Tax Expenses. With funds from the Gross Settlement Fund, the Escrow Agent shall indemnify and hold harmless the Synta Defendants and their counsel for Taxes and Tax Expenses (including, without limitation, Taxes payable by reason of any such indemnification). Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Gross Settlement Fund and shall timely be paid by the Escrow Agent out of the Gross Settlement Fund without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to Authorized Claimants any funds

1    necessary to pay such amounts, including the establishment of adequate reserves for any Taxes

2    and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg.

3    §1.468B-2(1)(2)); neither any of the Synta Defendants nor their counsel is responsible therefor,

4    nor shall they have any liability therefor. The Settling Parties agree to cooperate with the Escrow

5    Agent, each other, their tax attorneys and their accountants to the extent reasonably necessary to

6    carry out the provisions of this paragraph.

7    **Administration and Distribution of Gross Settlement Fund**

8         22.    ***Time to Appeal.*** The time to appeal from an approval of the Settlement shall

9    commence upon the Court's entry of the Judgment regardless of whether or not either the

10    Distribution Plan or an application for attorneys' fees and expenses has been submitted to the

11    Court or resolved.

12         23.    ***Distribution of Gross Settlement Fund.*** Upon further orders of the Court, the

13    Claims Administrator, subject to such supervision and direction of the Court and/or Co-Lead

14    Counsel as may be necessary or as circumstances may require, shall administer the claims

15    submitted by members of the Class and shall oversee distribution of the Gross Settlement Fund

16    to Authorized Claimants pursuant to the Distribution Plan. Subject to the terms of this Settlement

17    Agreement and any order(s) of the Court, the Gross Settlement Fund shall be applied as follows:

18         (a)    To pay all costs and expenses reasonably and actually incurred in providing

19    notice to the Class in connection with administering and distributing the Net Settlement Fund to

20    Authorized Claimants, and in connection with paying escrow fees and costs, if any;

21         (b)    To pay all costs and expenses, if any, reasonably and actually incurred in

22    claims administration and assisting with the filing and processing of such claims;

23         (c)    To pay the Taxes and Tax Expenses as defined herein;

24         (d)    To pay any Fee and Expense Award along with proportional interest earned

25    on the Settlement Fund that is allowed by the Court, subject to and in accordance with the

26    Agreement; and

27         (e)    To distribute the balance of the "Net Settlement Fund" to Authorized

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**    18

2987155.2

Claimants as allowed by the Agreement, any Distribution Plan or order of the Court along with proportional interest earned on the Settlement Fund.

24. **Distribution of Net Settlement Fund.** The Net Settlement Fund shall be distributed in accordance with the Distribution Plan that is approved by the Court.

25. All Persons who fall within the definition of the Class who do not timely and validly request to be excluded from the Class shall be subject to and bound by the provisions of this Settlement Agreement, the releases contained herein, and the Judgment with respect to all Released Claims, regardless of whether such Persons seek or obtain by any means, including, without limitation, by submitting a Proof of Claim and Release or any similar document, any distribution from the Gross Settlement Fund or the Net Settlement Fund.

26. **No Liability for Distribution of Settlement Funds.** Neither the Releasees nor their counsel shall have any responsibility for, interest in or liability whatsoever with respect to the distribution of the Gross Settlement Fund; the Distribution Plan; the determination, administration, or calculation of claims; the Settlement Fund's qualification as a "qualified settlement fund"; the payment or withholding of Taxes or Tax Expenses; the distribution of the Net Settlement Fund; or any losses incurred in connection with any such matters. The Releasors hereby fully, finally and forever release, relinquish and discharge the Releasees and their counsel from any and all such liability. No Person shall have any claim against Co-Lead Counsel or the Claims Administrator based on the distributions made substantially in accordance with the Agreement and the Settlement contained herein, the Distribution Plan or further orders of the Court.

27. **Balance Remaining in Net Settlement Fund.** If there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), Co-Lead Counsel may reallocate such balance among Authorized Claimants in an equitable and economic fashion, distribute the remaining funds through *cy pres*, or allow the money to escheat to federal or state governments, subject to Court approval. In no event shall the Net Settlement Fund revert to the Synta Defendants.

28. ***Distribution Plan Not Part of Settlement.*** It is understood and agreed by the Settling Parties that any Distribution Plan, including any adjustments to any Authorized Claimant's claim, is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Settlement Agreement, and any order or proceedings relating to the Distribution Plan shall not operate to terminate or cancel this Settlement Agreement or affect the finality of the Judgment, the Final Approval Order, or any other orders entered pursuant to this Settlement Agreement. The time to appeal from an approval of the Settlement shall commence upon the Court's entry of the Judgment regardless of whether either the Distribution Plan or an application for attorneys' fees and expenses has been submitted to the Court or approved.

**Attorneys' Fees and Reimbursement of Expenses**

29. ***Fee and Expense Application.*** Co-Lead Counsel may submit an application or applications (the "Fee and Expense Application") for distributions from the Gross Settlement Fund, for: (a) an award of attorneys' fees; plus (b) reimbursement of expenses incurred in connection with prosecuting the Action; plus (c) any interest on such attorneys' fees and expenses (until paid) at the same rate and for the same periods as earned by the Settlement Fund, as appropriate, and as may be awarded by the Court.

30. ***Payment of Fee and Expense Award.*** Any amounts that are awarded by the Court pursuant to the above paragraph (the "Fee and Expense Award") shall be paid from the Gross Settlement Fund consistent with the provisions of this Settlement Agreement.

31. ***Award of Fees and Expenses Not Part of Settlement.*** The procedure for, and the allowance or disallowance by the Court of, the Fee and Expense Application are not part of the Settlement set forth in this Settlement Agreement, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Settlement Agreement. Any order or proceeding relating to the Fee and Expense Application, or any appeal from any Fee and Expense Award or any other order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel this

Settlement Agreement, or affect or delay the finality of the Judgment and the Settlement of the Action as set forth herein. No order of the Court or modification or reversal on appeal of any order of the Court concerning any Fee and Expense Award or Distribution Plan shall constitute grounds for cancellation or termination of this Settlement Agreement.

32.     ***No Liability for Fees and Expenses of Co-Lead Counsel.*** The Synta Defendants shall have no responsibility for, and no liability whatsoever with respect to, any payment(s) to Co-Lead Counsel pursuant to this Settlement Agreement and/or to any other Person who may assert some claim thereto or any Fee and Expense Award that the Court may make in the Action, other than as set forth in this Settlement Agreement.

**Conditions of Settlement, Effect of Disapproval, Cancellation or Termination**

33.     ***Occurrence of Effective Date.*** Upon the occurrence of all of the events required in order to trigger the Effective Date as defined in ¶ 1(k), any and all remaining interest or right of the Synta Defendants in or to the Gross Settlement Fund, if any, shall be absolutely and forever extinguished, and the Gross Settlement Fund (less any Notice and Administrative Costs, Taxes or Tax Expenses or any Fee and Expense Award paid) shall be transferred from the Escrow Agent to the Claims Administrator as successor Escrow Agent within ten (10) days after the Effective Date.

34.     ***Failure of Effective Date to Occur.*** If, for whatever reason, the Effective Date does not occur or is not met, then this Settlement Agreement shall be cancelled and terminated, subject to and in accordance with ¶¶ 37-38, below, unless the Settling Parties mutually agree in writing to proceed with this Settlement Agreement.

35.     ***Exclusions.*** Co-Lead Counsel shall cause copies of requests for exclusion from the Class to be provided to counsel for the Synta Defendants. No later than 14 days after the final date for mailing requests for exclusion, Co-Lead Counsel shall provide counsel for the Synta Defendants with a complete and final list of Requests for Exclusion from the Class. With the motion for final approval of the Settlement, Co-Lead Counsel will file with the Court a complete list of Requests for Exclusion from the Class, including only the name, city and state of the

person or entity requesting exclusion.

36.   *Objections.* Settlement Class members who wish to object to any aspect of the Settlement must file with the Court a written statement containing their objection by the end of the period to object to the Settlement. Any award or payment of attorneys' fees made to counsel to an objector to the Settlement shall only be made by order of the Court order pursuant to the provisions of Federal Rule of Civil Procedure 23(e)(5)(B).

37.   ***Failure to Enter Proposed Preliminary Approval Order, Final Approval Order or Judgment.*** If the Court does not enter the Preliminary Approval Order, the Final Approval Order or the Judgment, or if the Court enters the Final Approval Order and the Judgment and appellate review is sought and, on such review, the Final Approval Order or the Judgment is finally vacated, modified or reversed, then this Settlement Agreement and the Settlement incorporated therein shall be cancelled and terminated; provided, however, the Settling Parties agree to act in good faith to secure Final Approval of this Settlement and to attempt to address in good faith concerns regarding the Settlement identified by the Court and any court of appeal. No Settling Party shall have any obligation whatsoever to proceed under any terms other than substantially in the form provided and agreed to herein; provided, however, that no order of the Court concerning any Fee and Expense Application or Distribution Plan, or any modification or reversal on appeal of such order, shall constitute grounds for cancellation or termination of this Settlement Agreement by any Settling Party. Without limiting the foregoing, the Synta Defendants shall have, in their sole and absolute discretion, the option to terminate the Settlement in its entirety in the event that the Judgment, upon becoming Final, does not provide for the dismissal with prejudice of the Action against all of them.

38.   *Termination.* Unless otherwise ordered by the Court, in the event that the Effective Date does not occur or this Settlement Agreement should terminate, or be cancelled or otherwise fail to become effective for any reason or the Settlement as described herein is not finally approved by the Court, or the Judgment is reversed or vacated following any appeal taken therefrom, then:

(a)  within five (5) business days after written notification of such event is sent by counsel for the Synta Defendants to the Escrow Agent, the Gross Settlement Fund, including the Settlement Amount and all interest earned on the Settlement Fund while held in escrow excluding only Notice Administrative and Claims Administration Costs that have either been properly disbursed or are due and owing, Taxes and Tax Expenses that have been paid or that have accrued and will be payable at some later date, and attorneys' fees and costs that have been disbursed pursuant to Court order will be refunded, reimbursed and repaid by the Escrow Agent to the Synta Defendants; if said amount or any portion thereof is not returned within such five (5) business day period, then interest shall accrue thereon at the rate of ten percent (10%) per annum until the date that said amount is returned;

(b)  within thirty (30) business days after written notification of such event is sent by Counsel for the Synta Defendants to Co-Lead Counsel, all attorneys' fees and costs which have been disbursed to Co-Lead Counsel pursuant to Court order shall be refunded, reimbursed and repaid by Co-Lead Counsel to the Synta Defendants;

(c)  the Escrow Agent or its designee shall apply for any tax refund owed to the Gross Settlement Fund and pay the proceeds to the Synta Defendants, after deduction of any fees or expenses reasonably incurred in connection with such application(s) for refund, pursuant to such written request;

(d)  the Settling Parties shall be restored to their respective positions in the Action as of the Execution Date, with all of their respective claims and defenses, preserved as they existed on that date;

(e)  the terms and provisions of this Settlement Agreement, with the exception of ¶¶ 39-44 (which shall continue in full force and effect), shall be null and void and shall have no further force or effect with respect to the Settling Parties, and neither the existence nor the terms of this Settlement Agreement (nor any negotiations preceding this Settlement Agreement nor any acts performed pursuant to, or in furtherance of, this Settlement Agreement) shall be used in the Action or in any other action or proceeding for any purpose (other than to enforce

(260 of 346), Page 260 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 260 of 346
Case 5:20-cv-03639-EJD   Document 426   Filed 06/23/25   Page 30 of 39

the terms remaining in effect); and

(f)    any judgment or order entered by the Court in accordance with the terms of this Settlement Agreement shall be treated as vacated, nunc pro tunc.

**No Admission of Liability**

39.    ***Final and Complete Resolution.*** The Settling Parties intend the Settlement as described herein to be a final and complete resolution of all disputes between them with respect to the Action and Released Claims and to compromise claims that are contested, and it shall not be deemed an admission by any Settling Party as to the merits of any claim or defense or any allegation made in the Action.

40.    ***Federal Rule of Evidence 408.*** The Settling Parties agree that this Settlement Agreement, its terms and the negotiations surrounding this Settlement Agreement shall be governed by Federal Rule of Evidence 408 and shall not be admissible or offered or received into evidence in any suit, action or other proceeding, except upon the written agreement of the Settling Parties hereto, pursuant to an order of a court of competent jurisdiction, or as shall be necessary to give effect to, declare or enforce the rights of the Settling Parties with respect to any provision of this Settlement Agreement.

41.    ***Use of Agreement as Evidence.*** Neither this Settlement Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Settlement Agreement or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claims, of any allegation made in the Action, or of any wrongdoing or liability of any of the Synta Defendants; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any liability, fault or omission of the Releasees in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. Neither this Settlement Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Settlement Agreement or the Settlement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that the Releasees may file this Settlement Agreement and/or the

Judgment in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim. The limitations described in this paragraph apply whether or not the Court enters the Preliminary Approval Order, the Final Approval Order, or the Judgment, or if the Settlement Agreement is terminated or rescinded.

## Miscellaneous Provisions

42.    *Voluntary Settlement.* The Settling Parties agree that the Settlement Amount and the other terms of the Settlement as described herein were negotiated in good faith by the Settling Parties, and reflect a settlement that was reached voluntarily and after consultation with competent legal counsel.

43.    *Consent to Jurisdiction.* All of the Synta Defendants and each Class Member hereby irrevocably submit to the exclusive jurisdiction of the Court only for the specific purpose of any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement. Solely for purposes of such suit, action, or proceeding, to the fullest extent that they may effectively do so under applicable law, the Synta Defendants and the Class Members irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the Court or that the Court is in any way an improper venue or an inconvenient forum. Nothing herein shall be construed as a submission to jurisdiction for any purpose other than any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement.

44.    *Resolution of Disputes; Retention of Exclusive Jurisdiction.* Any disputes between or among the Synta Defendants and any Class Members concerning matters contained in this Settlement Agreement shall, if they cannot be resolved by negotiation and agreement, be submitted to the Court. The Court shall retain exclusive jurisdiction over the implementation and enforcement of this Settlement Agreement.

45. **Binding Effect.** This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto. Without limiting the generality of the foregoing, each and every covenant and agreement herein by Indirect Purchaser Plaintiffs and Co-Lead Counsel shall be binding upon all Class Members.

46. **Authorization to Enter Settlement Agreement.** The undersigned representatives of the Synta Defendants represent that they are fully authorized to enter into and to execute this Settlement Agreement on behalf of all of the Synta Defendants. Co-Lead Counsel, on behalf of Indirect Purchaser Plaintiffs and the Class, represent that they are, subject to Court approval, expressly authorized to take all action required or permitted to be taken by or on behalf of the Indirect Purchaser Plaintiffs and the Class pursuant to this Settlement Agreement to effectuate its terms and to enter into and execute this Settlement Agreement and any modifications or amendments to the Settlement Agreement on behalf of the Class that they deem appropriate.

47. **Notices.** All notices under this Settlement Agreement shall be in writing. Each such notice shall be given either by (a) email; (b) hand delivery; (c) registered or certified mail, return receipt requested, postage pre-paid; (d) Federal Express or similar overnight courier; or (e) facsimile and first class mail, postage pre-paid and, if directed to any Class Member, shall be addressed to Co-Lead Counsel at their addresses set forth below, and if directed to the Synta Defendants, shall be addressed to their attorneys at the addresses set forth below or such other addresses as Co-Lead Counsel or counsel for the Synta Defendants may designate, from time to time, by giving notice to all parties hereto in the manner described in this paragraph.

If directed to the Indirect Purchaser Plaintiffs, address notice to:

> COTCHETT, PITRE & MCCARTHY, LLP
> Adam J. Zapala (azapala@cpmlegal.com)
> San Francisco Airport Office Center
> 840 Malcolm Road, Suite 200
> Burlingame, CA 94010
> Telephone: (650) 697-6000
> Facsimile: (650) 697-0577
>
> LIEFF CABRASER HEIMANN & BERNSTEIN LLP
> Lin Chan (lchan@lchb.com)
> 275 Battery Street, 29th Floor
> San Francisco, CA 94111

DocuSign Envelope ID: 2A8D48B4-3FD7-462F-A18E-6A5A404D2ABF

Telephone: (415) 956-1000
Facsimile: (415) 956-1008

SUSMAN GODFREY LLP
Kalpana Srinivasan (ksrinivasan@susmangodfrey.com)
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

If directed to the Synta Defendants, address notice to:

FROST LLP
Christopher Frost (chris@frostllp.com)
10960 Wilshire Blvd., Suite 1260
Los Angeles, CA 90024
Telephone: (424) 254-0441

48.    ***Confidentiality of Settlement Negotiations.*** Co-Lead Counsel shall keep strictly confidential and not disclose to any third party, including specifically any counsel representing any other current or former party to the Action, any non-public information regarding the Settling Parties' negotiation of this Settlement and/or the Settlement Agreement. For the sake of clarity, information contained within this Settlement Agreement shall be considered public, and the Synta Defendants may issue a press release regarding execution of the Settlement Agreement and the amount paid in connection with the Settlement Agreement.

49.    ***Headings.*** The headings used in this Settlement Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

50.    ***No Party Deemed to Be the Drafter.*** None of the parties hereto shall be deemed to be the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

51.    ***Choice of Law.*** This Settlement Agreement shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of California, and the rights and obligations of the parties to this Settlement Agreement shall be construed and enforced in accordance with, and governed by, the substantive laws of the State of California without giving effect to that State's choice of law principles.

52.     **Amendment; Waiver.** This Settlement Agreement shall not be modified in any respect except by a writing executed by all the parties hereto, and the waiver of any rights conferred hereunder shall be effective only if made by written instrument of the waiving party. The waiver by any party of any breach of this Settlement Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous, of this Settlement Agreement.

53.     **Execution in Counterparts.** This Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. Counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts and a complete set of executed counterparts shall be filed with the Court.

54.     **Notification of State Officials.** The Synta Defendants shall be responsible for providing all notices required by the Class Action Fairness Act, 28 U.S.C. § 1715, to be provided to state attorneys general or to the Attorney General of the United States.

55.     **Integrated Agreement.** This Settlement Agreement, along with the Confidential Supplemental Agreement, constitutes the entire agreement between the Settling Parties and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement other than the representations, warranties and covenants contained and memorialized herein and in the Confidential Supplemental Agreement. It is understood by the Settling Parties that, except for the matters expressly represented herein and in the Confidential Supplemental Agreement, the facts or law with respect to which this Settlement Agreement is entered into may turn out to be other than or different from the facts now known to each party or believed by such party to be true; each party therefore expressly assumes the risk of the facts or law turning out to be so different, and agrees that this Settlement Agreement shall be in all respects effective and not subject to termination by reason of any such different facts or law. Except as otherwise provided herein, each party shall bear its own costs and attorneys' fees.

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

IN WITNESS WHEREOF, the parties hereto, through their fully authorized representatives, have executed this Settlement Agreement as of the Execution Date.

INTERIM CO-LEAD COUNSEL FOR THE INDIRECT PURCHASER PLAINTIFFS, on behalf of Indirect Purchaser Plaintiffs individually and on behalf of the Settlement Class.

By:

Adam J. Zapala
COTCHETT, PITRE & MCCARTHY
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Fax: 650-697-0577
azapala@cpmlegal.com

Eric Chan
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
lchan@lchb.com

Kalpana Srinivasan
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

SYNTA DEFENDANTS' COUNSEL, on behalf of Synta Technology Corp. Of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd.; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon, Usa LLC; Dar Tson ("David") Shen; Joseph Lupica; and Dave Anderson.

By:

Christopher Frost
10960 Wilshire Blvd., Suite 1260
Los Angeles, CA 90024
Telephone: (424) 254-0441
chris@frostllp.com

Synta Technology Corp. of Taiwan

By:

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD                    29
2987155.2

1        Ta Kung Shen

2

3

4

    / / /

5

    Suzhou Synta Optical Technology Co. Ltd.

6

    By:_____

7                        D026B863A23B459...

    David Shen

8

9

    Synta Canada International Enterprises Ltd.;

10

    By:_____

11                       FBE64D9D5F6546C...

    Sylvia Shen

12

13

    Pacific Telescope Corp.

14

    By:_____

15                       FBE64D9D5F6546C...

    Sylvia Shen

16

17

    Olivon Manufacturing Co. Ltd.

18

    By:_____

19                       024599B6FD8F407...

    Jean Shen

20

21

    SW Technology Corporation;

22

    By:_____

23                       FBE64D9D5F6546C...

    Sylvia Shen

24

25

    Celestron Acquisition, LLC

26

    By:_____

27                       1D7D4B6D595E4CE...

    Corey Lee

28

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**    30
2987155.2

1

2    Olivon, USA LLC

3    By:_____

4        Jean Shen

5    Nantong Schmidt Opto-Electrical Technology Co. Ltd.

6    By:_____

7        Sheng Rong Zhu

8

9    David Shen

10   By: _____

11       David Shen

12

13   Joseph Lupica

14   By:_____

15       Joseph Lupica

16

17   Dave Anderson

18   By: _____

19       Dave Anderson

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

**Opt-Out List for *In re Telescopes Antitrust Litigation*, No. 5:20-cv-03639-EJD**

1. Linda Billingsley
2. William Borges IV
3. Linda Davis
4. Ian Kenneth Egland
5. Peter G. Hummer
6. Jared Tyler Jones
7. Gianina L. Nicolette
8. Barbara Prince
9. Trevor Reitsma
10. David Solimano
11. Stuart Tentoni
12. Michelle Zamberry

# EXHIBIT 11

Elman Barnes
401 21st St STE R
Sacramento, CA 95811
elmanmethod@theachievementcoaches.com

**FILED**

FEB 12 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Objector

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE TELESCOPES ANTITRUST LITIGATION

No. 5:20-cv-03639-EJD

This Document Relates to:
Indirect Purchaser Actions

## OBJECTIONS TO THE SETTLEMENT AND THE ADMINISTRATION THEREOF

Objector Elman Barnes (hereinafter "Objector") hereby states that he purchased an Orion telescope for approximately $250 at the Country Club Centre Walmart Supercenter in Sacramento in 2013 and is a member of the settlement class.

### I. The Claims Process is Designed to Discourage Participation and Improperly Discriminates Against Retail Purchasers

Pursuant to Rule 23(e)(2)(C)(ii), this Court must review "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."

Objector never received a mailed notification about the settlement nor otherwise received a claim number. The reason for this is obvious: Like many indirect purchasers shopping retail, the manufacturer would not know the name of the purchaser. Indeed, if Objector purchased the

item directly from a manufacturer, he would not be eligible for participation in the indirect settlement.[1]

Objector found out about the settlement online and visited the settlement website to find out more. Objector found that to enter a claim online he needed a *claim number*, which he does not possess since he is not one of the 4% of the potential class members on the Settlement Administrator's list of 166,875 purchasers. See https://veritaconnect.com/telescopesettlement/Claimant

In re Telescopes Antitrust Litigation Indirect Purchaser Actions Settlement

uments     Important Dates & Deadlines     Frequently Asked Questions     Contact Information

What do you want to do?
*Required Fields
*Select one:

○ I have a claim number and I would like to securely file a claim online.

○ I have a claim number and I would like to download a personalized claim form, print it out, and mail it in. (You will only be asked to supply contact information.)

○ I DO NOT have a claim number, but I would like to download a personalized claim form, print it out, and mail it in. (You will only be asked to supply contact information.)

Because Objector did not have a claim number, he selected the third option to download a personalized claim form. The claim form generated is attached hereto and incorporated herein by reference as Exhibit B. The claim form is a true and correct copy of the resulting claim form downloaded from the website.

The generated claim form states on Page 2, under the "Payment Selection" heading:

---

[1] The Settlement Administrator noted there are approximately 4,000,000 potential claimants and that 2,500,000 persons consist of Amazon.com purchasers. The Settlement Administrator stated that notice could be provided via Amazon, but it is unclear if the Amazon customers received the claims codes needed to file their claim online. Class Counsel should provide additional information in this regard. Furthermore, the Settlement Administrator maintains a class list of 166,875 records, about 4 percent of the potential claimants. Everyone else is prohibited from filing an online claim and must provide a paper claim via mail.

"If you wish to receive any payment pursuant to the Settlement Agreement electronically, please submit your claim online at www.telescopesettlement.com."

Objector *can't* submit his claim online because he does not have a claim number. Thus, the objector *can't* obtain a non-check form of payment.

This creates a situation where some class members who are contained on the small list of 166,875 class members are: (1) Provided an easy method to submit their claim; and (2) Are able to receive an easy form of payment such as electronic payment. For the other 96% of potential claimants like Objector, they must go through an onerous process.

Objector thus falls into the following subclass of class members: "Class members who purchased a telescope but do not appear on the list of 166,875 class members maintained by the settlement administrator."

Because of the favorable treatment provided to the 166,875 class members who received a claim number including an easy online form to fill out and different payment options, retail purchasers falling into Objector's sub-class are being discouraged from participation due to the onerous paper claims process and requirement to receive a paper check.

In addition, the 166,875 purchasers who received a claim number and the sub-class who did not necessarily means that the proposal does not treat "class members equitably relative to each other" in violation of Rule 23(e)(D). 96% of potential claimants fall into the paper-claim only group (unless the Amazon purchasers received actual claim numbers).

This also demonstrates that the named class members may "fairly and adequately protect the interests of the" 166,875 Class Members with claim numbers, but they clearly are not protecting the interests as to the Class Members who did not receive a claim number.

Indeed, by making onerous and difficult provisions as to persons who did not receive the claim number, Class Counsel is violating Rule 23(g)(4) by not adequately representing the interests of the class members, but only the 166,875 favored class members who received a claim number.

Certainly, forcing the normal retail buyer to submit a claim by paper and limiting them to receiving payment by paper check while other claimants received special and favored treatment, will discourage participation in this action by those forced to jump through hoops that the favored list of claimants do not have to.[2]

## II. If the Favored List is Appropriate, Class Counsel and the Settlement Administrator Must be More Diligent in Providing Claim Numbers

As explained, the list of Class Members who can be identified include 166,875 persons of a potential 4,000,000 claimants. However, only the favored persons receive claim numbers enabling an online claim and an electronic payment.

This Court should require full disclosure and determine whether Class Counsel and the Settlement Administrator can proactively obtain additional names to provide claim numbers to so that maximum reach occurs. Indeed, there will be a large disproportionate participation rate as to the select group of claimants who received a claim number and those who purchased the item retail and are not contained on any preferred claimant list.

This Court must also explore whether the 1,500,000 Amazon purchasers received claim forms or whether they were simply directed to the website and forced to download a paper form, fill it out, and mail it in. If so, why could the Settlement Administrator not provide claim numbers to these identifiable individuals?

---

[2]

Furthermore, why could the Settlement Administrator not have obtained similar lists from websites such as Walmart.com (which allows third-party vendors to sell their items and Walmart is used only as a checkout), e-Bay.com (which allows vendors to sell new products), etc.

It is clear that having a list of 166,875 potential claimants, giving them claims numbers and electronic payment choices, and then forcing all of the rest of the claimants to download a paper form, fill it out, mail it in, and then receive a paper check is not adequate to achieve a fair response and large number of claims.

### III.   The Settlement Improperly Contains a Waiver of Civil Code 1542 Provisions

Paragraph 13 of the Settlement Agreement states that to participate in the settlement, Class Members must waive California Civil Code § 1542. It is unreasonable to force consumers to voluntarily waive legal provisions that the legislature has bestowed upon them. Unknown claims should be excluded from the release provided by Class Members to the defendants.

There are then listed categories of causes of action that the settlement does not resolve such as product liability and personal injury claim, but the so-called "unknown" claims encompassed in the Section 1542 waiver is undefined and without any explanation.

California Civil Code 1542 provides that, "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

This statute exists to protect individuals from waiving rights they could not have known about. "Mere recital...that the protection of Civil Code, section 1542 is waived, or that the release covers unknown claims or unknown parties is not controlling." *Leaf v. City of San Mateo*, 104

Cal.App.3d 398, 411 (1980).

Neither Class Counsel nor the district court advised why the vast waiver of Section 1542 is appropriate in this case limited to antitrust matters, or even why it is needed.  California courts have explained that the waiver requires analysis and is generally "not appropriate." California courts require authority and factual reasons why the case is an exception. *Israel-Curley v. California Fair Plan*, 126 Cal.App.4th 123, 129 (2005); *Salehi v. Surfside III Condominium Owners' Assn.*, 200 Cal.App.4th 1146, 1159–1161 (2011).

In this case, since the Class Action only resolves and relates to antitrust matters including unjust enrichment stemming from the antitrust claims, this Court must ask itself, "What purpose does the 1542 waiver of 'unknown' claims serve?"

For this reason, the settlement should be disallowed unless the waiver is removed.

### IV.    The Claim Form Improperly Asks for the State of Residence

The paper claim form that claimants have to fill out asks the misleading question, "State of residence at time of purchase."  This is to determine if the purchase qualified as one in a repealer state.

The "State of Residence" is not relevant.  The relevant question is the state where the purchase occurred.  As an example, a claimant "residing" in northern Pennsylvania does not live in a repealer state; however, if he made the purchase just over the border in New York state, the antitrust tort occurred in New York and his purchase would be eligible.

On the other hand, a person who is "residing" in New York, but purchased the item in Pennsylvania, would not be eligible.

The website uses the phrase that the settlement "includes everyone who indirectly purchased one or more telescopes from January 1, 2005 to September 6, 2023, from a distributor/retailer that was manufactured by a defendant or alleged co-conspirator, while located in [the relevant states]." This language is more accurate, because a person is located in the state where they made the purchase at the time of the purchase, but it is still confusing and ambiguous language because a person might consider themselves located in New York because they have an apartment there, but they are technically ineligible if they drove to Pennsylvania to make the purchase.

The danger of the claim form is that it discourages persons who are eligible not to file because they do not "reside" in a non-repealer state. The proper language on the claim form must be: "What state did you purchase the telescope in?" Or "Did you purchase the telescope while in one of the following states: XXXXX."

It is imperative that this Court rectify the matter and require the claim form and settlement to specify that the eligible claimants are based on the place of purchase and/or where the consumer received the product, and **not** the place of residence as the claim form so wrongly demands certification of.

## V. This Court Should Appoint Counsel for the Sub-Classes

Lastly, it would appear that there is a reasonable possibility that, upon review of this objection, Settlement Administrator veritas might proceed to issue Objector with a claim number so that he can proceed to file his claim online, so as to moot his objection. While Objector would certainly appreciate being made able to file his claim online, Objector respectfully requests that the Court declare that Objector is part of a similarly situated sub-class of Class Members that were never provided with any claim number, and that Class Counsel be directed to direct

Settlement Administrator Veritas to make the necessary changes to the claims process overall so as not to violate Rule 23 and thereby create subclasses that are being treated unfairly as compared to the rest of the Class. Or if current Class Counsel is unwilling or unable to direct the Settlement Administrator in this regard, then separate counsel should be appointed for the sub class.

Respectfully submitted,

Elman Barnes

(279 of 346), Page 279 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 279 of 346
Telescopes Antitrust Litigation Case 5:20-cv-03639-EJD Document 399 Filed 02/22/25 Page 3 of 12



Settlement Administrator
P.O. Box 301172
Los Angeles, CA 90030-1172

**CEHI**



61101012701

CEHI-61101012701

Elman Barnes

1401 21st St STE R

Sacramento, CA 95811

US



VISIT THE SETTLEMENT WEBSITE BY
SCANNING THE PROVIDED QR CODE

*In re Telescopes Antitrust Litigation Indirect*
*Purchaser Actions*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No. 5:20-cv-03639-EJD
**Must Be Postmarked**
**No Later Than**
**May 20, 2025**

# Claim Form

COMPLETE AND SIGN THIS FORM AND FILE ONLINE NO LATER THAN **May 20, 2025** AT
**www.telescopesettlement.com**, OR FILE BY MAIL POSTMARKED BY **May 20, 2025**.

Questions? Call 1-833-419-3506 or visit the website, **www.telescopesettlement.com.**

If you wish to receive any payment pursuant to the Settlement Agreement electronically,
please submit your claim online at www.telescopesettlement.com.

## CLASS MEMBER INFORMATION:

First Name      M.I.      Last Name

ClaimID from Email or Postcard Notice (if you did not get a notice, leave this blank)

Primary Address

Primary Address Continued

City      State      ZIP Code

Email Address

Area Code      Telephone Number

*Failure to add your unique ClaimID, which can be found with your notice or by contacting the Settlement Administrator,*
*will result in denial of your claim. If you received a notice of this Settlement by U.S. mail, your unique ClaimID is on*
*the email or postcard. If you misplaced your notice, please contact the Settlement Administrator at* 1-833-419-3506 or
admin@telescopesettlement.com.



61101012701

1

| FOR CLAIMS PROCESSING ONLY | OB | CB | DOC | RED |
|---|---|---|---|---|
| | | | LC | A |
| | | | REV | B |

## ELIGIBILITY:

1. Did you purchase one or more Telescopes branded as Celestron, Meade, Orion, Sky-Watcher, or Zhumell from a retailer or distributor from January 1, 2005 to September 6, 2023?

  ○ Yes *(Proceed to Question 2)*  ○ No *(You are not eligible to submit a claim)*

2. If you answered "Yes" to Question 1, please enter your purchase information below:

Make

Model

_____ / _____ /
Date of purchase

State of residence at time of purchase

$ _____ . _____
Amount

Name of retailer or distributor where Qualifying Telescope was purchased

**If you purchased more than one telescope, please fill out all the information listed in Question 2 for each purchase on the additional page found at Appendix A or submit your claim online at www.telescopesettlement.com.**

**You do not need to submit receipts or confirming documentation at this time, but counsel for the Settlement Class may require it if an issue arises regarding the validity of your claim.**

## PAYMENT SELECTION:

How would you like to receive your payment? Choose **one** of the following:

  ○ **I wish to receive any payment pursuant to the Settlement Agreement by check at the address in the Class Member Information section.**

## OR

  ○ **If you wish to receive any payment pursuant to the Settlement Agreement electronically, please submit your claim online at www.telescopesettlement.com.**

This information will be kept confidential by the Settlement Administrator.

## CERTIFICATION AND SIGNATURE:

I declare under penalty of perjury under the laws of the United States of America that the information above is true and correct to the best of my knowledge and that I am authorized to submit this claim. I understand that my claim is subject to audit, review, and validation using all available information.

Signature: _____  Dated (mm/dd/yyyy): _____

Print Name: _____



2

**Appendix A**

**THIS PAGE INTENTIONALLY LEFT BLANK.**

# EXHIBIT 12

**FILED**

FEB 14 2025 ~ URT

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: TELESCOPES ANTITRUST

LITIGATION

No. 5:20-cv-03639-EJD

This Document Relates to:

Indirect Purchaser Actions

## OBJECTIONS TO THE SETTLEMENT

National Woodlands Preservation, Inc., a West Virginia corporation,

objects to proposed settlement pursuant to Federal Rule of Civil Procedure

23(e)(2)(C)(ii) because the "method of processing class-member claims"

and the "proposed method of distributing relief to the class" appears

defective with respect to non-individual entities.

Specifically, corporations, business entities, colleges, universities,

educational institutions, government agencies, and similar

non-individuals purchased telescopes during the class period. [1]  However,

neither the physical claim form nor the online claim form provides the

ability of an entity to lodge a claim.  The form only allows individuals to

file a claim.  There is no place to lodge a business name.

In addition, the settlement website uses verbiage that infers the

settlement is open only to individuals.  It states, "Did **you** purchase a

telescope from January 1, 2005 to September 6, 2023?"  "**You** need to make

a desicion [sic] about the settlement. To make the best decision for

**yourself**, read on."  This infers the settlement is open only to individuals.

Finally, no form of advertising was targeted to the types of

institutions and businesses – primarily education and research entities –

to provide them notice of the class action or allow them to understand

that the class action is open to them and not just individuals.

Therefore, this Court must:  (1) Direct modification of the claim form

to allow business claims; (2) Direct modification of the website to make it

clear that entities can file claims; (3) Direct advertisement and media to

businesses such as schools, astrology research centers, planetariums, etc.,

---

[1] During 2019 and 2020, National Woodlands Preservation Inc. purchased
two telescopes that are subject to this class action.  The purchases were
made from distributors of telescopes in West Virginia and not directly
from a manufacturer.

and make it clear that institutional and entity claims are allowed; and (4)

Expand the deadline for businesses to file claims to provide the same

opportunities that businesses had.

Respectfully submitted,

K. Luna
Chief Executive Officer
National Woodlands Preservation Inc.
110 James Street
Hinton WV  25951

**verita**

Home    Case Documents    Important Dates & Deadlines    Frequently Asked Questions    Contact Information

# Claim Form

*Required Fields

*First Name

*Last Name

*Current Address

Current Address Continued

*City

*Country

UNITED STATES ⌄

*State

Select ⌄

*Zip Code

*Telescopes...*
Settlement Administrator
P.O. Box 301172
Los Angeles, CA 90030-1172

## CEHI



61102158701

CEHI-61102158701

k luna

110 james street

hinton, WV 25951

US

VISIT THE SETTLEMENT WEBSITE BY
SCANNING THE PROVIDED QR CODE

*In re Telescopes Antitrust Litigation Indirect
Purchaser Actions*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No. 5:20-cv-03639-EJD
**Must Be Postmarked
No Later Than
May 20, 2025**

# Claim Form

COMPLETE AND SIGN THIS FORM AND FILE ONLINE NO LATER THAN **May 20, 2025** AT
**www.telescopesettlement.com**. OR FILE BY MAIL POSTMARKED BY **May 20, 2025**.

Questions? Call 1-833-419-3506 or visit the website, **www.telescopesettlement.com.**

If you wish to receive any payment pursuant to the Settlement Agreement electronically,
please submit your claim online at www.telescopesettlement.com.

## CLASS MEMBER INFORMATION:

First Name      M.I.    Last Name

ClaimID from Email or Postcard Notice (if you did not get a notice, leave this blank)

Primary Address

Primary Address Continued

City      State    ZIP Code

Email Address

Area Code    Telephone Number

*Failure to add your unique ClaimID, which can be found with your notice or by contacting the Settlement Administrator,
will result in denial of your claim. If you received a notice of this Settlement by U.S. mail, your unique ClaimID is on
the email or postcard. If you misplaced your notice, please contact the Settlement Administrator at 1-833-419-3506 or
admin@telescopesettlement.com.*





1

| FOR CLAIMS PROCESSING ONLY | OB | CB | DOC | RED |
|---|---|---|---|---|
| | | | LC | A |
| | | | REV | B |

## ELIGIBILITY:

1. Did you purchase one or more Telescopes branded as Celestron, Meade, Orion, Sky-Watcher, or Zhumell from a retailer or distributor from January 1, 2005 to September 6, 2023?

   Yes *(Proceed to Question 2)*     No *(You are not eligible to submit a claim)*

2. If you answered "Yes" to Question 1, please enter your purchase information below:

Make

Model

      /           /
Date of purchase

State of residence at time of purchase

$                  .
Amount

Name of retailer or distributor where Qualifying Telescope was purchased

**If you purchased more than one telescope, please fill out all the information listed in Question 2 for each purchase on the additional page found at Appendix A or submit your claim online at www.telescopesettlement.com.**

**You do not need to submit receipts or confirming documentation at this time, but counsel for the Settlement Class may require it if an issue arises regarding the validity of your claim.**

## PAYMENT SELECTION:

How would you like to receive your payment? Choose **one** of the following:

   **I wish to receive any payment pursuant to the Settlement Agreement by check at the address in the Class Member Information section.**

## OR

   **If you wish to receive any payment pursuant to the Settlement Agreement electronically, please submit your claim online at www.telescopesettlement.com.**

This information will be kept confidential by the Settlement Administrator.

## CERTIFICATION AND SIGNATURE:

I declare under penalty of perjury under the laws of the United States of America that the information above is true and correct to the best of my knowledge and that I am authorized to submit this claim. I understand that my claim is subject to audit, review, and validation using all available information.

Signature: _____     Dated (mm/dd/yyyy): _____

Print Name: _____



# EXHIBIT 13

Mike Sussman
23200 Camino del Mar #503
Boca Raton, FL 33433
mike.sussman@pm.me

# FILED

## FEB 26 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

February 13, 2024

United States District Court
280 South 1st Street, Room 2112
San Jose, CA 95113

In re: Telescopes Antitrust 5:20-cv-03639 EJD

To the Clerk:

I am writing as to the horrendous procedure that people have to go through to file objections and/or a claim in this case. I believe this procedure will result in an extremely low number of objections and claimants.

As to objections, I am not sure of the proper procedure. The website www.telescopesettlement.com simply says: **If you want to opt out or object, you must do so by February 13, 2025.** However, it gives no information where to send the objection, whether it goes to the claims administrator, class counsel, or the clerk. If the Clerk, is it a form, a letter, a motion? I assume the Clerk, so I had to go to the Court's website to get that address. The FAQ page says: **"If you are a member of the settlement class and do not opt out, you can object to the settlement if you do not like it. The deadline to object is February 13, 2025."** Again, no information on how to do an objection. I am sure not many consumers will waste their time trying to navigate the cryptic maze of how to object. The very minimum, the website should explain exactly what a person needs to do to let the Court know if they don't like this settlement. At the very least, they should provide the address to send objections to.

My problem that led to the objection is about the method used to file claims, which is confusing and meant for little work to be done by the administrators of the class action. If you received a claim number, you can file a claim online. But I understand that only a select few have received these claim numbers.

Despite my purchasing a Celestron PowerSeeker 80AZS Telescope about 7 years ago via Target, I did not receive any claim number.

Therefore the website makes me do a paper claim form. To get the paper claim to fill out, the website requires I enter my name and address. The form then comes out in a PDF that I must print. The printable PDF, despite giving the address and name, requires filling in that same information again (name and address). For what? To make it hard. The name and address is already printed on it. Then I must make an envelope and mail that form in.

Then the form asks what kind of payment I would like. I can choose paper check or I can check a box that says, "If you wish to receive any payment pursuant to the Settlement Agreement electronically, please submit your claim online at www.telescopesettlement.com."

SUSSMAN
23200 CAMINO DEL MAR APT 502
BOCA RATON, FL 33433-7157

CLERK US DISTRICT COURT
280 S 1ST ST RM 2112
SAN JOSE CA 95113-3008

I am perplexed as to how the second option can be accomplished considering that they did not provide me with a claim number and only gave a small group those numbers.

The question that must be asked is, "Is anyone really going to do this?" I am sure that despite I think 4,000,000 potential claimants, only a teeny tiny fraction is going to do all this circling around. After all, most people do not use postal mail.

If the settlement administrator is trying to avoid fraudulent claims, this is the easy way out. A better way would be to examine claims when multiple claimants share the same address (more claims than would be logical), limit electronic payments to one per Paypal address, one per Zelle address, one per Venmo, etc. (It doesn't make sense for a scammer to try to submit two claims to a single address, it'd be more easy to just submit a claim with multiple telescopes which could be looked at as well).

For that reason, I do not think the settlement should be approved unless Class Counsel takes the necessary steps to correct this absurd objections and claims process to make sure people who want to object can figure it out and those who want to file a claim can easily seek payment without the burden of sending in a form.

I would prefer an electronic payment. However, it refers me back to the website that stops me from filing a claim, so it is not possible. Everyone should receive the same options, such as an easy online form and a choice of payment methods.

Please make Class Counsel do their job and advocate for the class members. I know this CPM law firm thinks their advocacy ends upon receiving a settlement and at that time they just ignore problems claimants have or actually attack their claimants. I read a lot of bad things about how they mistreat people who complain. This shouldn't be. They need to focus their energy on fixing things, working with the claimants who have better ideas than they do, having better claims management software, etc.

Thank you for your time and help in making class actions great again.

Very truly yours,



Mike Sussman

LGL5077A05A0AAA.049066.02.02.000000

# EXHIBIT 14

Pat Zhen
PO Box 366047
San Juan PR  00936
legal@patzhen.com
(787) 523-8040

FILED

MAR 26 2025

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

Objector

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: TELESCOPES ANTITRUST
LITIGATION

No. 5:20-cv-03639-EJD

This Document Relates to:
Indirect Purchaser Actions

### REPLY IN SUPPORT OF OBJECTIONS TO THE SETTLEMENT

Objector Pat Zhen filed objections at Entry 402 explaining that under

precedent, Puerto Rico is a repealer state.  Without any discussion of the cases,

Class Counsel baldly asserted in a motion for approval at Entry 404 that Zhen

has no standing because Puerto Rico is not a repealer territory.  This response

makes no sense whatsoever.  Zhen's objection provided a detailed analysis and

Class Counsel provides no analysis.

Class Counsel failed to serve the motion at 404 upon Zhen.  The website

operated by the claims administrator did not list any due date for responses to

this motion at Entry 404 on the "Important Dates & Deadlines" of the website at

https://www.telescopesettlement.com/important-dates-deadlines.aspx .

A copy of the motion at Entry 404 was not provided on the website on the Case

Documents page.  https://www.telescopesettlement.com/case-documents.aspx

Zhen stands by the objection because Class Counsel unfairly excluded

Repealer Territory Puerto Rico purchasers, which is a repealer territory.

Respectfully submitted,



_____

Pat Zhen

# EXHIBIT 15

Generated: May 30, 2025 9:00AM                                                        Page 1/1



# U.S. District Court

### California Northern - San Francisco

Receipt Date: May 30, 2025 9:00AM

Pat Zhen
po box 366047
san juan, pr 00936

| Rcpt. No: 311173028 | | Trans. Date: May 30, 2025 9:00AM | | | Cashier ID: #AS (3748) | |
|---|---|---|---|---|---|---|
| **CD** | **Purpose** | **Case/Party/Defendant** | | **Qty** | **Price** | **Amt** |
| 203 | Notice of Appeal/Docketing Fee | | | 1 | 605.00 | 605.00 |

| **CD** | **Tender** | | | | | **Amt** |
|---|---|---|---|---|---|---|
| MO | Money Order | #29533028163 | 05/24/2025 | | | $605.00 |
| | | | Total Due Prior to Payment: | | | $605.00 |
| | | | Total Tendered: | | | $605.00 |
| | | | Total Cash Received: | | | $0.00 |

**Comments**: C20-03639 EJD

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

Zhen
Box 366047
San Juan PR 00936

Clerk US District Court
RE: Appeal Fee 5:20-cv-03639
    Telescope

# EXHIBIT 16

(301 of 346), Page 301 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 301 of 346
Case 5:20-cv-03639-EJD    Document 429    Filed 07/14/25    Page 1 of 27

1  Adam J. Zapala (SBN 245748)
   **COTCHETT, PITRE & McCARTHY, LLP**
2  840 Malcolm Road
   Burlingame, CA 94010
3  Telephone: (650) 697-6000
   azapala@cpmlegal.com
4
   Kalpana Srinivasan (Bar No. 237460)
5  **SUSMAN GODFREY L.L.P.**
   1900 Avenue of the Stars, Ste. 1400
6  Los Angeles, CA 90067
   Telephone: (310) 789-3100
7  ksrinivasan@susmangodfrey.com
8  Lin Y. Chan (SBN 255027)
   **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
9  275 Battery Street, 29th Floor
   San Francisco, CA 94111
10 Telephone: (415) 956-1000
   lchan@lchb.com
11
   *Co-Lead Counsel for the Indirect Purchaser Plaintiffs*
12
   [Additional Counsel Listed on Signature Page]
13

14
15              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
                  **SAN JOSE DIVISION**
16

17

18 | IN RE: TELESCOPES ANTITRUST | **Case No. 5:20-cv-03639-EJD** |
   | LITIGATION | |
19 | | |
   | | **INDIRECT PURCHASER PLAINTIFFS'** |
20 | | **NOTICE OF MOTION; MOTION; AND** |
   | | **MEMORANDUM OF POINTS AND** |
21 | ——————————————— | **AUTHORITIES IN SUPPORT OF** |
   | | **MOTION FOR APPEAL BOND** |
22 | THIS DOCUMENT RELATES TO: | |
   | | **Dept.:  Courtroom 4** |
23 | All Indirect Purchaser Actions | **Judge:  Hon. Edward J. Davila** |
   | | **Date:  August 14, 2025** |
24 | | **Time:  9:00 am** |
25

26

27

28
   **INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR**
   **APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
   **Case No. 5:20-cv-03639-EJD**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

      **PLEASE TAKE NOTICE THAT**, that on Thursday, August 14, 2025 at 9:00 AM, or as soon as the matter may be heard, the Indirect Purchaser Plaintiffs ("IPPs") will move and hereby do move the Honorable Edward J. Davila at the United States District Court for the Northern District of California, located in Courtroom 4, 280 South 1ˢᵗ Street, San Jose, California 95113. IPPs move this Court pursuant to Federal Rule of Appellate Procedure 7 for an Order compelling Objector-Appellants Elman Barnes, National Woodlands Preservation, Inc., Patrick Zhen, and Michael Sussman to each post an appeal bond to secure payment for costs on appeal.[1] This Motion is based upon this Notice of Motion and Motion; IPPs' accompanying Memorandum of Points and Authorities in support thereof; and all materials submitted in support thereof, including declarations and exhibits, and the record in this case, along with any oral argument that may be presented to the Court and any evidence submitted in connection therewith.

---

[1] Given the grave issues raised by this motion, as discussed in more detail herein, IPPs also request that the Court issue an order requiring each Objector-Appellant to either personally appear at the hearing on this motion, or to appear by video link remotely, and be required to provide government-issued identification demonstrating that these individuals are who they say they are.

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR  1
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

(303 of 346), Page 303 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 303 of 346
Case 5:20-cv-03639-EJD    Document 429    Filed 07/14/25    Page 3 of 27

1

**<u>TABLE OF CONTENTS</u>**

2

**Page(s)**

3
**I.      INTRODUCTION** ................................................................................................. **1**

4
**II.     BACKGROUND** ................................................................................................. **3**

5
**III.    ARGUMENT** ...................................................................................................... **3**

6
**A.  The Objectors Are Financially Able to Post Bonds** .............................. **4**

7
**B.  The Objectors' Out-Of-State Residence, or Other Conduct, Increases the Risk**
8
**That They Will Not Pay Appellees' Costs** .......................................... **6**

9
**C.  The Court Already Found the Objections Meritless** ............................. **7**

10
1.  **Elman Barnes Presents a Meritless Objection, Lacks Standing, and Likely**
**Does Not Exist** ........................................................................... **8**

11

12
2.  **National Woodlands Preservation, Inc. (Karla Luna) Presents a Meritless**
**Objection and Is Associated with Indicia Fraud.** ..................... **10**

13
3.  **Patrick Zhen Is Not a Class Member and Bears Indicia of Fraud** ............. **13**

14
4.  **Michael Sussman's Objection Lacks Merit and Is Associated with Indicia**
**of Fraud** ...................................................................................... **15**

15

16
**D.  The Court Should Impose an Appeal Bond of $42,818 on Each of the Objectors**
.......................................................................................................... **16**

17
1.  **The Bond Should Include Claims Administration Costs** ..................... **16**

18
2.  **The Appeal Bond Should Include Taxable Costs Under Rule 39** ............... **18**

19
**IV.    CONCLUSION** ................................................................................................ **19**

20

21

22

23

24

25

26

27

28

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*Ace Heating & Plumbing Co. v. Crane Co.*,
    453 F.2d 30 (3d Cir. 1971).............................................................................. 13

5

6

*In re Anthem, Inc. Data Breach Litig.*,
    327 F.R.D. 299 (N.D. Cal. 2018) ...................................................................... 8

7

*Azizian v. Federated Dep't Stores, Inc.*,
    499 F.3d 950 (9th Cir. 2007)............................................................... 3, 15, 16

8

9

*In re Broadcom Corp. Sec. Litig.*,
    No. SACV-01-275-DT(MLGx), 2005 U.S. Dist. LEXIS 45656 (C.D. Cal.
    Dec. 5, 2005) ............................................................................................ 16, 17

10

11

*Brown v. Hain Celestial Grp., Inc.*,
    No. 3:11-CV-03082-LB, 2016 WL 631880 (N.D. Cal. Feb. 17, 2016) ........... 13

12

13

*In re Cardizem CD Antitrust Litig.*,
    391 F.3d 812 (6th Cir. 2004)............................................................................. 5

14

15

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    No. 2:2000-md-01361, 2003 WL 22417252 (D. Me. Oct. 7, 2003) ............... 16

16

*Dennings v. Clearwire Corp.*,
    928 F. Supp. 2d 1270 (W.D. Wash. 2013) ...................................................... 1

17

18

*Dennings v. Clearwire Corp.*,
    No. C10-1859JLR, 2013 WL 945267 (W.D. Wash. Mar. 11, 2013) .............. 17

19

20

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) ........................................................... 13

21

*Embry v. ACER Am. Corp.*,
    C 09-01808 JW, 2012 WL 2055030 (N.D. Cal. June 5, 2012) ................... 3, 6, 7

22

23

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
    999 F.3d 1247 (11th Cir. 2021)...................................................................... 11

24

25

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.* (*In re First Capital*),
    33 F.3d 29 (9th Cir.1994)............................................................ 8, 10, 13, 14

26

*Fleury v. Richemont N. Am., Inc.*,
    No. C-05-4525 EMC, 2008 WL 4680033 (N.D. Cal. Oct. 21, 2008) .......... 4, 5, 6, 7

27

28

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR  ii
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

*Gendron v. Shastina Props., Inc.*,
    578 F.2d 1313 (9th Cir. 1978).............................................................................. 14

*Glasser v. Volkswagen of Am., Inc.*,
    645 F.3d 1084 (9th Cir. 2011) ............................................................................. 13

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019)................................................................................ 8

*In re Initial Pub. Offering Sec. Litig.*,
    728 F. Supp. 2d 289 (S.D.N.Y. 2010) ........................................................... 4, 6

*In re Initial Pub. Offering Sec. Litig.*,
    721 F. Supp. 2d 210 (S.D.N.Y. 2010), *opinion clarified*, No. 21
    MC 92 SAS, 2010 WL 5186791 (S.D.N.Y. July 20, 2010)............................... 18

*In re Ins. Brokerage Antitrust Litig.*,
    MDL 1663, No. 04-5184 (GEB), 2007 ........................................................... 17

*In re MagSafe Apple Power Adapter Litig.*,
    No. C 09-01911 JW, 2012 WL 2339721 (N.D. Cal. May 31, 2012) ........................ 5, 18

*Miletak v. Allstate Ins. Co.*,
    No. C 06- 03778 JW, 2012 WL 3686785 (N.D. Cal. Aug. 27, 2012)...................... *passim*

*Miller v. Travel Guard Grp., Inc.*,
    No. 21-CV-09751-TLT, 2024 WL 5341150 (N.D. Cal. Apr. 9, 2024).......................... 14

*In re Netflix Privacy Litig.*,
    No. 5:11-CV-00379-EJD, 2013 WL 6173772 (N.D. Cal. Aug. 27, 2012) ............... *passim*

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    968 F. Supp. 2d 367 (D. Mass. 2013) ............................................................. 13

*In re Opana ER Antitrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) ............................................................. 13

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    520 F. Supp. 2d 274 (D. Mass. 2007) ............................................................. 4

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 07-MD-01819 CW, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010)...................... 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    599 F. Supp. 2d 1179 (N.D. Cal. 2009) ........................................................... 13

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
    No. 07-cv-05634-CRB (N.D. Cal.), ECF Nos. 1356, 1378 ............................... 14

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR   iii
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 23-15118, 2024 WL
   810703 (9th Cir. Feb. 27, 2024), *cert. denied sub nom. Xanadu Corp v.
   Adlin*, 145 S. Ct. 278 (2024)..................................................................................14

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health &
   Welfare Fund v. Teikoku Pharma USA, Inc.*,
   74 F. Supp. 3d 1052 (N.D. Cal. 2014) ....................................................................12

*Yingling v. eBay, Inc.*,
   No. C 09–01733 JW, 2011 WL 2790181 (N.D. Cal. July 5, 2011) ...................................7

**Rules**

Fed. R. App. P. 3 ...........................................................................................................5

Fed. R. App. P. 7 .....................................................................................................*passim*

Fed. R. App. P. 39 ...................................................................................................*passim*

Fed. R. Civ. P. 23 ...............................................................................................3, 13

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR**
**APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
**Case No. 5:20-cv-03639-EJD**

iv

<div align="center">**MEMORANDUM OF POINTS AND AUTHORITIES**</div>

## I. INTRODUCTION

The Indirect Purchaser Plaintiffs ("IPPs") move this Court for an order requiring each Objector-Appellant to post an appeal bond in the amount of $42,818.[2] The Motion is warranted and should be granted because counsel for IPPs, and the class itself, will incur costs during the pendency of these putative appeals. Moreover, because the issues raised by these objectors are frivolous, the Ninth Circuit will almost certainly affirm this Court's determination that final approval was, and is, appropriate. *See Dennings v. Clearwire Corp.*, 928 F. Supp. 2d 1270, 1271 (W.D. Wash. 2013) (granting motion for a post-settlement approval appeal bond and ordering the objetors to "post a bond in the amount of $41,150.00 or dismiss their notice of appeal.") (cleaned up). Accordingly, the class will be required to await the distribution process (and thus incur costs) in order for the Ninth Circuit merely to reject these appeals. Moreover, as outlined in this Motion, an appeal bond from each Objector-Appellant is appropriate due to a substantial doubt concerning IPPs' ability to recover their costs from these Objector-Appellants and the good faith basis of these appeals. As outlined herin, these Objectors are associated with indicia of fraud, further supporting the need for a bond. *See id.*

On April 11, 2025, following over five years of contentious litigation and settlement negotiations, this Court granted final approval to the class action settlement (the "Settlement") between IPPs and the Synta Defendants[3] ("Defendants"). *See* ECF No. 397. The Settlement

---

[2] As detailed in the Notice of Motion, IPPs also request the Court issue an order requiring each Objector-Appellant to either personally appear at the hearing on this motion, or to appear by video link remotely, and be required to provide government-issued identification demonstrating that these individuals are who they say they are.

[3] Synta Defendants are: (1) Synta Technology Corp. of Taiwan (a/k/a Synta Technology Corp. and Good Advance Industries Ltd.), (2) Suzhou Synta Optical Technology Co., Ltd., (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd., (4) Synta Canada International Enterprises Ltd., (5)

---

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR   1
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

(308 of 346), Page 308 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 308 of 346
Case 5:20-cv-03639-EJD    Document 429    Filed 07/14/25    Page 8 of 27

1  provides a substantial monetary recovery to the IPP class: $32 million to indirect purhasers for the

2  supracompetitive prices they suffered when they purchased their telescopes due to Defendants'

3  anticompetitive conduct.

4      But, as with many large and successful class action settlements, the Settlement drew a

5  limited number of objections. After full briefing by IPPs and the opportunity for the objectors to

6  respond and be heard at the final fairness hearing,[4] the Court overruled all of the objections, found

7  the Settlement fair, adequate, and reasonable, and approved the Settlement in full.

8      However, Objectors Elman Barnes, National Woodlands Preservation, Inc. ("Woodlands"),

9  Patrick Zhen, and Michael Sussman (collectively, the "Objectors") chose to delay distribution of

10  the Settlement by appealing to the Ninth Circuit, a tactic all too often used—and abused—by

11  objectors who count on the likelihood that settling parties will reluctantly pay them to withdraw

12  their appeals rather than endure the delay and expense of continued litigation.

13      The appeals by the Objectors lack merit and will impose costs on counsel for IPPs and the

14  class generally. Not only that, as outlined in this Motion, the claims of Objectors bear substantial

15  indicia of fraud, raising questions about whether these "objectors" are fictitious entities and

16  people. *See infra* at 9-16. Consequently, IPPs now move the Court for an appeal bond from each

17  Objector under Rule 7, which states "[i]n a civil case, the District Court may require an appellant

18  to file a bond or provide other security in any form and amount necessary to ensure payment of

19  _____

20  Pacific Telescope Corp., (6) Olivon Manufacturing Co. Ltd., (7) SW Technology Corp., (8)

21  Celestron Acquisition, LLC, (9) Olivon USA LLC, (10) Dar Tson "David" Shen, (11) Joseph

22  Lupica, and (12) David Anderson (together, "Synta" or "Synta Defendants").

23  [4] Of the objectors from whom IPPs seek an appeal bond, none — personally or through counsel —

24  appeared at the Court's final fairness hearing. Given their decision to skip the one opportunity to

25  raise their concerns live to the Court, it strains credulity to believe the objectors here actually care

26  about the merits of the settlement or their appeals, rather than merely holding up the settlement

27  process.

28

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR  2
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1    costs on appeal." Bonds are necessary to curb Objectors' abuse of the judicial process, to prevent

2    harm to the Class, and to insure that, when Plaintiffs prevail on appeal, these Objectors will

3    actually pay costs, as required by Federal Rule of Appellate Procedure 39.

4    **II.      BACKGROUND**

5           This Court granted final approval of the Settlement on April 11, 2025 (*see* ECF No. 419.),

6    and out of approximately three million Class members, only four claimants objected to the

7    Settlement.[5] IPPs submitted their motion for final approval on February 28, 2025. *See* ECF No.

8    404. The Court held its final fairness hearing on April 3, 2025,[6] and on April 11, 2025, the Court

9    overruled the objections and granted the Settlement final approval in full. *See* ECF No. 419.

10          On May 5, 2025, the Objectors collectively lodged their appeals to the Ninth Circuit,

11   challenging this Court's Order granting final approval. As explained below, these "Objectors"—to

12   the extent they are real entities (and they are not)—are simply abusing the appeal process, and

13   each should be ordered to post an adequate bond in order to ensure the IPPs' costs on appeal.

14   **III.     ARGUMENT**

15          As many other courts in this district have recognized, objectors to a class action settlement

16   (that received final approval and provides substantial monetary relief to a class) should be required

17   to post an appeal bond before they may use the time and expense of appeal to hold the settlement

18   hostage. Rule 7 provides that "the district court may require an appellant to file a bond or provide

19   other security in any form and amount necessary to ensure payment of costs on appeal." *Azizian v.*

20   *Federated Dep't Stores, Inc*., 499 F.3d 950, 954–55 (9th Cir. 2007). The purpose of a Rule 7 bond

---

[5] But, as outlined further, some of these "objectors," like Zhen, are not class members at

all.  For example, Zhen is a resident of Puerto Rico and allegedly purchased a telescope there.

But Puerto Rico is not one of the indirect purchaser states including in this lawsuit, nor in the

settlement class definition. Accordingly, Zhen is not a settlement class member at all and

does not have standing to object or appeal. Fed. R. Civ. P. 23(e)(5)(A).

[6] None of the Objectors or counsel representing them attended the Final Fairness Hearing, despite

indicating otherwise in their objections on file with the Court, *see* ECF No. 245.

---

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR  3
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1    is to "protect an appellee against the risk of nonpayment by an unsuccessful appellant." *In re*

2    *Netflix Privacy Litig.* ("*Netflix*"), No. 5:11-CV-00379-EJD, 2013 WL 6173772, at *2 (N.D. Cal.

3    Aug. 27, 2012) (Davila, J.); *Embry v. ACER Am. Corp.*, C 09-01808 JW, 2012 WL 2055030, at *1

4    (N.D. Cal. June 5, 2012) (quoting *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008

5    WL 4680033, at *6 (N.D. Cal. Oct. 21, 2008)). "[T]he question of the need for a bond, as well its

6    amount, are left to the discretion of the trial court." *Fleury*, 2008 WL 4680033, at *6. "The trial

7    court may exercise discretion in regards to the need for a bond, as well as the bond amount." *Id.* at

8    *2. When faced with objectors threatening a settlement with meritless appeals, district courts

9    routinely require the objectors to post a bond. *See In re Pharm. Indus. Average Wholesale Price*

10   *Litig.*, 520 F. Supp. 2d 274, 277–78 (D. Mass. 2007) ("requiring objectors to post a bond will

11   ensure that a class litigating a frivolous appeal will not be injured or held up by spoilers"). As the

12   court in *In re Initial Public Offering Securities Litigation* explained, appeal bonds prevent

13   objectors from undermining our judicial system:

14          I concur with the numerous courts that have recognized that professional objectors
            undermine the administration of justice by disrupting the settlement in hopes of
15          extorting a greater share of the settlement for themselves and their clients . . . . Thus,
            the Objectors are required to file an appeal bond to secure payment of costs on
16          appeal.

17   728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010) (footnote omitted) (collecting cases).

18          In evaluating a proposed appellate bond, a court considers "(1) the appellant's finanical

19   ability to post a bond, (2) the risk that appellant would not pay the costs if the appeal loses, and (3)

20   an assessment of the likelihood that appellant will lose the appeal and be subject to costs." *Netflix*,

21   2013 WL 6173772, at *3. As detailed below, each factor favors imposing a bond on each of the

22   Objectors in this case.

23          **A.      The Objectors Are Financially Able to Post Bonds**

24          The first factor—ability to pay—is straightforward and met where there is "no indication

25   that [a party] is financially unable to post bond." *Fleury*, 2008 WL 4680033, at *7. Even where an

26   appellant claims inability to pay—which no objector in this case has asserted—this factor only

27   weighs against imposing a bond where the appellant adduces actual evidence of inability to pay

28   and other factors do not outweigh the need for an appeal bond. *See, e.g.*, *Netflix*, 2013 WL

---

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR  4
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1   6173772, at *3 (objectors "do not provide any evidence indicating a financial inability to pay");

2   *Miletak v. Allstate Ins. Co.*, No. C 06- 03778 JW, 2012 WL 3686785, at *2 n.4 (N.D. Cal. Aug.

3   27, 2012) ("Thus, insofar as Objector has 'submitted no financial information to indicate that she

4   is financially unable to post a bond, this factor weighs in favor of imposing a bond."); *In re*

5   *Cardizem CD Antitrust Litig.*, 391 F.3d 812, 818 (6th Cir. 2004) (failure to propose an alternative

6   or provide evidence that the bond was improper resulted in dismissal of appeal). Moreover, even if

7   an objector provides some evidence of a financial hardship in posting the bond, "the significant

8   risk of non-payment of costs and the lack of merit in Objectors' appeals" can nonetheless tip this

9   factor in favor of requiring a bond. *See In re MagSafe Apple Power Adapter Litig.*, No. C 09-

10   01911 JW, 2012 WL 2339721, *2 (N.D. Cal. May 31, 2012).

11       Here, the evidence suggests the Objectors are able to pay the bonds. First, the Objectors

12   have paid their appeal docketing fee, suggesting they have financial resources. *See* ECF No. 424.[7]

13   Moreover, previous declarations submitted to this Court detail Class Counsel's efforts to meet and

14   confer with these Objectors before the fairness hearing in an attempt to resolve their purported

15   "objections." *See, e.g.*, Decl. of Kalpana Srinivasan in Supp. of IPPs' Reply in Supp. of the Mot.

16   for Final Approval of Settlement & Mot. for Award of Attorneys' Fees, Reimbursement of Costs,

17   & Service Awards (N.D. Cal. Mar. 21, 2025), ECF No. 407-1. During these meet and confers,

18   none of the Objectors raised issues about lacking financial resources. Instead, each objector

19   appears to understand the legal system with respect to class action settlement objections: they were

20   able to file their objections with the Court, in some cases utilizing the federal court's ECF system.[8]

21

22   ——————————

[7] With that said, it appears that they have attempted—either intentionally or unintentionally—to

23   circumvent the required Ninth Circuit appeal fee. *See* ECF No. 422. Instead of each objector filing

24   their own appeal, as is required, the objectors have attempted to collectively file a "Notice of

25   Appeal," the effect of which is to require only one payment of an appeal fee, instead of the

26   required, separate four fees. This is improper. *See* Fed. R. App. P. 3(b).

27   [8] Should the Court desire a more fulsome record regarding the Objector's financial resources,

28

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR**   5
**APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
**Case No. 5:20-cv-03639-EJD**

1    To date, as in *Miletak* wherein the court granted the motion for an appeal bond, the "Objector[]s . .

2    . ha[ve] presented no evidence that [they] would be unable to pay an appeal bond." 2012 WL

3    3686785 at *2. "Thus, this factor weighs in favor of imposing an appeal bond." *Id.* (*citing Fleury*,

4    2008 WL 4680033, at *7).

5          **B.     The Objectors' Out-Of-State Residence, or Other Conduct, Increases the Risk
                     That They Will Not Pay Appellees' Costs**

6          When an appellant resides out-of-state, the difficulty of collecting payment post-appeal

7    increases, weighing in favor of posting a bond. *See In re Initial Pub. Offering*, 728 F. Supp. 2d at

8    293; *Netflix*, 2013 WL 6173772, at *3 ("Courts in the Northern District of California have

9    recognized the difficulty and risk associated with collecting costs from out-of-state appellants.");

10   *Fleury*, 2008 WL 84680033, at *7; *Embry*, 2012 WL 2055030,  at *1 (N.D. Cal. June 5, 2012)

11   ("With regards to the second factor—the difficulty of collecting payment post-appeal—Objector

12   Cannata resides outside of the jurisdiction of the Ninth Circuit, which also weighs in favor of

13   requiring a bond.").

14         Three of the four objectors—Sussman (Florida), Zhen (Puerto Rico), and Woodlands (West

15   Virginia)—purport to be located out-of-state.  *See* ECF Nos. 401, 402, 403. Enforcement of an

16   order imposing costs originates at the district court level, *see* Rule 7, and only one of the Objectors

17   (Elman Barnes) purportedly resides in California—placing the other three outside not only the

18   state but the geographic boundaries of the Ninth Circuit. *See Netflix*, 2013 WL 6173772, at *3

19   (location "may be weighed more heavily when an appellant lives outside the jurisdiction of the

20   Ninth Circuit.").

21         As such, should they refuse to pay, class counsel would be required to travel to Florida,

22   Puerto Rico, and West Virginia to institute collection proceedings and recover costs expended on

23   appeal. Accordingly, the Objectors' out-of-state residence "weighs in favor of requiring a bond."

24   *Id.* at *3.

25         Further, while Objector "Barnes" claims that "he" lives in California, that fact does not

26   _____

27   Class Counsel has served those objectors with discovery seeking a host of information, including

28   their financial resources.

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR    6
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1  weigh against imposing a bond, but simply renders this factor neutral with regard to Barnes. *See*

2  *Miletak*, 2012 WL 3686785, at *2 (discussing a California-resident objector); *see also infra* at 9-

3  24 (discussion of indicia of fraud associated with "Elman Barnes" objection).

4       Moreover, IPPs suspect that collecting costs from "Barnes" may prove challenging. For

5  starters, as outlined in a number of Declarations accompanying this Motion, Class Counsel have

6  received information suggesting that "Elman Barnes" is not who he says he is. *See* Decl. of Adam

7  J. Zapala in Supp. of IPPs' Mot. For Appeal Bond ("Zapala Decl."); Decl. of Nirav Engineer in

8  Supp. of IPPs' Mot. for Appeal Bond ("Engineer Decl."); and Decl. of Brian Hedley in Supp. of

9  IPPs' Mot. for Appeal Bond ("Hedley Decl."). In fact, Class Counsel do not believe an "Elman

10 Barnes" actually exists. *Id.* IPPs have similar concerns regarding the other three objectors—

11 "Patrick Zhen," "National Woodlands Preservation, Inc." (and its "CEO," a person allegedly

12 named "Karla Luna"), and "Michael Sussman." *See infra* at 11.

13      The Motion should be granted.

14      **C.    The Court Already Found the Objections Meritless**

15      The final factor bearing on the propriety of a bond assesses the merits of the appeals

16 themselves, and a Court's prior consideration and rejection of an objection favors imposing a

17 bond. *See Embry*, 2012 WL 2055030, at *1 (granting motion for appellate bond after finding that

18 objector's arguments regarding claims process and excessive attorney fees were without merit);

19 *Fleury*, 2008 WL 4680033, at *8 (granting bond where "the Court ha[d] considered each of [the

20 objector's] objections and found them meritless").

21      Here, the Court examined (and rejected) each of the Objectors' arguments—carefully

22 explaining why they were without merit—which further supports the requirement of an appeal

23 bond. *See* ECF. No. 419. Courts including this one have granted appeal bonds in similar

24 circumstances. *See, e.g.*, *Netflix*, 2013 WL 6173772, at *3 ("the Court engaged in an extensive

25 analysis of the Settlement, including the merits of the objections, and found the Settlement to be

26 fair, adequate and reasonable"); *Yingling v. eBay, Inc.*, No. C 09–01733 JW, 2011 WL 2790181, at

27 *2 (N.D. Cal. July 5, 2011) ("Court has already considered Objector's objections and found them

28 to be meritless"). As discussed further below, each of the Objector's objections and basis for

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR    7
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

(314 of 346), Page 314 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 314 of 346
Case 5:20-cv-03639-EJD    Document 429    Filed 07/14/25    Page 14 of 27

1    appeal lack merit and warrant granting a bond.

2           **1.    Elman Barnes Presents a Meritless Objection, Lacks Standing, and Likely Does Not Exist**

3         Objector "Elman Barnes" objected not to a term of the Settlement, but to a process that the

4    claims administrator—in its substantial discretion and in order to weed out fraudulent claims—

5    required of claimants to go through in order to submit a claim. Namely, the Court-appointed

6    claims administrator required persons and entities that did not already have a claim number to

7    request one from the claims administrator. Barnes's myopic focus on a non-burdensome claim

8    filing procedure ignores Class Counsel's, and the Claims Administrator's, duty to try to weed out

9    fraudulent claims. This procedure was hardly burdensome, as this Court correctly found in

10   approving the Settlement. The Court reasoned that requiring claimants to fill out forms to establish

11   class membership is reasonable. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 568

12   (9th Cir. 2019). Indeed, the Ninth Circuit has held that requiring potential claimants to fill out

13   forms to show class membership is reasonable and not unduly burdensome. *Id.* Barnes also

14   objected to the payment methods available to claimants without claim numbers. *See* ECF No. 399.

15   But this Court and others have approved settlements that provide for different payment methods to

16   class members. *See* ECF. No. 419; *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 332

17   (N.D. Cal. 2018). Barnes's objection lacks merit.

18        Regardless, "Mr. Barnes" does not have standing to object. As noted in IPPs' Motion for

19   Final Approval, "Barnes" is not aggrieved by the claims filing procedure. He successfully

20   submitted a claim on the telescope he allegedly purchased. *See* Zapala Decl., Ex. B. As a result,

21   nothing about the claims process prevented him from submitting a claim.

22        Finally, as noted above, not only is an appeal bond warranted because Barnes's grounds

23   for appeals are exceptionally weak and he is not "aggrieved," but "Barnes" is likely not a real

24   person at all.

25        Below, IPPs have outlined the indicia of fraud associated with "Mr. Barnes".

26        ***First***, Elman Barnes does not have an online presence whatsover (let alone an online

27   presence in the Sacramento area where he purports to live), which is exceptionally rare in this day

28   and age. Class Counsel retained an outside investigator who, utilizing methods ordinarily used in

---

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR  8
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1  the industry, concluded that no legitimate person named "Elman Barnes" exists in relation to the

2  claim submitted here. *See* Hedley Decl. ¶ 9. Investigators performed nationwide searches for the

3  name "Elman Barnes" utilizing ordinary investigation techniques and returned zero results. *See*

4  Hedley Decl. ¶ 6.

5      ***Second***, the email address Barnes provided (elmanmethod@theacheivementcoaches.com)

6  appears to be nonexistent. *See* Hedley Decl. ¶ 7. An online search for that email address returns no

7  results, again, a fact that is exceptionally rare in this day and age. *Id.* Moreover,

8  "achievementcoaches.com" does not exist as a real or active website and is registered to a

9  person/organization only to a redacted name. *Id.* When registrants buy domain names, they

10 typically disclose certain identifying data, like contact information. The person/organization who

11 bought this domain name engaged in the unusual steps of going through a third party to purchase

12 the domain name to keep their contact information private.

13     ***Third***, Barnes's mailing address is not legitimate. Barnes provided a non-residential

14 address (1401 21st Street, Ste. R, Sacramento, CA) in connection with his objection, again an

15 unusual action. *See* Hedley Decl. ¶ 7. The "1401 21st Street" address is associated with the

16 business "California Registered Agents."[9] "California Registered Agents" permits persons or

17 entities—usually entities—to use them as an address for purposes of service of process. *See*

18 Engineer Decl. ¶ 7. Although businesses normally designate an address for purposes of service of

19 process, individuals rarely do. *See* Zapala Decl. ¶ 16.

20     ***Fourth***, the addresses Barnes provided in connection with his objection and filings in

21 Court were inconsistent.  In addition to the "1401 21st Street" address discussed above, Barnes

22 listed an address of "401 21st Street, Ste. R, Sacramento California" on his objection.  *See, e.g.*,

23 ECF No. 399. The "401 21st Street" address does not exist. Zapala Decl. ¶ 15.  "Mr. Barnes's"

24 incorrect and inconsistent citation to his own address is further indicia of fraud. Instead, what

25 appears likely is that "Mr. Barnes" established the "1401" address solely for purposes of this

---

[9] *See* https://www.californiaregisteredagent.com (listing address as 1401 21st Street, Sacramento, California).

1  litigation. If, instead, this address were his regular address, it strains credulity to believe that he

2  would have miscited it, on multiple occasions, to the Court.

3      *Fifth*, Barnes's signature on various documents are radically different. *Compare below,*

4  ECF No. 399 (Barnes's purported objection where he signs the letter and signs his withdrawal of

5  an objection) *with* ECF No. 421 (signature on notice of appeal). Again, this consistency increases

6  the likelihood of fraud.

7      *Sixth*, "Barnes" has refused to confer with Class Counsel by video.  Class Counsel

8  requested, on numerous occasions, that Barnes meet and confer with Class Counsel to discuss his

9  objection and/or appeal. Although Barnes responded to emails and left counsel one voicemail, he

10  avoided getting on a video link call with Class Counsel. Zapala Decl. ¶ 19.

11      *Seventh*, "Barnes" claims to live in Sacramento, California. *See, e.g.*, Objection at ECF

12  No. 399.  But the envelopes to his various objections and other filings with the Court show that his

13  correspondence to the Court were mailed from Santa Clarita, a location in Southern California.

14  *See, e.g.,* Zapala Decl. ¶ 9; ECF No. 405-1.

15      The facts listed above heighten both the probability of fraud and the importance of an

16  appeal bond. Barnes' lack of standing (both because he likely does not exist and is not otherwise

17  aggrieved by the claims filing procedure he challenges) supports imposing an appeal bond.

18      **2.    National Woodlands Preservation, Inc. (Karla Luna) Presents a
        Meritless Objection and Is Associated with Indicia Fraud**

19      Woodlands' objection also lacks merit, as this Court already found. A person allegedly

20  named "Karla Luna" objected on behalf of purported class member "National Woodlands

21  Preservation, Inc." on the (incorrect) ground that businesses were not entitled to recover. *See* ECF

22  No. 401. This objection fails because the settlement *includes* businesses. The class definition,

23  published on the settlement website in the Settlement Agreement and Preliminary Approval Order,

24  as well as in the Email and Published Notice issued to potential class members, expressly makes

25  that clear: "all persons ***and entities*** in the Indirect Purchaser States (as defined herein) who, during

26  the period from January 1, 2005 to September 6, 2023 purchased one or more Telescopes from a

27  distributor (or from an entity other than a Defendant) that a Defendant or alleged co-conspirator

28  manufactured" may submit claims. *See* ECF Nos. 390-1, 391-1, 391-3 (emphasis added). This

---

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR  10
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1    objection lacks merit. The basis of the appeal is even more confusing: the express language of the

2    Settlement class definition includes entities, Woodlands filed a claim, and IPPs have confirmed

3    that business entities are eligible to participate. ECF Nos. 390-1, 391-1, 391-3. Consequently,

4    what is it that Woodlands is appealing?

5         Additionally, similar to Barnes, Woodlands (and its "CEO" Karla Luna) does not appear to

6    exist and therefore lacks standing to appeal as an "aggrieved" class member. The following

7    information indicates fraud and supports the imposition of an appeal bond.

8         **First**, the address (110 James Street, Hinton, West Virginia 25952) that Woodlands

9    provided with its objection is wrong. No entity named "National Woodlands Preservation, Inc." is

10   associated with that address. When Class Counsel obtained the telephone number associated with

11   that address, it turned out to be a law firm named "Ziegler and Ziegler Law PC." *See* Zapala Decl.

12   Ex. H (attaching a copy of a picture of that address).

13        **Second,** Woodlands appears not to exist as a compnay. When Class Counsel spoke with a

14   representative of the phone number associated with Woodlands' purported "110 James Street"

15   address, the person answering the phone told Class Counsel they "just work with a service

16   company that uses their address for a bunch of businesses." *See* Hedley Decl. ¶ 17. When Class

17   Counsel tried calling the service company, the service company refused to provide contact

18   information for any of their alleged clients, including "National Woodlands Preservation Inc." *See*

19   Zapala Decl. ¶ 29.

20        **Third,** Woodlands refused to provide an email or phone number in connection with its

21   objection, despite being required to do so. See Zapala Decl. ¶ 26. "Legitimate objectors do not

22   usually omit their email addresses and phone numbers." *In re Equifax Inc. Customer Data Sec.*

23   *Breach Litig.*, 999 F.3d 1247, 1265 (11th Cir. 2021).

24        **Fourth,** "National Woodlands Preservation Inc." has no online presence, and no

25   employees associated with it. A Google search of "National Woodlands Preservation Inc." returns

26   no website for the entity and no hits, aside from hits associated with filings in this very case.

27   Zapala Decl. ¶¶ 25-31.

28        **Fifth,** IPPs' oustide investigator researched whether Woodlands is fictitious and concluded

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR    11
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1   that it does not exist. *See* Hedley Decl. ¶ 17. While the investigator found a business certificate

2   filing for Woodlands (#480544) through West Virginia's Secretary of State dated August 16,

3   2019, the investigator found no further evidence that such an entity actually existed, such as a

4   record of employees or other filings. *See* Hedley Decl. ¶ 11. For example, the investigator found

5   that the "Certificate of Existence" does not provide any additional identifying information. *Id.* The

6   alleged entity had no UCC filings or additional regulatory or financial documents. *Id*. The

7   investigator also investigated the "110 James Street" address Woodlands provided. *See* Hedley

8   Decl. ¶ 14. Based on ordinary investigative techniques and the query of multiple databases

9   regarding residential and commercial addresses, that address maintained no association with an

10  entity named "National Woodlands Preservation, Inc." *Id.* Instead, as Class Counsel uncovered

11  when they called the phone number associated with that address, the address belongs to a law

12  firm: Ziegler & Ziegler. *See* Hedley Decl. ¶ 13.

13       **Sixth**, "Karla Luna," the person who signed Woodlands' objection, does not appear to

14  exist. IPPs' outside investigator found that the "110 James Street" address Woodlands provided

15  has no association with a person named "Karla Luna." Zapala Decl. ¶¶ 25-31. The investigator

16  also could not locate a "Karla Luna" associated with Woodlands. The investigator further found

17  no address, employment, or public record linking a "Karla Luna" with Woodlands. *See* Hedley

18  Decl. ¶ 16.  While individuals named "Karla Luna" exist in the United States, none of these

19  individuals had any connection to "National Woodlands Preservation Inc." *See* Hedley Decl. ¶ 17.

20       **Seventh**, the name "Karla Luna" has been associated with fraudulent claims in other class

21  action settlements. For instance, claims administrator Angeion has rejected—*forty-six times*—

22  purported claims coming from someone allegedly named "Karla Luna" because of suspected

23  fraud. *See, generally* Decl. of Ryan Hallman in Supp. of IPPs' Mot. For Appeal Bond ("Hallman

24  Decl.") ¶¶ 7-21 The claimant "Karla Luna" submitted claims associated with twenty-four distinct

25  email addresses, and the emails provided were associated with entities or persons known to be

26  fraud actors in connection with class action settlements. *Id.*

27       **Eighth**, like "Elman Barnes," the informatoin submitted by "National Woodlands

28  Preservation, Inc." is inconsistent.  It claims to exist in West Virginia and that it purchased

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR   12
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
**Case No. 5:20-cv-03639-EJD**

1  telescopes there. *See* ECF No. 401. But, its objection appears to have been mailed from

2  Providence, Rhode Island. *See* ECF No. 401-1.

3       Given the substantial question as to whether Woodlands exists, let alone qualifies as a

4  legitimate class member, an appeal bond is warranted.

5                    **3.    Patrick Zhen Is Not a Class Member and Bears Indicia of Fraud**

6       Zhen also lacks standing to object and appeal because he is not a class member. Zhen

7  objected based on the fact that the Settlement Class does not include Puerto Rico as an indirect

8  purchaser state. *See* ECF No. 402. IPPs' complaint only asserts indirect purchaser damages claims

9  from certain states. *See* ECF No. 1. That list ***never*** included Puerto Rico. And for good reason:

10  many courts in this district, and throughout the United States, have found that Puerto Rico is not

11  an *Illinois Brick* repealer state. *See, e.g., United Food & Commercial Workers Local 1776 &*

12  *Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052,

13  1085–86 (N.D. Cal. 2014); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-

14  MD-01819 CW, 2010 WL 5094289, at *4 (N.D. Cal. Dec. 8, 2010), *In re TFT-LCD (Flat Panel)*

15  *Antitrust Litig.*, 599 F. Supp. 2d 1179, 1187 (N.D. Cal. 2009); *In re Opana ER Antitrust Litig.*, 162

16  F. Supp. 3d 704, 723 (N.D. Ill. 2016); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp.

17  2d 367, 409–10 (D. Mass. 2013); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413

18  (S.D.N.Y. 2011). But regardless of the legal question of whether it is, or is not, an *Illinois Brick*

19  repealer state, Puerto Rico claims were never asserted in connection with the complaint. *See* ECF

20  No. 1. Moreover, the Settlement Class does not include consumers or entities that purchased

21  telescopes in Puerto Rico. *See* ECF No. 389 at 6.

22       Zhen's objection, therefore, is baseless because he does not have standing to object, as he

23  is not a part of the Settlement Class. The Federal Rules of Civil Procedure plainly state that only

24  class members have the ability to object to a class settlement. *See* Fed. R. Civ. Proc. 23(e)(5)(A).

25  Moreover, the Ninth Circuit has repeatedly (and correctly) held that "only an aggrieved class

26  member" has standing to object to a proposed class settlement. *See In re First Capital Holdings*

27  *Corp. Fin. Prods. Sec. Litig.* (*In re First Capital*), 33 F.3d 29, 30 (9th Cir.1994); *Glasser v.*

28  *Volkswagen of Am., Inc.*, 645 F.3d 1084, 1088 (9th Cir. 2011), *Brown v. Hain Celestial Grp., Inc.*,

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR    13
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1   No. 3:11-CV-03082-LB, 2016 WL 631880, at *10 (N.D. Cal. Feb. 17, 2016); *Ace Heating &*

2   *Plumbing Co. v. Crane Co.*, 453 F.2d 30, 32 (3d Cir. 1971). Because Zhen is indisputably not a

3   class member and thus lacks standing to object or appeal, this Court should impose an appeal bond

4   to ensure payment of appellate costs once the Ninth Circuirt rejects his appeal.

5       Moreover, like "Mr. Barnes" and "National Woodlands Preservation, Inc.," Zhen's claim

6   bears substantial indicia of fraud.

7       **First,** Zhen did not provide information requested by and customarily provided by

8   claimants—proof of purchase and residential address. Zhen never provided any evidence that he

9   purchased any telescope, much less that he purchased one in a state covered by the Settlement. *See*

10  Zapala Decl. ¶ 34. Similarly, instead of listing a residential address, he provided a P.O. Box. *See*

11  ECF No. 402.

12      **Second,** the residential address that IPPs located (503 Calle Modesta, Apt. 303, San Juan,

13  PR 00924-4501) for purposes of service is connected with an individual associated with settlement

14  claim fraud. *See* Zapala Decl. ¶ 36; and Engineer Decl. ¶¶ 11-12. The "503 Calle Modesta"

15  address is linked to an individual named "Karla Corea." *Id.* "Karla Corea" was connected to a

16  suspect claim in a case on which several of IPP counsel worked— *In re Transpacific Passenger*

17  *Air Transp. Antitrust Liti.*, No. 07-cv-05634-CRB (N.D. Cal.), ECF Nos. 1356 at 4 (noting that a

18  Nicaragua-based attorney, Karla Corea, who purportedly represented Corp Xanadu, emailed Class

19  Counsel threatening legal action). Judge Breyer, in *Transpacific*, disallowed that claim. *Id.* at ECF

20  No. 1378 ¶¶ 2-7; *see also In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 23-15118,

21  2024 WL 810703, at *1 (9th Cir. Feb. 27, 2024) (affirming district court), *cert. denied sub nom.*

22  *Xanadu Corp v. Adlin*, 145 S. Ct. 278 (2024).

23      **Finally,** another claims administrator has rejected multiple claims submitted by claimants

24  named "Pat" or "Patrick Zhen" for suspected fraud. Claims Administrator Angeion, which has

25  administered a number of class action settlements, has, on a number of occassions, received such

26  claims by Zhen. *See, generally* Hallman Decl. ¶¶ 7-21. Those claims were rejected because Zhen's

27  claims were associated with three different distinct email addresses and were associated with

28  fraud. *Id.* Angeion did so because, in each instance, "Mr. Zhen's" claim was associated with

---

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR**   14
**APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
**Case No. 5:20-cv-03639-EJD**

1   indicia of fraud.

2          **4.    Michael Sussman's Objection Lacks Merit and Is Associated with Indicia of Fraud**

3          Sussman objects on principally the same ground on which "Elman Barnes" objected—that

4   is, that claimants without a claim number must contact the claims administrator to get a claim

5   number and file a claim. This procedure is hardly burdensome or undue, especially since the

6   Court-appointed claims adminsitrator, Verita, imposed this requirement to avoid the filing of

7   fraudulent claims. *See* ECF No. 419.

8          As this Court found at final approval, Sussman's objection and arguments lack merit. *First*,

9   Sussman points to no actual provision in the Settlement itself that he claims to be unfair or

10  undeserving of final approval. His objection and appeal, therefore, are invalid on this basis alone.

11  *Second*, Sussman focuses on a procedure implemented not by the settlement agreement itself, but

12  by the claims administrator—an entity afforded with substantial discretion by courts to administer

13  its charge and weed ouf fraudulant claims. *See, e.g.*, *Gendron v. Shastina Props., Inc.,* 578 F.2d

14  1313, 1316 (9th Cir. 1978); *Miller v. Travel Guard Grp., Inc.*, No. 21-CV-09751-TLT, 2024 WL

15  5341150, at *21 (N.D. Cal. Apr. 9, 2024). Requiring potential claimants to engage in a double

16  authentication process to ensure they are not a "bot" to prevent the submission of false claims

17  saves the class substantial claims administration costs of adjudicating fraudulent claims is not

18  burdensome. Moreover, requiring claim numbers for online payment is neither unfair nor

19  burdensome. The claims administrator assigned claim numbers to anyone who filled out the

20  settlement intake form. See ECF No. 404. This form required only basic information, such as

21  name, address, and proof of purchase. *Id.* Once the claims administrator received the form, it sent

22  the claimant a claim number. *Id.*  As such, the objections lack merit.

23         Finally, like the other three Objectors, Sussman is associated with indicia of fraud. The

24  address Sussman provided (23200 Camino Del Mar, #503, Boca Raton, FL 33433), *see* ECF No.

25  403, does not appear to be an address for Sussman. It is not associated with anyone named "Mike"

26  or "Michael" Sussman. In connection with IPPs' continuing effort to verify these objectors' real

27  identity, IPPs attempted to serve Sussman with discovery and sent a process server to 23200

28  Camino Del Mar. The process server was unable to serve Sussman with the discovery, although he

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES; Case No. 5:20-cv-03639-EJD**    15

1   left a packet of information at the door that Sussman alleges is his address. *See* Declaration of

2   Reasonable Diligence from A&A Legal re: Mike Sussman. The process server spoke with

3   residents of the building *and* the property manager. Each resident and the property manager stated

4   that they did not know anyone by the name of Mike or Michael Sussman living at the address. *Id.*

5   It appears as though the address Sussman provided in connection with his objection is not actually

6   his address, additional indicia of fraud that further justifies the imposition of an appeal bond.

7          **D.     The Court Should Impose an Appeal Bond of $42,818 on Each of the**
                    **Objectors**

8                   Once a court decides to impose an appeal bond, it must decide the appropriate amount for

9   the bond. The Federal Rules of Appellate Procedure provide that a district court may tax costs

10  resulting from "(1) the preparation and transmission of the record; (2) the reporter's transcript, if

11  needed to determine the appeal; (3) premiums paid for a supersedeas bond or other bond to

12  preserve rights pending appeal; and (4) the fee for filing the notice of appeal." Fed. R. App. P.

13  39(e); *see also Netflix*, 2013 WL 6173772, at *4. In addition, the Ninth Circuit has held that "costs

14  other than those identified in FRAP 39 can qualify as 'costs' for purposes of Rule 7 if they are so

15  defined by some positive law, such as a fee-shifting statute." *Netflix*, 2013 WL 6173772, at *4

16  (citing *Azizian*, 499 F.3d at 958) ("[T]he costs identified in Rule 39(e) are among, but not

17  necessarily the only, costs available on appeal [for purposes of Rule 7]."). Additional costs, such

18  as the claims administration costs during the pendency of the appeal, can also be included in an

19  appeal bond, as this Court itself has held. *See Netflix*, 2013 WL 6173772, at *4; *In re Compact*

20  *Disc Minimum Advertised Price Antitrust Litig.*, No. 2:2000-md-01361, 2003 WL 22417252, at *1

21  (D. Me. Oct. 7, 2003) ("damages resulting from delay or disruption of settlement administration

22  caused by a frivolous appeal may be included in a Rule 7 bond"); *In re Broadcom Corp. Sec.*

23  *Litig.*, No. SACV-01-275-DT, 2005 U.S. Dist. LEXIS 45656, at *11–12 (C.D. Cal. Dec. 5, 2005).

24          **1.     The Bond Should Include Claims Administration Costs**

25                  Consistent with this Court's past decisions, it should include costs associated with the

26  claims administration process that the class will be forced to endure during the pendency of these

27  frivolous appeals. Courts, including this one, have repeatedly imposed claims administration costs

28  as costs associated with an appeal bond. For instance, in *Netflix*, this Court approved a privacy

---

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR   16**
**APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
**Case No. 5:20-cv-03639-EJD**

1   class action settlement over the objecton of certain objectors. *Netflix*, 2013 WL 1120801, at \*13.

2   When those objectors appealed, class counsel in that case sought an appeal bond, which included

3   the costs of claims administration that the class and counsel would endure while the objector

4   appeals proceeded. This Court granted the request, finding that "an appeal bond totaling $21,519

5   from each of the individual Objectors is proper[,]" which included claims administration costs. *See*

6   *also Azizian*, 499 F.3d at 958 (the court may include such expenses in the appeal bond if an

7   applicable rule or statute defines them as "costs"); *Miletak*, 2012 WL 3686785, at \*2 (including

8   $50,000 in "administrative costs" in the appeal bond, and defining such costs to include those

9   incurred in order "to continue to service and respond to class members' needs pending the

10   appeal") (internal quotations omitted); *In re Compact Disc*, 2003 WL 22417252, at \*1 ("damages

11   resulting from delay or disruption of settlement administration caused by a frivolous appeal may

12   be included in a Rule 7 bond"). Indeed, courts have granted bonds of up to $517,000, which

13   included the administrative costs of "updating address and other information needed to remain in

14   contact with Class members, locating lost Class members, sending notices to Class members to

15   apprise them of Objector's appeal and keep them informed about the status of the appeal, paying

16   monthly fees for maintaining the website created to inform Class members, and providing phone

17   support to answer inquiries from the Class members." *Broadcom*, 2005 U.S. Dist. LEXIS 45656,

18   at \*11–12.

19         As set forth in the evidence herein, Class Counsel expect that significant claims

20   administrative costs will be incurred pending the resolution of these frivolous appeals. These costs

21   include, but are not limited to, those necessary to: maintain and administer the Settlement Website

22   and toll-free phone number; answer questions from class members; manage and file taxes for the

23   settlement fund escrow account; process claims; and pay monthly storage costs. Class Counsel

24   projects, based on estimates from the court-appointed claims administrator, that the cost of

25   continuing such services will be approximately $2,595 per month, over a span of 16.5 months,[10]

26   _____

27   [10] *UNITED STATES COURT OF APPEALS for the NINTH CIRCUIT, Office of the Clerk,*

28   *FREQUENTLY ASKED QUESTIONS,* December 2023, https://www.ca9.uscourts.gov/general/faq/

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR   17
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

1  the average length of time from notice of appeal to decision in the Ninth Circuit. *See* Decl. of

2  Angelique Dizon in Supp. of IPPs' Mot. for Appeal Bond ¶¶ 3–4 (providing a detailed breakdown

3  of expenses associated with administration). Courts under similar circumstances have approved

4  administrative costs by multiplying the estimated monthly increase in settlement administration

5  costs by the median length of a Ninth Circuit appeal. *See Dennings v. Clearwire Corp.*, No. C10-

6  1859JLR, 2013 WL 945267, at *2 (W.D. Wash. Mar. 11, 2013) (approving $39,150 in

7  administrative costs in the amount of $39,150.00; using this "sound methodology that is supported

8  by evidence"). Accordingly, the Court should include $42,818 in increased and necessary

9  administrative costs (in addition to the $100 in taxable costs under Rule 39) when calculating each

10  bond to impose against the Objectors.

11          **2.**        **The Appeal Bond Should Include Taxable Costs Under Rule 39**

12        Rule 7 does not expressly require Plaintiffs to make any showing of costs for a bond

13  motion. *See* Rule 7; *In re Ins. Brokerage Antitrust Litig.*, MDL 1663, No. 04-5184 (GEB), 2007

14  WL 1963063, at *3 (D.N.J. July 2, 2007) (Rule 7 does not require any "showing of costs for a

15  bond motion"). Nonetheless, where a movant can show costs, courts incorporate them

16  when imposing appeal bonds, often to the tune of tens of thousands of dollars. *See In re Initial*

17  *Pub. Offering Sec. Litig.*, 721 F. Supp. 2d 210, 216 (S.D.N.Y. 2010), *opinion clarified*, No. 21

18  MC 92 SAS, 2010 WL 5186791, at *1 (S.D.N.Y. July 20, 2010) (awarding $25,000 in taxable

19  costs for copying and reproduction of the record); *Miletak*, 2012 WL 3686785, at *2 (granting

20  $10,000 in Rule 39 appellate costs alone); *In re MagSafe*, 2012 WL 2339721, at *1 (granting

21  $15,000 in taxable costs).

22        Here, the printing and administrative costs associated with responding to the appellate brief

23  will not be insignificant. Based on recent experience filing briefs in the Ninth Circuit, and in light

24  of the fact that the appeals have not yet—and may not ever—be consolidated, IPPs conservatively

25  estimate that the costs of printing, copying, and mailing the briefs in each appeal will total

26  approximately $175. Zapala Decl. ¶ 5. In two other recent Ninth Circuit appeals, counsel for IPPs

27  incurred printing and copying costs of $95.20 and $136, respectively, in addition to $60 in Federal

28  Express charges in each case. *Id.* A more precise estimate is not possible at this stage, as the

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR  18
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;
Case No. 5:20-cv-03639-EJD**

(325 of 346), Page 325 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 325 of 346
Case 5:20-cv-03639-EJD    Document 429    Filed 07/14/25    Page 25 of 27

1  ultimate cost will depend on the length of briefs that have yet to be written. Zapala Decl. ¶5.

2  **IV.    CONCLUSION**

3          This Court possesses ample authority and justification to require that each Objector post

4  Rule 7 appellate bonds. As explained above, each objection and subsequent appeal lacks legal

5  support and will delay the distribution of settlement money to the Class. The appellees should not

6  have to bear the costs of the unjustified appeal of these Objectors. Thus, IPPs respectfully request

7  that the Court enter an Order requiring each Objector to immediately post an appeal bond in the

8  amount of $42,818 or any other such amount that the Court finds appropriate.

9

10  Dated: July 14, 2025                          Respectfully Submitted,

11                                               */s/ Adam J. Zapala*

12                                               Adam J. Zapala (SBN 245748)
                                                 Elizabeth T. Castillo (SBN 280502)
13                                               Christian S. Ruano (SBN 352012)
                                                 **COTCHETT, PITRE & McCARTHY, LLP**
14                                               840 Malcolm Road
                                                 Burlingame, California 94010
15                                               Telephone: (650) 697-6000
                                                 Facsimile: (650) 697-0577
16                                               azapala@cpmlegal.com
                                                 ecastillo@cpmlegal.com
17                                               cruano@cpmlegal.com

18

19                                               */s/ Kalpana Srinivasan*
                                                 Kalpana Srinivasan (Bar No. 237460)
20                                               Marc M. Seltzer (Bar No. 54534)
                                                 Steven Sklaver (Bar No.237612)
21                                               Michael Gervais (Bar No. 330731)
                                                 **SUSMAN GODFREY L.L.P.**
22                                               1900 Avenue of the Stars, Ste. 1400
                                                 Los Angeles, CA 90067
23                                               Telephone: 310-789-3100
                                                 ksrinivasan@susmangodfrey.com
24                                               mseltzer@susmangodfrey.com
                                                 ssklaver@susmangodfrey.com
25                                               mgervais@susmangodfrey.com

26                                               Alejandra C. Salinas (pro hac vice)
                                                 Texas SBN 24102452
27                                               **SUSMAN GODFREY LLP**
                                                 1000 Louisiana Street, Suite 5100
28                                               Houston, Texas 77002

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR   19
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
**Case No. 5:20-cv-03639-EJD**

1

Telephone: (713) 651-9366
Facsimile: (713) 654-6666
asalinas@susmangodfrey.com

2

3

/s/ *Lin Y. Chan*
Eric B. Fastiff (SBN 182260)
efastiff@lchb.com
Lin Y. Chan (SBN 255027)
lchan@lchb.com
**LIEFF CABRASER HEIMANN &**
 **BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

4

5

6

7

8

9

*Co-Lead Counsel for the Indirect Purchaser*
*Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR    20**
**APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
**Case No. 5:20-cv-03639-EJD**

1

## **E-FILING ATTESTATION**

2

I, Adam J. Zapala, am the ECF User whose ID and password are being used to e-file this

3

document and all documents submitted therewith.  In compliance with Civil Local Rule 5-1(i)(3),

4

I hereby attest that each of the signatories have concurred in this filing.

5

6
                                            /s/ *Adam J. Zapala*
7                                           Adam J. Zapala

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR   21
APPEAL BOND; MEMORANDUM OF POINTS AND AUTHORITIES;**
**Case No. 5:20-cv-03639-EJD**

# EXHIBIT 17

1  Adam J. Zapala (SBN 245748)
   **COTCHETT, PITRE & McCARTHY, LLP**
2  840 Malcolm Road
   Burlingame, CA 94010
3  Telephone: (650) 697-6000
   azapala@cpmlegal.com
4
   Kalpana Srinivasan (SBN 237460)
5  **SUSMAN GODFREY L.L.P.**
   1900 Avenue of the Stars, Ste. 1400
6  Los Angeles, CA 90067
   Telephone: (310) 789-3100
7  ksrinivasan@susmangodfrey.com

8  Lin Y. Chan (SBN 255027)
   **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
9  275 Battery Street, 29th Floor
   San Francisco, CA 94111
10 Telephone: (415) 956-1000
   lchan@lchb.com
11
   *Co-Lead Counsel for the Indirect Purchaser Plaintiffs*
12
   [Additional Counsel Listed on Signature Page]
13

14              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
15                   **SAN JOSE DIVISION**

16

17 IN RE: TELESCOPES ANTITRUST            **Case No. 5:20-cv-03639-EJD**
   LITIGATION
18
                                          **INDIRECT PURCHASER PLAINTIFFS'**
19                                        **REPLY IN SUPPORT OF MOTION FOR**
                                          **APPEAL BOND**
20  _____

21 THIS DOCUMENT RELATES TO:             **Dept.: Courtroom 4**
                                          **Judge: Hon. Edward J. Davila**
22 All Indirect Purchaser Actions         **Date: August 14, 2025**
                                          **Time: 9:00 a.m.**
23  _____

24

25

26

27

28
   _____
   **INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR**
   **APPEAL BOND; Case No. 5:20-cv-03639-EJD**

1

## <u>TABLE OF CONTENTS</u>

2

**Page(s)**

3    **I.     INTRODUCTION** ......................................................................................... **1**

4    **II.     ARGUMENT** ................................................................................................ **2**

5
      **A.     It is Well-Settled that this Court Has Jurisdiction Over IPPs' Motion for an
6             Appeal Bond**........................................................................................ **2**

7    **B.     Objectors Do Not Deny That They Are Financially Able to Post Bonds** ........... **3**

8    **C.     Objectors Are Unlikely to Pay Costs If They Lose Their Appeal**...................... **3**

9    **D.     The Objectors Will Likely Lose the Appeal and Be Subject to Costs** ............... **4**

10   **E.     Objectors Do Not Refute the Indicia of Fraud Regarding Their Identities and
11            Claim Submissions** ............................................................................. **6**

12   **F.     The Imposition of Appeal Bonds in the Amount of$42,818 Are Appropriate**... **8**

13        **1.     IPPs' Request for the Imposition of Appeal Bonds Is Timely**................ **8**

14        **2.     The Appeal Bonds Are Reasonable** ..................................................... **8**

15        **3.     The Appeal Bonds Are Not Excessive** ................................................. **9**

16        **4.     Objectors' Proposed Appeal Bonds Are Inadequate** ............................ **10**

17        **5.     Interest Earned on the Settlement Fund Is Irrelevant**........................... **11**

18   **G.     IPPs Have Been Measured and Reasonable in Communicating with Objectors**
           ......................................................................................................... **11**

19
     **H.     The Subpoenas Served on Objectors Are Appropriate** .................................... **11**
20
     **III.     CONCLUSION** ......................................................................................... **13**

21

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4
5
*In re: Am. President Lines, Inc.*,
   779 F.3d 714 (D.C. Cir. 1985) ......................................................................... 10

6
*Boddie v. Connecticut*,
   401 U.S. 371 (1971) ........................................................................................ 10

7
8
*In re Broadcom Corp. Secs. Litig.*,
   No. SACV 01-275, LEXIS 45656 (C.D. Cal. Dec. 5, 2005). ......................... 2, 9

9
10
*Bros. Keeper Ministries v. United States*,
   No. 25-1864, 2025 WL 1723174 (9th Cir. May 23, 2025) ................................. 1

11
*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   281 F.R.D. 531 (N.D. Cal. 2012) ..................................................................... 12

12
13
*Clark v. Universal Builders, Inc.*,
   501 F.2d 324 (7th Cir.), *cert. denied,* 419 U.S. 1070 (1974) .......................... 10

14
15
*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
   No. 2:2000-md-01361, 2003 WL 22417252 (D. Me. Oct. 7, 2003) ................... 9

16
*D-Beam Ltd. P'ship v. Roller Derby Skates, Inc.*,
   366 F.3d 972 (9th Cir. 2004) ............................................................................. 1

17
18
*Embry v. ACER Am. Corp.*,
   C 09-01808 JW, 2012 WL 2055030 (N.D. Cal. June 5, 2012) ...................... 3, 5

19
20
*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
   33 F.3d 29 (9th Cir. 1994) ................................................................................. 6

21
*Fleury v. Richemont N. Am., Inc.*,
   No. C-05-4525 EMC, 2008 WL 4680033 (N.D. Cal. Oct. 21, 2008) ............ 3, 5

22
23
*Glasser v. Volkswagen of Am., Inc.*,
   645 F.3d 1084 (9th Cir. 2011) ........................................................................... 6

24
*Griggs v. Provident Consumer Discount Co.*,
   459 U.S. 56 (1982) ............................................................................................ 5

25
26
*In re Itel Secs. Litig.*,
   596 F. Supp. 226 (N.D. Cal. 1984), *aff'd* 791 F.2d 672 (9th Cir.1986) ........... 12

27
*Lindsey v. Normet*,
   405 U.S. 56 (1972) .......................................................................................... 10

28

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR**   ii
**APPEAL BOND; Case No. 5:20-cv-03639-EJD**

*Miletak v. Allstate Ins. Co.*,
    No. C 06-03778 JW, 2012 WL 3686785 (N.D. Cal. Aug. 27, 2012) ............................. 2, 9

*In re Netflix Priv. Litig.*,
    No. 5:11-CV-00379-EJD, 2013 WL 6173772 (N.D. Cal. Nov. 25, 2013) ............... *passim*

*O'Day v. George Arakelian Farms, Inc.*,
    536 F.2d 856 (9th Cir. 1976) ......................................................................................... 10

*United States v. Jacques*,
    6 F.4th 337 (2d Cir. 2021) ............................................................................................... 5

**Statutes**

California Civil Code § 1542 ...................................................................................................... 5

**Rules**

Fed. R. App. P. 4 ......................................................................................................................... 3

Fed. R. App. P. 7 ................................................................................................................. 4, 8, 9

Fed. R. App. P. 39 ....................................................................................................................... 9

Fed. R. Civ. P. 5 ........................................................................................................................ 13

Fed. R. Civ. P. 7 .......................................................................................................................... 9

Fed. R. Civ. P. 23 ........................................................................................................................ 6

Fed. R. Civ. P. 26 ...................................................................................................................... 12

Fed. R. Civ. P. 27 ...................................................................................................................... 13

Fed. R. Civ. P. 30 ...................................................................................................................... 12

Fed. R. Civ. P. 45 ...................................................................................................................... 12

Fed. R. Civ. P. 59 ........................................................................................................................ 3

Fed. R. Evidence 702 .................................................................................................................. 6

Ninth Cir. Rule 27 ..................................................................................................................... 13

## I.   INTRODUCTION

Indirect Purchaser Plaintiffs' ("IPPs") Motion for Appeal Bond should be granted in its entirety. IPPs filed a motion seeking for the Court to impose appeal bonds as to four objectors—Pat Zhen, National Woodlands Preservation, Inc. ("Woodlands"), Elman Barnes, and Mike Sussman (collectively, "Objectors")—in the amount of $42,818 for each objector ("Motion") (ECF No. 429). In the above-captioned action, Objectors filed a joint Notice of Appeal (ECF No. 421) and an Amended Notice of Appeal (ECF No. 428) in connection with the Order Granting Motion for Final Approval; Granting Motion for Attorneys' Fees, Expenses, and Service Awards ("Final Approval Order") (ECF No. 419), Judgment (ECF No. 420), and Amended Judgment (ECF No. 426). Each Objector filed a separate "opposition" to the Motion (collectively, "Opps."). Zhen Opp. (ECF No. 438); Sussman Opp. (ECF No. 440); Woodlands Opp. (ECF No. 441);[1] Barnes Opp. (ECF No. 442).

Objectors argue that IPPs seek appeal bonds to "punish" Objectors for their appeal. *See*, *e.g.*, Zhen Opp. at 1, 23; Sussman Opp. at 3.[2] Objectors are wrong. IPPs seek only an appeal bond based

---

[1] The Court should strike Woodlands' Opposition for attempting to proceed in *pro per*. Black letter law requires that, as a business entity, Woodlands must be represented in Court by counsel. Woodlands continues to file pleadings in this Court, and in the Ninth Circuit, on its own behalf and has failed to retain counsel. It cannot appear *in propria persona*. *See Bros. Keeper Ministries v. United States*, No. 25-1864, 2025 WL 1723174, at *1 (9th Cir. May 23, 2025) (citing *D-Beam Ltd. P'ship v. Roller Derby Skates, Inc.*, 366 F.3d 972, 973-74 (9th Cir. 2004)) ("[C]orporations and other unincorporated associations must appear in court through an attorney.").

[2] The Woodlands' Opposition incorporates Zhen's arguments. Woodlands Opp. at 1. The Woodlands' Opposition does not otherwise address imposition of the appeal bonds. Instead, it (1) objects to the subpoena that it received from IPPs; (2) addresses its business organization status without explaining the indicia of fraud associated with its conduct supporting the imposition of an appeal bond; and (3) objects to the Hallman Declaration, which states someone named "Karla Luna" (*i.e.,* the same name as its purported CEO) has filed claims in connection with other class actions settlements that Angeion

---

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION   1
FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

on estimated claims administration costs during the pendency of the appeal (*i.e.*, approximately 16.5 months) and estimated taxable costs on appeal. The Court should grant IPPs' Motion because (1) the grounds for Objectors' appeals are meritless and unlikely to succeed (Final Approval Order § II.B.5.b-e; Mot. § III.C), (2) their claims bear substantial indicia of fraud (Mot. § III.C), (3) their appeal will impose significant delay and costs on settlement administration and distribution (*id.* at 2, § III.D), and (4) due to the appellants' evasive tactics regarding their identities, it is unlikely that they will pay their costs on appeal, should the Ninth Circuit overrule their objections.

## II.      ARGUMENT

### A.      It Is Well-Settled that this Court Has Jurisdiction Over IPPs' Motion for an Appeal Bond

Zhen asserts that the Judgment terminated this Court's jurisdiction and thus precludes the trial court from ruling on a motion for an appeal bond. Zhen Opp. § I, n. 2. To the extent Zhen argues the Court lacks jurisdiction over the Motion because Objectors filed a Notice of Appeal, the Court should reject this argument.

Federal Rule of Appellate Procedure ("FRAP") 7 provides, "In a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." Various courts, including this one, have found appeal bonds appropriate and imposed them on objectors during the pendency of their appeals. *In re Netflix Priv. Litig.*, No. 5:11-CV-00379-EJD, 2013 WL 6173772, at *1, *5 (N.D. Cal. Nov. 25, 2013) (Davila, J.) ("*Netflix*"); *Miletak v. Allstate Ins. Co.*, No. C 06-03778 JW, 2012 WL 3686785, at *1-2 (N.D. Cal. Aug. 27, 2012*); In re Broadcom Corp. Secs. Litig.*, No. SACV 01-275 DT (MLGx), 2005 U.S. Dist. LEXIS 45656, *3-4, *18 (C.D. Cal. Dec. 5, 2005). This Court therefore has jurisdiction over the Motion.

Relatedly, Sussman suggests the Court lacked jurisdiction to enter the Amended Judgment on

---

Group rejected for indicia of fraud. Mot., Hallman Decl. ¶¶ 13-14. Similarly, the Barnes Opposition does not address the imposition of the appeal bonds and merely objects to the Hallman Declaration. *See generally* Barnes Opp.

1    June 23, 2025 after Objectors filed a Notice of Appeal on May 5, 2025 in connection with the

2    Judgment on April 11, 2025. Sussman Opp. at 2. But Federal Rule of Civil Procedure ("FRCP") 59(e)

3    expressly contemplates amended judgments, and FRAP 4(a)(4) extends the time for filing a notice of

4    appeal when a court enters an amended judgment. This Court therefore had the authority to enter the

5    Amended Judgment even after Objectors filed their Notice of Appeal under FRCP 59(e).

6    Furthermore, Sussman and Zhen did not suffer prejudice by entry of the Amended Judgment because

7    they filed an Amended Notice of Appeal in connection with the Amended Judgment on July 5, 2025,

8    and their opening brief before the Ninth Circuit is not due until September 2, 2025. *Zhen, et al.*, No.

9    25-3098 (9th Cir. July 21, 2025), ECF No. 16.

10        **B.    Objectors Do Not Deny That They Are Financially Able to Post Bonds**

11        In determining whether to impose an appeal bond, this Court first considers an appellant's

12   financial ability to post a bond. Mot. § III.A (citing *Netflix*, 2013 WL 6173772, at *3). Zhen and

13   Barnes and the entity, Woodlands, do not represent that they are financially unable to post bonds. *See*

14   *generally* Zhen Opp.; Woodlands Opp; Barnes Opp. While Sussman claims financial inability to post

15   a bond of $42,818, he misunderstands that the premium for a *surety bond amount* constitutes only a

16   small *percentage* of the bond amount, not the total bond amount. Sussman Opp. at 1. Requiring

17   Sussman to post a bond is even more important given the indicia of fraud associated with him. Mot.

18   § III.C.4. The facts largely show the Objectors have the financial ability to post bonds: They paid a

19   docketing fee for filing an appeal (Mot. at 5); all but one Objector did not raise any financial hardship

20   in connection with posting bonds (*id.*); and both Zhen and Barnes offered to post bonds (Zhen Opp.

21   § I; Barnes Opp. at 1). This first factor weighs in favor of imposing appeal bonds.

22        **C.    Objectors Are Unlikely to Pay Costs If They Lose Their Appeal**

23        The second factor assesses the risk that an appellant would not pay the costs if the appeal were

24   unsuccessful. Mot. § III.B (citing *Netflix*, 2013 WL 6173772, at *3). Courts in this District recognize

25   the difficulty and risk associated with collecting costs from out-of-state appellants; and with

26   appellants engaged in potential fraud, as the indicia suggests in this case. *Id.* (citing *Netflix*, 2013 WL

27   6173772, at *3; *Embry v. ACER Am. Corp.*, C 09-01808 JW, 2012 WL 2055030, at *1 (N.D. Cal.

28   June 5, 2012); *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008 WL 4680033, *7 (N.D.

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION    3
FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

1   Cal. Oct. 21, 2008)). Because enforcing an order imposing appeal costs would require seeking relief

2   in out-of-state district courts, collecting costs from purportedly out-of-state appellants like Zhen,

3   allegedly in Puerto Rico, Sussman in Florida, and Woodlands in West Virginia would be difficult.

4   Mot. § III.B (citing FRAP 7). Although Barnes purportedly resides in California, Class Counsel have

5   substantial concerns about his true identity and he has done nothing in his Opposition to rebut the

6   indicia of fraud raised as to his claims. *Id.* § III.C.1. IPPs have neither been able to physically serve

7   subpoenas on Zhen, Sussman, or Barnes at the addresses they provided nor at other addresses

8   associated with them through IPPs' investigation. Castillo Decl. ¶ 3. While Woodlands exists on

9   paper, it appears to be a shell operation with no physical or online presence, phone number, or email,

10   and its alleged CEO "Karla Luna" has submitted claims other class action settlement administrators

11   have rejected for indicia of fraud. Mot. § III.C.2.

12         Moreover, several other facts indicate that collecting costs from Objectors will be impossible.

13   No Objector personally appeared at the Fairness Hearing (nor, given the substantial doubt about their

14   true identities, do IPPs believe they will *ever* appear in person, even if ordered by this Court to do

15   so). Tr. of Proceedings 20:11-21 (Apr. 3, 2025). No Objector has provided proof of identity in the

16   form of government-issued identification or even proof of standing in the form of proof of purchase.

17   Castillo Decl. ¶¶ 4-5. No Objector has met-and-conferred with IPPs by videoconference or telephone

18   despite IPPs' repeated requests to do so. Mot. § III.A (citing Decl. of Kalpana Srinivasan in Supp. of

19   IPPs' Reply in Supp. of the Mot. for Final Approval of Settlement & Mot. for Award of Attorneys'

20   Fees, Reimbursement of Costs, & Service Awards (N.D. Cal. Mar. 21, 2025), ECF No. 407-1);

21   Castillo Decl. ¶ 6. Although someone claiming to be Barnes once called the cellphone of one of IPPs'

22   attorneys at a random time and left a voicemail, he failed to answer his phone when the attorney

23   returned his call. *Id.* ¶ 7. Barnes also never agreed to a set date and time to meet with IPPs and refused

24   to appear on video. *Id.* No Objector has represented that it will pay costs on appeal. *Id.* ¶ 8. Given

25   three Objectors' purported out-of-state residence and all Objectors' substantial indicia of fraud, this

26   second factor supports imposing appeal bonds.

27        **D.**    **The Objectors Will Likely Lose the Appeal and Be Subject to Costs**

28        The third factor assesses the likelihood that an appellant will lose the appeal and be subject to

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION**   **4**
**FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

costs. Mot. § III.C (citing *Netflix*, 2013 WL 6173772, at *3). Courts in this District have imposed appeal bonds on objectors in class actions after finding their objections meritless. *Id.* (citing *Embry*, 2012 WL 2055030, at *1; *Fleury*, 2008 WL 4680033, at *8). Here, this Court overruled each Objector's objections, finding them meritless. Final Approval Order § II.B.5.b-e. Neither the Zhen Opposition nor the Barnes Opposition addresses the merits of their objections. *See generally* Zhen Opp.; Barnes Opp. The Woodlands Opposition merely reiterates its objection that entities could not submit claims to the settlement, which is verifiably false. Woodlands Opp. at 2; Final Approval Order § II.B.5.b. The Sussman Opposition focuses on the Court's lack of jurisdiction, which IPPs address *supra* § II.A. Moreover, Sussman's Opposition relies on cases involving criminal procedure and arbitrability—two issues far removed from the situation here. *United States v. Jacques*, 6 F.4th 337 (2d Cir. 2021) analyzes criminal procedure and *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982), is a case concerning whether a district court must stay its proceedings during an interlocutory appeal on arbitrability. *See* Sussman Opp. at 2-3.

The Objectors will most likely lose their appeals because none of them have provided proof of purchase to establish standing—let alone, proof of their identity. Castillo Decl. ¶¶ 4-5. Consequently, none of the Objectors have standing to object or appeal. *Id.* Zhen, even if he could provide proof of purchase in Puerto Rico, is not a member of the Settlement Class because the Settlement Class *does not include* Puerto Rico purchasers. Mot. § III.C.3.

Furthermore, Objectors would also likely lose the appeal on the merits for the following reasons: (1) Woodlands' objection is based on the (mistaken) argument that entities could not submit claims, which is inaccurate and moot (Final Approval Order § II.B.5.b); (2) Barnes' objection to the California Civil Code § 1542 waiver in the Settlement Agreement was overruled given its uncontroversial nature in the class action context (*id.* § II.B.5.c); (3) Sussman's objection that the settlement notice did not contain adequate information on submitting an objection was inaccurate (*id.* § II.B.5.e), particularly because he *filed* an objection; and (4) finally, Barnes and Sussman's objections to the claims administration process were overruled because courts have routinely approved similar such processes in other cases and the settlement administrator, Verita Global, LLC, in this case used an effective and necessary tool to prevent fraud (*id.* § II.B.5.c, e). Given each

(338 of 346), Page 338 of 346
Case: 25-3098, 09/03/2025, DktEntry: 27.2, Page 338 of 346
Case 5:20-cv-03639-EJD    Document 443    Filed 08/04/25    Page 10 of 18

1    Objector's lack of standing and meritless objections, the third factor supports imposing appeal bonds.

2    **E.    Objectors Do Not Refute the Indicia of Fraud Regarding Their Identities and Claim Submissions**

3

4    It is uncontroverted that only class members can object to a proposed settlement. *See* FRCP

5    23(e)(5)(A). The Ninth Circuit has repeatedly held that "only an aggrieved class member" has

6    standing to object to a proposed settlement. Mot. § III.C.3 (citing *In re First Capital Holdings Corp.*

7    *Fin. Prods. Sec. Litig. (In re First Capital)*, 33 F.3d 29, 30 (9th Cir. 1994)). The Ninth Circuit also

8    regularly dismisses appeals for lack of standing. *Id.* (citing *Glasser v. Volkswagen of Am., Inc.*, 645

9    F.3d 1084, 1089 (9th Cir. 2011)). As discussed *supra* § II.D, no Objector has agreed to validate their

10   identity with government-issued identification. Castillo Decl. ¶ 4. No Objector has provided any

11   proof of purchase to establish standing. *Id.* ¶ 5. Further, no Objector has met-and-conferred with IPPs

12   by phone or by videoconference despite IPPs' repeated requests. *Id.* ¶ 6. Indeed, the Objectors have

13   repeatedly avoided engaging in any contact that would facilitate verification of their identity. The

14   Objectors' persistent avoidance was the first indication of fraud.

15   As to each Objector, IPPs have presented other, substantial indicia of fraud, which none have

16   refuted in their Oppositions:

17   - <u>"Patrick Zhen"</u> Instead of providing a residential or mailing address, Zhen provided a P.O.

18   Box on his pleadings; his filings do not deny an affiliation with "Karla Corea," who is

19   connected to a fraudulent claimant in another class action; and he does not refute that he

20   submitted multiple claims to other class settlements that were rejected for indicia of fraud.

21   Mot. § III.C.3.[3] Additionally, Zhen filed a group notice of appeal on behalf of the other

22   purported Objectors. *See* ECF No. 421 (obtaining signatures of other purported objectors).

23

24   [3] Zhen attempts to discredit the Hallman Declaration by arguing that it lacks the "scientific rigor

25   necessary for admissibility as an expert opinion under Federal Rule of Evidence 702." Zhen Opp. §

26   III. But IPPs attach the Hallman Declaration to illustrate a history of claims rejected based on indicia

27   of fraud, which is based on the organization's personal knowledge—not as an expert opinion under

28   Rule 702. Even so, Zhen points to nothing in the Declaration that purportedly lacks "scientific rigor."

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION   6**
**FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

And yet Zhen does not explain how he was able to confer with the other three Objectors *and* obtain their signatures for purposes of filing the Notice of Appeal on behalf of all of them. Zhen's silence on this issue is notable: Woodlands failed to provide a phone number, email address, or a physical address associated with it on its pleadings. *Id.* § III.C.2. Thus, the information provided by Woodlands in connection with its objection made it impossible to contact it because the address it provided was not its own, but an address for a West Virginia registered agent service. Mot., Hedley Decl. ¶ 14. Indeed, Class Counsel were not even able to contact Woodlands and its purported CEO "Karla Luna" during attempted meet and confers at the final approval stage. Mot., Zapala Decl. ¶¶ 24-27, 31. Nonetheless, Zhen (an alleged arms' length objector who apparently had no prior connection to Woodlands) was able to procure "Ms. Luna's" signature on the Notice of Appeal. Zhen does not explain how this occurred. Moreover, the indicia of fraud associated with Zhen is not limited to this action: in another recent consumer class action, the plaintiffs submitted a response to Zhen's objection to a settlement which describes his lack of standing, his refusal to validate his identity, and the red flags raised by his claim. *See* Castillo Decl., Ex. 1 (Class Counsel's Response to the Objection of Pat Zhen, *Kessler, et al. v. The Quaker Oats Co.*, No. 7:24-cv-00526-KMK (July 21, 2025), ECF No. 57). Zhen's conduct there mirrors his conduct here.

- <u>Sussman</u> Sussman likely provided a fake residential address. Although he contends that he "accidentally" provided the wrong apartment number on his pleadings, he fails to explain why his apartment building's property manager and other residents did not know anyone by the name of Mike or Michael Sussman living in the apartment building when a process server spoke to them in connection with attempting service of a subpoena on him. Mot. § III.C.4.

- <u>Woodlands</u> Woodlands' Certificate of Existence and Business Entity Details by itself does not legitimize its business operations or confer standing to object or appeal. Woodlands Opp., Exs. 3-4. Moreover, Woodlands' Opposition to the Motion fails to rebut the indicia of fraud associated with it in connection with the Motion. It omits any explanation for its lack of physical presence, online presence, phone number, or email address. It does not explain why it has no record of ever having employed any individuals or explanation of why an entity with

INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION   7
FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD

1     no employees and no physical or online presence would have purchased telescopes. It does

2     not explain the total lack of a connection with a legitimate individual named "Karla Luna,"

3     much less an individual purporting to have that name who is its CEO.  Nor does it refute the

4     evidence that its claimed CEO is the same Karla Luna who submitted multiple claims rejected

5     for indicia of fraud in connection with other class action settlements. Mot. § III.C.2.

6     •  <u>Barnes</u> Barnes fails to refute the facts IPPs present showing that his claimed identity is likely

7     a sham. *Id.* § III.C.1. Additionally, he fails to address, much less rebut, his inconsistent

8     mailing address, his inconsistent signature, and the discrepancy between the Sacramento

9     mailing address he provided and the Santa Clarita post office from where the letter was

10    mailed. *Id.* Nor does he explain why no person named "Elman Barnes" appears to exist at all

11    based on Class Counsel's investigation. *Id.* And, consistent with the other Objectors, he fails

12    to explain why he continues to avoid getting on any video calls with Class Counsel to verify

13    his identity.

14    The above facts regarding the specter of fraud further support the likelihood that Objectors

15  will lose the appeal and be subject to costs (and likely sanctions), and warrant the imposition of appeal

16  bonds.

17       **F.**     **The Imposition of Appeal Bonds in the Amount of $42,818 Are Appropriate**

18            **1.**     **IPPs' Request for the Imposition of Appeal Bonds Is Timely**

19    Zhen argues the Motion, which IPPs filed on July 14, 2025, is untimely, noting that they

20  should have filed it "three months ago when [Objectors'] Notice of Appeal was filed." Zhen Opp. at

21  1-2. FRAP 7 does not impose a deadline for an appellee to move for an appeal bond or for a district

22  court to impose an appeal bond. Here, as in *Netflix*, IPPs moved the Court to impose appeal bonds on

23  Objectors after the Court held a Fairness Hearing and Objectors filed their Notice of Appeal. *Netflix*,

24  2013 WL 6173772, at *1–2. This Court granted the motion for appeal bond in *Netflix*, requiring each

25  Objector to either post a $21,519 bond or file a notice of dismissal of his or her appeal. *Id.* at *5. The

26  Motion is therefore timely.

27            **2.**     **The Appeal Bonds are Reasonable**

28    Zhen and Barnes contend the appeal bonds are excessive. Barnes improperly claims the appeal

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION  8
FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

1  bond should be limited to $50, the purported maximum value of his recovery. Barnes Opp. at 1.

2  Pursuant to FRAP 7, the Court may set the appeal bond at the "amount necessary to ensure payment

3  of costs on appeal." These costs include taxable costs under FRAP 39(e). The Ninth Circuit has held

4  that other costs qualify for purposes of FRCP 7. Mot. § III.D.

5      In *Netflix*, this Court identified claims administration costs during the pendency of the appeal

6  as one such cost that qualifies FRCP 7's purposes. *Netflix*, 2013 WL 6173772, at *4. Other district

7  courts agree.[4] Zhen and Barnes are therefore wrong that an appeal bond must be limited to taxable

8  costs (Zhen Opp. § V) or the purported maximum value of his claim (Barnes Opp. at 1).

9      Here, IPPs request that each Objector post an appeal bond of $42,818 based on claims

10 administration costs and taxable costs under Rule 39. Mot. § III.D. Consistent with *Netflix*, these costs

11 do not include attorneys' fees. *Netflix*, 2013 WL 6173772, at *4 n. 2. Appeal bonds are not excessive

12 merely because the appellants who must post them find them subjectively too high. Courts have

13 imposed appeal bonds higher than IPPs seek here under similar circumstances. Mot. § III.D.1 (citing

14 *Miletak*, 2012 WL 3686785, at *2 (appeal bond of $50,000); *Broadcom*, 2005 U.S. Dist. LEXIS

15 45656, at *11-12 (appeal bond of $517,700)). The Court should impose an appeal bond of $42,818

16 on each Objector. To the extent the Court credits Sussman's claim of financial hardship, it should

17 nevertheless impose an appeal bond for a reduced but nonetheless robust amount. Imposing an appeal

18 bond as to Sussman is important given that he is out-of-state, his objection is meritless, and the indicia

19 of fraud. *See supra* § II.C-E.

20              **3.    The Appeal Bonds Are Not Excessive**

21     Zhen claims the appeal bonds are "excessive" and therefore unconstitutional. Zhen Opp. § VI.

22 The cases on which Zhen relies grapple with circumstances not present here—situations in which the

23

24

25

---

26 [4] *See* Mot. § III.D (citing *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. 2:2000-

27 md-01361, 2003 WL 22417252, at *1 (D. Me. Oct. 7, 2003); *Broadcom*, 2005 U.S. Dist. LEXIS

28 45656, at *11–12).

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION  9**
**FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

appeal bond did not relate to permissible appeal costs or state law due process issues.[5] As discussed *supra* § II.F.2, courts have imposed appeal bonds in amounts *exceeding* the amount sought here. Furthermore, Zhen's reference to "Class Counsel's demand for $42,000" suggests that, like Sussman, he misunderstands that the premium for a surety bond amount is calculated as a small percentage of the bond amount (*i.e.*, he would not have to pay $42,818 to post a bond of $42,818). Zhen Opp. § VI; *see supra* § II.B.[6]

### 4.    Objectors' Proposed Appeal Bonds Are Inadequate

Zhen and Barnes offer to post bonds of $250 and $50, respectively. Zhen Opp. § I; Barnes Opp. at 1. But those proposed amounts are inadequate to ensure payment of IPPs' costs on appeal, estimated at $42,818. Mot. § III.D. Additionally, the amount of $42,818 had assumed an appeal duration of 16.5 months (*id.* § III.D.1) and has only increased since Zhen recently moved for and received a 30-day extension for all Objectors to file the opening brief with the Ninth Circuit.[7] Zhen and Barnes' proposed amounts also fail to account for the difficulty and risk associated with

---

[5] Zhen Opp. § VI (citing *Lindsey v. Normet,* 405 U.S. 56, 77 (1972) (double-bond requirement for appealing an Oregon Forcible Entry and Wrongful Detainer Statute action unconstitutional because appeal was unrelated to actual rent accrued or specific damage sustained by the landlord)); *O'Day v. George Arakelian Farms, Inc.*, 536 F.2d 856, 860 (9th Cir. 1976) (holding double-bond requirement had no rational relationship to the payment of interest on the award and costs of appeal); *Clark v. Universal Builders, Inc.,* 501 F.2d 324, 341–42 (7th Cir.), *cert. denied,* 419 U.S. 1070 (1974) (this case briefly discusses assessment of costs, not bonds); *In re: Am. President Lines, Inc.,* 779 F.3d 714, 716, 718-19 (D.C. Cir. 1985) (remanding case to district court where appeal bond was excessive because it was based on attorneys' fees); *Boddie v. Connecticut*, 401 U.S. 371, 380 (1971) (discussing how due process of law prohibits a state from denying access to its courts to indigents who seek judicial dissolution of their marriages).

[6] To the extent Objectors fail to find a surety company to extend an appeal bond to them because they will not verify their identities, this failure corroborates the indicia of fraud present here.

[7] *Zhen, et al.*, No. 25-3098 (9th Cir. July 21, 2025), ECF No. 16.

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION    10
FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

1 collecting costs from them. *See supra* § II.C.

2         **5.     Interest Earned on the Settlement Fund Is Irrelevant**

3        Zhen maintains the Court need not impose appeal bonds given that the settlement is accruing

4 interest, which will likely offset claims administration costs during the pendency of Objectors'

5 appeal. Zhen Opp. § V.d. However, any interest earned on the settlement fund does not relate to the

6 amount of an appeal bond. *See Netflix*, 2013 WL 6173772, at *3 (listing three relevant factors in

7 determining whether to impose an appeal bond, none of which are interest earned on the settlement

8 fund).

9         **G.     IPPs Have Been Measured and Reasonable in Communicating with Objectors**

10        Zhen accuses IPPs of abusing, intimidating, harassing, and punishing Objectors in this matter.

11 Zhen Opp. §§ I-V. Other Objectors suggest the same. Sussman Opp. at 3; Woodlands Opp. at 1-2;

12 *see generally* Barnes Opp. These accusations are baseless. Indeed, the correspondence between IPPs

13 and Objectors, some of which are attached to the Oppositions,[8] only show that IPPs have been

14 reasonable and accommodating in their ongoing efforts to meet-and-confer with Objectors since they

15 filed objections to final approval of the settlement. *See* Mot. § III.A (detailing Class Counsel's efforts

16 to meet and confer with these Objectors before the fairness hearing in an attempt to resolve their

17 purported "objections."). As the correspondence confirms, it is the Objectors that have avoided IPPs'

18 repeated efforts to discuss their objections and appeal. Each Objector could have quickly dispelled

19 the indicia of fraud by verifying their identities, proof of purchase, and contact information, but have

20 repeatedly refused to do so.

21         **H.     The Subpoenas Served on Objectors Are Appropriate**

22        Finally, although not relevant to the Motion, Zhen, Sussman, and Woodlands challenge the

23 discovery subpoenas they received in connection with their objections and appeal. Zhen Opp. at 5-6;

24 Sussman Opp. at 2; Woodlands Opp. at 1. But, as discussed above, the subpoenas are relevant both

25 to the Court's determination of whether to impose appeal bonds on Objectors and its continuing duty

26 to oversee administration of the Settlement and its judgment. *See supra* §§ II.B-D.

27 ———————————————

28 [8] Zhen Opp., Exs. 1-8; Susmann Opp., Ex. 1; Woodlands Opp., Ex. 1.

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION  11
FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

1    Contrary to Zhen's contention (Zhen Opp. § II), IPPs do not need to seek leave to serve

2    subpoenas on Objectors. The subpoenas are proper because Objectors voluntarily appeared in

3    litigation and are therefore subject to discovery. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*,

4    281 F.R.D. 531, 533 (N.D. Cal. 2012) (finding post-judgment discovery served on objectors

5    appropriate under FRCP 26 regardless of whether styled as FRCP 30 (party) or FRCP 45 (non-party)

6    so long as it seeks non-privileged material "relevant to the claim or defense of any party"). IPPs may

7    seek information from objectors to obtain relevant, needed, and narrowly tailored information

8    regarding each objector's standing as a settlement class member to assert objections, the underlying

9    basis for its objections, and its relationship with counsel that may be pertinent to informing the court

10   about the nature and merits of the appeal. *Netflix*, 2013 WL 6173772, at *5 (citing *CRT*, 281 F.R.D.

11   at 533-34). Here, IPPs served subpoenas on Objectors to establish their purchase(s), their identities

12   (which appear fraudulent), relationships with each other, and objections to other class settlements.

13   Zhen Opp., Ex. 6; Sussman Opp., Ex. 1; Woodlands Opp., Ex. 1. The subpoenas constitute needed

14   and narrowly tailored discovery seeking information regarding Objectors' standing, true identities,

15   motivations, relationships, and history of objections in other cases.

16       Finally, this Court retains jurisdiction to preserve the integrity of its judgments in general and,

17   specifically, to protect the Court's final judgment. *Netflix*, 2013 WL 6173772, at *4; *In re Cathode*

18   *Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. at 533-34; *In re Itel Secs. Litig.*, 596 F. Supp. 226, 233

19   (N.D. Cal. 1984), *aff'd* 791 F.2d 672 (9th Cir.1986). The Final Approval Order and Amended

20   Judgment confirm this fact. *See* Final Approval Order at 20 ("Without affecting the finality of this

21   Order in any way, the Court retains jurisdiction of all matters relating to the interpretation,

22   administration, implementation, effectuation, and enforcement of this Order and the Settlement

23   Agreement."); Amended Judgment ¶ 1 ("The Court has jurisdiction over the subject matter of this

24   litigation, the Actions within this litigation, and the parties to the Settlement, including all members

25   of the Settlement Class and Defendants."). Discovery from Objectors therefore also falls under the

26   Court's continuing jurisdiction under the Final Approval Order and Final Judgment. This Court

27

28

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION   12**
**FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

1   should disregard Objectors' challenges regarding the propriety of the timing of the subpoenas.[9]

2   **III.    CONCLUSION**

3          For the foregoing reasons, the Court should order each Objector to post a bond of $42,818 (or

4   any other such amount that the Court finds appropriate) or file a notice of dismissal of its appeal. IPPs

5   have demonstrated that multiple factors indicate it is unlikely that any Objector will pay court-

6   mandated costs in the likely event they lose their appeal.

7

8   Dated: August 4, 2025                    Respectfully Submitted,

9                                             */s/ Elizabeth T. Castillo*

10                                            Adam J. Zapala (SBN 245748)
                                              Elizabeth T. Castillo (SBN 280502)

11                                            Christian S. Ruano (SBN 352012)
                                              **COTCHETT, PITRE & McCARTHY, LLP**

12                                            840 Malcolm Road
                                              Burlingame, California 94010

13                                            Telephone: (650) 697-6000
                                              Facsimile: (650) 697-0577

14                                            azapala@cpmlegal.com
                                              ecastillo@cpmlegal.com

15                                            cruano@cpmlegal.com

16

17                                            */s/ Kalpana Srinivasan*

18                                            Kalpana Srinivasan (Bar No. 237460)
                                              Marc M. Seltzer (Bar No. 54534)

19                                            Steven Sklaver (Bar No.237612)
                                              Michael Gervais (Bar No. 330731)

20                                            **SUSMAN GODFREY L.L.P.**
                                              1900 Avenue of the Stars, Ste. 1400

21                                            Los Angeles, CA 90067

22                                            Telephone: 310-789-3100

23   [9] Plaintiffs further discuss the appropriateness, relevance, and burden and expense of complying with

24   these subpoenas in (1) Plaintiffs' Response to Pat Zhen's Emergency Motion Pursuant to Federal

25   Rule of Civil Procedure 5.2(e) for a Protective Order filed concurrently herewith and (2) Plaintiffs'

26   Response to Appellant Pat Zhen's Emergency Motion Under Circuit Rule 27-3 for a Protective Order

27   and for Sanctions filed before the Ninth Circuit. *Zhen, et al. v. Synta Technology Corp., et al.*, No.

28   25-3098 (9th Cir. July 30, 2025), ECF No. 15.1.

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION    13
FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**

1             ksrinivasan@susmangodfrey.com
mseltzer@susmangodfrey.com
2             ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com
3

4             Alejandra C. Salinas (*pro hac vice*)
Texas SBN 24102452
5             **SUSMAN GODFREY LLP**
1000 Louisiana Street, Suite 5100
6             Houston, Texas 77002
Telephone: (713) 651-9366
7             Facsimile: (713) 654-6666
8             asalinas@susmangodfrey.com

9             */s/ Lin Y. Chan*
Eric B. Fastiff (SBN 182260)
10            efastiff@lchb.com
Lin Y. Chan (SBN 255027)
11            lchan@lchb.com
12            **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
13            275 Battery Street, 29th Floor
San Francisco, California 94111
14           Telephone: (415) 956-1000
Facsimile: (415) 956-1008
15

16            *Co-Lead Counsel for the Indirect Purchaser Plaintiff*

**INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION 14 FOR APPEAL BOND; Case No. 5:20-cv-03639-EJD**