**Nos. 25-3098**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

IN RE: TELESCOPES
ANTITRUST LITIGATION

ZHEN, et al.,
*Objectors-Appellants*,

v.

INDIRECT PURCHASER PLAINTIFFS,
*Plaintiffs-Appellees,*

v.

SYNTA TECHNOLOGY CORP., ET AL.,
*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of California, San Jose Division
Hon. Edward J. Davila
D.C. No. 5:20-cv-03639–EJD

**EXCERPTS OF RECORD
VOLUME 5 OF 7**

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

Kalpana Srinivasan (SBN 237460)
**SUSMAN GODFREY LLP**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE &**
**McCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

*Settlement Class Counsel for Indirect Purchaser Plaintiffs-Appellees*

Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

Kalpana Srinivasan (Bar No. 237460)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | **Case No. 5:20-cv-03639-EJD** |
| This Document Relates to: | **DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN** |
| All Indirect Purchaser Actions | |

I, Carla A. Peak, pursuant to 28 U.S.C. § 1746 declare as follows:

1.      My name is Carla A. Peak. I have personal knowledge of the matters set forth herein, and if called as a witness I could and would testify competently to them.

2.      I am Vice President of Legal Notification Services for Verita Global, LLC ("Verita"), formerly KCC Class Action Services, LLC or KCC, a firm that provides comprehensive class action services, including legal notification, email and postal mailing campaign implementation, website design, call center support, class member data management, claims processing, check and voucher disbursements, tax reporting, settlement fund escrow and reporting, and other related services critical to the effective administration of class actions. Verita has developed efficient, secure and cost-effective methods to properly handle the voluminous data and mailings associated with the noticing, claims processing and disbursement requirements of settlements to ensure the orderly and fair treatment of class members and all parties in interest.

3.      I am a nationally recognized expert in the field of legal notification and I have served as an expert in over 500 federal and state cases involving class action notice plans.

4.      Verita has been selected by counsel for the parties to serve as the Settlement Administrator for the settlement in this case.

5.      I provide this Declaration to describe my and Verita's experience,[1] as well as the proposed notice plan (the "Notice Plan" or "Notice Program") for the Settlement[2] designed to provide notice to Settlement Class Members for this class action settlement. Verita will work with the parties to implement the Notice Plan, as well as make any decisions about notice and administration.

**EXPERIENCE**

6.      As an industry leader, Verita has been retained to administer more than 7,500 class actions and distributed settlement payments totaling well over a trillion dollars. Our experience

---

[1] KCC acquired Gilardi & Co. LLC in 2015. KCC and Gilardi rebranded as Verita in June 2024. This Declaration combines the class action notice and administration experience of both firms.

[2] Capitalized terms not defined herein are defined in the Settlement Agreement.

1

**5-ER-0802**

includes many of the largest and most complex administrations of both private litigation and of actions brought by state and federal government regulators.

7.    Verita has administered notice plans in a wide range of class actions in the Northern District of California, for example: *Abante Rooter and Plumbing, Inc. v. Alarm.com Inc.*, No. 4:15-cv-06314 11; *Aruliah v. Impax Laboratories, Inc.*, No. 3:14-cv-03673; *Banks v. Nissan North America, Inc.*, No. 4:11-cv-02022; *Bonoan v. Adobe, Inc.*, No. 3:19-cv-01068; *Camberis v. Ocwen Loan Servicing, LLC*, No. 3:14-cv-02970; *Chen v. Chase Bank USA, N.A.*, No. 3:19-cv-01082; *Chinitz v. Intero Real Estate Services*, No. 5:18-cv-05623; *Cisneros v. American General Financial Services, Inc.*, No. 3:11-cv-02869; *Diaz v. Google LLC*, No. 5:21-cv-03080; *Drieu v. Zoom Video Communications, Inc.*, No. 3:20-cv-02353; *Edwards v. National Milk Producers Federation*, No. 4:11-cv-04766; *Ehret v. Uber Technologies, Inc.*, No. 3:14-cv-00113; *Heath v. Google LLC*, No. 5:15-cv-01824; *Hickcox-Huffman v. US Airways, Inc.*, No. 5:10-cv-05193; *Hendricks v. StarKist Co.*, No. 4:13-cv-00729; *Holman v. Experian Information Solutions, Inc.*, No. 4:11-cv-00180; *In re Anthem, Inc. Data Breach Litig.*, No. 5:15-md-02617; *In re Carrier IQ, Inc., Consumer Privacy Litig.*, No. 3:12-md-02330; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 4:07-cv-05944; *In re Extreme Networks, Inc. Securities Litig.*, No. 5:15-cv-04883; *In re Facebook Biometric Information Privacy Litig.*, No. 3:15-cv-03747; *In re HIV Antitrust Litig.*, No. 3:19-cv-02573; *In Re GEICO General Insurance Co.*, No. 4:19-cv-03768; *In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521; *In Re LinkedIn User Privacy Litig.*, No. 5:12-cv-03088; *In Re Lithium Ion Batteries Indirect Antitrust Litig.*, No. 4:13-md-02420; *In Re: NCAA Athletic Grant-In-Aid Antitrust Litig.*, No. 4:14-md-02541; *In re Nexus 6P Products Liability Litig.*, No. 5:17-cv-02185; *In re: Nvidia GTX 970 Graphics Chip Litig.*, No. 4:15-cv-00760; *In Re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-02143; *Johnson v. Triple Leaf Tea Inc.*, No. 3:14-cv-01570; *Knight v. Concentrix Corp.*, No. 4:18-cv-07101; *McArdle v AT&T Mobility LLC*, No. 4:09-cv-01117; *Mullins v. Premier Nutrition Corp.*, No. 3:13-cv-01271; *Nevarez v. Forty Niners Football Company, LLC*, No. 4:16-cv-07013; *Norris v. Mazzola*, No. 3:15-cv-04962; *Perks v. Activehours Inc.*, No. 5:19-cv-05543; *Perrine v. Sega of America, Inc.*, No. 3:13-cv-01962; *Schneider v.*

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

**5-ER-0803**

*Chipotle Mexican Grill, Inc*., No. 4:16-cv-02200; *Sheikh v. Tesla, Inc*., No. 5:17-cv-02193; *Ragano v. Michaels Stores, Inc*., No. 3:11-cv-03908; *Slovin v. Sunrun, Inc*., No. 4:15-cv-05340; *Steinfeld v. Discover Financial Services*, No. 3:12-cv-01118; and *Weeks v. Google LLC*, No. 5:18-cv-00801.

8.      Verita has also administered notice plans in a wide range of federal antitrust class actions, including: *Barba v. Shire U.S., Inc*., No. 1:13-cv-21158 (S.D. Fla.); *In re Aftermarket Filters Antitrust Litigation*, No. 1:08-cv-04883 (N.D. Ill.); *In re Asacol Antitrust Litigation*, No. 1:15-cv-12730 (D. Mass.); *In re Blood Reagents Antitrust Litigation*, No. 09-md-2081 (E.D. Pa.); *In re Domestic Drywall Antitrust Litigation*, No. 2:13-md-02437 (E.D. Pa.); *Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Company, Ltd.*, No. 2:09-cv-00852 (E.D. Wis.); *In re College Athlete NIL Litigation*, No. 20-cv-03919 (N.D. Cal.); *In re: Fresh and Process Potatoes Antitrust Litigation*, 4:10-md-02186 (D. Idaho); *In re HIV Antitrust Litigation*, No. 3:19-cv-2573 (N.D. Cal.); *In re Hypodermic Products Antitrust Litigation*, No. 05-cv-1602 (D. N.J.); *In re Intuniv Antitrust,* No. 1:16-cv-12396 (D. Mass.); *In Re Korean Ramen Antitrust Litigation*, No. 13-cv-4115 (N.D. Cal.); *In re Lidoderm Antitrust Litigation,* No. 3:14-md-02521 (N.D. Cal.); *In re Lithium Ion Batteries Indirect Antitrust Litigation*, No. 13-md-02420 (N.D. Cal.); *In re: Nexium (Esomeprazole) Antitrust Litig*., No. 1:12-md-2409 (D. Mass.); *In re Potash Antitrust Litigation* (II), No. 1:08-cv-06910 (N.D. Ill.); *In re Remicade Antitrust Litigation*, No. 2:17-cv-04326 (E.D. Pa.);  *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 1:14-md-02503 (D. Mass.); *In re: Skelaxin (Metaxalone) Antitrust Litigation*, No. 1:12-md-02343 (E.D. Tenn.); *In re Thalomid and Revlimid Antitrust Litigation*, No. 2:14-cv-06997 (D.N.J.); and *In re Titanium Dioxide Antitrust Litigation*, No. 10–CV–00318 (D. Md.).

9.      I have personally been involved in many large and significant cases, including *In re Experian Data Breach Litigation*, No. 8:15-cv-01592 (C.D. Cal.), a national data breach class action involving over 15 million T-Mobile consumers whose information was stored on an Experian server; *In re: The Home Depot, Inc., Customer Data Security Breach Litig.,* No. 1:14-md-02583 (N.D. Ga.), a national data breach class action involving over 40 million consumers

3

**5-ER-0804**

who made credit or debit card purchases in a Home Depot store; *In re: Skelaxin (Metaxalone) Antitrust Litigation*, No. 1:12-md-02343 (E.D. Tenn.), a multi-state antitrust settlement involving both third party payors and consumers that purchased or paid for the brand and generic version of the prescription drug metaxalone; *Chambers v. Whirlpool Corporation*, No. 8:11-cv-01733 (C.D. Cal.), a national product defect case involving class members who experienced or may experience the overheating of an automatic dishwasher control board; *In re Trans Union Corp. Privacy Litigation*, MDL No. 1350 (N.D. Ill.), perhaps the largest discretionary class action notice campaign involving virtually every adult in the United States and informing them about their rights in the $75 million data breach settlement; and *In re Residential Schools Litigation*, No. 00-CV-192059 (Ont. S.C.J.), the largest and most complex class action in Canadian history incorporating a groundbreaking notice program to disparate, remote aboriginal persons qualified to receive benefits in the multi-billion dollar settlement.

10.  Verita has worked with the Interim Co-Lead Counsel firms as notice and claims administrator in numerous other class actions. These include, but are not limited to, *Cymbalista v. JPMorgan Chase Bank NA*, No. 2:20-cv-00456 (E.D.N.Y.); *Dennis v. Amerigroup Washington, Inc.*, No. 3:19-cv-05165 (W.D. Wash.); *Diaz v. Google LLC*, No. 5:21-cv-03080 (N.D. Cal.); *Gutierrez v. Wells Fargo Bank, N.A.*, No. 3:07-cv-05923 (N.D. Cal.); *In re Anadarko Basin Oil and Gas Lease Antitrust Litig.*, No. 16-cv-209 (W.D. Okla.); *In re A-Power Energy Generation Systems, Ltd. Securities Litig.*, No. 2:11-ml-2302 (C.D. Cal.); *In re Diamond Foods, Inc. Securities Litig.*, No. 3:11-cv-05386 (N.D. Cal.); *In re LendingClub Securities Shareholder Litig.*, No. CIV 537300 (Calif. Super. San Mateo Cty.); *In re Medical Capital Securities Litig.*, No. 10-ml-02145 (C.D. Cal.); *In re Mercedes-Benz Tele Aid Contract Litig.*, No. 2:07-cv-02720 (D.N.J.); *In re Titanium Dioxide Antitrust Litigation*, No. 10–CV–00318 (D. Md.); *Kerrigan Capital LLC v. David Strohm, et al.*, No. 534431 (Calif. Super. San Mateo Cty.); *Pine v. A Place For Mom, Inc.*, No. 2:17-cv-01826 (W.D. Wash.); *Shephard v. Lowe's HIW, Inc.*, No. 3:12-cv-03893 (N.D. Cal.); *Steinfeld v. Discover Financial Services*, No. 3:12-cv-01118 (N.D. Cal.); *Tait v. BSH Home Appliances Corp.*, No. 10-cv-00711 (C.D. Cal.); *Wannemacher v. Carrington Mortg. Servs., LLC*,

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

No. 8:12-cv-02016 (C.D. Cal.); *Weisblatt v. Apple, Inc*., No. 5:10-cv-02553 (N.D. Cal.); and *Zaborowski v. MHN Government Services, Inc*., No. 3:12-cv-05109 (N.D. Cal.).

11.      In forming my opinions, I draw from my in-depth class action case experience. I have worked in the class action notification field for more than 20 years. During that time, I have been involved in all aspects in the design and implementation of class action notice planning, as well as the drafting of plain language notice documents that satisfy the requirements of Rule 23 and adhere to the guidelines set forth in the *Manual for Complex Litigation, Fourth* and by the Federal Judicial Center ("FJC").

12.      The reach of the Notice Program is consistent with other effective court-approved notice programs. Additionally, the Notice Program is intended to comply with the FJC's 2010 Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (the "FJC Checklist"), which considers at least 70% reach among class members to be reasonable.

### NOTICE PLAN

### *Proposed Class Definition*

13.      The Settlement Class is defined as all persons and entities in the Indirect Purchaser States[3] who, during the period from January 1, 2005 to September 6, 2023, purchased one or more Telescopes from a distributor (or from an entity other than a Defendant) that a Defendant or alleged co-conspirator manufactured. Excluded from the Class are Defendants; their parent companies, subsidiaries and Affiliates; any co-conspirators; Defendants' attorneys in this Action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this Action; all jurors in this Action; and all Persons who directly purchased Telescopes from Defendants but only for those direct purchases of Telescopes.

### *Individual Notice*

---

[3] "Indirect Purchaser States" means Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

14.     The estimated size of the Settlement Class is 4 million consumers. It is my understanding that contact information is available for 2,641,850 Settlement Class Members. Of these, approximately 2,500,000 can be provided with notice via Amazon.[4]

15.     In May, IPP Counsel provided Verita with 13 data files. Verita combined the data files to create the "Class List." The Class List was reviewed and analyzed to remove duplicates and standardized addresses. Upon completion of this analysis, the Class List contained 422,934 records. Of these, 256,049 were deemed to be duplicates based on name, address and email addresses. After removing the duplicate records, 166,875 unique records remained on the Class List. Of the 166,875 unique records, 4,636 contain only an email address, 91,828 contain only a postal address, 45,386 contain both an email and postal address, and 25,025 do not have an associated email or postal address.

16.     Verita will send an email notice to all Settlement Class Members for which an email address is available on the Class List. The proposed email notice is attached as Exhibit A. Prior to distributing the email notice, all email addresses will be subject to a cleansing and validation process to, among other things, remove extra spaces and fix common domain name errors, as well as compare addresses against known bad email addresses and verify email existence with Internet Service Providers ("ISPs").

17.     The email notice will be formatted to avoid common "red flags" that could cause the email to be blocked by spam filters. For example, the content of the notice will be placed in the body of the email rather than as an attachment to avoid spam filters and improve deliverability. The email notice will contain a link to the case website.

18.     The email campaign will return data regarding the number of emails successfully delivered and email bouncebacks. Where an email is undeliverable, and a mailing address is available, notice will be sent by mail.

---

[4] Amazon uses personal information to deliver and communicate with customers about their purchases of products and services. https://www.amazon.com/gp/help/customer/display.html?nodeId=G6CVQVUVGMD3BJQ2 (last visited Apr. 9, 2024.)

6

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

19.     Verita will send a postcard notice to all Settlement Class Members whose email was known to be undeliverable and a corresponding postal address exists, or only a postal address is available on the Class List. The proposed postcard notice is attached as Exhibit B. Prior to mailing, the postal addresses will be checked against the National Change of Address (NCOA)[5] database maintained by the USPS; certified via the Coding Accuracy Support System (CASS);[6] and verified through Delivery Point Validation (DPV).[7]

20.     Notices returned by the USPS as undeliverable will be re-mailed to any address available through postal service forwarding order information. For any returned mailing that does not contain an expired forwarding order with a new address indicated, Verita will conduct further address searches using credit and other public source databases to attempt to locate new addresses and will re-mail these notices where possible.

*Target Analysis*

21.     To develop the media notice campaign and verify its effectiveness, MRI-SIMMONS/comScore multi-platform data[8] was studied among a proxy target of adults who participate in stargazing. This proxy target differs from the class definition but is necessary and

---

[5] The NCOA database contains records of all permanent change of address submissions received by the USPS for the last four years. The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and last known address.

[6] Coding Accuracy Support System is a certification system used by the USPS to ensure the quality of ZIP+4 coding systems.

[7] Records that are ZIP+4 coded are then sent through Delivery Point Validation to verify the address and identify Commercial Mail Receiving Agencies. DPV verifies the accuracy of addresses and reports exactly what is wrong with incorrect addresses.

[8] For decades, MRI and Simmons Research conducted two of the most trusted consumer studies in the United States. MRI's 'Survey of the American Consumer' was the gold standard for consumer audiences across industries. In 2021, MRI-Simmons combined these trusted, gold-standard consumer studies to launch MRI-Simmons USA, the most comprehensive study on American consumers. This high-quality, nationally representative study provides marketers, media, and agencies with the most accurate consumer truth set. Released quarterly, MRI-Simmons USA employs address-based probabilistic sampling, measuring real people, randomly chosen to represent the US population in all its variations.

7

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

common in class action notice plans. The reported characteristics, demographics, interests, and media habits of the proxy target aided in the media planning and selection process.

*Media Campaign*

22.     In addition to the individual notice efforts described above, Verita has created a robust, multi-faceted online and print media campaign to provide the best notice possible to Settlement Class Members under the circumstances of this litigation.

23.     Verita will implement a media campaign consisting of online advertisements, print publications, and a press release. The proposed publication notice is attached as Exhibit C.

24.     Approximately 23,850,000 digital impressions will be purchased programmatically via one or more ad exchanges and distributed over various websites and the social media platforms Facebook, Instagram and Reddit. The impressions will be targeted to internet users who have likely purchased telescopes, demonstrated an online interest in Celestron, telescopes, astronomy, stargazing, sky/star maps, astrophotography, astroimaging, telescope accessories, astronomical accessories, and/or used stargazing apps and sky guides, where available.

25.     The notices will appear on both desktop and mobile devices, including tablets and smartphones, in display and native ad formats. All digital media notices will include an embedded link to the settlement website.

26.     The Notice Plan also includes a paid search campaign to help drive Settlement Class Members who are actively searching for information about the litigation to the dedicated settlement website. Paid search ads are driven by the user's search activity, meaning that if someone searches for (or has recently searched for) terms related to the litigation, the user may be served with an advertisement directing them to the dedicated settlement website. The search terms used as part of the paid search campaign will directly relate to the settlement, as well as the subject matter of the class action.

27.     The digital media campaign will be monitored by Verita's digital specialists to analyze key campaign performance indicators and make real-time modifications, as needed.

8

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

**5-ER-0809**

*Specialty Media*

28.     Verita will promote a co-branded post on *Astronomy Magazine's* Facebook page which has over 1.4 million followers. Astronomy targets amateur astronomers, and contains columns on sky viewing, reader-submitted astrophotographs, articles on astronomy and astrophysics for general readers, as well as telescope reviews.

29.     Digital advertisements will appear on *Sky & Telescope's* website (skyandtelescope.org) for a one-month period. Approximately 100,000 digital impressions will be achieved during this time. A digital banner ad will also be published in its weekly newsletter.

30.     *Sky & Telescope* is run by the American Astronomical Society. Its content covers all aspects of amateur astronomy, delivers the latest astro-gear product reviews as well as news, science observing tips, and imaging techniques. Its website receives over 500,000 unique visitors per month and its weekly newsletter has approximately 63,000 subscribers.

*Press Release*

31.     Verita will cause a press release to be issued nationwide to a variety of press outlets, including Associated Press (AP) News.[9] The press release will help garner "earned media" (*i.e.*, other media may report about the story). Earned media can provide a valuable role in distributing news and information about the litigation through trusted sources.

*Response Mechanisms*

32.     Verita will establish and maintain a case-specific website to allow Settlement Class Members to obtain additional information about the settlement as well as relevant court filings from the action. Settlement Class Members will be able to complete their claims forms online. Settlement Class Members will be also able to view, download, and/or print the long form Website Notice, the operative Class Action Complaint, Defendant's Answer to the Class Action Complaint, the Settlement Agreement, Plaintiffs' Motion for Preliminary Approval, the Court's Preliminary

---

[9] The Associated Press is an American not-for-profit news agency headquartered in New York City. Founded in 1846, it operates as a cooperative, unincorporated association, and produces news reports that are distributed to its members, major U.S. daily newspapers and radio and television broadcasters.

Approval Order, and other relevant documents and court filings. The proposed long form notice is attached as Exhibit D. Settlement Class Members will also be able to review a list of frequently asked questions and answers, and important dates and deadlines.

33.     Verita will establish a case-specific toll-free number to allow Settlement Class Members to call to learn more about the settlement in the form of frequently asked questions and speak with a live representative to answer settlement related questions. The toll-free number will also allow Settlement Class Members to request to have additional information mailed to them.

34.     Verita will establish a case-specific email address to allow Settlement Class Members to correspond directly with Verita regarding the settlement.

<b>CLAIMS PROCESS</b>

35.     To obtain a settlement payment, Settlement Class Members must submit a claim form online or by mail. A draft claim form is attached as Exhibit E. Each identifiable Settlement Class Member who is sent an individual notice will be assigned a unique identifier or "Claim ID" that may be used to expedite claims filing by "pre-populating" name, mailing address, and/or email address information. Claim IDs will be provided in the Individual Notices. Settlement Class Members who receive an individual notice and wish to file a claim form online may enter their Claim ID to view and submit a claim form that has been automatically pre-populated with information corresponding to their unique identifier.

36.     The claim form will seek information necessary to validate and process Settlement Class Members' claims, such as their full name, mailing address, telephone number, email address, and any documentation necessary to substantiate their claim, as well as their signature as verification that all information provided on the claim form is accurate. If a claim is denied due to lack of signature or other required information or documentation, the Settlement Class Member will be notified and provided with an opportunity to correct the claim.

37.     Verita will process all claim forms in accordance with the Settlement Agreement. Claims rates vary depending on multiple factors and can be extremely challenging to predict with certainty. Although the exact size of the Settlement Class is unknown for this Settlement, based

10

<b>5-ER-0811</b>

on Verita's expertise and experience with settlements of this nature and class size (approximately 4 million indirect purchaser consumers), we estimate the claims rate will be between 1.0%-7.5%. The claims rate could be more or less than estimated and will ultimately be determined at the conclusion of the administration.

***Payment***

38.     Settlement Class Members who submit valid and timely claims will have the choice of receiving payment through either (i) direct payment by check, or (ii) digital payment through services such as Zelle, PayPal, Venmo, or Amazon.

**PROCEDURES FOR SECURELY HANDLING DATA**

39.     Verita designed its in-house processing platform to securely safeguard client information, as well as mitigate potential external and internal fraud. Verita implements assurance controls that assure: (1) data transmission between Verita and its client organizations are complete; (2) new claims (participant data and noticing materials) are established accurately and completely; (3) claims processing is performed completely and accurately; (4) disbursements are authorized and performed accurately and completely; (5) output is printed accurately (e.g. claim forms, deficiency letters, etc.); (6) processing is appropriately authorized and scheduled and that deviations from scheduled processing are identified and resolved; (7) physical access to the data center is restricted to properly authorized individuals; and (8) changes to the existing applications are authorized, tested, approved, and properly implemented.

40.     As a result of providing administrative services within the public sector, most notably with the SEC, Verita continues to develop its system security posture. As a contractor, Verita is subject to annual reviews according to the SEC's information security program.

**INSURANCE**

41.     Verita's services agreement governs the terms and conditions of Verita's employment, including liability and acceptance of responsibility. Verita maintains insurance

11

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

**5-ER-0812**

applicable to its services including professional indemnity insurance, general liability, property, comprehensive crime, electronic and computer crime, and cyber liability insurance.

### NOTICE PLAN COSTS

42. According to the Settlement Agreement, Verita will be paid exclusively out of the Settlement Fund. Verita has agreed to cap the costs of notice and settlement administration at $450,500. These costs are based upon the scope of work currently contemplated and include tasks such as data intake and processing, distributing the Email Notice, printing and mailing the Mail Notice, address searches, re-mailing Mail Notices to updated and/or newly located addresses, postage, the media campaign, the declaration in support of preliminary approval, weekly case reporting, setting up and maintaining the Settlement Website, including the Website Notice, processing claims and exclusion requests, automated call support (including script drafting and management, monthly maintenance fees, updates, listening to, transcribing and responding to voicemails), processing claims filed, curing deficient claims, claim calculations, disbursements and handling, and staff hours.

43. The costs of settlement administration are consistent with industry standards and cases of similar size and expected scope. These estimated costs are the product of extensive pre-administration consultation with the parties on the expected scope of work. Notice and settlement administration costs as a general matter are a combination of media placements, unitized pricing, and hourly rates. While Verita can and does project costs based upon input from the parties about the likely engagement, informed by our own experience, ultimately, we are a neutral third-party administrator tasked with handling any administrative tasks requested and required by the circumstances of the administration, regardless of whether the administration falls within projections or greatly exceeds them. These realities are beyond Verita's control and cannot be altered by Verita to limit the work required.

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

**5-ER-0813**

**CONCLUSION**

44.    The proposed Notice Plan is expected to reach more than 80% of the Class, on average 1.6 times each, through the direct and indirect notice efforts described above. Coverage will be further enhanced through the specialty media and press release.

45.    In my opinion, the Notice Plan proposed is consistent with other effective settlement notice programs. It is the best notice practicable and meets the "reasonably certain to inform" due process communications standard of *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). The Notice is consistent with the guidelines set forth in Rule 23, the *Manual for Complex Litigation, Fourth*, and the FJC Checklist, which considers 70% reach among class members to be a "high percentage" and reasonable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of September 2024, at Ocean City, New Jersey.

_____

Carla A. Peak

13

**5-ER-0814**

# Exhibit A

14

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

To:
From: Notice Administrator <XXXXXX@website.com>
Subject: Telescope Class Action and Settlement Notice

This is a Court-Approved Legal Notice about a Class Action Lawsuit.

## If you purchased a telescope from January 1, 2005 to September 6, 2023, you *may* be entitled to a payment from a $32 million class action settlement.

**Visit www.[website].com to learn more or to file a Claim Form online.**

You have been identified as a potential member of a class action Lawsuit that could affect your rights and you may be eligible to receive a payment from a settlement.

A settlement has been proposed by the Indirect Purchaser Plaintiffs in a class action lawsuit against Synta Technology Corp. of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon, USA LLC; Dar Tson ("David") Shen; Joseph Lupica; Dave Anderson; Jean Shen; Sylvia Shen; Jack Chen; Laurence Huen; and Corey Lee ("Settling Defendants and Co-Conspirators"). The other, non-settling, defendants and co-conspirators are Ningbo Sunny Electronic Co. Ltd.; Sunny Optical Technology Co., Ltd.; Meade Instruments Corp.; Sunny Optics Inc.; Wenjun "Peter" Ni; and Wenjian Wang. The lawsuit claims defendants and co-conspirators (1) unlawfully divided the consumer telescopes market and fixed prices for consumer telescopes and (2) unlawfully attempted to monopolize and conspired to monopolize the consumer telescope market in the United States. The settlement resolves the Indirect Purchaser Plaintiffs claims against the Settling Defendants and Co-Conspirators only.

**Who is included?**

Records collected during the litigation indicate that you might be covered by the settlement. The settlement includes all persons and entities in the Indirect Purchaser States who, from January 1, 2005 to September 6, 2023, purchased one or more Telescopes from a distributor (or from any entity other than a defendant) that any defendant or alleged co-conspirator manufactured ("Settlement Class Members"). Indirect Purchaser States include Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

"Telescopes" refers to optical instruments that magnify and enhance the view of faraway objects, and does *not* include other optical instruments not marketed as telescopes, such as binoculars, siting scopes, microscopes, etc. Typically, such telescopes were branded Celestron, Orion, Skywatcher, Zhumell, or Meade.

**What does the settlement provide?**

The Settling Defendants have agreed to create a $32,000,000 settlement fund to provide cash payments to Settlement Class Members who submit a valid Claim Form.

**What are my options?**

You may (1) participate in the settlement and receive your portion of the settlement fund, (2) request to exclude yourself from the settlement, or (3) object to the settlement.

3030370.4

Participate in the Settlement.  If you wish to participate in the settlement and receive your portion of the settlement fund, you must complete and submit a Claim Form by **Month __, 2024**. Claim Forms are available and may be filed online at www.[website].com. You can also visit the website to have a paper claim form mailed to you.

Exclude Yourself from the Settlement.  If you do not want to be legally bound by the settlement, you must exclude yourself by **Month __, 2024**. Unless you exclude yourself from the settlement, you will not be able to sue the Settling Defendants and Co-Conspirators for any claim released by the Settlement Agreement. Instructions on how to exclude yourself from the settlement are available at www.[website].com.

Object to the Settlement.  If you wish to object to the settlement, you must file or mail a written object with the Clerk of the Court.  If you wish to appear at the Court hearing to determine the fairness of the settlement, you must notify the Court that you or your lawyer intend to appear at the Court's fairness hearing. Objections are due **Month __, 2024**. Instructions on how to object to the settlement are available at www.[website].com.

**The Court's Fairness Hearing.**

The Court will hold a fairness hearing in this case (*In Re Telescopes Antitrust Litig. Indirect Purchaser Actions*, No. 5:20-cv-03639-EJD) on Month __, 2024, at __:_0 _.m. At this hearing, the Court will decide whether to approve: (1) the settlement; (2) Interim Co-Lead Counsel's request for up to __% of the settlement fund in attorneys' fees and expenses; and (3) $_,000 Service Awards to each Named Plaintiff. You may appear at the hearing, but you do not have to. You also may hire your own attorney, at your own expense, to appear or speak for you at the hearing.

**WANT MORE INFORMATION?**

Visit www.[website].com, email ____@website.com, call 1-8xx-xxx-xxxx, or write to *In Re Telescopes Antitrust Litig. Indirect Purchaser Actions* Settlement Administrator, [address] [city][ST].

3030370.4

# Exhibit B

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD



United States District Court
*In Re Telescopes Antitrust Litig. Indirect Purchaser Actions*
Case No. 5:20-cv-03639-EJD

## Class Action Notice
*Authorized by the U.S. District Court*

| **Did you purchase a telescope from January 1, 2005, to September 6, 2023?** |  | **There is a $32,000,000 settlement of a lawsuit.**<br><br>**You may be entitled to money.** |  | **To be part of this settlement, you can respond by [date].**<br><br>**You can visit [website] to learn more.** |
| --- | --- | --- | --- | --- |

**Key things to know:**

- This is an important legal document.
- If you take no action, any ruling from the court will apply to you, and you will not be able to sue Synta Tech. Corp. of Taiwan; Suzhou Synta Optical Tech. Co. Ltd.; Nantong Schmidt Opto-Electrical Tech. Co. Ltd.; Synta Canada Intl. Ent. Ltd.; Pacific Telescope Corp.; Olivon Mfg. Co. Ltd.; SW Tech. Corp.;

Celestron Acquisition, LLC; Olivon, USA LLC; Dar Tson ("David") Shen; Joseph Lupica; Dave Anderson; Jean Shen; Sylvia Shen; Jack Chen; Laurence Huen; and Corey Lee about the same issues.

- If you have questions or need assistance, please call [phone number]
- You can learn more at [website] or by scanning the QR code.

# Court-Approved
# Legal Notice



<<MAIL ID>>

<<NAME 1>>
<<NAME 2>>
<<ADDRESS LINE 1>>
<<ADDRESS LINE 2>>
<<ADDRESS LINE 3>>
<<ADDRESS LINE 4>>
<<ADDRESS LINE 5>>
<<CITY, STATE ZIP>>
<<COUNTRY>>

This is an important notice
about a class action lawsuit.

# Exhibit C

16

**5-ER-0822**

LEGAL NOTICE

# If you purchased a telescope from January 1, 2005 to September 6, 2023, you *may* be entitled to a payment from a $32 million class action settlement.

**Visit www.[website].com to learn more or to file a Claim Form online.**

A settlement has been proposed by the Indirect Purchaser Plaintiffs in a class action lawsuit against Synta Technology Corp. of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon, USA LLC; Dar Tson ("David") Shen; Joseph Lupica; Dave Anderson, Jean Shen; Sylvia Shen; Jack Chen; Laurence Huen; and Corey Lee ("Settling Defendants and Co-Conspirators"). The other, non-settling, defendants or co-conspirators are Ningbo Sunny Electronic Co. Ltd.; Sunny Optical Technology Co., Ltd.; Meade Instruments Corp.; Sunny Optics Inc.; Wenjun "Peter" Ni; and Wenjian Wang (collectively, "Non-Settling Defendants and Co-Conspirators"). The lawsuit claims defendants and co-conspirators (1) unlawfully divided the consumer telescopes market and fixed prices for consumer telescopes and (2) unlawfully attempted to monopolize and conspired to monopolize the consumer telescope market in the United States. The settlement resolves the Indirect Purchaser Plaintiffs' claims against the Settling Defendants and Co-Conspirators only.

**Who is included?** The settlement includes all persons and entities in the Indirect Purchaser States who, from January 1, 2005 to September 6, 2023, purchased one or more Telescopes from a distributor (or from any entity other than a defendant) that any defendant or alleged co-conspirator manufactured ("Settlement Class Members"). "Indirect Purchaser States" include Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

"Telescopes" refers to optical instruments that magnify and enhance the view of faraway objects, and does not include other optical instruments not marketed as telescopes, such as binoculars, siting scopes, microscopes, etc. Typically, such telescopes were branded Celestron, Orion, Skywatcher, Zhumell, or Meade.

**What does the settlement provide?** The Settling Defendants have agreed to create a $32,000,000 settlement fund to provide cash payments to Settlement Class Members who submit a valid claim form.

**What are my options?** You may (1) participate in the settlement and receive your portion of the settlement fund, (2) request to exclude yourself from the settlement, or (3) object to the settlement.

**5-ER-0823**

<u>Participate in the Settlement</u>. If you wish to participate in the settlement and receive your portion of the settlement fund, you must complete and submit a claim form by Month __, 2024. Claim forms are available and may be filed online at www.[website].com. You can also visit the website to have a paper claim form mailed to you. A claim may be made regardless of whether you purchased a telescope manufactured by a Settling Defendant or a Non-Settling Defendant or Co-Conspirator.

<u>Exclude Yourself from the Settlement</u>.  If you do not want to be legally bound by the settlement, you must exclude yourself by Month __, 2024. Unless you exclude yourself from the settlement, you will not be able to bring your own lawsuit against the Settling Defendants and Co-Conspirators for any claim released by the settlement agreement. Instructions on how to exclude yourself from the settlement are available at www.[website].com.

<u>Object to the Settlement</u>.  If you wish to object to the settlement, you must file or mail a written objection to the Clerk of the Court.  If you wish to appear at the Court hearing to determine the fairness of the settlement, you must notify the Court that you or your lawyer intend to appear at the Court's fairness hearing. Objections must be filed or postmarked by Month __, 2024. Instructions on how to object to the settlement are available at www.[website].com.

**The Court's Fairness Hearing.** The Court will hold a fairness hearing in this case (*In Re Telescopes Antitrust Litig. Indirect Purchaser Actions*, No. 5:20-cv-03639-EJD) on Month __, 2024, at __:_0 _.m. At this hearing, the Court will decide whether to approve: (1) the settlement; (2) Interim Co-Lead Counsel's request for up to 33% of the settlement fund in attorneys' fees; (3) Interim Co-Lead Counsel's request for reimbursement of litigation expenses not to exceed $XXXX; and (3) $3,000 service awards for each named class representative. You may appear at the hearing, but you do not have to. You also may hire your own attorney, at your own expense, to appear or speak for you at the hearing.

**Want more information?** Visit www.[website].com, email ___@website.com, call 1-8xx-xxx-xxxx or write to *In Re Telescopes Antitrust Litig. Indirect Purchaser Actions* Settlement Administrator, [address] [city][ST].

# Exhibit D

17

**5-ER-0825**



United States District Court for the Northern District of California

*In re Telescopes Antitrust Litigation Indirect Purchaser Actions*

Case No. 5:20-cv-03639-EJD

# Class Action Notice

## *Authorized by the U.S. District Court*

| **Did you purchase a telescope from January 1, 2005, to September 6, 2023?**<br><br>*A class action lawsuit and a settlement of part of that lawsuit could affect your rights.*<br><br>*You may be eligible to receive a payment from a $32 Million settlement.* | **Your options:**<br><br>**1. Make a claim.** *Get a payment.*<br><br>**2. Do nothing.** *You will get no payment and be bound by the settlement and the lawsuit.*<br><br>**3. Opt out of the settlement or the lawsuit.**<br><br>**4. Object to the settlement.** | <u>**You are not being sued.**</u><br><br>*This notice explains the lawsuit, the settlement, and your legal rights and options.*<br><br>*Please read entire notice carefully.* |
|---|---|---|



**You need to make a decision about the settlement.**

**To make the best decisions for you, read on.**

Important things to know:
- You must file a claim to receive money from the settlement.
- If you do nothing, you will still be bound by the settlement and the lawsuit, and your rights will be affected.
- If you want to opt out or object, you must do so by MONTH XX, 2024
- You can learn more at: *www.[website].com*

## Table of Contents

**Key Information**…………………………………………………………................. 3

What is happening in this lawsuit?
What are my options?
What are the most important dates?

**Learning About The Lawsuit**…………………………………………………….......4

What is this Lawsuit about?
Why is there a Settlement?
Who are the Settling Defendants and Co-Conspirators?

**Important Facts About How The Settlement Might Affect You**………………………………………… 5

How do I know if I am a member of the Settlement Class?
Who manufactured the Telescopes included in the Settlement?
What if I'm still not sure if I'm included in the Settlement Class?
What are the consequences of doing nothing?
What if I don't want to be part of the Settlement Class?
How do I submit an objection to the Settlement?

**Opting Out / Excluding Yourself**…………………………………………………………8

What are the consequences of excluding myself?
If I opt out of the Settlement Class, can I still get a cash payment?
How do I opt out?

**The Lawyers Representing You**…………………………………………………………8

Do I have a lawyer in the case?
How will Interim Co-Lead Counsel be paid?

**Key Resources**…………………………………………………………………………...9

How I get more information?

2995150.8

**5-ER-0827**

## Key Information

| **What is happening in this lawsuit?** |
| --- |

A group of people filed a class action lawsuit against Synta Technology Corp. of Taiwan (aka Synta Technology Corp. and Good Advance Industries Ltd.); Suzhou Synta Optical Technology Co., Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd. Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC and Olivon USA, LLC (collectively, "the Synta Defendants") and related individuals. These plaintiffs claimed that they paid more for telescopes than they would have paid had the Synta Defendants and related individuals not allegedly conspired to unlawfully fix or stabilize prices for Telescopes. In the same complaint, this group of people also filed a class action lawsuit Ningbo Sunny Electronic Co. Ltd. ("Ningbo Sunny").

| **What is a class action lawsuit?** |
| --- |
| A class action is a lawsuit in which one or more people sue on behalf of a larger group called the Class. |

The Synta Defendants and related individuals have agreed to pay $32 million to settle claims against them. The group of people who Synta has agreed to pay is called the settlement class and it includes everyone who indirectly purchased one or more telescopes from January 1, 2005 to September 6, 2023, from a distributor/retailer that was manufactured by a defendant or alleged co-conspirator, while located in Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, or Wisconsin ("Indirect Purchaser States"). Typically, the qualifying telescopes related to this lawsuit were branded "Celestron", "Orion", "Skywatcher", "Zhumell" or "Meade."

If you are in this class and would like to get paid, you must <u>file a claim</u> by returning a claim form or make a claim on the settlement website at <u>www.[website].com</u>.

| **What are my options?** |
| --- |

| | |
| --- | --- |
| **Make a Claim to Get Paid from the Settlement** | To receive a payment from the settlement, you must make a claim. You can do so on this website. [ONLINE: Click here to make a claim. / PAPER: You can return a claim form by mail or make a claim at www.[website].com.] |
| | The only way to receive a settlement payment is to make a valid claim. |
| | If you bought a qualifying telescope, you may have received an email or postcard with a claim code saying you are part of the settlement. You can use your claim code to file a claim for a payment <u>here</u>. If you did not receive an email or postcard, but believe you purchased a qualifying telescope, you can make a claim at <u>www.[website].com.</u> You can also visit the website if you would like to have a paper claim form mailed to you. |
| **Do Nothing** | If you do nothing: |
| | • You will *not* get any money from the settlement; |

2995150.8

3

|  | |
|---|---|
|  | • You will remain in the settlement class and your claims against the Settling Defendants and Co-Conspirators will be bound by the orders of the Court; and<br><br>• You will *not* retain your right to bring your own lawsuit against the Synta Defendants for the conduct described above.<br><br><u>Read below</u> for more details about the types of claims covered by the lawsuit. |
| **Exclude Yourself from the Settlement** | You can opt out of the settlement class (also known as excluding yourself) if you want to separately bring the kinds of claims against Defendants and co-conspirators that are the subject of this lawsuit.<br><br>If you opt out of the settlement class:<br><br>• You will *not* get any settlement payment;<br><br>• You will retain your right to bring your own lawsuit against defendants and co-conspirators regarding the same conduct.<br><br>More detail on opting out can be found below.<br><br>If you are considering bringing a separate claim against defendants and co-conspirators, you should consult your own attorney who can advise you regarding any possible claims you may have and the deadlines in this litigation.<br><br>The deadline to opt out is: MONTH XX, 2024. |
| **Object to the Settlement** | If you are a member of the settlement class and do *not* opt out, you can object to the settlement if you do not like it.<br><br>More detail on objecting to the settlement can be found below.<br><br>The deadline to object is: MONTH XX, 2024. |

## What are the most important dates?

The deadline to make a claim for a settlement payment is MONTH XX, 2024.

The deadline to opt out of the settlement class is MONTH XX, 2024.

The deadline to object to the settlement is MONTH XX, 2024.

# Learning About The Lawsuit

## What is this lawsuit about?

2995150.8

4

**5-ER-0829**

Plaintiffs claim that defendants unlawfully (1) conspired to fix or stabilize prices, rig bids, and allocate the market for consumer telescopes and (2) attempted and conspired to monopolize the market for consumer telescopes in the United States.

A copy of the complaint is available at www.[website].com.

Defendants deny any and all allegations of wrongdoing, fault, liability, or damage of any kind.

**The Court has not decided whether any defendant violated any laws. This notice is not an opinion by the Court about whether the plaintiffs or defendants are right.**

> **Where can I learn more?**
>
> You can get a complete copy of the plaintiffs' complaint, the settlement agreement, and various Court orders by visiting:
>
> www.[website].com

## Why is there a settlement?

The Court did not decide in favor of the plaintiffs or the defendants. Instead, the plaintiffs negotiated a settlement with the Settling Defendants that allows them to avoid the risks and costs of lengthy and uncertain litigation and the uncertainty of a trial and appeals. It also allows settlement class members to be compensated without further delay. The plaintiffs and their attorneys believe the settlement is in the best interests for all settlement class members.

## Who are the Settling Defendants and Co-Conspirators?

The entities and people plaintiffs sued and with whom they settled are called the "Settling Defendants and Co-Conspirators" and include Synta Technology Corp. of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon, USA LLC; Dar Tson ("David") Shen; Joseph Lupica; Dave Anderson; Jean Shen;

> **What does it mean to "release" a claim?**
>
> If a claim is released, it is forever resolved and cannot be the basis for a new lawsuit.

Sylvia Shen; Jack Chen; Laurence Huen; and Corey Lee. The additional entities and people Plaintiffs sued are called the "Other Defendants" and include Ningbo Sunny Electronic Co. Ltd. Plaintiffs also named the following as "Other Co-Conspirators": Sunny Optical Technology Co., Ltd.; Meade Instruments Corp.; Sunny Optics Inc.; Wenjun "Peter" Ni; and Wenjian Wang.

A claim may be made regardless of whether you indirectly purchased a telescope manufactured by a Settling Defendant/Co-Conspirator or a non-settling Other Defendant/Other Co-Conspirators.

If you do not opt out of the settlement class, your claims against the Settling Defendants will be released and you will not be able to sue them for these claims. More information about the released claims is below.

# Important Facts About How The Settlement Might Affect You

## How do I know if I am a member of the settlement class?

You are a settlement class member if, between January 1, 2005 and September 6, 2023, you purchased one or more telescopes from a retailer or distributor (or from an entity other than a defendant) that any defendant or alleged co-conspirator manufactured while residing in one of the Indirect Purchaser States. This is known under the antitrust and consumer protection laws as an "indirect purchase." Commonly, such qualifying telescopes include Celestron, Orion, Skywatcher,

2995150.8

5

Zhumell and Meade branded telescopes. If you are unsure whether your telescope qualifies, please visit [www.website.com].

"Telescopes" refers to optical instruments that magnify and enhance the view of faraway objects, as further described in paragraphs 96 through 99 of the Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Complaint (linked here, www.website.com), and does not include other optical instruments not marketed as telescopes, such as binoculars, siting scopes, microscopes, etc.

**Note:** You are not a member of the settlement class if you are the defendants; their parent companies, subsidiaries and affiliates; any co-conspirators; defendants' attorneys in this action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this action; all jurors in this action; and all persons or entities who directly purchased telescopes exclusively from defendants.

## Who manufactured the Telescopes included in the settlement?

Telescopes were manufactured by defendants or alleged co-conspirators. These include any Telescope manufactured by:

- Celestron Acquisition, LLC;
- Meade Instruments Corp.;
- Nantong Schmidt Opto-Electrical Technology Co. Ltd;
- Ningbo Sunny Electronic Co. Ltd.;
- Olivon Manufacturing Co. Ltd.;
- Olivon, USA LLC;
- Pacific Telescope Corp.;
- Suzhou Synta Optical Technology Co. Ltd.;
- Sunny Optical Technology Co., Ltd.;
- Sunny Optics Inc.;
- SW Technology Corporation;
- Synta Canada International Enterprises Ltd.; or
- Synta Technology Corp. of Taiwan;

Typically, the qualifying telescopes related to this lawsuit were branded:

- Celestron;
- Orion;
- Skywatcher;
- Zhumell; or
- Meade

To receive a payment, you must make a claim.

## What if I'm still not sure if I'm included in the settlement class?

**IF YOU ARE STILL NOT SURE WHETHER YOU ARE INCLUDED, YOU CAN SEND AN EMAIL TO ___@WEBSITE.COM, CALL 1-___-___-____ OR VISIT www.[website].com FOR MORE INFORMATION.**

## What are the consequences of doing nothing?

If you do nothing, you will *not* receive a cash payment from this settlement. If the Court approves the settlement, you will be bound by the settlement agreement. This means you will not be able to commence a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Settling

Defendants and Co-Conspirators or any other person released by the settlement agreement about the issues resolved by this settlement and released by the settlement agreement.

## What if I don't want to be part of the settlement class?

You can opt out of the settlement class, but if you do so you will *not* be eligible to receive payment from the settlement or be allowed to object to the settlement. You will retain your right to sue defendants and co-conspirators.

Information about how to opt out of the settlement class is below.

## How do I submit an objection to the settlement?

You can ask the Court to deny approval of the settlement by filing an objection. You can't ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, no settlement payments will be sent out, and the lawsuit will continue.

Any objection to the proposed settlement must be in writing. If you file a timely written objection, you may, but are not required to, appear at the fairness hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. All written objections and supporting papers must (a) clearly identify the case name and number (*In Re Telescopes Antitrust Litig. Indirect Purchaser Actions*, No. 5:20-cv-03639-EJD), (b) be submitted to the Court either by filing them electronically or in person at any location of the United States District Court for the Northern District of California or by mailing them to the Clerk at the address below, and (c) be filed or postmarked on or before Month __, 2024.

Your objection must also include:

1) your full name, current address, email address, and telephone number;
2) proof of membership in a settlement class;
3) the reasons why you object to the settlement, including any documents supporting your objection;
4) if you have retained an attorney,
   a. the full name, current address, telephone number, and email address of your attorney;
   b. the state bar(s) to which your attorney is admitted; and
   c. a list of all other class actions you or your attorney has been involved in making objections over the last 10 years (whether or not you or your attorney appeared in the matter);
5) a statement indicating whether you or your attorney intend to appear at the fairness hearing; and
6) your signature or the signature of your attorney.

Your objection must be mailed to the Clerk of the Court and be postmarked by Month __, 2024.

| **Clerk of the Court** |
|:---:|
| Clerk of the Court<br>United States District Court, Northern District of California<br>Robert F. Peckham Federal Building & United States Courthouse<br>280 South 1st Street, Room 2112<br>San Jose, CA 95113 |

The fairness hearing is currently scheduled at the date, time, and location below.

2995150.8

7

==__:__ _.m. on Month __, 2024==

**United States District Court of the Northern
District of California
Robert F. Peckham Federal Building &
United States Courthouse
Courtroom 4, 280 South 1st Street
San Jose, California 95113**

Please continue to monitor the settlement website [==LINK==], as the Court may change the location, date, and/or time. Notice of such changes may be given only on the website.

<u>**DO NOT CONTACT THE COURT WITH QUESTIONS ABOUT THE SETTLEMENT OR CLAIMS PROCESS. ONLY OBJECTIONS SHOULD BE FILED WITH THE COURT.**</u>

## Opting Out / Excluding Yourself

### What are the consequences of excluding myself?

You have the right to opt out of the settlement class—also known as "excluding yourself" from the settlement class. If you opt out of the settlement class, you may start, or continue, your own lawsuit against any of the defendants or co-conspirators. If you intend to do so, you should talk to your own lawyer soon, because you may have missed any applicable deadlines. You will be responsible for the cost of any services provided by your own lawyer.

### If I opt out of the settlement class, can I still get a cash payment?

No. If you opt out of the settlement class, do *not* send in a claim form to ask for a cash payment because you will no longer be eligible.

### How do I opt out?

To opt out or exclude yourself from the settlement class, you must send a letter to the Settlement Administrator by mail, postmarked no later than ==Month __, 2024.== Your letter must include:

1) your full name, current address, email address, and telephone number;
2) a clear statement saying you elect to be excluded from the settlement in *In Re Telescopes Antitrust Litig. Indirect Purchaser Actions*, No. 5:20-cv-03639-EJD (N.D. Cal.); and
3) your signature.

Mail your exclusion request, postmarked no later than ==Month __, 2024==, to:

*In Re Telescopes Antitrust Litig. Indirect Purchaser Actions* Settlement Administrator
==P.O. Box _____==
==City, ST _____-____==

## The Lawyers Representing You

2995150.8

8

## Do I have a lawyer in this case?

Yes. The Court appointed Cotchett, Pitre & McCarthy, LLP; Lieff Cabraser Heimann & Bernstein, LLP; and Susman Godfrey L.L.P. to represent you and other settlement class members. These lawyers are called Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs. These lawyers and their firms are experienced in handling similar cases. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

## How will Interim Co-Lead Counsel be paid?

If the settlement is approved and becomes final, Interim Co-Lead Counsel will ask the Court to award attorneys' fees not to exceed 33% of the Settlement Fund ($32 million) and will seek reimbursement of litigation expenses not to exceed $XXXXX, as well as service awards of $3,000 to each of the named class representatives. If approved, these amounts will be deducted from the settlement fund before making payments to settlement class members who submit valid claim forms.

# Key Resources

## How do I get more information?

This notice summarizes the proposed settlement. For the precise terms of the settlement, please see the settlement agreement available at www.[website].com, by contacting Interim Co-Lead Counsel at _____, by accessing the Court docket in this case, for a fee, through the Court's PACER system at https://ecf.cand.uscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, Robert F. Peckham Federal Building & United States Courthouse, 280 South 1st Street, Room 2112, San Jose, CA 95113, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

You may also email _____@website.com or call 1-___-___-___.

**DO NOT CONTACT THE COURT WITH QUESTIONS ABOUT THE SETTLEMENT OR CLAIMS PROCESS.**

You can also contact Interim Co-Lead Counsel at the addresses listed below:

| Case Website | www.website.com | |
|---|---|---|
| Settlement Administrator | *In Re Telescopes Antitrust Litig. Indirect Purchaser Actions Settlement Administrator*, P.O. Box _____, City, ST _____-____. | |
| Co-Lead Counsel | Adam J. Zapala<br>COTCHETT, PITRE & McCARTHY, LLP<br>840 Malcolm Road<br>Burlingame, CA 94010<br>Telephone: (650) 697-6000<br><br>Lin Y. Chan<br>LIEFF CABRASER HEIMANN &<br>BERNSTEIN LLP | Kalpana Srinivasan<br>SUSMAN GODFREY L.L.P.<br>1900 Avenue of the Stars, Ste. 1400<br>Los Angeles, CA 90067<br>Telephone: (310) 789-3100 |

2995150.8

9

**5-ER-0834**

| | 275 Battery Street, 29th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 956-1000 |
|---|---|

2995150.8

# Exhibit E

18

DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN
CASE NO. 5:20-CV-03639-EJD

*Telescopes Antitrust Litigation*
Settlement Administrator
P.O. Box ####
City, ST ZIP

## CEHI



**VISIT THE SETTLEMENT WEBSITE BY SCANNING THE PROVIDED QR CODE**

*In re Telescopes Antitrust Litigation Indirect Purchaser Actions*

**U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

Case No. 5:20-cv-03639-EJD

**Must Be Postmarked
No Later Than
<mark>DATE</mark>**

# Claim Form

COMPLETE AND SIGN THIS FORM AND FILE ONLINE NO LATER THAN **DATE** AT
**www.website.com**, OR FILE BY MAIL POSTMARKED BY **DATE**.

Questions? Call 1-###-###-#### or visit the website, **www.Website.com**

## CLASS MEMBER INFORMATION:

First Name                    M.I.    Last Name

ClaimID from Email or Postcard Notice (if you did not get a notice, leave this blank)

Primary Address

Primary Address Continued

City                                          State    ZIP Code

Email Address

Area Code    Telephone Number

*Failure to add your unique ClaimID will result in denial of your claim. If you received a notice of this Settlement by U.S. mail, your unique ClaimID is on the envelope or postcard. If you misplaced your notice, please contact the Settlement Administrator at 1-###-###-#### or email@website.com.*

## ELIGIBILITY:

1. Did you purchase one or more Telescopes branded as Celestron, Meade, Orion, Sky-Watcher, or Zhumell from a retailer or distributor during between January 1, 2005 to September 6, 2023?

○ Yes *(Proceed to Question 2)*    ○ No *(You are not eligible to submit a claim)*

| FOR CLAIMS PROCESSING ONLY | OB | CB | DOC / LC / REV | RED / A / B |
|---|---|---|---|---|

**5-ER-0837**

2. If you answered "Yes" to Question 1, please enter your purchase information below:

Make

Model

Date of purchase

$ ___ . ___

Amount

Name of retailer or distributor where Qualifying Telescope was purchased

**You do not need to submit receipts or confirming documentation at this time, but counsel for the Settlement Class may require it if an issue arises regarding the validity of your claim.**

## PAYMENT SELECTION:

Choose **one** of the following:

○ PayPal

Email address associated with your PayPay account

○ Zelle

Email address or phone number associated with your Zelle account

○ Venmo

Mobile number associated with your Venmo account

○ Physical Check –Payment will be mailed to the address provided above.

## CERTIFICATION AND SIGNATURE:

I declare under penalty of perjury under the laws of the United States of America that the information above is true and correct to the best of my knowledge and that I am authorized to submit this claim. I understand that my claim is subject to audit, review, and validation using all available information.

Signature: _____     Dated (mm/dd/yyyy): _____

Print Name: _____

**5-ER-0838**

Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

Kalpana Srinivasan (Bar No. 237460)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | **Case No. 5:20-cv-03639-EJD** |
| THIS DOCUMENT RELATES TO:<br><br>All Indirect Purchaser Actions | **DECLARATION OF ALEJANDRA C. SALINAS IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND ISSUANCE OF NOTICE** |

**DECLARATION OF ALEJANDRA C. SALINAS IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND ISSUANCE OF NOTICE**      1

**5-ER-0839**

I, Alejandra C. Salinas, declare as follows:

1.      I am an attorney at Susman Godfrey L.L.P., one of the three firms appointed as Interim Co-Lead Counsel for Indirect Purchaser Plaintiffs ("IPPs") in the above-captioned proceeding. I am a member of the State Bar of Texas and am admitted to practice *pro hac vice* before this Court. I make this declaration based on my own personal knowledge. If called upon to testify, I could and would testify competently to the truth of the matters stated herein.

2.      I submit this declaration in support of IPPs' Motion for Preliminary Approval of Settlement and Issuance of Notice ("Motion") in the above-captioned matter.

3.      Attached hereto as Exhibit A is a true and correct copy of the Settlement Agreement, fully executed by the parties on August 31, 2024.

4.      The Settlement Agreement was reached after multiple mediation sessions guided by Hon. Suzanne Segal, a former Magistrate Judge of the Central District of California. The first mediation occurred on July 20, 2021, without reaching a resolution. After a second mediation on September 6, 2023, the parties accepted Judge Segal's mediator's proposal and executed an agreement in principle to resolve the matter. After reaching the agreement in principle, the parties worked diligently to draft and execute the Settlement Agreement.

5.      This litigation was vigorously contested. The parties engaged in extensive motion practice, including three separate rounds of briefing on motions to dismiss, motions regarding entry of protective, discovery, and scheduling orders, and at least fourteen discovery dispute briefs. Motion practices on these issues typically followed weeks or months of meeting and conferring between the parties.

6.      Plaintiffs served Defendants with at least 140 document requests and 18 interrogatories. Plaintiffs also issued and negotiated at least 30 subpoenas to non-parties, securing substantial structured transaction data for the purposes of performing an overcharge pass-through analysis and identifying settlement class members. The parties took and defended dozens of depositions.

7.      Contested issues between the parties that necessitated motion practice included, but

**DECLARATION OF ALEJANDRA C. SALINAS IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND ISSUANCE OF NOTICE                                         2**

were not limited to, search terms, production of relevant and non-privileged documents, production of documents improperly withheld as privileged, collection and production of transactional and costs data, proper responses to interrogatories, and deposition scheduling.

8.     Interim Co-Lead Counsel for IPPs has dedicated a total of 20,126 hours to litigating this case as of July 22, 2024. The blended average rate for counsel is $568, resulting in an estimated lodestar of $11,427,361.

9.     The Settlement Agreement does not release claims regarding named Defendant Ningbo Sunny or any of its officers, affiliates or related entities in their capacity acting on behalf of Ningbo Sunny.

10.     Interim Co-Lead Counsel for IPPs ultimately selected Verita Global, LLC as the settlement claims and notice administrator after a competitive bidding process involving six vendors. The bidding process was iterative, with several of the vendors submitting multiple rounds of revised bids. Counsel selected Verita because its bid was the most cost-effective, efficient, and comprehensive plan. Verita's notice and claims plan utilizes diverse notice methods to achieve the broadest reach possible.  Verita estimates that notice and claims administration will cost $350,771. Verita has agreed to a not-to-exceed amount for notice and claims administration of $450,500.

11.     As of the filing of this Motion, IPPs' current unreimbursed litigation costs are approximately $776,894. These costs include: $581,785 for expert and consultant costs; $99,417 for document review platform hosting costs; $15,103 for document translation costs; $37,644 for court reporter and other deposition-related costs; $8,472 for travel costs; $8,500 for mediation costs; and $25,973 for other miscellaneous costs, including bank fees and process service.

12.     IPPs retained Dr. Russell Mangum, the Executive Vice President at Cirque Analytics, as an expert to research and calculate class-wide damage models. This included researching and developing alternative models due to Defendants' unwillingness to provide transactional data and revising those models once Defendants did produce transactional data. Dr. Mangum was also provided with third party retail transactional data obtained by counsel through discovery. Dr. Mangum and his associates were preparing their expert reports when the parties

**DECLARATION OF ALEJANDRA C. SALINAS IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND ISSUANCE OF NOTICE**                                  **3**

reached the agreement to settle the case.

13.     Dr. Mangum also evaluated the relevant commerce based on sales data provided through discovery from Celestron, Orion, and Meade. His sales estimates of Telescopes to IPPs between January 1, 2005, and September 6, 2024, were approximately $636 million. Based on evaluation of third-party transaction data, Dr. Mangum calculated that the size of the damages class was approximately 4 million customers. Dr. Mangum also calculated that damages for the IPP Class were in the range of $29 million to $32 million (with an overcharge of five percent and a pass-through rate between 90 percent and 100 percent), and could have been as high as $165 million (with an overcharge of 26 percent and a pass-through rate of 100 percent). Dr. Mangum calculated class wide damages based on overcharges estimated from multiple regression analyses, informed by a thorough review of the relevant economic review, and from studying the Court-approved methods of Dr. Douglas Zona from the *Orion* litigation.

14.     I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 16th day of September, 2024 in Houston, Texas.

*/s/ Alejandra C. Salinas*
Alejandra C. Salinas

**DECLARATION OF ALEJANDRA C. SALINAS IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND ISSUANCE OF NOTICE**                4

# EXHIBIT A

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C4

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03639-EJD |
| This Document Relates to: | SETTLEMENT AGREEMENT |
| Indirect Purchaser Actions | |

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD

2987155.2

5-ER-0844

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

This Settlement Agreement (defined below) is made and entered into this 31st day of August, 2024 (the "Execution Date"), by and among the Synta Defendants and the Indirect Purchaser Plaintiffs, both individually and on behalf of the proposed Settlement Class (defined below) in the above-captioned action ("Action"). This Settlement Agreement is intended by the Synta Defendants and the Indirect Purchaser Plaintiffs ("the Settling Parties" as further defined below) to fully, finally, and forever resolve, discharge and settle the Released Claims (defined below), upon and subject to the terms and conditions hereof.

## RECITALS

WHEREAS, Indirect Purchaser Plaintiffs are prosecuting the Action on their own behalf and on behalf of the proposed Settlement Class against the Synta Defendants and other Defendants and alleged co-conspirators;

WHEREAS, Indirect Purchaser Plaintiffs allege, among other things, that the Synta Defendants violated the antitrust and consumer protection laws by conspiring amongst themselves and with the other Defendants and alleged co-conspirators to fix, raise, maintain, or stabilize the prices of Telescopes, and these acts caused the Class to incur damages;

WHEREAS, the Synta Defendants have denied and continue to deny each and all of Indirect Purchaser Plaintiffs' claims and allegations of wrongdoing; have not conceded or admitted any liability, or that they violated or breached any law, regulation, or duty owed to the Indirect Purchaser Plaintiffs; have denied and continue to deny all charges of wrongdoing or liability against it arising out of any of the conduct, statements, acts or omissions alleged in the Action; and further deny the allegations that the Indirect Purchaser Plaintiffs or any member of the Class were harmed by any conduct by the Synta Defendants alleged in the Action or otherwise;

WHEREAS, Indirect Purchaser Plaintiffs and the Synta Defendants have engaged in extensive discovery regarding the facts pertaining to Indirect Purchaser Plaintiffs' claims and the Synta Defendants' defenses;

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                    1
2987155.2

WHEREAS, Indirect Purchaser Plaintiffs and the Synta Defendants agree that neither this Settlement Agreement nor any statement made in the negotiation thereof shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by the Synta Defendants or of the truth of any of the claims or allegations alleged in the Action;

WHEREAS, Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs ("Co-Lead Counsel") have concluded, after due investigation and after carefully considering the relevant circumstances, including, without limitation, the claims asserted in the Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Complaint, the legal and factual defenses thereto, and the applicable law, that it is in the best interests of the Indirect Purchaser Plaintiffs and the proposed Settlement Class to enter into this Settlement Agreement to avoid the uncertainties of litigation and to assure that the benefits reflected herein are obtained for the Indirect Purchaser Plaintiffs and the Class, and, further, that Co-Lead Counsel consider the Settlement set forth herein to be fair, reasonable and adequate and in the best interests of the Indirect Purchaser Plaintiffs and the Class;

WHEREAS, the Synta Defendants have concluded, despite their belief that they are not liable for the claims asserted against them in the Action and that they have good defenses thereto, that they will enter into this Settlement Agreement in order to avoid the further expense, inconvenience, and distraction of burdensome and protracted litigation, and thereby put to rest this controversy with respect to the Indirect Purchaser Plaintiffs and the Class and avoid the risks inherent in complex litigation; and

WHEREAS, arm's length settlement negotiations have taken place between counsel for Indirect Purchaser Plaintiffs and the Synta Defendants over many months, including in multiple mediations before Judge Suzanne Segal (Ret.), and this Settlement Agreement, which embodies all of the terms and conditions of the Settlement between the Settling Parties, both individually and on behalf of the Class, has been reached as a result of the Settling Parties' negotiations

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                                   2
2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

(subject to the approval of the Court) as provided herein and is intended to supersede any prior agreements or understandings between the Settling Parties.

## AGREEMENT

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among the Settling Parties, by and through their undersigned attorneys of record, in consideration of the covenants, agreements, and releases set forth herein and for other good and valuable consideration, that the Action and the Released Claims as against the Synta Defendants shall be finally and fully settled, compromised and dismissed on the merits and with prejudice, without costs as to Indirect Purchaser Plaintiffs, the Class, or the Synta Defendants, upon and subject to the approval of the Court, following notice to the Class, on the following terms and conditions:

## DEFINITIONS

1.     As used in this Settlement Agreement, the following terms shall have the meanings specified below:

(a)     "Action" means *In re Telescopes Antitrust Litigation* – All Indirect Purchaser Actions, Case No. 5:20-cv-03639-EJD, and each of the cases brought on behalf of indirect purchasers previously consolidated and/or included as part of Docket No. 5:20-cv-03639-EJD.

(b)     "Affiliates" means entities controlling, controlled by or under common control with a Releasee or Releasor.

(c)     "Authorized Claimant" means any Indirect Plaintiff Purchaser who, in accordance with the terms of this Settlement Agreement, is entitled to a distribution consistent with any Distribution Plan or order of the Court ordering distribution to the Class.

(d)     "Claims Administrator" means the claims administrator(s) to be selected by Co-Lead Counsel.

(e)     The "Class" or "Settlement Class" is defined as all persons and entities in the Indirect Purchaser States (as defined herein) who, during the period from January 1, 2005 to September 6, 2023, purchased one or more Telescopes from a distributor (or from an entity other

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                                    3
2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

than a Defendant) that a Defendant or alleged co-conspirator manufactured. Excluded from the Class are Defendants; their parent companies, subsidiaries and Affiliates; any co-conspirators; Defendants' attorneys in this Action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this Action; all jurors in this Action; and all Persons who directly purchased Telescopes from Defendants but only for those direct purchases of Telescopes.

(f)     "Class Member" or "Settlement Class Member" means a Person who falls within the definition of the Settlement Class and who does not timely and validly elect to be excluded from the Class in accordance with the procedure to be established by the Court.

(g)     "Co-Lead Counsel" means the law firms of Cotchett, Pitre & McCarthy, LLP; Lieff Cabraser Heimann & Bernstein LLP; and Susman Godfrey LLP.

(h)     "Court" means the United States District Court for the Northern District of California.

(i)     "Distribution Plan" means any plan or formula of allocation, to be approved by the Court, whereby the Net Settlement Fund shall in the future be distributed to Authorized Claimants.

(j)     "Document" is synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a), including, without limitation, electronic or computerized data compilations. A draft of non-identical copy is a separate document within the meaning of this term.

(k)     "Effective Date" means the first date by which all of the following events and conditions have been met or have occurred:

(1)     All parties have executed this Settlement Agreement;

(2)     The Court has preliminarily approved the Settlement Agreement, certified the Settlement Class for purposes of effectuating this Settlement, and approved the Settlement after providing notice to the Settlement Class as defined herein;

(3)     The Court has entered a Final Judgment; and

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                                    4
2987155.2

**5-ER-0848**

Docusign Envelope ID: C4680BB8-4144-4161-A095-742BDFF855C1

(4)     The Final Judgment (as more fully described in ¶ 7 of this Settlement Agreement) has become final, with the occurrence of the following: (A) the entry by the Court of a final order approving the Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure together with entry of a final judgment dismissing the Action and all claims therein by the Class against the Synta Defendants with prejudice as to all Class Members (the "Final Judgment"), and (B) the expiration of the time for appeal or to seek permission to appeal from the Court's approval of the Settlement Agreement and entry of the Final Judgment or, if an appeal from an approval and Final Judgment is taken, the affirmance of such Final Judgment in its entirety, without modification, by the court of last resort to which an appeal of such Final Judgment may be taken, provided, however, a modification or reversal on appeal of any amount of Co-Lead Counsel's fees and expenses awarded by the Court from the Settlement Fund or any plan of allocation or distribution of the Settlement Fund shall not be deemed a modification of all or part of the terms of this Settlement Agreement or the Final Judgment. It is agreed that neither the provisions of Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. § 1651, shall be taken into account in determining the above-stated times.

(l)     "Escrow Agent" means the agent jointly designated by Co-Lead Counsel and the Synta Defendants, and any successor agent.

(m)     "Execution Date" means the first date set forth above in this Settlement Agreement, which is August _31_, 2024.

(n)     "Final" means, with respect to any order of court, including, without limitation, the Judgment, that such order represents a final and binding determination of all issues within its scope and is not subject to further review on appeal or otherwise. Without limitation, an order becomes "Final" when: (a) no appeal has been filed and the prescribed time for commencing any appeal has expired; or (b) an appeal has been filed and either (i) the appeal has been dismissed and the prescribed time, if any, for commencing any further appeal has expired, or (ii) the order has been affirmed in its entirety and the prescribed time, if any, for commencing

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                    5
2987155.2

**5-ER-0849**

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

any further appeal has expired. For purposes of this Settlement Agreement, an "appeal" includes appeals as of right, discretionary appeals, interlocutory appeals, proceedings involving writs of certiorari or mandamus, and any other proceedings of like kind. Any appeal or other proceeding pertaining solely to any order adopting or approving a Distribution Plan, and/or to any order issued in respect of an application for attorneys' fees and expenses consistent with this Settlement Agreement, shall not in any way delay or preclude the Judgment from becoming Final.

(o)    "Gross Settlement Fund" or "Settlement Fund" means the Settlement Amount plus any interest that may accrue.

(p)    "Indirect Purchaser Plaintiffs" means John Goerger, Scott Plummer, Donnie Houston, Ronald Troillet, Sigurd Murphy, Thien Ngo, Arthur Sines, Jesse Smith, Greg Kendall, Austin Griffith, Keith Uehara, Madeline Bekielewski,[1] Michael Price, Brian Murphy, Timothy McQuaid, Sara Day Brewer, Robert Welsh, Bentaro Huset, Jason Glydewell, Deborah Lemar, James Riley, David Dick, Leon Greenberg, Anthony Di Mambro, Steven Zellers, Michael Liskow, Philip Moore, Doug Lundy, John Maurice, David Kerber, Thomas Berta, Greg Ross, Vincent Catanzaro, David Quaglietta, and Herbert Nelson, as well as any other Person added as an Indirect Purchaser Plaintiff in the Action.

(q)    "Indirect Purchaser States" means Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

(r)    "Judgment" means the order of judgment and dismissal of the Action with prejudice.

(s)    "Net Settlement Fund" means the Gross Settlement Fund, less the

---

[1] Richard Bekielewski was an original class representative, but he passed away during the pendency of the litigation.  His wife, Madeline Bekielewski, has taken over his estate and claims.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                        6
2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

payments set forth in ¶ 17.

(t)    "Notice, Administrative and Claims Administration Costs" means the reasonable sum of nonrefundable settlement money to be paid out of the Gross Settlement Fund to pay for notice to the Class and related administrative and claims administration costs.

(u)    "Person(s)" means an individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and any spouses, heirs, predecessors, successors, representatives or assignees of any of the foregoing.

(v)    "Proof of Claim and Release" means the form to be sent to the Class, upon further order(s) of the Court, by which any member of the Class may make claims against the Gross Settlement Fund.

(w)    "Released Claims" means any and all manner of claims, demands, rights, actions, suits, causes of action, whether class, individual or otherwise in nature, fees, costs, penalties, injuries, damages whenever incurred, liabilities of any nature whatsoever, known or unknown (including, but not limited to, "Unknown Claims"), foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, contingent or non-contingent, in law or in equity, under the laws of any jurisdiction, which Releasors or any of them, whether directly, representatively, derivatively, or in any other capacity, ever had, now have or hereafter can, shall or may have, relating in any way to any conduct on or before the Effective Date and arising out of or related in any way in whole or in part to any facts, circumstances, acts, or omissions by Releasees which were alleged or which could have been alleged in the Action, including but not limited to any conduct by Releasees regardless of where it occurred at any time on or before the Effective Date concerning, arising out of or related to (1) the purchase, pricing, selling, discounting, marketing, manufacturing and/or distributing of Telescopes; (2) any agreement, combination or conspiracy to raise, fix, maintain or stabilize the prices of Telescopes or restrict, reduce, alter or allocate the supply, quantity or quality of Telescopes or concerning the development, manufacture, supply,

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD                    7
2987155.2

5-ER-0851

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

distribution, transfer, marketing, sale or pricing of Telescopes, or any other restraint of competition alleged in the Action or that could have been or hereafter could be alleged against the Releasees relating to Telescopes, or (3) any other restraint of competition relating to Telescopes that could have been or hereafter could be alleged against the Releasees as a violation of the Sherman Act or any other antitrust, unjust enrichment, unfair competition, unfair practices, trade practices, price discrimination, unitary pricing, racketeering, civil conspiracy or consumer protection law, whether under federal, state, local or foreign law provided however, that nothing herein shall release: (i) claims involving any negligence, personal injury, breach of contract, bailment, failure to deliver lost goods, damaged or delayed goods, product defect, securities or similar claim relating to any Telescopes; and (ii) claims for damages under the state or local laws of any jurisdiction other than an Indirect Purchaser State, as defined herein in this Settlement Agreement. For the avoidance of doubt, this Settlement Agreement does not release any claims for direct purchases of Telescopes.

(x)     "Releasees" refers jointly and severally, individually and collectively to the Synta Defendants (as defined in ¶ 1(ee) below) and each of their respective past and/or present direct and indirect parents, members, subsidiaries, Affiliates, predecessors, joint ventures, heirs, executors, administrators, successors and assigns, and their respective past, present and/or future officers, directors, employees, agents, attorneys and legal representatives, servants, and representatives, and the predecessors, successors, heirs, executors, administrators and assigns of each of the foregoing.  For the avoidance of doubt, "Releasees" does not refer to, or mean, alleged co-conspirator and named Defendant Ningbo Sunny or any of its officers, affiliates or related entities in their capacity on behalf of Ningbo Sunny.

(y)     "Releasors" refers jointly and severally, individually and collectively to the Indirect Purchaser Plaintiffs and each and every member of the Class on their own behalf and on behalf of their respective past, present, and/or future direct and indirect parents, members, subsidiaries and Affiliates, and their past, present and/or future officers, directors, employees, agents, attorneys and legal representatives, servants, and representatives, and the predecessors,

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

successors, heirs, executors, administrators and assigns of each of the foregoing.

(z)   "Settlement" means the settlement of the Released Claims set forth herein.

(aa)   "Settlement Agreement" means this settlement agreement dated ~~June~~ August 31, 2024.

(bb)   "Settlement Amount" means Thirty-Two Million U.S. Dollars ($32,000,000.00).

(cc)   "Settling Parties" means, collectively, the Indirect Purchaser Plaintiffs (on behalf of themselves and the Class) and the Synta Defendants.

(dd)   "Synta Co-Conspirators" means Jean Shen, Sylvia Shen, Jack Chen, Laurence Huen, and Corey Lee.

(ee)   "Synta Defendants" means Synta Technology Corp. of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd.; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon, USA LLC; Dar Tson ("David") Shen; Joseph Lupica; and Dave Anderson.

(ff)   "Telescopes" refers to optical instruments that magnify and enhance the view of faraway objects, as further described in paragraphs 96 through 99 of the Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Complaint, and does not include other optical instruments not marketed as telescopes, such as binoculars, siting scopes, microscopes, etc.

(gg)   "Unknown Claims" means any Released Claim that an Indirect Purchaser Plaintiff and/or Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Releasees that if known by him, her or it, might have affected his, her or its settlement with and release of the Releasees, or might have affected his, her or its decision not to object to this Settlement. Such Unknown Claims include claims that are the subject of California Civil Code § 1542 and equivalent, similar or comparable laws or principles of law. California Civil Code § 1542 provides:

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                    9
2987155.2

**5-ER-0853**

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

**Preliminary Approval Order, Notice Order and Settlement Hearing**

2. ***Reasonable Best Efforts to Effectuate this Settlement.*** The Settling Parties: (a) acknowledge that it is their intent to consummate this Settlement Agreement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement the terms and conditions of this Settlement Agreement and to exercise their reasonable best efforts to accomplish the terms and conditions of this Settlement Agreement. The Synta Defendants agree to provide data reasonably necessary and available to them for Plaintiffs to effectuate Class Notice, allocation, and payments to the Settlement Class.

3. ***Motion for Preliminary Approval.*** At a time to be determined by Co-Lead Counsel, Co-Lead Counsel shall submit this Settlement Agreement to the Court and shall apply for entry of a Preliminary Approval Order, requesting, *inter alia,* preliminary approval of the Settlement. The motion shall include (a) the proposed Preliminary Approval Order, and (b) a request for certification of the Class for settlement purposes pursuant to Federal Rule of Civil Procedure 23.

4. ***Proposed Notice.*** At a time to be determined in their sole discretion, Co-Lead Counsel shall submit to the Court for approval a proposed form of, method for and schedule for dissemination of notice to the Class. This motion shall recite and ask the Court to find that the proposed form of and method for dissemination of the notice to the Class constitutes valid, due and sufficient notice to the Class, constitutes the best notice practicable under the circumstances, and complies fully with the requirements of Federal Rule of Civil Procedure 23.

5. ***Claims Administrator.*** Indirect Purchaser Plaintiffs shall retain a Claims

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**          10

2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

Administrator, which shall be responsible for the claims administration process including distribution to Class Members pursuant to a court-approved plan of distribution. The fees and expenses of the Claims Administrator shall be paid exclusively out of the Settlement Fund. In no event shall the Synta Defendants be separately responsible for any fees or expenses of the Claims Administrator.

6. ***Requests for Exclusion (Opt Outs).*** Any Class Member that wishes to seek exclusion from the Settlement Class by "opting out" must timely submit a written request for exclusion to the Claims Administrator (a "Request for Exclusion"). To be effective, each such Request for Exclusion must state: the Settlement Class Member's full legal name, address and telephone number; that the Class Member purchased one or more Telescopes from a Distributor (or from an entity other than a defendant) who in turn purchased from one of the Defendants during the Class Period; and that the Class Member (1) wants to be excluded from the *In re Telescopes Antitrust Litigation* – Indirect Purchaser Actions class action settlement with the Synta Defendants and (2) understands that by so doing, the Class Member will not be able to get any money or benefits from the Settlement with the Synta Defendants under the Settlement Agreement. All Requests for Exclusion must be signed and dated by the Class Member or its officer or legal representative, and be (1) mailed to the Claims Administrator via First Class United States Mail (or United States Mail for overnight delivery) and postmarked by a date certain to be specified on the Notice, or (2) received by the Claims Administrator by that date, Persons who opt out are not entitled to any monetary award from the Settlement Fund.

7. ***Motion for Final Approval and Entry of Final Judgment.*** Prior to the date set by the Court to consider whether this Settlement should be finally approved, Co-Lead Counsel shall submit a motion for final approval of the Settlement by the Court. The Settling Parties shall jointly seek entry of the Final Approval Order and Judgment:

    (a)    certifying the Settlement Class, as defined in this Settlement Agreement, pursuant to Federal Rule of Civil Procedure 23, solely for purposes of this Settlement;

    (b)    fully and finally approving the Settlement contemplated by this Settlement

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**       11

2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

Agreement and its terms as being fair, reasonable and adequate within the meaning of Federal Rule of Civil Procedure 23 and directing its consummation pursuant to its terms and conditions.

(c) finding that the notice given to the Class Members constituted the best notice practicable under the circumstances and complies in all respects with the requirements of Federal Rule of Civil Procedure 23 and due process;

(d) directing that the Action be dismissed with prejudice as to the Synta Defendants and, except as provided for herein, without costs;

(e) discharging and releasing the Releasees from all Released Claims;

(f) permanently barring and enjoining the institution and prosecution, by Indirect Purchaser Plaintiffs and Class Members, of any other action against the Releasees in any court asserting any claims related in any way to the Released Claims;

(g) reserving continuing and exclusive jurisdiction over the Settlement, including all future proceedings concerning the administration, consummation and enforcement of this Settlement Agreement;

(h) determining pursuant to Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of a final judgment as to the Synta Defendants; and

(i) containing such other and further provisions consistent with the terms of this Settlement Agreement to which the parties expressly consent in writing.

8. **Stay Order.** Upon the Execution Date, the Action shall be stayed, and any existing stay shall remain in place, as against the Synta Defendants only. Should the Action be tried against any Defendants other than the Synta Defendants, the parties specifically agree that any findings therein shall not be binding on or admissible in evidence against the Synta Defendants or prejudice the Synta Defendants in any way in any future proceeding involving the Synta Defendants.

9. Upon the date that the Court enters an order preliminarily approving the Settlement, Indirect Purchaser Plaintiffs and members of the Class shall be barred and enjoined from commencing, instituting or continuing to prosecute any action or any proceeding in any

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD** 12
2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

court of law or equity, arbitration tribunal, administrative forum or other forum of any kind worldwide based on the Released Claims.

**Releases**

10. ***Released Claims.*** Upon the Effective Date, the Releasors (regardless of whether any such Releasor ever seeks or obtains any recovery by any means, including, without limitation, by submitting a Proof of Claim and Release, any distribution from the Gross Settlement Fund) by virtue of this Settlement Agreement shall be deemed to have, and by operation of the Judgment shall have fully, finally and forever released, relinquished and discharged all Released Claims against the Releasees.

11. ***No Future Actions Following Release.*** The Releasors shall not, after the Effective Date, seek (directly or indirectly) to commence, institute, maintain or prosecute any suit, action or complaint or collect from or proceed against the Synta Defendants or any other Releasee (including pursuant to the Action) based on the Released Claims in any forum worldwide, whether on his, her, or its own behalf or as part of any putative, purported or certified class of purchasers or consumers.

12. ***Covenant Not to Sue.*** Releasors hereby covenant not to sue the Releasees with respect to any such Released Claims. Releasors shall be permanently barred and enjoined from instituting, commencing or prosecuting against the Releasees any claims based in whole or in part on the Released Claims. The Settling Parties contemplate and agree that this Settlement Agreement may be pleaded as a bar to a lawsuit, and an injunction may be obtained, preventing any action from being initiated or maintained in any case sought to be prosecuted by or on behalf of Indirect Purchaser Plaintiffs or Class Members with respect to the Released Claims.

13. ***Waiver of California Civil Code § 1542 and Similar Laws.*** The Releasors acknowledge that, by virtue of the execution of this Settlement Agreement, and for the consideration received hereunder, it is their intention to release, and they are releasing, all Released Claims, even Unknown Claims. In furtherance of this intention, the Releasors expressly waive and relinquish, to the fullest extent permitted by law, any rights or benefits conferred by

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**          13
2987155.2

**5-ER-0857**

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

the provisions of California Civil Code § 1542, as set forth in ¶ 1(gg), or equivalent, similar or comparable laws or principles of law. The Releasors acknowledge that they have been advised by Co-Lead Counsel of the contents and effects of California Civil Code § 1542, and hereby expressly waive and release with respect to the Released Claims any and all provisions, rights and benefits conferred by California Civil Code § 1542 or by any equivalent, similar or comparable law or principle of law in any jurisdiction. The Releasors may hereafter discover facts other than or different from those which they know or believe to be true with respect to the subject matter of the Released Claims, but the Releasors hereby expressly waive and fully, finally and forever settle and release any known or unknown, suspected or unsuspected, foreseen or unforeseen, asserted or unasserted, contingent or non-contingent, and accrued or unaccrued claim, loss or damage with respect to the Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such additional or different facts. The release of unknown, unanticipated, unsuspected, unforeseen, and unaccrued losses or claims in this paragraph is not a mere recital.

14. ***Claims Excluded from Release.*** Notwithstanding the foregoing, the releases provided herein shall not release claims against the Synta Defendants for product liability, breach of contract, breach of warranty or personal injury, claims for direct purchases of Telescopes or any other claim unrelated to the allegations in the Action of restraint of competition or unfair competition with respect to Telescopes. Additionally, the releases provided herein shall not release any claims to enforce the terms of this Settlement Agreement.

**Settlement Consideration and Settlement Fund**

15. ***Settlement Payments.*** The Synta Defendants shall pay by wire transfer the Settlement Amount ($32,000,000) to the Escrow Agent pursuant to escrow instructions as follows: (i) a $1 million non-reimbursable amount within 10 days of preliminary approval; (ii) a further $1 million within 12 months of preliminary approval, which latter amount shall be refunded to the Synta Defendants if the Settlement is not approved; and (iii) the entire remaining portion of the Settlement Amount according to the terms of the parties' Confidential Supplemental Agreement

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                    14

2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

but not to exceed 18 months from preliminary approval. This Settlement Amount constitutes the total amount of payment that the Synta Defendants are required to make in connection with this Settlement Agreement. This amount shall not be subject to reduction, and upon the occurrence of the Effective Date, no funds shall revert to the Synta Defendants except as provided herein. The Escrow Agent shall only act in accordance with the mutually agreed escrow instructions.

16. **Stipulated Judgment.** Synta Technology Corp. of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd.; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC;  Olivon, USA LLC; and Dar Tson ("David") Shen will execute a stipulated judgment for $32 million (less any amounts paid toward the Settlement Fund) concurrently with the execution of the Settlement Agreement. The stipulated judgment will be held in escrow, and not filed or entered, unless there is an uncured default of the Settlement Agreement following 30 days' written notice to the defaulting party or parties.

17. **Disbursements Prior to Effective Date.** No amount may be disbursed from the Gross Settlement Fund unless and until the Effective Date, except that: (a) Notice, Administrative and Claims Administration Costs may be paid from the Gross Settlement Fund as they become due; (b) Taxes and Tax Expenses (as defined in ¶ 21(b) below) may be paid from the Gross Settlement Fund as they become due; and (c) attorneys' fees and reimbursement of litigation costs may be paid as ordered by the Court, which may be disbursed during the pendency of any appeals, which may be taken from the judgment to be entered by the Court finally approving this Settlement.

18. **Refund by Escrow Agent.** If the Settlement as described herein is not finally approved by any court, or it is terminated as provided herein, or the Judgment as described herein is not approved or entered or is overturned on appeal or by writ, the Gross Settlement Fund, including the Settlement Amount and all interest earned on the Settlement Amount while held in

**5-ER-0859**

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

escrow, excluding only Notice, Administrative and Claims Administration Costs and Taxes and/or Tax Expenses, shall be refunded, reimbursed and repaid by the Escrow Agent to the Synta Defendants within five (5) business days after receiving notice pursuant to ¶ 38 below.

19.    **Refund by Co-Lead Counsel.** If the Settlement as described herein is not finally approved by any court, or it is terminated as provided herein, or the Judgment as described herein is not approved or entered or is overturned on appeal or by writ, any attorneys' fees and costs previously paid pursuant to this Settlement Agreement (as well as interest on such amounts) shall be refunded, reimbursed and repaid by Co-Lead Counsel within thirty (30) business days after receiving notice pursuant to ¶ 38 below.

20.    **No Additional Payments by the Synta Defendants.** Under no circumstances will the Synta Defendants be required to pay more or less than the Settlement Amount pursuant to this Settlement Agreement and the Settlement set forth herein. For purposes of clarification, the payment of any Fee and Expense Award (as defined in ¶ 30 below), the Notice, Administrative and Claims Administrative Costs, and any other costs associated with the implementation of this Settlement Agreement shall be exclusively paid from the Settlement Amount.

21.    **Taxes.** The Settling Parties and the Escrow Agent agree to treat the Gross Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1. The Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this paragraph, including the "relation-back election" (as defined in Treas. Reg. § 1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agent to prepare and deliver timely and properly the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

(a)    For the purpose of § 1.468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent. The Escrow Agent shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**          16

2987155.2

**5-ER-0860**

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

by, e.g., (i) obtaining a taxpayer identification number, (ii) satisfying any information reporting or withholding requirements imposed on distributions from the Gross Settlement Fund, and (iii) timely and properly filing applicable federal, state and local tax returns necessary or advisable with respect to the Gross Settlement Fund (including, without limitation, the returns described in Treas. Reg. § 1.468B-2(k)) and paying any taxes reported thereon. Such returns (as well as the election described in this paragraph) shall be consistent with the provisions of this paragraph and in all events shall reflect that all Taxes as defined in ¶ 21(b) below on the income earned by the Gross Settlement Fund shall be paid out of the Gross Settlement Fund as provided in ¶ 21(b) hereof;

(b)     The following shall be paid out of the Gross Settlement Fund: (i) all taxes (including any estimated taxes, interest or penalties) arising with respect to the income earned by the Gross Settlement Fund, including, without limitation, any taxes or tax detriments that may be imposed upon the Synta Defendants or their counsel with respect to any income earned by the Gross Settlement Fund for any period during which the Gross Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes (collectively, "Taxes"); and (ii) all expenses and costs incurred in connection with the operation and implementation of this paragraph, including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this paragraph (collectively, "Tax Expenses"). In all events neither any of the Synta Defendants nor their counsel shall have any liability or responsibility for the Taxes or the Tax Expenses. With funds from the Gross Settlement Fund, the Escrow Agent shall indemnify and hold harmless the Synta Defendants and their counsel for Taxes and Tax Expenses (including, without limitation, Taxes payable by reason of any such indemnification). Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Gross Settlement Fund and shall timely be paid by the Escrow Agent out of the Gross Settlement Fund without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to Authorized Claimants any funds

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                    17
2987155.2

**5-ER-0861**

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

necessary to pay such amounts, including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. §1.468B-2(1)(2)); neither any of the Synta Defendants nor their counsel is responsible therefor, nor shall they have any liability therefor. The Settling Parties agree to cooperate with the Escrow Agent, each other, their tax attorneys and their accountants to the extent reasonably necessary to carry out the provisions of this paragraph.

**Administration and Distribution of Gross Settlement Fund**

22. ***Time to Appeal.*** The time to appeal from an approval of the Settlement shall commence upon the Court's entry of the Judgment regardless of whether or not either the Distribution Plan or an application for attorneys' fees and expenses has been submitted to the Court or resolved.

23. ***Distribution of Gross Settlement Fund.*** Upon further orders of the Court, the Claims Administrator, subject to such supervision and direction of the Court and/or Co-Lead Counsel as may be necessary or as circumstances may require, shall administer the claims submitted by members of the Class and shall oversee distribution of the Gross Settlement Fund to Authorized Claimants pursuant to the Distribution Plan. Subject to the terms of this Settlement Agreement and any order(s) of the Court, the Gross Settlement Fund shall be applied as follows:

(a) To pay all costs and expenses reasonably and actually incurred in providing notice to the Class in connection with administering and distributing the Net Settlement Fund to Authorized Claimants, and in connection with paying escrow fees and costs, if any;

(b) To pay all costs and expenses, if any, reasonably and actually incurred in claims administration and assisting with the filing and processing of such claims;

(c) To pay the Taxes and Tax Expenses as defined herein;

(d) To pay any Fee and Expense Award along with proportional interest earned on the Settlement Fund that is allowed by the Court, subject to and in accordance with the Agreement; and

(e) To distribute the balance of the "Net Settlement Fund" to Authorized

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**      18
2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

Claimants as allowed by the Agreement, any Distribution Plan or order of the Court along with proportional interest earned on the Settlement Fund.

24. ***Distribution of Net Settlement Fund.*** The Net Settlement Fund shall be distributed in accordance with the Distribution Plan that is approved by the Court.

25. All Persons who fall within the definition of the Class who do not timely and validly request to be excluded from the Class shall be subject to and bound by the provisions of this Settlement Agreement, the releases contained herein, and the Judgment with respect to all Released Claims, regardless of whether such Persons seek or obtain by any means, including, without limitation, by submitting a Proof of Claim and Release or any similar document, any distribution from the Gross Settlement Fund or the Net Settlement Fund.

26. ***No Liability for Distribution of Settlement Funds.*** Neither the Releasees nor their counsel shall have any responsibility for, interest in or liability whatsoever with respect to the distribution of the Gross Settlement Fund; the Distribution Plan; the determination, administration, or calculation of claims; the Settlement Fund's qualification as a "qualified settlement fund"; the payment or withholding of Taxes or Tax Expenses; the distribution of the Net Settlement Fund; or any losses incurred in connection with any such matters. The Releasors hereby fully, finally and forever release, relinquish and discharge the Releasees and their counsel from any and all such liability. No Person shall have any claim against Co-Lead Counsel or the Claims Administrator based on the distributions made substantially in accordance with the Agreement and the Settlement contained herein, the Distribution Plan or further orders of the Court.

27. ***Balance Remaining in Net Settlement Fund.*** If there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), Co-Lead Counsel may reallocate such balance among Authorized Claimants in an equitable and economic fashion, distribute the remaining funds through *cy pres*, or allow the money to escheat to federal or state governments, subject to Court approval. In no event shall the Net Settlement Fund revert to the Synta Defendants.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                    19
2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

28. ***Distribution Plan Not Part of Settlement.*** It is understood and agreed by the Settling Parties that any Distribution Plan, including any adjustments to any Authorized Claimant's claim, is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Settlement Agreement, and any order or proceedings relating to the Distribution Plan shall not operate to terminate or cancel this Settlement Agreement or affect the finality of the Judgment, the Final Approval Order, or any other orders entered pursuant to this Settlement Agreement. The time to appeal from an approval of the Settlement shall commence upon the Court's entry of the Judgment regardless of whether either the Distribution Plan or an application for attorneys' fees and expenses has been submitted to the Court or approved.

**Attorneys' Fees and Reimbursement of Expenses**

29. ***Fee and Expense Application.*** Co-Lead Counsel may submit an application or applications (the "Fee and Expense Application") for distributions from the Gross Settlement Fund, for: (a) an award of attorneys' fees; plus (b) reimbursement of expenses incurred in connection with prosecuting the Action; plus (c) any interest on such attorneys' fees and expenses (until paid) at the same rate and for the same periods as earned by the Settlement Fund, as appropriate, and as may be awarded by the Court.

30. ***Payment of Fee and Expense Award.*** Any amounts that are awarded by the Court pursuant to the above paragraph (the "Fee and Expense Award") shall be paid from the Gross Settlement Fund consistent with the provisions of this Settlement Agreement.

31. ***Award of Fees and Expenses Not Part of Settlement.*** The procedure for, and the allowance or disallowance by the Court of, the Fee and Expense Application are not part of the Settlement set forth in this Settlement Agreement, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Settlement Agreement. Any order or proceeding relating to the Fee and Expense Application, or any appeal from any Fee and Expense Award or any other order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel this

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD          20
2987155.2

5-ER-0864

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

Settlement Agreement, or affect or delay the finality of the Judgment and the Settlement of the Action as set forth herein. No order of the Court or modification or reversal on appeal of any order of the Court concerning any Fee and Expense Award or Distribution Plan shall constitute grounds for cancellation or termination of this Settlement Agreement.

32.     ***No Liability for Fees and Expenses of Co-Lead Counsel.*** The Synta Defendants shall have no responsibility for, and no liability whatsoever with respect to, any payment(s) to Co-Lead Counsel pursuant to this Settlement Agreement and/or to any other Person who may assert some claim thereto or any Fee and Expense Award that the Court may make in the Action, other than as set forth in this Settlement Agreement.

**Conditions of Settlement, Effect of Disapproval, Cancellation or Termination**

33.     ***Occurrence of Effective Date.*** Upon the occurrence of all of the events required in order to trigger the Effective Date as defined in ¶ 1(k), any and all remaining interest or right of the Synta Defendants in or to the Gross Settlement Fund, if any, shall be absolutely and forever extinguished, and the Gross Settlement Fund (less any Notice and Administrative Costs, Taxes or Tax Expenses or any Fee and Expense Award paid) shall be transferred from the Escrow Agent to the Claims Administrator as successor Escrow Agent within ten (10) days after the Effective Date.

34.     ***Failure of Effective Date to Occur.*** If, for whatever reason, the Effective Date does not occur or is not met, then this Settlement Agreement shall be cancelled and terminated, subject to and in accordance with ¶¶ 37-38, below, unless the Settling Parties mutually agree in writing to proceed with this Settlement Agreement.

35.     ***Exclusions.*** Co-Lead Counsel shall cause copies of requests for exclusion from the Class to be provided to counsel for the Synta Defendants. No later than 14 days after the final date for mailing requests for exclusion, Co-Lead Counsel shall provide counsel for the Synta Defendants with a complete and final list of Requests for Exclusion from the Class. With the motion for final approval of the Settlement, Co-Lead Counsel will file with the Court a complete list of Requests for Exclusion from the Class, including only the name, city and state of the

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

person or entity requesting exclusion.

36.   ***Objections.*** Settlement Class members who wish to object to any aspect of the Settlement must file with the Court a written statement containing their objection by the end of the period to object to the Settlement. Any award or payment of attorneys' fees made to counsel to an objector to the Settlement shall only be made by order of the Court order pursuant to the provisions of Federal Rule of Civil Procedure 23(e)(5)(B).

37.   ***Failure to Enter Proposed Preliminary Approval Order, Final Approval Order or Judgment.*** If the Court does not enter the Preliminary Approval Order, the Final Approval Order or the Judgment, or if the Court enters the Final Approval Order and the Judgment and appellate review is sought and, on such review, the Final Approval Order or the Judgment is finally vacated, modified or reversed, then this Settlement Agreement and the Settlement incorporated therein shall be cancelled and terminated; provided, however, the Settling Parties agree to act in good faith to secure Final Approval of this Settlement and to attempt to address in good faith concerns regarding the Settlement identified by the Court and any court of appeal. No Settling Party shall have any obligation whatsoever to proceed under any terms other than substantially in the form provided and agreed to herein; provided, however, that no order of the Court concerning any Fee and Expense Application or Distribution Plan, or any modification or reversal on appeal of such order, shall constitute grounds for cancellation or termination of this Settlement Agreement by any Settling Party. Without limiting the foregoing, the Synta Defendants shall have, in their sole and absolute discretion, the option to terminate the Settlement in its entirety in the event that the Judgment, upon becoming Final, does not provide for the dismissal with prejudice of the Action against all of them.

38.   ***Termination.*** Unless otherwise ordered by the Court, in the event that the Effective Date does not occur or this Settlement Agreement should terminate, or be cancelled or otherwise fail to become effective for any reason or the Settlement as described herein is not finally approved by the Court, or the Judgment is reversed or vacated following any appeal taken therefrom, then:

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                                    22
2987155.2

5-ER-0866

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

(a)     within five (5) business days after written notification of such event is sent by counsel for the Synta Defendants to the Escrow Agent, the Gross Settlement Fund, including the Settlement Amount and all interest earned on the Settlement Fund while held in escrow excluding only Notice Administrative and Claims Administration Costs that have either been properly disbursed or are due and owing, Taxes and Tax Expenses that have been paid or that have accrued and will be payable at some later date, and attorneys' fees and costs that have been disbursed pursuant to Court order will be refunded, reimbursed and repaid by the Escrow Agent to the Synta Defendants; if said amount or any portion thereof is not returned within such five (5) business day period, then interest shall accrue thereon at the rate of ten percent (10%) per annum until the date that said amount is returned;

(b)     within thirty (30) business days after written notification of such event is sent by Counsel for the Synta Defendants to Co-Lead Counsel, all attorneys' fees and costs which have been disbursed to Co-Lead Counsel pursuant to Court order shall be refunded, reimbursed and repaid by Co-Lead Counsel to the Synta Defendants;

(c)     the Escrow Agent or its designee shall apply for any tax refund owed to the Gross Settlement Fund and pay the proceeds to the Synta Defendants, after deduction of any fees or expenses reasonably incurred in connection with such application(s) for refund, pursuant to such written request;

(d)     the Settling Parties shall be restored to their respective positions in the Action as of the Execution Date, with all of their respective claims and defenses, preserved as they existed on that date;

(e)     the terms and provisions of this Settlement Agreement, with the exception of ¶¶ 39-44 (which shall continue in full force and effect), shall be null and void and shall have no further force or effect with respect to the Settling Parties, and neither the existence nor the terms of this Settlement Agreement (nor any negotiations preceding this Settlement Agreement nor any acts performed pursuant to, or in furtherance of, this Settlement Agreement) shall be used in the Action or in any other action or proceeding for any purpose (other than to enforce

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                                         23
2987155.2

the terms remaining in effect); and

(f)    any judgment or order entered by the Court in accordance with the terms of this Settlement Agreement shall be treated as vacated, nunc pro tunc.

**No Admission of Liability**

39.    ***Final and Complete Resolution.*** The Settling Parties intend the Settlement as described herein to be a final and complete resolution of all disputes between them with respect to the Action and Released Claims and to compromise claims that are contested, and it shall not be deemed an admission by any Settling Party as to the merits of any claim or defense or any allegation made in the Action.

40.    ***Federal Rule of Evidence 408.*** The Settling Parties agree that this Settlement Agreement, its terms and the negotiations surrounding this Settlement Agreement shall be governed by Federal Rule of Evidence 408 and shall not be admissible or offered or received into evidence in any suit, action or other proceeding, except upon the written agreement of the Settling Parties hereto, pursuant to an order of a court of competent jurisdiction, or as shall be necessary to give effect to, declare or enforce the rights of the Settling Parties with respect to any provision of this Settlement Agreement.

41.    ***Use of Agreement as Evidence.*** Neither this Settlement Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Settlement Agreement or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claims, of any allegation made in the Action, or of any wrongdoing or liability of any of the Synta Defendants; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any liability, fault or omission of the Releasees in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. Neither this Settlement Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Settlement Agreement or the Settlement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that the Releasees may file this Settlement Agreement and/or the

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                    24
2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

Judgment in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim. The limitations described in this paragraph apply whether or not the Court enters the Preliminary Approval Order, the Final Approval Order, or the Judgment, or if the Settlement Agreement is terminated or rescinded.

**Miscellaneous Provisions**

42. ***Voluntary Settlement.*** The Settling Parties agree that the Settlement Amount and the other terms of the Settlement as described herein were negotiated in good faith by the Settling Parties, and reflect a settlement that was reached voluntarily and after consultation with competent legal counsel.

43. ***Consent to Jurisdiction.*** All of the Synta Defendants and each Class Member hereby irrevocably submit to the exclusive jurisdiction of the Court only for the specific purpose of any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement. Solely for purposes of such suit, action, or proceeding, to the fullest extent that they may effectively do so under applicable law, the Synta Defendants and the Class Members irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the Court or that the Court is in any way an improper venue or an inconvenient forum. Nothing herein shall be construed as a submission to jurisdiction for any purpose other than any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement.

44. ***Resolution of Disputes; Retention of Exclusive Jurisdiction.*** Any disputes between or among the Synta Defendants and any Class Members concerning matters contained in this Settlement Agreement shall, if they cannot be resolved by negotiation and agreement, be submitted to the Court. The Court shall retain exclusive jurisdiction over the implementation and enforcement of this Settlement Agreement.

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

45. ***Binding Effect.*** This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto. Without limiting the generality of the foregoing, each and every covenant and agreement herein by Indirect Purchaser Plaintiffs and Co-Lead Counsel shall be binding upon all Class Members.

46. ***Authorization to Enter Settlement Agreement.*** The undersigned representatives of the Synta Defendants represent that they are fully authorized to enter into and to execute this Settlement Agreement on behalf of all of the Synta Defendants. Co-Lead Counsel, on behalf of Indirect Purchaser Plaintiffs and the Class, represent that they are, subject to Court approval, expressly authorized to take all action required or permitted to be taken by or on behalf of the Indirect Purchaser Plaintiffs and the Class pursuant to this Settlement Agreement to effectuate its terms and to enter into and execute this Settlement Agreement and any modifications or amendments to the Settlement Agreement on behalf of the Class that they deem appropriate.

47. ***Notices.*** All notices under this Settlement Agreement shall be in writing. Each such notice shall be given either by (a) email; (b) hand delivery; (c) registered or certified mail, return receipt requested, postage pre-paid; (d) Federal Express or similar overnight courier; or (e) facsimile and first class mail, postage pre-paid and, if directed to any Class Member, shall be addressed to Co-Lead Counsel at their addresses set forth below, and if directed to the Synta Defendants, shall be addressed to their attorneys at the addresses set forth below or such other addresses as Co-Lead Counsel or counsel for the Synta Defendants may designate, from time to time, by giving notice to all parties hereto in the manner described in this paragraph.

If directed to the Indirect Purchaser Plaintiffs, address notice to:

COTCHETT, PITRE & MCCARTHY, LLP
Adam J. Zapala (azapala@cpmlegal.com)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

LIEFF CABRASER HEIMANN & BERNSTEIN LLP
Lin Chan (lchan@lchb.com)
275 Battery Street, 29th Floor
San Francisco, CA 94111

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                    26
2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

Telephone: (415) 956-1000
Facsimile: (415) 956-1008

SUSMAN GODFREY LLP
Kalpana Srinivasan (ksrinivasan@susmangodfrey.com)
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

If directed to the Synta Defendants, address notice to:

FROST LLP
Christopher Frost (chris@frostllp.com)
10960 Wilshire Blvd., Suite 1260
Los Angeles, CA 90024
Telephone: (424) 254-0441

48. ***Confidentiality of Settlement Negotiations.*** Co-Lead Counsel shall keep strictly confidential and not disclose to any third party, including specifically any counsel representing any other current or former party to the Action, any non-public information regarding the Settling Parties' negotiation of this Settlement and/or the Settlement Agreement. For the sake of clarity, information contained within this Settlement Agreement shall be considered public, and the Synta Defendants may issue a press release regarding execution of the Settlement Agreement and the amount paid in connection with the Settlement Agreement.

49. ***Headings.*** The headings used in this Settlement Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

50. ***No Party Deemed to Be the Drafter.*** None of the parties hereto shall be deemed to be the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

51. ***Choice of Law.*** This Settlement Agreement shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of California, and the rights and obligations of the parties to this Settlement Agreement shall be construed and enforced in accordance with, and governed by, the substantive laws of the State of California without giving effect to that State's choice of law principles.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD** 27

2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

52.     ***Amendment; Waiver.*** This Settlement Agreement shall not be modified in any respect except by a writing executed by all the parties hereto, and the waiver of any rights conferred hereunder shall be effective only if made by written instrument of the waiving party. The waiver by any party of any breach of this Settlement Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous, of this Settlement Agreement.

53.     ***Execution in Counterparts.*** This Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. Counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts and a complete set of executed counterparts shall be filed with the Court.

54.     ***Notification of State Officials.*** The Synta Defendants shall be responsible for providing all notices required by the Class Action Fairness Act, 28 U.S.C. § 1715, to be provided to state attorneys general or to the Attorney General of the United States.

55.     ***Integrated Agreement.*** This Settlement Agreement, along with the Confidential Supplemental Agreement, constitutes the entire agreement between the Settling Parties and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement other than the representations, warranties and covenants contained and memorialized herein and in the Confidential Supplemental Agreement. It is understood by the Settling Parties that, except for the matters expressly represented herein and in the Confidential Supplemental Agreement, the facts or law with respect to which this Settlement Agreement is entered into may turn out to be other than or different from the facts now known to each party or believed by such party to be true; each party therefore expressly assumes the risk of the facts or law turning out to be so different, and agrees that this Settlement Agreement shall be in all respects effective and not subject to termination by reason of any such different facts or law. Except as otherwise provided herein, each party shall bear its own costs and attorneys' fees.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                      28

2987155.2

Docusign Envelope ID: C4680BB8-1144-4161-A095-742BDFF855C1

IN WITNESS WHEREOF, the parties hereto, through their fully authorized representatives, have executed this Settlement Agreement as of the Execution Date.

INTERIM CO-LEAD COUNSEL FOR THE INDIRECT PURCHASER PLAINTIFFS, on behalf of Indirect Purchaser Plaintiffs individually and on behalf of the Settlement Class.

By: _____

Adam J. Zapala
COTCHETT, PITRE & MCCARTHY
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Fax: 650-697-0577
azapala@cpmlegal.com

Lin Chan
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
lchan@lchb.com

Kalpana Srinivasan
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

SYNTA DEFENDANTS' COUNSEL, on behalf of Synta Technology Corp. Of Taiwan; Suzhou Synta Optical Technology Co. Ltd.; Nantong Schmidt Opto-Electrical Technology Co. Ltd.; Synta Canada International Enterprises Ltd.; Pacific Telescope Corp.; Olivon Manufacturing Co. Ltd.; SW Technology Corporation; Celestron Acquisition, LLC; Olivon, Usa LLC; Dar Tson ("David") Shen; Joseph Lupica; and Dave Anderson.

By: _____

Christopher Frost
10960 Wilshire Blvd., Suite 1260
Los Angeles, CA 90024
Telephone: (424) 254-0441
chris@frostllp.com

Synta Technology Corp. of Taiwan

By: _____

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD    29
2987155.2

Docusign Envelope ID: C4680BB8-1444-4161-A095-742BDFF855C4

Case 5:20-cv-03639-EJD   Document 390-1   Filed 09/16/24   Page 32 of 33

Ta Kung Shen

/ / /

Suzhou Synta Optical Technology Co. Ltd.

By:_____

David Shen

Synta Canada International Enterprises Ltd.;

By:_____

Sylvia Shen

Pacific Telescope Corp.

By:_____

Sylvia Shen

Olivon Manufacturing Co. Ltd.

By:_____

Jean Shen

SW Technology Corporation;

By:_____

Sylvia Shen

Celestron Acquisition, LLC

By:_____

Corey Lee

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**SETTLEMENT AGREEMENT; Case No. 5:20-cv-03639-EJD**                30
2987155.2

Docusign Envelope ID: C4680BB9-1144-4161-A095-742BDFF855C4

Case 5:20-cv-03639-EJD   Document 390-1   Filed 09/16/24   Page 33 of 33

Olivon, USA LLC

By:_____

Jean Shen

Nantong Schmidt Opto-Electrical Technology Co. Ltd.

By:_____

Sheng Rong Zhu

David Shen

By:_____

David Shen

Joseph Lupica

By:_____

Joseph Lupica

Dave Anderson

By:_____

Dave Anderson

Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

Kalpana Srinivasan (Bar No. 237460)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>All Indirect Purchaser Actions | **Case Nos. 5:20-cv-03639-EJD**<br><br>**INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND ISSUANCE OF NOTICE**<br><br>**Judge: Hon. Edward J. Davila** |

**5-ER-0876**

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 31, 2024 or as soon thereafter as the matter may be heard by the Honorable Edward J. Davila of the United States District Court of the Northern District of California, located in Courtroom 4, 280 South 1st Street, San Jose, California 95113, Indirect Purchaser Plaintiffs ("IPPs") will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 23 and in accordance with the Northern District's Procedural Guidance for Class Action Settlements, for an order:

(1)      finding that the Court will likely approve the proposed class action settlements with Defendants Synta Technology Corp. of Taiwan, Suzhou Synta Optical Technology Co., Ltd., Nantong Schmidt Opto-Electrical Technology Co. Ltd., Synta Canada International Enterprises Ltd., Pacific Telescope Corp., Olivon Manufacturing Co. Ltd., SW Technology Corporation, Celestron Acquisition, LLC, Olivon USA, LLC, Dar Tson ("David") Shen, Joseph Lupica, and Dave Anderson (collectively, "Defendants"), under Rule 23(e)(2);

(2)      provisionally certifying the settlement class;

(3)      approving the proposed forms of settlement class notice and the settlement class notice program as fully compliant with Federal Rule of Civil Procedure 23 and due process; and directing notice to the settlement class in connection with the proposed settlement;

(4)      appointing the proposed class representatives: Madeline Bekielewski,[1] Thomas Berta, Carey Briggs, Vincent Catanzaro, David Dick, Austin Griffith, Donnie Houston, Bentaro Huset, Greg Kendall, David Kerber, Deborah Lemar, Doug Lundy, John Maurice, Timothy McQuaid, Philip Moore, Brian Murphy, Herbert Nelson, Scott Plummer, Michael Price, David Quaglietta, Greg Ross, Ronald Troillett, Robert Welsh, Tony DiMambro, Jason Glydewell, Leon Greenberg, Michael Liskow, Sigurd Murphy, Jim Riley, Keith Uehara, Steven Zellers, Sarah Day Brewer, Thien Ngo, Jesse Smith, and Arthur Sines (the "Named Representatives") as representatives for the settlement class;

---

[1] Richard Bekielewski was an original class representative, but he passed away during the pendency of the litigation.  His wife, Madeline Bekielewski, has taken over his estate and claims.

ii      MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0877**

(5)     appointing Cotchett, Pitre & McCarthy, LLP; Lieff Cabraser Heimann & Bernstein, LLP; and Susman Godfrey L.L.P. (collectively, "Interim Co-Lead Counsel") as class counsel for the settlement class;

(6)     authorizing retention of Verita Global, LLC as notice and claims administrator; and

(7)     scheduling a hearing to finally approve the settlement and determine whether the proposed settlement is fair, reasonable, and adequate under Rule 23(e)(2) and whether the settlement class should be certified (the "Final Approval Hearing").

This motion is based on this Notice of Motion and Motion to Direct Notice to the Class Regarding Settlement; the following memorandum of points and authorities; the Declaration of Alejandra C. Salinas; the Declaration of Carla Peak ("Verita Decl."), and the proposed forms of notice and other exhibits attached thereto as Exhibits A-E, all filed concurrently herewith; the pleadings and the papers on file in this action; and such other matters as the Court may consider.

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................... ii

TABLE OF CONTENTS........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................... v

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 2

STANDARD OF REVIEW .................................................................................... 3

ARGUMENT ........................................................................................................ 4

I.     The Settlement Meets the Standards for Preliminary Approval ...................... 4

       A.  The Class Has Been Zealously Represented ................................................ 4

       B.  The Settlement Agreement Results from Arm's-Length Negotiations....................... 6

       C.  The Settlement Agreement Represents an Excellent Result for the Class................ 7

       D.  The Settlement Agreement Treats Class Members Equitably ................................ 11

       E.  The Settlement Agreement Satisfies the District's Procedural Guidance................ 12

II.    The Settlement Class Warrants Settlement Certification.................................. 17

       A.  The Settlement Class Meets the Requirements of Rule 23(a)................................ 17

       B.  The Settlement Class Meets the Requirements of Rule 23(b)(3).............................. 20

III.   The Proposed Notice Program Complies with Rule 23 and Due Process........................ 22

       A.  The Proposed Notice Forms Are Plain and Easy to Understand .............................. 22

       B.  The Proposed Notice Plan Will Reach a Broad Audience........................................ 23

IV.    The Court Should Schedule a Fairness Hearing and Related Dates. ........................... 24

CONCLUSION ........................................................................................................ 24

# **TABLE OF AUTHORITIES**

<u>Cases</u>

*In re 3D Sys. Secs. Litig.*,
No. 21-cv-1920 (NGG) (TAM), 2023 U.S. Dist. LEXIS 98693 (E.D.N.Y. June 5, 2023) .............................................................................................................. 10

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................................................................... 9, 17, 20, 21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ................................................................................... 20

*Bellinghausen v. Tractor Supply Co.*,
303 F.R.D. 611 (N.D. Cal. 2014) .............................................................. 18

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ...................................................................... 7

*In re Cathode Ray Tube Antitrust Litig.*,
No. 07-cv-05944-JST, 2022 WL 4596621 (N.D. Cal. Aug. 1, 2022).................. 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 07-cv-05944-JST, 2020 WL 1873554 (N.D. Cal. Mar. 11, 2020) ................ 19

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 14-CV-2058 JST, 2017 WL 2481782 (N.D. Cal. June 8, 2017)................... 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)................... 21

*In re Cement & Concrete Antitrust Litig.*,
817 F.2d 1435 (9th Cir. 1987), *rev'd on other grounds*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989)............................................................................ 13

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004)......................................................................... 4

*In re Citric Acid Antitrust Litig.*,
No. 95-1092, C-95-2963 FMS, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996) ......... 20

Consumer Fin. Prot. Bureau,
*Arbitration Study: Report to Congress, Pursuant to Dodd–Frank Wall Street Reform & Consumer Protection Act § 1028(a)* (2015), available at https://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf .................................................................................................. 9

*Deaver v. Compass Bank*,
No. 13-cv-00222-JSC, 2015 WL 8526982 (N.D. Cal. Dec. 11, 2015) ................. 8

2982687.6

**5-ER-0880**

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ................................................................................... 19

*Fleming v. Impax Lab'ys Inc.*,
No. 16-CV-06557-HSG, 2021 WL 5447008 (N.D. Cal. Nov. 22, 2021) ................................ 8

*Four in One Co. v. S.K. Foods, L.P.*,
No. 2:08–cv–3017 KJM EFB, 2014 WL 4078232 (E.D. Cal. Aug. 14, 2014) ....................... 11

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ......................................................................... 20, 21

*Harbour v. Cal. Health & Wellness Plan*,
No. 5:21-CV-03322-EJD, 2024 WL 171192 (N.D. Cal. Jan. 16, 2024) ............................... 15

*Hefler v. Wells Fargo & Co.*,
No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 150292 (N.D. Cal. Sept. 4,
2018) ....................................................................................................... 10

*In re High-Tech Emp. Antitrust Litig.*,
No. 11–cv–02509-LHK, 2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ............................... 11

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ............................................................................ 18

*In re Kia Hyundai Vehicle Theft Litig.*,
No. 8:22-ml-03052-JVS, 2023 WL 8126849 (C.D. Cal. Nov. 3, 2023) ............................... 12

*In re: Lithium Ion Batteries Antitrust Litig.*,
No. 13-md-02420-YGR, 2017 WL 6728701 (N.D. Cal. Dec. 22, 2017) ......................... 12, 16

*In re MacBook Keyboard Litig.*,
No. 5:18-CV-02813-EJD, 2023 WL 3688452 (N.D. Cal. May 25, 2023) ............................... 8

*In re MyFord Touch Consumer Litig.*,
No. 13-cv-03072, 2019 WL 1411510 (N.D. Cal. Mar. 28, 2019) ....................................... 7

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................... 8, 9

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ............................................................................. 22

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014) ........................................................................ 18

*In re Optical Disk Drive Antitrust Litig.*,
No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) .................................... 20

2982687.6

**5-ER-0881**

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    No. 5:16-cv-06370-EJD (N.D. Cal.) ...................................................................... 7

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ......................................................................... 20

*In re Syncor ERISA Litig.*,
    516 F.3d 1095 (9th Cir. 2008) ............................................................................... 4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ........................................................................ 21

*Vataj v. Johnson*,
    No. 19-cv-06996-HSG, 2021 U.S. Dist. LEXIS 75879 (N.D. Cal. Apr. 20,
    2021) ..................................................................................................................... 11

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ............................................................................. 21

Statutes

28 U.S.C. § 1332(d) ................................................................................................. 16

28 U.S.C. § 1712 ...................................................................................................... 16

28 U.S.C. § 1713 ...................................................................................................... 16

28 U.S.C. § 1714 ...................................................................................................... 16

28 U.S.C. § 1715(b) ................................................................................................. 16

Class Action Fairness Act ..................................................................................... 4, 16

Other Authorities

Fed. R. Civ. P. 23 ............................................................................................. *passim*

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-
    settlements/ (last updated Sept. 5, 2024) ............................................................... 4

*Manual for Complex Litigation* § 21.632 (4th ed. 2004) ....................................... 17

*Stellar Dreams*, The Science Haven,
    https://www.thesciencehaven.org/stellardreams (last visited Sept. 12, 2024) ..... 16

2982687.6

**5-ER-0882**

## INTRODUCTION

The Indirect Purchaser Plaintiffs ("IPPs") brought this action on behalf of a class of purchasers from states permitting indirect purchaser lawsuits to recover damages caused by a decade-long alleged conspiracy to unlawfully fix prices, rig bids, and allocate the market for consumer telescopes. This motion seeks preliminary approval of the proposed settlement for purposes of directing notice to class, approval of the proposed methods and forms of providing notice, and the scheduling of final approval, which, if granted, would conclude this litigation.[2]

The Settlement Agreement, attached as Ex. A to the Salinas Declaration, provides an excellent recovery to the settlement class—$32 million in total. This is an outstanding result considering the facts and circumstances of this litigation. The Settlement Agreement is fair, reasonable, and adequate: class representatives and Interim Co-Lead Counsel vigorously prosecuted the case and obtained an excellent result in the face of substantial risks, vigorous opposition, and difficulties regarding collection. In addition, the proposed settlement class warrants settlement class certification upon final approval because all major issues are common and can be adjudicated collectively, as courts repeatedly find in antitrust cases.

Pursuant to Rule 23 and the Northern District's Procedural Guidance for Class Action Settlements, Plaintiffs respectfully request that this Court (1) preliminarily approve the proposed Settlement; (2) find that it will likely certify the Settlement Class upon final approval; (3) direct notice to the Settlement Class, along with a finding that the forms and notice plan comply with Rule 23 and due process; (4) appoint the Class Representatives as representatives for the Settlement Class; (5) appoint Interim Co-Lead Counsel as counsel for the Settlement Class; (6) authorize retention of Verita as notice and claims administrator; and (7) set a schedule for Final Approval, including a deadline for opting out of the settlement or objecting and any motions for attorneys' fees, costs, and service awards.

---

[2] Another Defendant—Ningbo Sunny Electronic Co. Ltd., a China-based Defendant—has not appeared in this action.

1

**STATEMENT OF FACTS**

The Settlement Agreement presented here would end extensive and hard-fought litigation that began in June 2020. As detailed below, and as this Court knows having presided over it, this case has been typified by voluminous, contested discovery and multiple rounds of motions addressing complex antitrust issues.

The parties and their counsel participated in an initial, full-day mediation with the Honorable Judge Suzanne Segal, a former Magistrate Judge of the Central District of California. Salinas Decl. ¶4. That first session did not result in a settlement. *Id.* On September 6, 2023, the parties and their counsel engaged in a second, full-day mediation with Judge Segal, at which, after months of extensive arms-length negotiations, the Parties reached an agreement in principle to resolve this case by both accepting a supervised mediator's proposal. *Id.* Since reaching an agreement in principle, the parties have worked diligently to draft and negotiate the Settlement Agreement, notices, and other settlement exhibits, and to select the proposed Settlement Administrator through a competitive bidding process. *Id.* ¶10.

The Settlement Agreement grants a release on behalf of a class of indirect purchasers of telescopes manufactured by Defendants, defined as follows:

> All persons and entities in the Indirect Purchaser States (as defined herein) who, during the period from January 1, 2005 to September 6, 2023, purchased one or more Telescopes from a distributor (or from an entity other than a Defendant) that a Defendant or alleged co-conspirator manufactured. Excluded from the Class are Defendants; their parent companies, subsidiaries and Affiliates; any co-conspirators; Defendants' attorneys in this Action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this Action; all jurors in this Action; and all Persons who directly purchased Telescopes from Defendants but only for those direct purchases of Telescopes.

Salinas Decl. Ex. A ¶1(e). The Indirect Purchaser States are defined in both as:

> Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

2

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0884**

*Id*., Ex. A ¶1(q).

The Settlement Agreement provides that upon final approval and entry of judgment, class members will release their claims against the Defendants. *Id*., Ex. A ¶7(e). In return for the releases and other terms set forth in the Settlement Agreement, the Defendants agree to pay a total of $32 million.

### STANDARD OF REVIEW

Pursuant to Federal Rule of Procedure 23(e), a class action settlement must be approved by the Court before it can become effective. The process for court approval is comprised of two principal steps: preliminary approval of the proposed settlement and direction of notice to the class; and final approval, including a hearing at which argument concerning the fairness, adequacy, and reasonableness of the settlement is presented.

By this motion, Plaintiffs respectfully ask the Court to take the first step and enter an order preliminarily approving the Settlement Agreement, finding that the Court will likely grant final approval, and directing class notice, pursuant to the parties' proposed notice program under Rule 23(e)(1).

In determining whether a proposed settlement initially appears fair, reasonable, and adequate, the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Separately, this District's Procedural Guidance for Class Action Settlements ("Procedural Guidance") instructs the parties to submit specific information in connection with a motion under

2982687.6

Rule 23(e)(1).[3] In particular, the Procedural Guidance seeks information regarding: (i) any differences between the settlement class and the class as asserted in the operative complaint, and between the claims to be released and the claims alleged in the operative complaint; (ii) the anticipated class recovery under the settlement and the potential class recovery if plaintiffs were to fully prevail; (iii) the proposed allocation plan; (iv) expected participation by class members in the settlement; (v) the settlement administrator, the selection process, and the anticipated administrative costs; (vi) the proposed notice, including deadlines to opt out of or object to the settlements; (vii) a proposal regarding the award of attorneys' fees and litigation costs that counsel intend to request; (viii) incentive awards that the parties intend to request; (ix) the allocation of any unused settlement funds, including a reversion, if any; (x) notice of and compliance with CAFA; and (xi) past distributions in comparable class settlements.

In evaluating settlement approval, the Court should consider the strong public policy favoring "settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *accord Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004). The settlement here readily meets all standards for preliminary settlement approval.

## ARGUMENT

## I.      The Settlement Meets the Standards for Preliminary Approval

### A.      The Class Has Been Zealously Represented

First, the class representatives and interim class counsel have vigorously represented the interests of the class in this action for more than three years. During this time, Plaintiffs engaged in extensive motion practice—including briefing over three rounds of motions to dismiss, numerous motions regarding entry of a protective order, discovery order, and scheduling order, and fourteen

---

[3] *See Procedural Guidance for Class Action Settlements*, United States District Court, Northern District of California, https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (last updated Sept. 5, 2024).

4

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0886**

discovery disputes. Salinas Decl. ¶5; ECF Nos. 140, 161, 162, 171, 175, 198, 202, 225, 227, 237, 247, 277, 283, 284, 287, 289, and 307.

This motion practice was supported by a significant amount of expert work. For example, due to the Defendants' years-long delay in producing transactional data and cost data, Plaintiffs' damages expert, Dr. Russell Mangum and his associates undertook significant effort and expense to research and develop potential alternative analyses to support the Plaintiffs' claims. Salinas Decl. ¶¶12, 13. Once some of this data was ultimately produced by Defendants in 2023, Dr. Mangum and his associates conducted further analyses with respect to the merits of Plaintiffs' claims and began to prepare to serve expert reports, which were scheduled to be exchanged on December 8, 2023. *Id*. ¶12; ECF No. 339.

Plaintiffs' expert work followed substantial and costly fact discovery. Plaintiffs served Defendants with at least 140 document requests and 18 interrogatories (most of which were served on multiple Defendants). Salinas Decl. ¶6. Plaintiffs also issued over 30 subpoenas to non-parties and obtained substantial structured data regarding these intermediaries' direct purchases of telescopes from the Defendants and their sales to the Indirect Purchaser Plaintiffs, for purposes of demonstrating "pass through" and economic harm; and identifying settlement class members. *Id.* Plaintiffs conducted extensive discovery negotiations with Defendants, including weekly meet and confers, on topics ranging from production of documents and transactional data, the identification of appropriate document custodians, the use of search terms, the completeness of discovery responses, and deposition scheduling. *Id.* ¶5. Plaintiffs conducted similar extensive discovery efforts with a substantial number of non-parties to obtain data critical to the case. *Id*. ¶6. Plaintiffs also reviewed a significant portion of the more than 3.9 million documents Defendants produced, and voluminous electronic transactional and cost data from Defendants and non-parties. *Id.* This included informally translating thousands of documents written in Chinese through translator software and formally translating dozens of documents written in Chinese for use in depositions. *Id.* ¶11. Lastly, Plaintiffs took depositions of Defendants' senior executives and defended 23 class representative depositions. *Id.* ¶6.

5

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0887**

Moreover, as noted above, to obtain this discovery, Plaintiffs brought and prevailed on numerous discovery letter briefs before Magistrate Judge DeMarchi. *Id*. ¶5. Almost all of these disputes followed weeks, if not months, of meet and confer efforts that resulted in numerous hearings before the Court. *Id.* Among other things, this work included successfully compelling Defendants to run Plaintiffs' proposed search terms, produce all non-privileged documents that hit on one or more of those search terms, produce documents that were improperly withheld as privileged, collect and produce transactional and cost data, answer numerous interrogatories and other queries regarding Defendants' transactional data and the destruction of other potential data, and the scheduling of Defendants' depositions. *Id.*

Likewise, the class representatives have personally been actively engaged—they each provided pertinent information about their purchases of price-fixed products, searched for and provided documents and information in response to Defendants' written discovery requests, regularly communicated with their counsel, and sat for depositions.

Taken together, these litigation efforts show that the Settlement Agreement is the product of well-informed negotiations and vigorous advocacy on behalf of the class warranting preliminary approval and dissemination of settlement class notice.

**B.      The Settlement Agreement Results from Arm's-Length Negotiations**

The Settlement Agreement also arises out of serious, arm's-length negotiations between counsel for IPPs and Defendants. After years of litigation and extensive discovery, counsel for IPPs and Defendants convened multiple times over several months to arrive at settlement terms. Salinas Decl. ¶4. This included two full-day mediations with an experienced and well-respected mediator, Honorable Suzanne Segal, a former Magistrate Judge of the Central District of California. *Id.*  The agreement to settle was reached only after both sides accepted Judge Segal's mediator's proposal after protracted negotiations. *Id*.

Moreover, the Settlement Agreement bears no signs of collusion among the parties. The Ninth Circuit has identified three indicators of potential collusion in the settlement negotiation process: (i) when class counsel receives a disproportionate distribution of the settlement proceeds; (ii) when the parties negotiate a "clear sailing" arrangement providing for the independent payment

6

MOTION TO DIRECT NOTICE RE SETTLEMENT<br>CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0888**

of attorney's fees; and (iii) when the parties arrange for a reversion of unused funds to defendants. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–48 (9th Cir. 2011). Here, none of those hallmarks are present. The Settlement Agreement will be paid *pro rata* to class members with qualifying purchases from the Indirect Purchaser States, and it includes no "clear sailing" agreement or any agreement on the amount of attorney's fees to be awarded. Instead, counsel will seek reasonable attorney's fees consistent with Ninth Circuit case law and under the supervision of the District Court. There will also be no reversion of unused funds to the Defendants.

Indeed, Judge Segal's extensive involvement and oversight weigh heavily in favor of finding procedural fairness and that there was no collusion between the parties. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (participation of mediator is not dispositive but is "a factor weighing in favor of a finding of non-collusiveness."); *In re MyFord Touch Consumer Litig.*, No. 13-cv-03072, 2019 WL 1411510, at *8 (N.D. Cal. Mar. 28, 2019) ("[h]ere, the parties reached settlement under the supervision of Judge Kim; indeed, the Settlement Agreement is based on Judge Kim's Mediator's Proposal. Thus, the settlement proposal is the product of arm's-length bargaining.") (citation omitted).

**C.      The Settlement Agreement Represents an Excellent Result for the Class**

The relief provided to the class is more than "adequate," considering (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed distribution plan; (iii) the terms of any proposed award of attorney's fees; and (iv) any agreement required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C).

**1.      The Settlement Agreement Is Fair, Reasonable, and Adequate**

The Settlement Agreement provides substantial monetary relief—a $32 million non-reversionary fund for the benefit of Indirect Purchasers. That amount represents an excellent result given the potential recovery and the substantial risks and delay of ongoing litigation in this case, along with potential collection and ability to pay problems with foreign defendants, as evidenced in the *Orion* litigation. *See docket generally, Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,* No. 5:16-cv-06370-EJD (N.D. Cal.). The parties reached this settlement while Defendants' renewed motion to dismiss was still pending and IPPs were preparing to serve expert reports. "[I]t is well-

7

settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *In re MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2023 WL 3688452, at *9 (N.D. Cal. May 25, 2023) (alteration in original).

The IPPs' damages expert calculated that the class may have obtained a judgment in the range of $29 million to $165 million. Salinas Decl. ¶13. The $32 million settlement fund is well within the IPPs' expert's range and represents between approximately 19% to 110% of the preliminary total estimate of damages at trial. *Id.* Thus, this recovery is consistent with recoveries in this District. *See In re MacBook Keyboard Litig.*, No. 5:18-cv-02813-EJD, 2023 WL 3688452, at *9 (N.D. Cal. May 25, 2023) (finding that a settlement amount was satisfactory because it represented "approximately 9% to 28% of the total estimated damages *at trial*"); *Fleming v. Impax Lab'ys Inc.*, No. 16-CV-06557-HSG, 2021 WL 5447008, at *10 (N.D. Cal. Nov. 22, 2021) (settlement recovery representing 12.5% of total recoverable damages is "in a range consistent with the median settlement recovery in class actions"); *Deaver v. Compass Bank*, No. 13-cv-00222-JSC, 2015 WL 8526982, at *7 (N.D. Cal. Dec. 11, 2015) (finding a settlement that equaled "10.7 percent of the total potential liability exposure, before any deductions for fees, costs, or incentive awards" was "fair and reasonable"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving settlement accounting for only "9% of the maximum potential recovery").

### 2. The Claims Process Is Straightforward

Claims Process. The Settlement Agreement in this case provides direct monetary relief to class members through a straightforward claims process. Plaintiffs present a proposed claim form, which will be made available to class members electronically and in hard copy. Verita Decl. Ex. E. Following this Court's order to direct notice to the class regarding the Settlement Agreements, class members will be able to make claims for their purchases by providing basic information about themselves (e.g., name, mailing address, and email address); the total number of covered products purchased from January 1, 2005 to September 6, 2023; and each class member's state of residence at the time of purchase. *Id.* Although a class member will not be required to submit proof of purchase, the claim form advises them to retain all purchase documentation until the claim is closed.

8

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0890**

*Id.* After all claims have been submitted and a review of the claim data is performed, the claims administrator may request supporting documentation from claimants. *Id.*

Claims Rate. Plaintiffs and Verita estimate the total number of claimants to range from 40,000 to 300,000, resulting in a claims rate between 1% and 7.5% percent of the approximately 4 million class members. Verita Decl. ¶37.  While low as a matter of absolute levels, such claims rates are the norm in cases such as this in which the per-claim dollar amount is also relatively low. For example, the landmark 2015 Arbitration Study by the Consumer Financial Protection Bureau, which examined 105 settlements in financial consumer fraud cases, showed that low claims rates in cases with low individual claim amounts has been a persistent phenomenon.[4] This reflects the fact that in cases with very small individual claim values, class members are often unlikely to take the time to submit a claim, even if that process is as streamlined as possible. Indeed, the low-dollar value of individual claims is precisely why class actions are necessary to enforce the law—not only to obtain redress, but also to deter future misconduct. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997). That said, in conjunction with the Court-appointed claims administrator, Class Counsel will seek to increase the claims rate as much as feasible. For example, Amazon will be providing direct notice to millions of settlement class members who purchased a telescope through Amazon.

Distribution Process. Following the close of the claims period, the settlement administrator will make payments to class members with valid claims through either (i) direct payment by check; or (ii) digital payment through services such as PayPal, Venmo, Amazon, or Google Wallet. Verita Decl. *Id.* ¶38.

### 3.    Counsel Will Seek Reasonable Attorneys' Fees

In evaluating the adequacy of the proposed settlements, the Court must also take into account the terms of any proposed attorneys' fees, including the timing of payment. Fed. R. Civ. P.

---

[4] Consumer Fin. Prot. Bureau, *Arbitration Study: Report to Congress, Pursuant to Dodd–Frank Wall Street Reform & Consumer Protection Act § 1028(a)* (2015), available at https://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf.

9

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0891**

23(e)(2)(C)(iii). Accordingly, the Procedural Guidance instructs class counsel to include information about (1) the fees they intend to request, (2) their lodestar calculation, including the total number of hours billed to date and the requested multiplier, if any, and (3) the relationship among the amount of the award, the amount of the common fund, and counsel's lodestar calculation. *See* Procedural Guidance, Preliminary Approval (6).

Here, while the Settlement Agreement does not contemplate a specific award of attorney's fees, it does provide that any Court-awarded fees will be paid from the gross settlement fund. Plaintiffs anticipate requesting a total fee award not to exceed $10.66 million, along with proportional interest that accumulates on the settlement fund, which represents an attorney fee award not to exceed a third of the recovery in this case. In view of class counsel's lodestar of over $11 million through the filing of this motion, such a request would presently result in a negative lodestar multiplier of .96. Salinas Decl. ¶8. A preliminary calculation shows that counsel has spent a total of 20,126 hours on this case during that time period, with a blended average rate of $568 per hour. *Id*. Accordingly, a lodestar cross-check supports the reasonableness of a fee request, in light of this hard-fought, intensely litigated case.

### 4.     Other Related Agreements

Rule 23(e)(3) requires parties to identify "any agreement made in connection with" the settlement. This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." Fed. R. Civ. P. 23(e) 2003 advisory committee notes. Plaintiffs have entered into a Confidential Supplemental Agreement, which is available to the Court upon request for *in camera* and under seal review. The Confidential Supplemental Agreement is in the class's interest and grants certain rights in favor of the class. This Confidential Supplemental Agreement is available for the Court's inspection, should it require it. Confidential supplemental agreements in class action litigation are normal and permissible. *See, e.g., In re 3D Sys. Secs. Litig.*, No. 21-cv-1920 (NGG) (TAM), 2023 U.S. Dist. LEXIS 98693, at *21 (E.D.N.Y. June 5, 2023) (describing such agreement as "standard"); *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 150292, at *23 (N.D. Cal. Sept. 4, 2018) (discussing existence of

10

MOTION TO DIRECT NOTICE RE SETTLEMENT<br>CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0892**

confidential supplemental agreement); *Vataj v. Johnson*, No. 19-cv-06996-HSG, 2021 U.S. Dist. LEXIS 75879, at *28 (N.D. Cal. Apr. 20, 2021) (approving class action settlement with side, supplemental agreement).

### D.   The Settlement Agreement Treats Class Members Equitably

The proposed Settlement Agreement does not contemplate any unwarranted preferential treatment of class representatives or segments of the class. *See* Fed. R. Civ. P. 23(e)(2)(D). Matters of concern for the Court may include "whether the apportionment of relief among class members takes appropriate account of differences among their claims." Fed. R. Civ. P. 23(e)(2) 2018 advisory committee notes; *see also* Procedural Guidance, Preliminary Approval (1)(e) (instructing parties to describe the proposed allocation plan).

Under the terms of the Settlement Agreement, the plan of distribution is, appropriately, left for the determination of the Court. Here, Plaintiffs propose a *pro rata* plan of allocation to each class member with damages claims arising from purchases in the Indirect Purchaser States that will be based upon the number of approved purchases of Defendants' consumer telescopes during the settlement class period. Thus, the recovery to individual class members is tied to the volume and type of their purchases, the number of other qualified class members making claims against the settlement fund, and the size of the overall fund.

As courts have repeatedly held, this is a reasonable and fair way to compensate classes, especially in antitrust class actions. *See In re Cathode Ray Tube (CRT) Antitrust Litig.,* No. 14-CV-2058 JST, 2017 WL 2481782, at *5 (N.D. Cal. June 8, 2017) (approving settlement distribution plan that "fairly treats class members by awarding a *pro rata* share to the class members based on the extent of their injuries.") (quotation omitted); *In re High-Tech Emp. Antitrust Litig.,* No. 11–cv–02509-LHK, 2015 WL 5159441, at *8 (N.D. Cal. Sept. 2, 2015) (approving *pro rata* distribution); *Four in One Co. v. S.K. Foods, L.P.*, No. 2:08–cv–3017 KJM EFB, 2014 WL 4078232, at *15 (E.D. Cal. Aug. 14, 2014) (approving "plan of allocation providing for a *pro rata* distribution of the net settlement fund based on verified claimants' volume of qualifying purchases" as "fair, adequate, and reasonable"). The proposed plan of allocation is thus "fair, adequate, and reasonable" and merits approval.

11

**E.      The Settlement Agreement Satisfies the District's Procedural Guidance**

In accordance with this District's Procedural Guidance, Plaintiffs have provided above relevant information regarding (i) the anticipated class recovery under the settlement and the potential class recovery if Plaintiffs were to fully prevail; (ii) the proposed allocation plan; (iii) expected participation by class members in the settlement; and (iv) attorneys' fees that counsel intend to request. In addition, the proposed notice and notice program are detailed below. The remaining relevant provisions of the Procedural Guidance are addressed here.

**1.      The Litigation and Settlement Class Are Fundamentally Identical**

Where a litigation class has not been certified, parties should explain any differences between the settlement class and class asserted in the operative complaint. *See* Procedural Guidance, Preliminary Approval (1)(a). Here, the settlement class is nearly identical to the class asserted in the Fourth Amended Consolidated Class Action Complaint ("FAC"). ECF No. 300, ¶198.

The only substantive differences in the Settlement Agreement class and the FAC class are setting an affirmative end date to the settlement class of September 6, 2023, and excluding certain government entities, jurors, and direct purchases of telescopes from the Settlement Agreement class, as is appropriate and warranted. *See, e.g., In re Kia Hyundai Vehicle Theft Litig.*, No. 8:22-ml-03052-JVS (KESx), 2023 WL 8126849, at *5 (C.D. Cal. Nov. 3, 2023) (granting preliminary approval after settlement agreement was amended to exclude "Government Entities" from the release); *In re: Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420-YGR, 2017 WL 6728701, at *1 (N.D. Cal. Dec. 22, 2017) (granting preliminary approval to a class definition that excluded "federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case.").

**2.      The Release Tracks the Allegations in the Complaint**

Where a litigation class has not been certified, parties should explain any differences between the claims to be released and claims asserted in the complaint. *See* Procedural Guidance, Preliminary Approval (1)(b). There are no material differences between the claims released in the Settlement Agreement against the Defendants and the claims in IPPs' FAC against the Defendants.

12

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0894**

*Compare* FAC, *with* Salinas Decl. Ex. A. The Settlement Agreement releases all antitrust and consumer protection claims that the classes brought against Defendants and their subsidiaries and affiliates. *Id.* Plaintiffs have not released any claims against Defendants for product liability, breach of contract, breach of warranty or personal injury, or any other claim unrelated to the allegations in the operative complaint. Salinas Decl. Ex. A ¶1(w)(3)(i). The Settlement Agreement does not release claims regarding named Defendant Ningbo Sunny or any of its officers, affiliates or related entities in their capacity on behalf of Ningbo Sunny. *Id.* Ex. A ¶1(x).

Because antitrust conspirators are subject to joint and several liability, class members who made valid purchases from any Defendant named in the conspiracy will be entitled to submit a claim. *See, e.g., In re Cement & Concrete Antitrust Litig.*, 817 F.2d 1435, 1439 (9th Cir. 1987), *rev'd on other grounds*, *California v. ARC Am. Corp.*, 490 U.S. 93, 109 (1989) ("Antitrust defendants are jointly and severally liable for the acts of their coconspirators. Therefore, the settling defendants were liable to all class members, not to just those members who purchased cement from them personally. Accordingly, class members who purchased cement from nonsettling defendants had valid claims, and thus were entitled to share in the fund.") (citing *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257 (7th Cir.1980)). Joint and several liability applies with equal force in an indirect purchaser context. *See In re Cathode Ray Tube Antitrust Litig.*, No. 07-cv-05944-JST, 2022 WL 4596621, at *3 (N.D. Cal. Aug. 1, 2022) ("Eliminating any doubt on this point is the fact that "[n]othing in *Illinois Brick* displaces the rule of joint and several liability, under which each member of a conspiracy is liable for all damages caused by the conspiracy's entire output.") (quoting *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002)).

Plaintiffs believe the Settlement Agreement will not impact any other known cases if approved. The Settlement Agreement specifically excludes any telescope purchases made directly from a Defendant. Salinas Decl. Ex. A ¶1(e).

### 3.     The Settlement Administrator Selection Process and Costs

The Procedural Guidance instructs parties to identify (1) the proposed settlement administrator, (2) the settlement administrator selection process, (3) the number of proposals submitted, (4) the methods of notice and claims payment proposed, (5) counsel's history of

13

engagements with the settlement administrator over the last two years, (6) anticipated administration costs, (7) the reasonableness of those costs in relation to the value of the settlement, and (8) who will pay the costs. *See* Procedural Guidance, Preliminary Approval (2). Here, the answer to each of these questions supports the fairness and adequacy of the settlement administration process proposed.

Selection Process. To select a settlement administrator, Plaintiffs conducted a competitive bidding process with multiple proposed administrators. Salinas Decl. ¶10. Having considered the competing bids, Plaintiffs selected Verita, whose proposal represented the most cost-effective, efficient, and comprehensive plan, which Plaintiffs believe provides the best value for the class in light of the other proposals. *Id.*

Method of Notice and Claims Payment. In their solicitation for bids from claims administrators, Plaintiffs required that any proposal employ contemporary and diverse methods of notice to ensure the broadest reach possible, consistent with Federal Rule of Civil Procedure 23 and current best practices. *Id*. Every administrator proposed a program that included direct notice to class members for whom Plaintiffs have contact information (e.g., via email and direct mail), online digital internet banner advertising across different advertising networks, outreach through social media channels, and a press release. *Id.* Some proposals included additional print publications and digital advertising. *Id.*

Counsel's History of Engagements with Verita. Interim Co-Lead Counsel's firms have had experience with Verita.[5] Verita Decl. ¶10. Over the last ten years, Interim Co-Lead Counsel have hired Verita for administration of settlements in over a dozen class actions. *Id.*

Anticipated Administration Costs. Verita estimates that notice and claims administration will cost $350,771. Salinas Decl. ¶10. Verita has agreed to a not-to-exceed amount for notice and claims administration of $450,500. *Id.* This cost is reasonable, as it represents approximately 1% of the total proceeds from the Settlement Agreement.

---

[5] Verita was formerly known as KCC Class Action Services, LLC or KCC.

14

### 4. Costs and Expenses

The Procedural Guidance instructs counsel to state whether and in what amounts they seek payment of costs and expenses. *See* Procedural Guidance, Preliminary Approval (6). Here, Plaintiffs anticipate requesting reimbursement of out-of-pocket litigation expenses, not to exceed $1.5 million total. Salinas Decl. ¶11. This amount includes, *inter alia*, expenses for experts, document review and translation costs, deposition costs, and other miscellaneous litigation costs.

### 5. Service Awards

The Procedural Guidance instructs parties to include information about the amount of any contemplated service awards and evidence supporting the awards. *See* Procedural Guidance, Preliminary Approval (7). While the Settlement Agreements do not specifically *require* service awards for class representatives, IPPs anticipate seeking Court approval of such awards—not to exceed $3,000 for each of the Class Representatives. These service awards are to compensate the Class Representatives for the substantial time and effort they spent on behalf of the class participating in the litigation, preparing for and sitting for depositions, and searching for and collecting documents. Plaintiffs believe this amount is reasonable in light of the excellent result achieved through this settlement. The amount requested is also "under the presumptively reasonable amount of $5,000 and [is] consistent with precedent." *See Harbour v. Cal. Health & Wellness Plan*, No. 5:21-CV-03322-EJD, 2024 WL 171192, at *9 (N.D. Cal. Jan. 16, 2024). Thus far in this litigation, Plaintiffs have not sought service awards and contemplate this will be the only service award for the Class Representatives.

### 6. Reversions and *Cy Pres* Awardees

As noted above, there will be no reversion of unused funds to the Defendants. Should a balance remain after distribution to the class (whether by reason of tax refunds, uncashed checks, or otherwise), Interim Co-Lead Class Counsel will seek to reallocate such settlement funds to class members that did cash their checks, if economically feasible to do so. If unused settlement funds are not economically feasible to redistribute, Interim Co-Lead Class Counsel proposes to donate the funds to Stellar Dreams, a program directed by Science Haven, a 501(c)(3) non-profit, subject to the Court's approval.  Stellar Dreams' goal is "to close the equity gap in science, particularly

15

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0897**

astronomy, by giving 100 telescopes, astronomy education, and citizen science opportunities to students in grades 5-12, who come from underrepresented backgrounds in science and astronomy."[6]

### 7. Class Action Fairness Act ("CAFA")

Pursuant to the Settlement Agreement and as required by CAFA, the Defendants will serve notices in accordance with the requirements of 28 U.S.C. § 1715(b) within ten days of the filing of this motion. Salinas Decl. Ex. A ¶54. This Court has jurisdiction over this case under 28 U.S.C. § 1332(d) and CAFA, which vests original jurisdiction in this Court for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any plaintiff class member is different from that of any defendant. The Settlement Agreement does not provide for a recovery of coupons (28 U.S.C. § 1712), does not result in a net loss to any class member (28 U.S.C. § 1713), and does not provide for payment of greater sums to some class members solely on the basis of geographic proximity to the Court (28 U.S.C. § 1714). Thus, the Settlement Agreement is in substantive compliance with CAFA.

### 8. Past Distributions

The Procedural Guidance instructs parties to provide information for at least one past comparable settlement, including (i) the total settlement fund, (ii) the total number of class members, (iii) the total number of class members to whom notice was sent, (iv) the methods of notice, (v) the number of claim forms submitted, (vi) the average recovery per class member or claimant, (vii) the amounts distributed to *cy pres* recipients, (viii) administrative costs, and (ix) attorney's fees and costs. *See* Procedural Guidance, Preliminary Approval (11). As shown below, the claims rate and administrative costs compare favorably to similar settlements.

| Case | *Telescopes* (IPPs) (proposed) | *Batteries* (IPPs) |
|---|---|---|
| **Total Settlement Fund** | $32 million | $113.45 million |
| **Total Estimated Number of Class Members** | 4 million | 193 million |

---

[6] *Stellar Dreams*, The Science Haven, https://www.thesciencehaven.org/stellardreams (last visited Sept. 12, 2024).

16

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0898**

| Total Number of Class Members to Whom Notice Was Sent | 1.3 million | 7.3 million |
|---|---|---|
| Method(s) of Notice | Direct notice; indirect notice, including digital media, and press release | Direct notice; indirect notice, including broadcast, digital media, and press release |
| Number of Claims Submitted | | 946,241 |
| Average Recovery | | $2.15 per device (repealer states) $1.23 per device (non-repealer states) |
| Expected Residual | $0 | $0 |
| Attorneys' Fees | $10.7 million | $34.035 million |
| Litigation Costs | $776,894[7] | $6.85 million |
| Administrative Costs | $450,500[8] | $4.1 million |

## II.   The Settlement Class Warrants Settlement Certification

At this stage, the Court must also determine whether it is likely to certify the settlement class, under Rule 23(a) and (b)(3), for purposes of judgment on the proposal. *See* Fed. R. Civ. P. 23(e)(1)(B)(ii); *see also Amchem*, 521 U.S. at 620; *Manual for Complex Litigation* § 21.632 (4th ed. 2004). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620. Each element of Rule 23's requirements is satisfied here.

### A.   The Settlement Class Meets the Requirements of Rule 23(a)

#### 1.   Numerosity

The first prerequisite for certifying a class is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In this case, Plaintiffs seek to certify a class of all persons or entities who indirectly purchased one or more telescopes manufactured by a

---

[7] As of the filing of this motion.

[8] Contractually capped not-to-exceed amount for notice and claims administration.

17

Defendant from a distributor or retailer in an Indirect Purchaser State. According to Plaintiffs' damages expert, there are millions of class members, such that joinder of all is impracticable. *See* Salinas Decl. ¶13. "There is no exact class size that meets the numerosity requirement; rather, where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 616 (N.D. Cal. 2014) (internal quotation marks omitted). Therefore, the first prerequisite of Rule 23(a) is met.

### 2. Commonality

The second prerequisite for certifying a class is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Courts have consistently found that "[c]ommon issues predominate in proving an antitrust violation 'when the focus is on the defendants' conduct and not on the conduct of the individual class members.'" *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 318 (N.D. Cal. 2014). In this case, common questions of fact and law predominate over individual questions. Plaintiffs have alleged that Defendants engaged in a conspiracy to fix, raise, maintain and/or stabilize the price of telescopes. The common questions of fact or law include whether the Defendants in fact entered into an illegal agreement to fix, raise, maintain and/or stabilize the price of telescopes; whether the antitrust conspiracy did result in the artificial inflation of the price of telescopes; and whether those overcharges were passed on to consumers. The second prerequisite of Rule 23(a) is met.

### 3. Typicality

To certify a settlement class, or any class, "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). The Plaintiffs' FAC raises claims that the Defendants illegally fixed, raised, maintained, and/or stabilized the prices and allocated the market for consumer telescopes, which resulted in artificially inflated market-wide prices charged by Defendants and paid by indirect purchasers. All class representatives indirectly purchased one or more telescopes that were manufactured by a Defendant

18

or their corporate family. Because the class representatives' claims are typical of the members of the class, the third prerequisite of Rule 23(a) is met. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-05944-JST, 2020 WL 1873554, at *6 (N.D. Cal. Mar. 11, 2020) ("the claims of the representative Plaintiffs are typical of the claims of the class members because they all indirectly purchased . . . products at supra-competitive levels as a result of the alleged price-fixing conspiracy during the relevant time period.").

### 4. Adequacy of Representation

Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quotations removed).

Here, the interests of the Class Representatives and Interim Co-Lead Counsel are completely aligned with the interests of the absent class members. The Class Representatives suffered the same injury as the absent class members in that they paid artificially inflated prices for telescopes manufactured by Defendants. Interim Co-lead Counsel also has the same interest in proving that Defendants engaged in an illegal antitrust conspiracy. The vigor with which the Class Representatives and their counsel have litigated this case is well-documented on the docket over the past three and a half years. Plaintiffs have expended considerable time, energy and resources in gathering evidence in support of their case and in contesting Defendants' efforts to dismiss or minimize their case. And Class Counsel respectfully submit that they have vigorously and competently litigated this class for the benefit of their clients.

Rule 23(g) separately asks this Court to appoint class counsel to represent the settlement class. At the outset of this action, the Court appointed Interim Co-Lead Counsel for Plaintiffs after a competitive application process. ECF No. 95. Considering Interim Co-Lead Counsel's work in this action, their collective expertise and experience in handling similar actions, and the resources

they have committed to representing the class, they should be appointed as Class Counsel for the proposed settlement class under Rule 23(g)(3) and confirmed under Rule 23(g)(1).

### B.     The Settlement Class Meets the Requirements of Rule 23(b)(3)

In addition to the requirements of Rule 23(a), at least one of the prongs of Rule 23(b) must be satisfied. Here, Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1.     Predominance

The settlement class satisfies Rule 23(b)(3) because common questions predominate over questions affecting individual class members. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). Rule 23(b)(3) does not require that all elements of a claim are susceptible to class-wide proof; rather, it only requires that common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013).

In horizontal price-fixing cases, questions as to the existence of the alleged conspiracy and as to the occurrence of price-fixing are readily found to predominate. *See In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005); *In re Citric Acid Antitrust Litig.*, No. 95-1092, C-95-2963 FMS, 1996 WL 655791, at *8 (N.D. Cal. Oct. 2, 1996); *see also Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."). This case is no different. Here, resolution of Plaintiffs' claims depends principally on whether Defendants participated in an anticompetitive conspiracy, and whether that conspiracy caused an artificial and non-competitive increase to the market price of telescopes. Thus, if Plaintiffs were able to prove these elements, based on common evidence, a jury could reasonably find that every class member suffered some injury as a result. *See In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444, at *4–5 (N.D. Cal.

20

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0902**

Feb. 8, 2016); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5391159, at *3–5 (N.D. Cal. Sept. 24, 2013); *In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*TFT-LCD I*"), 267 F.R.D. 583, 600–01 (N.D. Cal. 2010).

On the other hand, if, for example, class members brought their claims individually, each would have to rely on the same liability evidence and prove damages using the same economic modeling on which Plaintiffs intended to rely. Here, Plaintiffs have provided, though prior briefing, ample common factual evidence to support a finding that a conspiracy existed to fix prices and divide the consumer telescope market. Plaintiffs' experts have also examined the factual record and performed economic analyses regarding the common effect of the alleged conspiracy on individual purchasers.

Moreover, under the proposed Settlement, there will not need to be a class trial, meaning there are no potential concerns about any individual issues, if any, creating trial inefficiencies. *See Amchem Prods.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").

### 2.    Superiority

Fed. R. Civ. P. 23(b)(3)'s superiority inquiry calls for a comparative analysis of whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods.*, 521 U.S. at 615; *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy."). Class treatment is superior to other methods for the resolution of this case, including from a judicial efficiency perspective and given the relatively small amounts of alleged damages for each individual consumer. Indeed, litigating every class member's claims separately would result in a waste of judicial and party resources, given that the vast majority of evidence of liability would be identical. *See Hanlon*, 150 F.3d at 1023. Moreover, Settlement Class Members remain free to exclude themselves if they wish to do so.

21

2982687.6

**5-ER-0903**

**III.     The Proposed Notice Program Complies with Rule 23 and Due Process**

A court approving a class action settlement must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). For a Rule 23(b)(3) class, the court must also "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). A class action settlement notice is satisfactory if it generally describes "the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015). Plaintiffs propose an efficient and straightforward program designed by experienced notice and claims administrator Verita.

Plaintiffs request that the Court authorize Interim Co-Lead Counsel to spend up to $450,500 of the Settlement Fund to retain Verita for the purpose of effectuating notice and claims administration consistent with the Settlement Agreement and Rule 23. Although counsel does not anticipate any overages, any notice and claims costs above $450,500 will only be paid from the Settlement Fund subject to further application and Court approval.

**A.     The Proposed Notice Forms Are Plain and Easy to Understand**

Under Plaintiffs' proposed notice program, Verita will provide notice to the settlement class with all information required by Rule 23(c)(2)(B). Having followed, as closely as possible, the suggested language for notices in this Procedural Guidance, Plaintiffs submit for approval proposed notices to class members. *See* Verita Decl. ¶¶11, 42; *see also* Procedural Guidance, Preliminary Approval (3)–(5). Copies of the proposed notice and claims documents are attached to the Verita Decl. as Exhibits A-E.

The proposed notices are written in plain and easy-to-understand language. They set forth a clear schedule of deadlines and provide class members with at least thirty-five days to opt out of or object to the Settlement Agreements prior to Plaintiffs' motion for attorney's fees and costs. *See* Procedural Guidance, Preliminary Approval (9). And they also inform class members that Interim Co-Lead Class Counsel will request attorneys' fees (and the amount thereof).

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0904**

**B.      The Proposed Notice Plan Will Reach a Broad Audience**

The proposed notice plan is a multi-layered approach that is designed to reach class members.  First, a direct mail and email notice will be sent to class members for whom a facially valid mailing address and email address is available, and a long-form notice will be mailed to all persons who request one. Verita Decl. ¶¶14-20. Verita will process physical addresses through the national change of address ("NCOA") database and further analysis will be performed on any mail returned non-deliverable after use of the NCOA database. In addition, Amazon has agreed to facilitate direct notice to its customers that purchased impacted Telescopes by email. *Id.*

Second, Plaintiffs have also proposed an extensive and effective publication notice program to supplement direct notice. Verita Decl. ¶¶22-31. The publication plan includes paid media and earned media components. *Id.* The paid and earned media plan includes advertising in industry publications; "banner" ads on national trade publication websites; "banner" ads targeting consumers and businesses who are electronic hobbyists and enthusiasts; "banner" ads in national e-newsletters targeted to the settlement classes; targeted ads placed on various social media platforms (e.g., Facebook, Instagram, and Reddit); and a news release disseminated via earned media. *Id.*

Third, Plaintiffs will launch a case-specific settlement website that will post all the notice documents and all print and digital ads. *Id.* ¶¶25, 26, 32, 39. The website will provide potential Class Members with the opportunity to get detailed information about the Settlements and relevant documents, including the notice documents, the Preliminary Approval Order, the Settlement Agreements, other relevant filings and Court Orders, and allow them to make claims online. *Id.*

Fourth, Verita will also support a dedicated toll-free phone number, which will appear in the notice documents and ads. *Id.* ¶33. The number will have an interactive voice response system that will present callers with a series of choices to hear pre-recorded information about the Settlements. *Id.* If callers need further help, they will have an opportunity to speak with a live operator during business hours. *Id.*

23

The notice experts at Verita have opined that the proposed notice plan will reach over 80% of the possible class members and meets the requirements of Rule 23 and communicates information by complying "with the plain language requirement." *Id*. ¶¶11-12, 44.-45

**IV.     The Court Should Schedule a Fairness Hearing and Related Dates.**

Plaintiffs propose the following schedule for class notice and final approval:

| Event | Time |
|---|---|
| Order directing notice to the class regarding the Settlement Agreements | X |
| "Notice Date." Notice campaign to begin, including email, broadcast and digital media, publication, and internet notice. | X + 42 days |
| Claims period to begin | X + 42 days |
| Last day for motion for attorneys' fees, costs, and service awards | X + 69 days (35 days before objection deadline) |
| Last day for objections and requests for exclusion from the class | X + 104 days (62 days from Notice Date) |
| Last day for motion in support of Final Approval of settlements | X + 119 days (15 days after objection deadline) |
| Final Approval Hearing | X + 154 days (35 days after final approval motion) |
| Close of claims period | X + 200 days |

**CONCLUSION**

For all the reasons set forth above, IPPs respectfully request that this Court (1) find it will likely approve the Settlement; (2) find it will likely certify the settlement class; (3) direct notice to the settlement class after finding that the forms and notice plan comply with Rule 23 and due process; (4) appoint the Class Representatives as representatives for the settlement class; (5) appoint Interim Co-Lead Class Counsel as counsel for the settlement class; (6) authorize retention of Verita as notice and claims administrator; and (7) set a schedule for Final Approval and related dates; and any motions for attorneys' fees, costs, and service awards, and schedule a Final Approval Hearing.

24

2982687.6

**5-ER-0906**

Dated:  September 16, 2024

Respectfully Submitted,

_/s/ Kalpana Srinivasan_____

Kalpana Srinivasan (Bar No. 237460)
Marc M. Seltzer (Bar No. 54534)
Steven Sklaver (Bar No.237612)
Michael Gervais (Bar No. 330731)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Phone: 310-789-3100
ksrinivasan@susmangodfrey.com
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com

Alejandra C. Salinas (*pro hac vice*)
Texas SBN 24102452
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
asalinas@susmangodfrey.com

/s/ *Lin Y. Chan*_____

Lin Y. Chan (SBN 255027)
Eric B. Fastiff (SBN 182260)
Reilly T. Stoler (SBN 310761)
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
lchan@lchb.com
efastiff@lchb.com
rstoler@lchb.com

25

MOTION TO DIRECT NOTICE RE SETTLEMENT
CASE NO. 5:20-cv-03639-EJD

2982687.6

**5-ER-0907**

*/s/ Adam J. Zapala*
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

26

2982687.6

**5-ER-0908**

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03639-EJD |
| This Document Relates to:<br><br>Indirect Purchaser Actions | [PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE |

[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD

3046536.4

**5-ER-0909**

WHEREAS, Interim Co-Lead Counsel and Plaintiffs Madeline Bekielewski,[1] Thomas Berta, Carey Briggs, Vincent Catanzaro, David Dick, Austin Griffith, Donnie Houston, Bentaro Huset, Greg Kendall, David Kerber, Deborah Lemar, Doug Lundy, John Maurice, Timothy McQuaid, Philip Moore, Brian Murphy, Herbert Nelson, Scott Plummer, Michael Price, David Quaglietta, Greg Ross, Ronald Troillett, Robert Welsh, Tony DiMambro, Jason Glydewell, Leon Greenberg, Michael Liskow, Sigurd Murphy, Jim Riley, Keith Uehara, Steven Zellers, Sarah Day Brewer, Thien Ngo, Jesse Smith, and Arthur Sines ("Plaintiffs") have applied for an order preliminarily approving the terms and conditions of the Settlement as set forth in the Settlement Agreement, which is attached as Exhibit A to the Declaration of Alejandra C. Salinas ("Salinas Declaration");

WHEREAS, the Settlement requires, among other things, that all Released Claims against Released Parties be settled and compromised;

WHEREAS, this Court has considered the Settlement Agreement, the Motion for Preliminary Approval of Class Action Settlement and Issuance of Notice, and all papers filed in support of the Motion and the entire docket in this matter; and

WHEREAS, this Court preliminarily finds, for the purpose of settlement only, that the Settlement Class meets all the prerequisites of Federal Rule of Civil Procedure 23 for class certification, including numerosity, commonality, typicality, predominance of common issues, superiority, and that the Plaintiffs and Lead Counsel are adequate representatives of the Settlement Class;

NOW THEREFORE, good cause appearing and pursuant to Federal Rule of Civil Procedure 23, it is hereby ORDERED that:

---

[1] Richard Bekielewski was an original class representative, but he passed away during the pendency of the litigation. His wife, Madeline Bekielewski, has taken over his estate and claims.

**[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**                    2
3046536.4

1. The capitalized terms used herein shall have the meanings set forth in the Settlement Agreement.

**Preliminary Certification of Settlement Class for Purpose of Settlement Only**

2. The Settlement is hereby preliminarily approved as fair, reasonable, and adequate such that notice thereof should be given to members of the Settlement Class. Under Federal Rule of Civil Procedure 23(b)(3), the Settlement Class, as set forth in the Settlement Agreement and defined as follows, is preliminarily certified for the purpose of settlement only:

> all persons and entities in the Indirect Purchaser States[2] who, during the period from January 1, 2005 to September 6, 2023, purchased one or more Telescopes from a distributor (or from an entity other than a Defendant) that a Defendant or alleged co-conspirator manufactured.

3. Excluded from the Class are Defendants; their parent companies, subsidiaries and Affiliates; any co-conspirators; Defendants' attorneys in this Action; federal government entities and instrumentalities, states and their subdivisions; all judges assigned to this Action; all jurors in this Action; and all directly purchased Telescopes from Defendants. The Settlement Class also excludes members who timely exercised their right to exclude themselves pursuant to the procedures described in the Notice.

4. Specifically, the Court preliminary approves the Settlement as set forth in the Settlement Agreement, including the releases contained therein, and the proposed plan of allocation and distribution described in Exhibit A to the Salinas Declaration, because the Court

---

[2] "Indirect Purchaser States" means Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

**[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**          3
3046536.4

will likely be able to find that the Settlement is fair, reasonable and adequate after considering the Rule 23(e)(2)(A)–(D) factors and governing case law.

5.   If the Settlement Agreement is not finally approved by this Court, or if such final approval is reversed or materially modified on appeal by any court, this Order (including but not limited to the certification of the class) shall be vacated, null and void, and of no force or effect, and Defendants and Plaintiffs shall be entitled to make any arguments for or against certification for litigation purposes.

6.   Interim Co-Lead Counsel, Cotchett, Pitre & McCarthy, LLP; Lieff Cabraser Heimann & Bernstein, LLP; and Susman Godfrey L.L.P., and the Plaintiffs are appointed as representatives and counsel of the Settlement Class.

**Notice to the Settlement Class**

7.   Interim Co-Lead Counsel has provided the Court with information sufficient to enable it to determine whether to give notice of the proposed settlement to the Class pursuant to Rule 23(e)(1)(A). The Court approves the Notice Plan and attendant documents and forms, which are attached to the Verita Declaration as Exhibits A-E, and finds that their dissemination substantially in the manner and form set forth in the Motion meets the requirements of Federal Rule of Civil Procedure 23 and due process, constitutes the best notice practicable under the circumstances, and is reasonably calculated, under the circumstances, to apprise members of the Settlement Class of the pendency of the Actions, the effect of the proposed Settlement (including the releases contained therein), the anticipated Motion for a Fee and Expense Award and for Service Awards, and their rights to participate in, opt out of, or object to any aspect of the proposed Settlement.

8.   By _____ [ten (10) days after the issuance of this Order], Defendants shall cause to be paid into the Escrow Account $1,000,000 to cover the administrative costs associated with Notice.

**[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**      4
3046536.4

9.     By _____ [no later than twelve (12) months after the issuance of this Order], Defendants shall cause to be paid into the Escrow Account another $1,000,000 (for a total of $2,000,000).

10.    By _____ [no later than eighteen (18) months after the issuance of this Order] and as detailed in Paragraph 15 of the Settlement Agreement, Defendants shall pay the entire remaining Settlement funds into the Escrow Account.

11.    Verita shall provide Notice consistent with the Notice Plan outlined in the Motion and Verita Declaration, and Notice shall be disseminated to Settlement Class Members by the Notice Date of _____ [not later than 42 days after the issuance of this Order].  Verita is authorized to utilize funds from the Settlement Fund for these purposes.

**Settlement Administration**

12.    The Court appoints Verita Global, LLC as the notice and claims administrator. Verita shall supervise and administer the notice procedures, establish and operate the settlement website, administer the claims processes, distribute payments according to the processes and criteria set forth in the Settlement Agreement, and perform any other duties that are reasonably necessary and/or provided for in the Settlement Agreement. Funds required to pay Verita may be paid from the Settlement Fund as they become due as set forth in the Settlement Agreement.

13.    Counsel may pay Verita up to $450,500 from the Settlement Fund to effectuate the notice plan and claims administration. Any notice and claims costs above $450,500 may only be paid from the Settlement Fund subject to further application and Court approval.

14.    The Settlement Administrator shall act in compliance with the Amended Stipulated Protective Order, ECF No. 158, including, but not limited to, making all necessary efforts and precautions to ensure the security and privacy of Settlement Class Member information and protect it from loss, misuse, unauthorized access and disclosure, and to protect against any reasonably anticipated threats or hazards to the security of Settlement Class Member information; not using the information provided by Defendants or Settlement Class Counsel in

**[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**          5
3046536.4

connection with the Settlement or this Notice Plan for any purposes other than providing notice or conducting claims administration; and not sharing Settlement Class Member information with any third parties without advance consent from the parties.

15.     Settlement Class Members who wish to make a Claim must do so by submitting a Claim Form starting on _____ [Notice Date] and no later than _____ [200 days after the Notice Date]. The Settlement Administrator shall determine the eligibility of Claims submitted and allocate the Settlement Funds in accordance with the Settlement Agreement, subject to review and insight from Interim Co-Lead Counsel.

16.     Settlement Class Members who wish to object to the Settlement must object in writing and: (1) clearly identify the case name and number; (2) your full name, current address, email address, and telephone number; (3) proof of membership in the settlement class; (4) the reasons why you object to the settlement, including any documents supporting your objection; (5) if you have retained an attorney, (a) the full name, current address, telephone number, and email address of your attorney; (b) the state bar(s) to which your attorney is admitted; and (c) a list of all other class actions you or your attorney has been involved in making objections over the last 10 years (whether or not you or your attorney appeared in the matter); (6) a statement indicating whether you or your attorney intend to appear at the fairness hearing; and (7) your signature or the signature of your attorney.

17.     Objections must be filed with the Court or post-marked by _____ [no later than 104 days from the Notice Date], to the Court at the following address: Clerk of the Court, United States District Court for the Northern District of California, 280 South 1st Street, Room 2112, San Jose, California 95113.

18.     Any Settlement Class Member who seeks to be excluded from the Settlement Class must submit a request for exclusion, sending written request, which must be postmarked by _____ [no later than 104 days from the Notice Date]. A request to opt-out

must be timely sent by U.S. mail to the Settlement Administrator, requesting exclusion, providing their name, address, a signature, the name and number of the Action, and a clear and explicit statement that they wish to be excluded from the Settlement. The date of the postmark on the envelope containing the written request to opt-out shall be the exclusive means used to determine whether a request to opt-out has been timely submitted. In the event a postmark is illegible, the date of mailing shall be deemed to be three (3) days prior to the date that the Settlement Administrator received a copy of the request to opt-out of the Settlement. The Settlement Class Member must pay for postage. Any member of the Settlement Class who does not file a valid and timely request for exclusion shall be bound by the final judgment dismissing the Actions on the merits with prejudice.

### Fairness Hearing

19.     The Fairness Hearing shall be held by the Court on October 31, 2024, to determine whether the requirements for certification of the Settlement Class have been met; whether the proposed settlement of the Actions on the terms set forth in the Settlement should be approved as fair, reasonable, adequate, and in the best interests of the Settlement Class Members; whether Interim Co-Lead Counsel's motion or application for Fees and Expense Award and application for the Service Awards should be approved; and whether final judgment approving the Settlement and dismissing the Actions on the merits with prejudice against the Named Plaintiffs and all other Settlement Class Members should be entered. The date and time of the Fairness Hearing may, without further direct notice to the Settlement Class Members (except those who have filed timely and valid objections and requested to speak at the Final Fairness Hearing), be changed, continued or adjourned by order of the Court.

20.     The Fairness Hearing will take place at:

**U. S. District Court of the Northern District of California**
**Robert F. Peckham Federal Building & Courthouse**
**Courtroom 4, 280 South 1st Street**
**San Jose, California 95113**

**[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**          7
3046536.4

21. Any Objector who timely submits an Objection has the option to appear and request to be heard at the Fairness Hearing, either in person or through the Objector's counsel. Any Objector wishing to appear and be heard at the Final Fairness Hearing must include a Notice of Intention to Appear in the body of the Objector's Objection. Objectors who fail to submit or include such timely Notice of Intention to Appear may not speak at the Final Fairness Hearing without permission of the Court.

22. By _____ [not later than 69 days after the Preliminary Approval Order and 35 days before the objection and opt-out deadline], Interim Co-Lead Counsel shall file all papers in support of any Motion for a Fee and Expense Award and/or for Service Awards, and shall serve copies of such papers upon Defense Counsel and upon any objectors who have validly complied this Order.

23. By _____ [not later than 119 days after the Notice Date and fifteen (15) days after the objection and opt-out deadline], Interim Co-Lead Counsel and Plaintiffs shall file all papers in support of the application for the Final Approval of Settlement and Final Judgment.

24. All opposition papers shall be filed or postmarked by _____ [the last day to file an objection or opt out of the Settlement], and any reply papers shall be filed by _____ [fifteen (15) days after the objection and opt-out deadline].

25. Interim Co-Lead Counsel's Motion or Application for a Fee and Expense Award and for Service Awards will be considered separately from the fairness, reasonableness, and adequacy of the Settlement. Any appeal from any order relating solely to Settlement Class Counsel's Motion for a Fee and Expense Award, and/or for Service Awards, or any reversal or modification of any such order, shall not operate to terminate, vacate, or cancel the Settlement.

**[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**                    8
3046536.4

**Miscellaneous**

26.    No later than ten (10) days after the Motion for Preliminary Approval of the Settlement has been filed with the Court, Defendants will serve the Class Action Fairness Act ("CAFA") Notice on the Attorney General of the United States and the state attorneys general as required by 28 U.S.C. § 1715(b). Thereafter, Defendants will serve any supplemental CAFA Notice as appropriate.

27.    Defense Counsel and Interim Co-Lead Counsel are hereby authorized to utilize all reasonable procedures in connection with the administration of the Settlement which are not materially inconsistent with either this Order or the Settlement Agreement.

28.    This Order may be modified by the Court upon motion by either or both parties, for good cause shown.

**IT IS SO ORDERED, ADJUDGED AND DECREED.**

Dated: _____, 2024.

_____
Hon. Edward J. Davila
UNITED STATES DISTRICT JUDGE

**[PROPOSED] ORDER PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND ISSUING NOTICE; Case No. 5:20-cv-03639-EJD**                     9
3046536.4

Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

Kalpana Srinivasan (Bar No. 237460)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| **IN RE TELESCOPES ANTITRUST LITIGATION** | **Case No. 5:20-cv-03639-EJD** |
| | **FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** |
| **THIS DOCUMENT RELATES TO:** | |
| **Indirect Purchaser Actions** | 1. **SHERMAN ACT §§ 1, 2;** |
| | 2. **CLAYTON ACT § 7;** |
| | 3. **STATE ANTITRUST LAWS; and** |
| | 4. **STATE CONSUMER PROTECTION LAWS; and for** |
| | 5. **UNJUST ENRICHMENT** |
| | **JURY TRIAL DEMANDED** |

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
10445742v1/016869

**5-ER-0918**

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 3 |
| III. | PARTIES | 5 |
|  | A. Plaintiffs | 5 |
|  | B. Defendants | 8 |
|  |    1. Synta Defendants | 8 |
|  |       a. Corporate Defendants | 8 |
|  |       b. Individual Defendants | 10 |
|  |    2. The Ningbo Sunny Defendant | 11 |
|  | C. Agents and Co-Conspirators | 12 |
|  |    1. Defendants' Corporate Families Acted as Single Enterprises, and Defendant Parent Companies Exercised Substantial Control over Their U.S. Affiliates | 14 |
|  |    2. Defendants' High-Level Employees Organized the Conspiracy, and Their Subordinate Employees—Including Those of Their U.S. Subsidiaries—Executed the Conspiracy | 15 |
|  |    3. Defendants and Co-Conspirators Who Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family | 16 |
|  |    4. The Nature of the Telescope Industry Required Foreign Companies Named As Defendants and Co-Conspirators Herein to Use Their United States Subsidiaries and Affiliates As Distribution and Sales Arms | 18 |
| IV. | FACTUAL ALLEGATIONS | 18 |
|  | A. Telescopes | 18 |
|  | B. Relevant Market: The Market for Telescopes in the United States | 19 |
|  | C. Defendants Are Liable for the Anticompetitive Conduct Alleged Herein | 20 |
|  | D. The Federal Trade Commission's Actions in the Telescope Market | 22 |
|  | E. Defendant Dar Tson ("David") Shen Orchestrated and Participated in the Creation of Ningbo Sunny as a Sham Competitor for Synta, and Managed Ningbo Sunny to Promote Synta's Anticompetitive Ends | 23 |
|  | F. Defendants and Co-Conspirators Agreed to Sell Different Telescopes in the Telescope Market | 27 |

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                    i

G.  Defendants and Co-Conspirators Colluded on Ningbo Sunny's Acquisition of Meade ................................................................................................29

H.  Defendants and Co-Conspirators Conspired to Interfere with Orion's Acquisition of the Hayneedle Assets ................................................................31

I.  Illustrative Examples of Defendants' Anticompetitive Conduct and Conspiracy to Fix Prices, Rig Bids, and Allocate the Market ........................................31

J.  The Structure and Characteristics of the Telescope Market Renders the Conspiracy More Plausible ................................................................................39

    1.  The Telescope Market Was Subject to Market Allocation ........................40

    2.  The Telescope Market Has High Barriers to Entry ................................40

    3.  The Telescope Market Is Highly Concentrated ................................41

    4.  There Is Inelasticity of Demand for Telescopes ................................42

V.  CLASS ACTION ALLEGATIONS ................................................................43

A.  California Law Should Be Applied to the Indirect Purchaser States' Damages Class ................................................................................................44

    1.  The Conspiracy's Contacts with California: Location of Defendants and Co-Conspirators ................................................................44

    2.  The Conspiracy's Contacts with California: Location of Individuals ........45

    3.  Specific Targets of the Conspiracy Were from California ........................45

    4.  The Conspiracy's Contacts with California: Facilitation of the Conspiracy in California ................................................................45

    5.  Defendants and Co-Conspirators Targeted California ............................46

B.  Alternatively, Plaintiffs Seek to Certify State Damages Classes ........................46

VI.  PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY ......................54

VII.  THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS ...........57

A.  The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims ................................................................57

B.  Fraudulent Concealment Tolled the Statute of Limitations ................................58

VIII.  CAUSES OF ACTION ................................................................................................62

First Cause of Action
Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) Restraint of Trade (on behalf of Plaintiffs and the Nationwide Injunctive Class) ................................62

Second Cause of Action
Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) Monopolization (on behalf of Plaintiffs and the Nationwide Injunctive Class) ................................64

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

Third Cause of Action
Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) Attempted
    Monopolization (on behalf of Plaintiffs and the Nationwide Injunctive Class) .....65

Fourth Cause of Action
Violation of Section 7 of the Clayton Act (15 U.S.C. § 18) (on behalf of Plaintiffs
    and the Nationwide Injunctive Class) ......................................................................67

Fifth Cause of Action
Violation of the State Antitrust Laws (on behalf of Plaintiffs and the Damages
    Class or, Alternatively, the State Damages Classes) .............................................68

Sixth Cause of Action
Violation of State Consumer Protection Laws (on behalf of Plaintiffs and the
    Damages Class or, Alternatively, the State Damages Classes) .............................93

Seventh Cause of Action
Unjust Enrichment (on behalf of Plaintiffs and the Damages Class or, Alternatively,
    the State Damages Classes) ...................................................................................112

IX.    PRAYER FOR RELIEF ...................................................................................................112

X.    JURY DEMAND ..............................................................................................................114

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;
Case No. 5:20-cv-03639-EJD

iii

5-ER-0921

Indirect Purchaser Plaintiffs ("Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against Defendants (1) Synta Technology Corp. of Taiwan (a/k/a Synta Technology Corp. and Good Advance Industries Ltd.), (2) Suzhou Synta Optical Technology Co., Ltd., (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd., (4) Synta Canada International Enterprises Ltd., (5) Pacific Telescope Corp., (6) Olivon Manufacturing Co. Ltd., (7) SW Technology Corp., (8) Celestron Acquisition, LLC, (9) Olivon USA LLC, (10) Dar Tson "David" Shen, (11) Joseph Lupica, (12) David Anderson (together, "Synta" or "Synta Defendants"), and (13) Ningbo Sunny Electronic Co. Ltd. ("Ningbo Sunny" or "Ningbo Sunny Defendant") (collectively, "Defendants"). The following co-conspirator entities and individuals were engaged in and facilitated the conspiracy and conduct alleged herein: (1) Jean Shen, (2) Sylvia Shen, (3) Jack Chen, (4) Lauren Huen, (5) Corey Lee, (6) Sunny Optical Technology Co., Ltd., (7) Meade Instruments Corp., (8) Sunny Optics Inc., (9) Wenjun "Peter" Ni, and (10) Wenjian Wang ("Co-Conspirators"). Plaintiffs name the foregoing entities and individuals as Defendants or Co-Conspirators for engaging in a conspiracy to unlawfully fix or stabilize prices, rig bids, and allocate the market for telescopes and customers as well as for unlawful monopolistic conduct, including attempted monopolization and conspiracy to monopolize, in the United States. Plaintiffs hereby allege, on information and behalf, except as to those allegations that pertain to themselves, as follows:



*Source:* https://www.shutterstock.com/video/search/astronomer-looking-through-telescope

## I. INTRODUCTION

1. Astronomy is among the oldest hobbies of mankind. Even the occasional backyard

sky watching by the unaided eye or a small telescope can be a marvelous experience. Astronomy has inspired thousands of Americans to buy telescopes and learn about the starry names and patterns overhead. These amateur astronomers have experienced joys from intellectual discovery and knowledge of the night sky. Unfortunately, Americans have collectively paid hundreds of millions of dollars in illegal overcharges for telescopes since 2005 as a result of a long-running conspiracy to unlawfully fix or stabilize prices, rig bids, and allocate the market and customers, and gain an unlawful monopoly in the United States in the market for telescopes, causing the prices of telescopes to be raised above competitive levels.

2.      In November 2016, a California-based distributor and seller of telescopes, binoculars, and accessories, Orion Technologies, Inc. ("Orion"), filed a lawsuit in this District against Ningbo Sunny and its affiliates—identifying their primary competitor, Synta Technology Corp. of Taiwan and its affiliates, including the defendants named herein—for conspiring to "divide the market, fix prices, [and] throttle competition" in violation of the Sherman, Clayton, and California Cartwright Acts, as well as California's unfair competition law. *See Optronic Techs., Inc. v. Ningbo Sunny Electronic Co., Ltd. et al.*, No. 5:16-cv-06370-EJD-VKD (N.D. Cal.) ("*Orion* Action"). Specifically, Orion alleged the defendants conspired to: (1) fix the prices and credit terms of telescopes purchased in the United States; (2) facilitate Ningbo Sunny's purchase of Meade Instruments Corp.; and (3) divide the telescope market by product type and by customer. Additionally, Orion accused the defendants of forming, or attempting to form, a monopoly and pushing Orion out of the United States telescope market by refusing to deal with Orion and unlawfully concentrating the market for telescope manufacturing services.

3.      Following a six-week trial and two days of deliberation, the jury delivered a verdict in favor of Orion on December 5, 2019, awarding Orion $16.8 million in damages after finding that the defendants had violated the Sherman Act and the Clayton Act by engaging in anticompetitive conduct in the domestic telescope market. United States District Judge Edward J. Davila delivered a partial final judgment in the amount of $50.4 million by trebling the jury's award and granting post-judgment interest.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                2

4.     As alleged herein, as a result of Defendants' conduct, Plaintiffs and the Classes (defined *infra*) paid artificially inflated prices for telescopes during the period from and including January 1, 2005 through the present ("Class Period") and have thereby suffered harm.

## II.     JURISDICTION AND VENUE

5.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable, including injunctive, relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 16), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337 (28 U.S.C. §§ 1331, 1337). This Court has subject-matter jurisdiction over state law claims pursuant to Title 28, United States Code, Sections 1332(d) and 1367 (28 U.S.C. §§ 1332(d) and 1367) because: (1) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the Classes are citizens of a state different from those of Defendants; and (2) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

7.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and Title 28, United States Code, Sections 1391(b) through (d) (28 U.S.C. §§ 1391 (b), (c), and (d)) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants variously reside, are licensed to do business in, are doing business in, have agents in, and are found in or transact business in this District.

8.     This Court has *in personam* jurisdiction over Defendants because Defendants either

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 3

directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of telescopes throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) were engaged in an illegal conspiracy to fix or stabilize prices, rig bids, and allocate the market of telescopes, and to monopolize, that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States. Furthermore, Defendants SW Technology Corp. and Celestron Acquisition, LLC are headquartered in California, and Co-Conspirator Meade Instruments Corp. is headquartered in California.

9.      Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects on interstate commerce within the United States.

10.      The activities of Defendants and Co-Conspirators directly targeted the United States telescope market and were within the flow of, were intended to have and did have a substantial effect on the interstate commerce of the United States. Defendants' telescopes are sold in the flow of United States interstate commerce.

11.      Telescopes manufactured abroad by Defendants and Co-Conspirators and sold in the United States are goods brought into the United States for sale and therefore constitute import commerce. To the extent any telescopes are purchased in the United States and such telescopes do not constitute import commerce, Defendants' and Co-Conspirators' activities with respect thereto, as more fully alleged herein during the Class Period, had and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, caused antitrust injury to Plaintiffs and members of the Classes in the United States.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                            4

12.     By reason of the unlawful activities alleged herein, Defendants' and Co-Conspirators' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants and Co-Conspirators, directly and through their agents, engaged in activities affecting all states to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for telescopes, as well as to monopolize those markets. The conspiracy unreasonably restrained trade and adversely affected the market for telescopes in the United States.

13.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased telescopes.

14.     Intra-District Assignment: Assignment to the San Jose division of the Court is proper pursuant to Northern District of California Local Rule 3-2(c) because a substantial part of the events giving rise to the claims arose in this district. Some Plaintiffs made purchases in Santa Clara County. Defendants' illegal conspiracy included acts occurring in or directed at Santa Clara County, and Defendants marketed and/or sold telescopes throughout the district during the Class Period. Orion, a target of Defendants' conduct, is headquartered in Santa Cruz County.

## III.   PARTIES

### A.    Plaintiffs

15.     Plaintiff **John Goerger** purchased at least one telescope in Arizona indirectly from Defendants or Co-Conspirators during the Class Period.

16.     Plaintiff **Scott Plummer** purchased at least one telescope in Arizona indirectly from Defendants or Co-Conspirators during the Class Period.

17.     Plaintiff **Donnie Houston** purchased at least one telescope in Arkansas indirectly from Defendants or Co-Conspirators during the Class Period.

18.     Plaintiff **Ronald Troillett** purchased at least one telescope in Arkansas indirectly from Defendants or Co-Conspirators during the Class Period.

19.     Plaintiff **Sigurd Murphy** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 5

20.    Plaintiff **Thien Ngo** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

21.    Plaintiff **Arthur Sines** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

22.    Plaintiff **Jesse Smith** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

23.    Plaintiff **Greg Kendall** purchased at least one telescope in the District of Columbia from Defendants or Co-Conspirators during the Class Period.

24.    Plaintiff **Austin Griffith** purchased at least one telescope in Florida indirectly from Defendants or Co-Conspirators during the Class Period.

25.    Plaintiff **Keith Uehara** purchased at least one telescope in Hawaii indirectly from Defendants or Co-Conspirators during the Class Period.

26.    Plaintiff **Richard Bekielewski** purchased at least one telescope in Illinois indirectly from Defendants or Co-Conspirators during the Class Period.

27.    Plaintiff **Michael Price** purchased at least one telescope in Iowa indirectly from Defendants or Co-Conspirators during the Class Period.

28.    Plaintiff **Brian Murphy** purchased at least one telescope in Maine indirectly from Defendants or Co-Conspirators during the Class Period.

29.    Plaintiff **Timothy McQuaid** purchased at least one telescope in Massachusetts indirectly from Defendants or Co-Conspirators during the Class Period.

30.    Plaintiff **Sara Day Brewer** purchased at least one telescope in Michigan indirectly from Defendants or Co-Conspirators during the Class Period. She is currently a Utah resident.

31.    Plaintiff **Robert Welsh** purchased at least one telescope in Michigan indirectly from Defendants or Co-Conspirators during the Class Period. He is currently a Utah resident.

32.    Plaintiff **Bentaro Huset** purchased at least one telescope in Minnesota indirectly from Defendants or Co-Conspirators during the Class Period.

33.    Plaintiff **Jason Glydewell** purchased at least one telescope in Mississippi indirectly

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 6

from Defendants or Co-Conspirators during the Class Period.

34.    Plaintiff **Deborah Lemar** purchased at least one telescope in Missouri indirectly from Defendants or Co-Conspirators during the Class Period.

35.    Plaintiff **James Riley** purchased at least one telescope in Missouri indirectly from Defendants or Co-Conspirators during the Class Period.

36.    Plaintiff **David Dick** purchased at least one telescope in Montana indirectly from Defendants or Co-Conspirators during the Class Period. He is currently a Utah resident.

37.    Plaintiff **Leon Greenberg** purchased at least one telescope in Nevada indirectly from Defendants or Co-Conspirators during the Class Period.

38.    Plaintiff **Anthony Di Mambro** purchased at least one telescope in New Hampshire indirectly from Defendants or Co-Conspirators during the Class Period.

39.    Plaintiff **Steven Zellers** purchased at least one telescope in New Mexico indirectly from Defendants or Co-Conspirators during the Class Period.

40.    Plaintiff **Michael Liskow** purchased at least one telescope in New York indirectly from Defendants or Co-Conspirators during the Class Period.

41.    Plaintiff **Philip Moore** purchased at least one telescope in North Carolina indirectly from Defendants or Co-Conspirators during the Class Period.

42.    Plaintiff **Doug Lundy** purchased at least one telescope in Oregon indirectly from Defendants or Co-Conspirators during the Class Period.

43.    Plaintiff **John Maurice** purchased at least one telescope in Oregon indirectly from Defendants or Co-Conspirators during the Class Period.

44.    Plaintiff **David Kerber** purchased at least one telescope in Rhode Island indirectly from Defendants or Co-Conspirators during the Class Period.

45.    Plaintiff **Thomas Berta** purchased at least one telescope in South Carolina indirectly from Defendants or Co-Conspirators during the Class Period.

46.    Plaintiff **Greg Ross** purchased at least one telescope in Tennessee indirectly from Defendants or Co-Conspirators during the Class Period.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                   7

47.    Plaintiff **Vincent Catanzaro** purchased at least one telescope in Utah indirectly from Defendants or Co-Conspirators during the Class Period.

48.    Plaintiff **David Quaglietta** purchased at least one telescope in Vermont indirectly from Defendants or Co-Conspirators during the Class Period.

49.    Plaintiff **Herbert Nelson** purchased at least one telescope in Wisconsin indirectly from Defendants or Co-Conspirators during the Class Period.

**B.    Defendants**

    **1.    Synta Defendants**

        **a.    Corporate Defendants**

50.    The Synta Defendants that are entities are the parents, subsidiaries, affiliates, predecessors, and/or successors of each other (collectively, "Synta Corporate Defendants").

51.    Defendant **Synta Technology Corp. of Taiwan** ("Synta Technology") is a Taiwanese company with its principal place of business at No. 89 Lane 4 Chia-An W. Road, Lung-Tan, Taoyuan, 32546 Taiwan, China. Synta Technology is also known as **Synta Technology Corp.** and **Good Advance Industries Ltd.** ("Good Advance"). During the Class Period, Synta Technology—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and/or controls Synta Technology. Synta Technology was listed as a "Celestron Party" in Celestron Acquisition, LLC's settlement agreement with Orion. *Orion* Action, ECF No. 301-30 ("Settlement Agreement"). David Shen signed the settlement agreement with Orion on behalf of Good Advance. *Id.*

52.    Defendant **Suzhou Synta Optical Technology Co., Ltd**. ("Suzhou Synta") is a Chinese company with its principal place of business at No. 65 Yushan Road, New District, Suzhou, China 215011. During the Class Period, Suzhou Synta—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and controls Suzhou Synta. Suzhou Synta is Synta Technology's primary

manufacturing subsidiary. Synta Canada (*see supra*) owns 20 percent of Suzhou Synta. David Shen signed the settlement agreement with Orion on behalf of Suzhou Synta. Settlement Agreement, *Orion* Action.

53.     Defendant **Nantong Schmidt Opto-Electrical Technology Co. Ltd.** ("Nantong Synta") is a Chinese company with its principal place of business at No. 399 West Zhongshan Road, Rugao City, Jiangsu, China. During the Class Period, Nantong Synta—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and controls Nantong Synta. David Shen signed the settlement agreement with Orion on behalf of Nantong Synta. Settlement Agreement, *Orion* Action.

54.     Defendant **Synta Canada International Enterprises Ltd.** ("Synta Canada") is a Canadian company with its principal place of business at 7531 Lucas Road, Richmond, BC V6Y1G1, Canada. During the Class Period, Synta Canada—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Synta Canada owns 20 percent of Suzhou Synta. David Shen and/or his family own and control Synta Canada.

55.     Defendant **Pacific Telescope Corp.** ("Pacific Telescope") is a Canadian company with its principal place of business at 11880 Hammersmith Way, Richmond, British Columbia V7A 5C8, Canada. During the Class Period, Pacific Telescope—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Pacific Telescope was established in 1997 to sell Synta's Sky-Watcher brand of telescopes in Canada. David Shen is a co-owner of Pacific Telescope.

56.     Defendant **Olivon Manufacturing Co. Ltd.** ("Olivon Canada") is a Canadian company with its principal place of business at 11880 Hammersmith Way, Richmond, BC V7A 5C8, Canada. During the Class Period, Olivon Canada—directly and/or through its subsidiaries,

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

9

which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen controls Olivon Canada and Olivon USA LLC .

57. Defendant **SW Technology Corporation** ("SW Technology") is a Delaware corporation with its principal place of business at 2835 Columbia Street, Torrance, California 90503. SW Technology is a subsidiary and wholly owned and/or controlled by its parent, Synta Technology. During the Class Period, SW Technology—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. In 2005, David Shen established SW Technology to acquire Celestron Acquisition, LLP as a wholly owned subsidiary. He continues to operate SW Technology.

58. Defendant **Celestron Acquisition, LLC** ("Celestron") is a Delaware limited liability company with its principal place of business at 2835 Columbia Street, Torrance, California 90503. Celestron is a subsidiary of and is wholly owned and/or controlled by its parent, SW Technology. During the Class Period, Celestron—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Synta Technology was listed as a "Celestron Party" in Celestron's settlement agreement with Orion, rendering Synta Technology an affiliate of Celestron. Settlement Agreement, *Orion* Action.

59. Defendant **Olivon USA, LLC** ("Olivon USA") is a Nevada corporation with its principal place of business at 5525 Coley Avenue, Las Vegas, Nevada 89146. During the Class Period, Olivon USA, LLC—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen controls Olivon USA and Olivon Canada.

#### b.    Individual Defendants

60. Defendant **Dar Tson ("David") Shen** is the founder, owner, and chairman of the

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 10

aforementioned Synta Corporate Defendants, unless otherwise noted. Mr. Shen personally participated in the conspiracy alleged herein. He owns and/or controls the Synta Corporate Defendants during the Class Period, unless otherwise noted. Mr. Shen is a member of Celestron's board, the Executive Management Group. He signed the settlement agreement with Orion on behalf of Synta Technology. Although Mr. Shen founded and oversees the Synta Corporate Defendants, he was concurrently an officer of Ningbo Sunny, a direct horizontal competitor, from 2001 to 2005. In fact, Mr. Shen held a 26 percent ownership interest in Ningbo Sunny until 2005, when Synta Technology acquired Celestron through SW Technology. Mr. Shen regularly comes to this District to meet with distributors of Synta telescopes.

61.    Defendant **Joseph Lupica** is Celestron's former CEO. Through the collusive arrangements of Defendants and Co-Conspirators, he became CEO of Meade Instrument Corp. ("Meade")—Celestron's main competitor. Mr. Lupica resides in Palm Springs, California. He personally participated in the conspiracy alleged herein. He began replacing Meade's management with Celestron's officers, directors, employees, and/or agents, including Celestron's Vice President of Sales, Victor Aniceto, who was hired as Meade's Vice President of Sales. Later, when Mr. Lupica retired, Mr. Aniceto was promoted to Meade's President. Mr. Lupica has admitted that Ningbo Sunny could not have acquired Meade but for the collusive assistance it received from Synta Corporate Defendants.

62.    Defendant **Dave Anderson** is Celestron's former CEO. He resides in or near Minneapolis, Minnesota. Mr. Anderson personally participated in the conspiracy alleged herein.

### 2.    The Ningbo Sunny Defendant

63.    Defendant **Ningbo Sunny Electronic Co. Ltd.** is a Chinese company with its principal place of business at 199 An Shan Lu, Yuyao, Ningbo, Zhejiang, China 315400. During the Class Period, Ningbo Sunny—directly and/or through its subsidiaries, which it wholly owned and/or controlled, and through Defendant Celestron (*see supra*) and other distributors—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 11

**C.    Agents and Co-Conspirators**

64.    Co-Conspirator **Jean Shen** owns and controls Olivon Canada and Olivon USA and is Mr. Shen's sister. She represented to telescope distributors that the Synta Corporate Defendants' competitor, Ningbo Sunny, was one of "my family's companies[.]" Mr. Shen also exercises control over Olivon Canada and Olivon USA through her.

65.    Co-Conspirator **Sylvia Shen** is the co-owner of Pacific Telescope along with Mr. Shen and Mr. Chen (*see infra*), a member of Celestron's Executive Management Group, SW Technology's CEO, CFO, and Secretary, Mr. Shen's sister, and Mr. Chen's wife. Mr. Shen also exercises control over Pacific Telescopes through her. She signed the settlement agreement with Orion on behalf of SW Technology.

66.    Co-Conspirator **Jack Chen** is the co-owner of Pacific Telescope along with Mr. Shen and Ms. Sylvia Shen, a member of Celestron's Executive Management Group, and Ms. Sylvia Shen's husband. Mr. Shen also exercises control over Pacific Telescopes through Mr. Chen.

67.    Co-Conspirator **Laurence Huen** is a member of Celestron's Executive Management Group and Mr. Shen's close advisor and confidante. He resides in British Columbia, Canada. Mr. Huen assisted Joseph Lupica (*see infra*) and acted as a conduit of information between Synta Defendants and Ningbo Sunny Defendant.

68.    Co-Conspirator **Corey Lee** is Celestron's CEO. He resides in California.

69.    Co-Conspirator **Sunny Optical Technology Co., Ltd.** ("Sunny Optical") is a Chinese company with its principal place of business at 27-29 Shunke Road, Yuyao, Zhejiang, China. Sunny Optical is Ningbo Sunny's affiliate. Sunny Optical manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District, during the Class Period. On information and belief, Sunny Optical's activities in the United States were under the control and direction of Ningbo Sunny at all times during the Class Period.

70.    Co-Conspirator **Sunny Optics Inc.** ("Sunny Optics") is a Delaware corporation formed for the purpose of Ningbo Sunny's acquisition of Meade. Upon information and belief,

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                  12

Sunny Optics is Ningbo Sunny's subsidiary.

71. Co-Conspirator **Meade Instruments Corp.** is a Delaware corporation with its principal place of business at 27 Hubble, Irvine, California 92618. Meade is a subsidiary and wholly-owned and/or controlled by its parent, Ningbo Sunny. Meade manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District, during the Class Period. On information and belief, Meade's activities in the United States were under the control and direction of Ningbo Sunny at all times during the Class Period. Meade has filed for bankruptcy (*see* Case No. 8:19-bk-14714-CB (C.D. Cal.)), is subject to the bankruptcy stay, and is not named as a defendant.

72. Co-Conspirator **Wenjun ("Peter") Ni** is the founder, owner, and CEO of Ningbo Sunny and Meade. On information and belief, Mr. Ni controlled Sunny Optical, Meade, and Sunny Optics during the Class Period.

73. Co-Conspirator **Wang Wenjian** is Sunny Optical's director and controlling shareholder and Mr. Ni's uncle.

74. As indicated above, Defendants and Co-Conspirators shared certain executives that facilitated the conspiracy. For example, although Mr. Shen founded Synta Technology in 1980, he also served as an officer and vice chairman of its direct competitor, Ningbo Sunny, from November 2001 to July 2005. Mr. Shen also owned 26 percent of Ningbo Sunny until 2005, at which time he transferred his shares to his sister-in-law, Dong Yun Xue, who continues to hold that interest. As another example, Joe Lupica was the CEO of both Celestron and Meade, and his transition from Celestron's CEO to Meade's CEO is part of the conspiracy alleged herein.

75. Defendants acted as the principals of or agents for the unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

76. Various persons, partnerships, sole proprietors, firms, corporations, companies, and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of the conspiracy

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 13

or the anticompetitive conduct. The co-conspirators committed overt acts and communicated with others in the conspiracy to restrain, restrict, exclude, and foreclose competition in the telescope market (*see infra*) in every state and territory of the United States. Celestron and Meade are headquartered in California. Ningbo Sunny's and Synta's conduct in California, and related conduct occurring in every other state and territory, substantially affected and continues to affect a substantial amount of trade and commerce and has injured consumers in every state and territory of the United States.

77.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, limited liability entity, or company, the allegation means that the corporation, limited liability entity, or company engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the business or affairs of the corporation, limited liability entity, or company.

### 1. Defendants' Corporate Families Acted as Single Enterprises, and Defendant Parent Companies Exercised Substantial Control over Their U.S. Affiliates

78.     When Defendants reached agreement on fixing or stabilizing prices, rigging bids, or allocating the market of telescopes—whether as a result of formal or informal meetings or discussions arranged to implement or enforce cartel purposes and agreements—Defendants and Co-Conspirators meant for their collusive agreements to impact the pricing for all telescopes subject to the cartel's anticompetitive efforts regardless of where they were sold.

79.     As part of a single, integrated, global enterprise, Defendants and Co-Conspirators manufacture, market, and/or sell telescopes. They sell their telescopes around the world, including in the United States. Accordingly, to achieve the cartel's anticompetitive aims, Defendants and Co-Conspirators effectuated the cartel by establishing pricing and allocating the market in which they compete.

80.     Foreign-based Defendants and Co-Conspirators established United States (and other North American) subsidiaries not only to market and sell their telescopes in the United States

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                      14

but also to effectuate and achieve the cartel's aims and purposes. Without doing so, these corporate entities would have had to perform such functions themselves. These corporate entities chose not to do so and instead established corporate subsidiaries and affiliates that perform functions at the direction of and are controlled by their officers in China.

81.    These United States (and other North American) subsidiaries have no authority to set prices below the prices for telescopes agreed to among the cartel's members. For these subsidiaries, pricing authority largely was held by their Chinese corporate parent or affiliate.

82.    Because their foreign-based corporate parent or affiliate had significant control over all aspects of their business (*e.g.*, type of telescopes, prices, supply, business strategy, customer development and relations, sales, personnel decisions), the United States (and other North American) subsidiaries operated as little more than distribution and sales units of their foreign-based corporate parents or affiliates. Indeed, the foreign-based corporate parent and affiliates named their own family members as employees and officers of their United States subsidiaries. As a result, the United States (and other North American) subsidiaries were—as intended—able to advance the cartel aims in the United States.

**2.    Defendants' High-Level Employees Organized the Conspiracy, and Their Subordinate Employees—Including Those of Their U.S. Subsidiaries—Executed the Conspiracy**

83.    Defendants and Co-Conspirators organized the telescope conspiracy at a high-level within their respective corporate families. Both executives and subordinate employees carried out the conspiracy. Additionally, given the nature of the industry, the subsidiaries and affiliates implemented the conspiratorial agreements within their respective corporate families.

84.    Each of the corporate families alleged herein (*i.e.*, Synta and Ningbo Sunny) operates not as separate corporate entities but as a single enterprise. Each corporate family holds itself out to the public as a single, integrated enterprise. Each of the parent and/or foreign entities named in this case operate a hierarchical corporate structure wherein it treats subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent.

85.    Each corporate parent alleged herein also coordinates and manages the finances and

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                    15

**5-ER-0936**

meetings among officers from each of the different subsidiaries to facilitate an integrated enterprise to link the various supply chains to the corporate families' clients. The parent defendants dominate and control the finances, policies, and business practices of their various subsidiaries, including the United States subsidiaries.

86.   In light of the fact that the United States subsidiaries named in this Complaint were treated as mere distribution and sales units of the Chinese parent or foreign affiliate, they were generally kept informed about the competitor meetings and discussions occurring abroad and were not permitted to undercut the pricing and market allocation agreements reached during those meetings and discussions.

87.   By virtue of their integrated enterprises, and by virtue of the other allegations in this complaint, each Defendant and Co-Conspirator entered into the conspiracy alleged herein on behalf of, and reported these meetings and discussions to, its respective corporate family and United States subsidiaries. In fact, Chinese-based parents and affiliates often provided pricing instructions to their United States subsidiaries, which acted as their distribution and sales arms in the United States.

**3.   Defendants and Co-Conspirators Who Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family**

88.   In meetings and discussions between Defendants and Co-Conspirators in furtherance of the telescope conspiracy (*see infra*), Plaintiffs allege generally which corporate family was represented in a particular meeting or communications. The individual participants in the conspiratorial meetings and discussions did not distinguish among entities within a particular corporate family, referring to themselves or others, for example, merely as "Synta," "Celestron," "Sunny," or "Meade." Indeed, the officers from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective United States' subsidiaries. Further, because of their generic uses of Defendants and Co-Conspirators' names, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts nor did they distinguish

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                16

among entities within the respective corporate families. Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and United States affiliates. As a result, the entire corporate family was represented in meetings and discussions by its agents and was party to the agreements reached in those meetings.

89.   For example, in an email from Peter Ni to Celestron's former CEO, Dave Anderson, and Celestron's board members, Laurence Huen, Mr. Chen and Ms. Sylvia Shen, Mr. Ni wrote "But the premise of this case is CELESTRON/SYNTA should be provided the financial support to SUNNY" and "[a]t present, Meade has already started to borrow money from East West Bank by offering guarantees from sunny." *See infra*.

90.   Similarly, Meade's then Vice-President of Sales Victor Aniceto wrote to then-Meade CEO Joe Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business." *See infra.*

91.   Additionally, former CEO of Celestron and Meade, Joe Lupica, wrote in an email to Sunny Optics and Meade, "On the other hand if we take advantage of the strong relationships among Ningbo Sunny, Synta, Celestron and Meade (under Peter's ownership) ***we can quickly turn the company around and the four companies can dominate the telescope industry***" (emphasis added). Further revealing the interrelatedness of Ningbo Sunny and its affiliates is the manner in which invoices were paid. For example, Sunny Optical's financial statements reflect Meade paying invoices issued by the law firm which represented Ningbo Sunny in the acquisition of Meade.

92.   Further, Defendants and Co-Conspirators knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, Defendants and Co-Conspirators would not have entered into the agreements if affiliates could simply undercut the agreements reached.

/ / /

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                              17

**4.    The Nature of the Telescope Industry Required Foreign Companies Named As Defendants and Co-Conspirators Herein to Use Their United States Subsidiaries and Affiliates As Distribution and Sales Arms**

93.    Defendants and Co-Conspirators' United States subsidiaries are wholly-owned and/or controlled by their foreign parents or affiliates. As part of each Defendant's global enterprise, its United States subsidiary or affiliate assists the foreign parent or affiliate with the distribution and/or sale of telescopes to consumers in the United States. In most cases, the United States subsidiaries carry out the distribution and/or sales of telescopes to customers in the United States after obtaining telescopes manufactured at the foreign parent or affiliate's factories located abroad. Generally, United States' subsidiaries facilitate direct purchaser orders for telescopes with parents or affiliates overseas. That is, the foreign parent or affiliate manufactures telescopes abroad and sends the telescopes directly to the United States, often through its United States (or other North American) subsidiaries or affiliates. Indeed, the foreign parents and affiliates make millions—if not, billions—of dollars of "sales" annually to their United States' (and other North American) subsidiaries and affiliates as part of their global business.

94.    In sum, the foreign-based Defendants and Co-Conspirators sell directly to the United States and operates their telescope business as a single global enterprise with their subsidiaries and affiliates in the United States and North America generally.

## IV.    FACTUAL ALLEGATIONS

### A.    Telescopes



*Source:* https://particle.scitech.org.au/space/best-telescope-buy/

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 18

95.    Humans have looked up at the heavens and wondered what is out there for millennia. Thousands of amateur astronomers grab their telescope and aim it towards the open sky each day. There is never a shortage of interesting sights in the vast universe. For example, despite the fact that it is only a mere blip on the cosmic scale, the Milky Way galaxy contains over 100 billion stars, and one can uncover the tiny details and see what the naked eye cannot with the help of a telescope.

96.    A telescope is an optical instrument that magnifies and enhances the view of faraway objects. Most telescopes available for purchase to consumers fall into one of two main categories, refractor or reflector, though a combination of the two, Schmidt-Cassegrain telescopes, are also available.

97.    A refractor telescope contains convex (bending outwards) lenses to collect, focus, and magnify light. Rays of light travel through the objective (main) lens where they are focused at the focal length of the eyepiece.

98.    A reflector telescope, contains concave (bending inwards like a cave) mirrors. Light travels down the tube where it is reflected (hence the name reflector) up to a secondary mirror near the top of the tube, which directs the light into the eyepiece. This exact system is known as a Newtonian reflector.

99.    The Schmidt-Cassegrain telescope has gained immense popularity over the last 30 years. This type of telescope uses both lenses and mirrors in a compound system.

**B.    Relevant Market: The Market for Telescopes in the United States**

100.    The relevant market is the market for telescopes in the United States. The telescopes at issue in this case are those used by amateur astronomers rather than those found at observatories and universities. This market is $250 million to $500 million annually. The Synta and Ningbo Sunny Defendants control the market for telescopes in the United States.

101.    Ningbo Sunny and Synta together control 80 percent of the market for telescopes in the United States. Together, they have engaged in exclusionary conduct that has harmed competition and caused purchasers of telescopes to pay supra competitive prices.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                19

102.   For example, as described elsewhere in this complaint, although Ningbo Sunny and Synta are each capable of manufacturing all types of telescopes, Ningbo Sunny and Synta have an illegal agreement or understanding that Synta manufactures and sells higher-end telescopes, while Ningbo Sunny manufactures and sells lower-end telescopes. Both higher-end telescopes and lower-end telescopes are part of the same overall market for telescopes in the United States.

103.    Pursuant to that unlawful agreement or understanding, Synta will not manufacture, sell, or respond to a request for quotation ("RFQ") for telescopes offered by Ningbo Sunny, and *vice versa*. As a result of their understanding, Ningbo Sunny and Synta can and do fix and stabilize prices thereby charge supracompetitive prices, rig bids, restrict supply, and engage in other anticompetitive conduct that artificially increases the prices of telescopes purchased by American consumers from Defendants and Co-Conspirators.

104.   Ningbo Sunny and Synta have faced limited competition in the market for telescopes in the United States because of their unlawful agreements and their conspiracies to monopolize.

105.   Moreover, as described further in this complaint, in 2005 Synta acquired Celestron as a wholly-owned subsidiary. Celestron became the dominant higher-end telescope distributor in the United States though Defendants and Co-Conspirators' efforts. Subsequently, Ningbo Sunny acquired Meade with Synta's help and assistance and became the dominant lower-end telescope distributor in the United States.

**C.   Defendants Are Liable for the Anticompetitive Conduct Alleged Herein**

106.   Orion's claims withstood motions to dismiss and summary judgment before proceeding to trial in November 2019. As mentioned, *supra*, Orion won a $16.8 million jury verdict against Ningbo Sunny and its subsidiaries, which was statutorily trebled under 15 U.S.C. § 15(a) to $50.4 million.

107.   In the *Orion* Action, the jury unanimously found, *inter alia*:

    a.   Ningbo Sunny agreed with its competitors to fix or stabilize the prices and credit terms for telescopes and accessories in violation of Section 1 of the

Sherman Act;

b.  Ningbo Sunny agreed with a third party, other than a competitor, to fix the price or credit terms for telescopes and accessories in a manner that unreasonably restrained trade, such that the anticompetitive effects outweighed any procompetitive effects, in violation of Section 1 of the Sherman Act;

c.  Ningbo Sunny agreed with a competitor or potential competitor either (a) not to compete with each other in the market for telescopes and accessories, or (b) to divide customers or potential customers between them, in violation of Section 1 of the Sherman Act;

d.  Ningbo Sunny agreed with a third party, other than a competitor or potential competitor, either (a) not to complete with each other in the market for telescopes and accessories, or (b) to divide customers or potential customers between them in a manner that unreasonably restrained trade, such that the anticompetitive effects outweighed any procompetitive effects, in violation of Section 1 of the Sherman Act;

e.  Ningbo Sunny engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act;

f.  Ningbo Sunny had a specific intent to achieve monopoly power in the telescope market in violation of Section 2 of the Sherman Act;

g.  There is or was a dangerous probability that Ningbo Sunny could achieve monopoly power in violation of Section 2 of the Sherman Act;

h.  Ningbo Sunny knowingly entered into an agreement with another person or entity to obtain or maintain monopoly power in the telescope market in violation of Section 2 of the Sherman Act;

i.  Ningbo Sunny specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in the telescope market in

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                21

**5-ER-0942**

violation of Section 2 of the Sherman Act;

j.     Ningbo Sunny committed an overt act in furtherance of the conspiracy in violation of Section 2 of the Sherman Act; and

k.     Ningbo Sunny and Sunny Optical's acquisition of Co-Conspirator Meade created a reasonable likelihood of substantially lessening competition or creating a monopoly in the telescope market in violation of Section 7 of the Clayton Act.

*See* Verdict Form*, Orion* Action (Nov. 26, 2019), ECF No. 501.

### D.     The Federal Trade Commission's Actions in the Telescope Market

108.   Antitrust concerns in the telescope market are not new; indeed, they arose in 2005, when Synta acquired Celestron, the largest distributor of telescopes in the United States at the time and a rival of Meade, another telescope distributor. In May 2002, Meade had itself attempted to acquire Celestron. The parties abandoned the deal, however, after the Federal Trade Commission ("FTC") authorized staff to seek a temporary restraining order and a preliminary injunction in federal district court to stop any attempt by Meade to purchase all, or certain assets, of Tasco Holdings, Inc.'s Celestron International, the number two performance telescope provider in the United States and the only other supplier of Schmidt-Cassegrain telescopes. According to the FTC's complaint, Meade's acquisition of Celestron assets would adversely impact the telescope market by eliminating substantial actual competition between the two companies and by creating a monopoly in the market for telescopes.[1]

109.   Similarly, in 1991, the FTC gave final approval to a consent agreement settling charges that a proposed joint venture between Meade and Celestron would have created a virtual monopoly in the manufacture and sale of certain telescopes. The agreement placed a 10-year requirement on Harbour Group Investments, L.P. and Diethelm Holding Ltd. (the former parents

---

[1] FTC Authorizes Injunction to Pre-empt Meade Instruments' Purchase of All, or Certain Assets, of Tasco Holdings, Inc.'s Celestron International, Fed. Trade Comm'n (May 29, 2002), *available at* https://www.ftc.gov/news-events/press-releases/2002/05/ftc-authorizes-injunction-pre-empt-meade-instruments-purchase-all.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                              22

of Meade and Celestron, respectively) to obtain FTC approval before acquiring any company that manufactures or sells certain telescopes in the United States. This consent agreement followed a decision by the United States District Court for the District of Columbia granting the FTC's motion for a preliminary injunction barring the acquisition of any assets or other interest in Celestron International by Harbour Group (Meade's parent) and further barring Diethelm (Celestron's parent) from acquiring any assets or other interest in Meade.[2]

**E.      Defendant Dar Tson ("David") Shen Orchestrated and Participated in the Creation of Ningbo Sunny as a Sham Competitor for Synta, and Managed Ningbo Sunny to Promote Synta's Anticompetitive Ends**

110.   Ningbo Sunny was not formed as a new business venture by independent investors, but rather was created to serve as a sham competitor to Synta at the direction of Defendant Dar Tson ("David") Shen. Mr. Shen had earlier been acquainted with Co-Conspirator Wenjun ("Peter") Ni, and in or around 2001 provided Mr. Ni with a large share of the seed capital necessary for Ningbo Sunny's formation. At the time, Mr. Ni did not have significant available financial resources or the ability to adequately capitalize Ningbo Sunny. In exchange for this infusion of funds, Mr. Shen was granted a 26 percent ownership stake in the new company, an arrangement that gave him significant influence over Ningbo Sunny's affairs and the ability to control and direct the manner in which it pretended to compete with its nominal rival, the by-then well-established, Synta. The creation of Ningbo Sunny gave Mr. Shen the ability to coordinate the activities of a much larger share of the industry's sales than would have been achievable otherwise.

111.   At all times relevant here, and beginning at least as early as 2001 and extending to the present, Ningbo Sunny and Synta coordinated their actions in the consumer telescope market, instead of acting as true competitors.  Indeed, Mr. Shen and Mr. Ni have been close personal friends who met and spoke regularly with each other.

112.   In 2004, Mr. Shen and Mr. Ni deepened their ties by collaborating to form a new

---

[2] *FTC v. Harbour Grp. Invs.*, Civil Action No. 90-2525, 1990 US Dist. LEXIS 15542 (D.D.C. Nov. 19, 1990).

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 23

entity they named Sky-Rainbow, which would later serve as a conduit used by the Defendants to transfer funds between Celestron and Ningbo Sunny to acquire Meade.

113.   Synta's 2005 acquisition of Celestron marked a major step in Synta and Ningbo Sunny's coordinated effort to dominate and exert control over the U.S. telescopes market. In preparation for this step, Mr. Shen resigned from his position as Vice Chairman of Ningbo Sunny. As Laurence Huen explained in an August 2013 email: "David resigned this position on July 2005, in order to avoid any concern of conflict of interest after he acquired Celestron on April 2005." Mr. Shen also nominally divested himself of his interest in Ningbo Sunny by transferring his 26 percent ownership interest to his brother and sister-in-law. This resignation and transfer was, in fact, a sham and Mr. Shen thereafter continued to exert his influence over the management of Ningbo Sunny.

114.   In May 2005, one month after the acquisition, Sylvia Shen of Synta informed Joe Lupica of Celestron and later Meade that it was David Shen's decision to allocate higher-end and lower-end telescopes: "David decided to move all the production for 114mm or smaller items to Sunny" and "Synta will concentrate on bigger and higher end products[.]"

----- Original Message -----
From: sylvia
To: JOE LUPICA
Cc: Sylvia Chen
Sent: Tuesday, May 24, 2005 12:14 PM
Subject: Re: Telephone Conversation with Joe Messner

Dear Joe,
Thank you for your message.
David thinks that you have a very good understanding about his thoughts. He would like you to keep in touch with Joe Messner from time to time to maintain a friendly relationship. To keep the business from Bushnell is one concern, but David is more concern about the potential lawsuit in patent conflict.
I think it is also important to have face-to-face communciations with Joe Messner, I'll check with David to see his opinions and availability.
David decided to move all the production for 114mm or smaller items to Sunny, except Bushnell's. It's a sensative moment, we would rather keep Bushnell's as is. Sytna will concentrate on bigger and higher end products, thus we can support Celestron better.
We appreciate your understanding and efforts.
Thank you and best regards,
Sylvia
----- Original Message -----

115.   In February 2007, Laurence Huen of Celestron wrote: "The facts supporting the movement were well received by David … knowing that he has got certain 'strategic alignment' with Sunny. So shifting to Sunny, if suggested by him, will never be a problem."

116.   In November 2008, Joe Lupica emailed David Shen, Sylvia Shen, and Laurance Huen:

Dear David, Sylvia and Laurence:

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 24

I have reviewed the nondisclosure agreement sent by Baird to Sunny regarding the Meade transaction. … David, are you and Mr. Ni interested in buying Meade jointly?

I would recommend David or Mr. Ni sign this agreement and have them send the financial packet to Laurence. Laurence can make copies and send one copy to David, Mr. Ni and myself. We can then evaluate the possibility of acquiring Meade.

117. In October 2010, Joe Lupica emailed Laurence Huen:

We may have to do this through Sunny because of legal issues associated with Celestron and Meade. …

If David and his family are looking out five to seven years this would be a very advantageous acquisition. Over the first two years we would probably make less than Celestron as a stand-alone company. The other thing for David and his family to consider is that this transaction would complicate our business beyond its current level of complexity. Would the family feel comfortable adding more complexity to the operation beyond what we current have? I don't know the answer to this but they would have to place more faith and trust into others outside the family for the overall success of their business empire. Only the family can answer if this is the approach they want to take.

118. In October 2010, Corey Lee of Celestron emailed Victor Aniceto of Celestron and later Meade: "I think Sunny will *only* do something like that if it was a deal brokered by David."

119. In August 2011, Joe Lupica emailed Dave Anderson of Celestron, Corey Lee, Victor Aniceto:

The visit to Sunny was beneficial in understanding Sunny and Synta's relationship. … I was told that David visits at least 1x a month. … I asked Junwen about the pricing they charge these smaller brands and he thinks that they pay 10 – 15% higher but these are all quoted by Synta. It looks like Synta is Sunny's sales arm.

120. Moreover, in November 2005, the shareholder equity interest of Mr. Shen's brother, Dagong Shen, grew from 10% to 26%. That 26% equity interest remains in the Shen family today, now under the name of David Shen's sister-in-law and Dagong Shen's wife, Yongxue Dong.

121. The interconnections between Mr. Shen and Mr. Ni only deepened when Synta acquired Celestron in 2005.

122. Following Synta's acquisition of Celestron, Synta personnel conducted regular

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                    25

weekly calls with Celestron personnel in the United States in order to manage Celestron's affairs. In addition, starting at least as early as 2008, employees and managers within the Quality Assurance department at Celestron traveled at regular intervals several times a year to China to inspect operations at the manufacturing facilities operated at the direction of Synta (until recently at Suzhou, later at Rugao) and Ningbo Sunny (at Ningbo), Celestron's two most significant suppliers of telescopes. These facilities were located within a few hours' drive of each other, within Jiangsu Province in cities surrounding greater Shanghai. It was the customary practice of Celestron personnel to conduct their inspection activities first at Synta and then on subsequent days at Ningbo Sunny, or vice versa, but always with visits to both suppliers scheduled as part of the same trip from California to China.

123.   On these occasions, Celestron's hosts at Synta or Ningbo Sunny would entertain their guests in the evening. If the event took place in Suzhou or Rugao, senior Ningbo Sunny executives (including Mr. Ni) would travel from Ningbo to Suzhou or Rugao to meet with attendees from Celestron *and* Synta; if at Ningbo, senior Synta executives (including Mr. Shen) would travel from Suzhou or Rugao to Ningbo to meet with their counterparts at Celestron *and* Ningbo Sunny. At Celestron-Synta-Ningbo Sunny dinners, and at continuation sessions later at nightclubs, Mr. Shen and Mr. Ni generally sat at the same table, and had face-to-face discussion providing them ample opportunities to confirm their ongoing loyalty and discuss the coordinated management of their telescopes businesses.

124.   Upon information and belief, at all times relevant and beginning at least as early as 2008, and extending to at least the period when Orion initiated suit in 2016, Messrs. Shen and Ni met together and traveled together elsewhere as well. Mr. Ni would often accompany Mr. Shen on trips to Taiwan, where Mr. Shen operated another telescopes company, so that the pair could meet for several rounds of golf. These trips provided Synta and Ningbo Sunny further opportunities to coordinate the conduct of Synta and Ningbo Sunny and collude with each other.

125.   In November 2013, Ningbo Sunny executives inspected Meade's facilities and operations in Southern California and Mexico as part of their research related to Ningbo Sunny's

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                  26

planned acquisition of Meade. A delegation of seven executives, including Mr. Shen and Mr. Ni, traveled from China to North America for the inspections. The group first flew to Los Angeles, then visited Meade headquarters in Irvine, California, and continued on to Meade's facilities in Tijuana, Mexico. From there, Mr. Shen and Mr. Ni split off from the group and traveled together to play golf in San Diego, traveled together to Tucson, Arizona, and finally returned to Los Angeles before their return flight to China. Their joint traveling together provided further opportunities for them to collude over the marketing and sales of telescopes in the United States.

126. The foregoing conduct including their shared travel strongly supports the allegations that strong bonds existed between Mr. Shen and Mr. Ni long before 2013, when Ningbo Sunny made its collusive acquisition of Meade.

127. The Synta assistance to and coordination with Ningbo Sunny in connection with its acquisition of Meade was not an isolated event; it was merely in furtherance of longstanding cooperation between the entities. Indeed, Mr. Shen's coordination of business activities with Ningbo Sunny, including the formation of Ningbo Sunny, began long before the acquisition of Meade. This conduct is part and parcel of related and similar efforts to set up additional telescopes manufacturers who were made to appear to the outside world as rival competitors, but which were, in fact, influenced by Mr. Shen. These manufacturers included Sky-Watcher, a company so closely affiliated with Celestron that its offices were located within Celestron's offices, and Viewway, another manufacturer Mr. Shen formed in Guangzhou, China.

**F.     Defendants and Co-Conspirators Agreed to Sell Different Telescopes in the Telescope Market**

128. Through their unlawful agreements with horizontal competitors, Synta and Ningbo Sunny effectively divided the telescope market. As alleged above, Synta and Ningbo Sunny agreed that Synta would manufacture and supply higher-end telescopes and Ningbo Sunny would manufacture and supply lower-end telescopes and that they would not compete.

129. They also agreed that Synta would not manufacture or respond to RFQs for telescopes manufactured by Ningbo Sunny and *vice versa*. Both adhered to their agreements. As

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                              27

a result of their respective market shares, agreements not to compete, and significant barriers to entry (*see infra*), Synta and Ningbo Sunny both have engaged in conduct to control the respective telescopes that each sell. Ningbo Sunny and Synta therefore can and do limit supply, fix or stabilize prices, rig bids, and charge supracompetitive prices, and engage in other anticompetitive conduct that artificially increases the prices of telescopes.

130. In the years following Ningbo Sunny's formation, Synta and Ningbo Sunny manufactured telescopes for distributors like Meade and Orion.  During this period, while both Synta and Ningbo enjoyed some success, Defendants were unable to obtain a dominant market share as a number of unaffiliated telescope manufacturing competitors remained.

131. In 2005, Defendants identified an opportunity to avoid this competition. Celestron, a major telescope distributor, was looking to be acquired by a purchaser that could provide additional capital.  If Defendants purchased Celestron, they could then just direct all Celestron manufacturing to Synta and Ningbo Sunny rather than having to compete with other manufacturers for Celestron's business. This would effectively preclude any other telescope manufacturer from being able to compete for Celestron's business.

132. Accordingly in April 2005, it was announced that Synta would acquire Celestron. And in May 2005, Celestron's manufacturing of higher-end telescopes was allocated to Synta and Celestron's manufacturing lower-end telescopes was allocated to Ningbo Sunny.

133. In 2004, Synta Technology began marketing and selling Ningbo Sunny telescopes to U.S.-based purchasers including Orion, an arrangement that was a product of the close coordination between Synta and Ningbo Sunny.

134. Contemporaneously with Synta's 2005 acquisition of Celestron, Synta announced to U.S.-based purchasers, including Orion, that it would no longer manufacture certain telescopes that it had manufactured and supplied to these customers in the past. Synta recommended that these U.S. purchasers acquire the models that Synta had previously supplied from Ningbo Sunny instead. Synta's withdrawal from the market with respect to these product lines and urging purchasers to acquire these products to Ningbo Sunny was made pursuant to a market allocation

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                28

agreement that was part and parcel of their overarching agreement to suppress competition by dividing up the markets between them.

135.   In a December 7, 2007 SEC Form S-1 filing, Meade reported that it "has begun to see increased pricing pressure from Celestron as a result of this change in ownership and a substantial capital infusion by Synta." Meade added: "We have experienced, and continue to experience, difficulties with these manufacturers, including reductions in the availability of production capacity, failure to meet our quality control standards, failure to meet production deadlines and increased manufacturing costs."

136.   By 2009, Synta Technology employee Joyce Huang had abandoned pretense of working only for Synta-affiliated companies, and began issuing invoices to telescope purchasers on behalf of Ningbo Sunny.

137.   In 2010, Synta informed U.S. retailer customers, including Orion, that some of its low-end telescope products would thenceforth be produced by Ningbo Sunny.

138.   As of 2012, Synta employee Ms. Huang was coordinating meetings between Mr. Shen of Synta, Mr. Ni of Ningbo Sunny, and at least one U.S. customer, Peter Moreo of Orion.

### G.   Defendants and Co-Conspirators Colluded on Ningbo Sunny's Acquisition of Meade

139.   Meade was a leading American telescope manufacturer and supplier for many years. It owned critical patents, had a manufacturing facility in Mexico, and manufactured high- and low-end telescopes. One of the patents was for GoTo technology, a highly valued type of telescope mount and related software that can automatically point a telescope at astronomical objects that the user selects. GoTo technology was also the subject of extensive litigation between Meade and Celestron.

140.   When Meade was offered for sale in 2013, Jinghua Optical Co. Ltd. ("Jinghua"), a smaller manufacturer of telescopes and competitor of Ningbo Sunny and Synta, made a bid to purchase it. If Jinghua had been able to purchase Meade, it would have gained critical knowledge about the manufacture of telescopes and accessories as well as Meade's patent portfolio,

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 29

permitting it to better compete with Ningbo Sunny and Synta in the telescope market.

141.    Ningbo Sunny and Synta colluded to prevent Jinghua's acquisition of Meade, which would have diversified manufacturing, preserved an independent distributor, and increased competition in the telescope industry. Ningbo Sunny and Synta were motivated to scupper the Jinghua deal and to conspire because the FTC had blocked Meade and Celestron's merger in 1991 and 2002. Additionally, Synta could not acquire Meade due to its ownership of Celestron. As a result, Ningbo Sunny's Mr. Ni and Synta's Mr. Chen agreed that if Ningbo Sunny moved to acquire Meade, Celestron and Synta would provide financial and other assistance to complete the acquisition. This is not the kind of arrangement into which true competitors enter.

142.    Synta/Celestron made substantial payments and loans to Ningbo Sunny to facilitate the Meade acquisition. These payments were documented, for example, in an accounting provided by Celestron's CFO, Paul Roth. As part of this unlawful agreement, Celestron took equity in Meade, which is memorialized in shadow books kept by Defendants and Co-Conspirators.

143.    On information and belief, in exchange for this support, Ningbo Sunny concealed Synta's and Celestron's involvement or assistance in its acquisition of Meade from the FTC; Ningbo Sunny offered Celestron equity in Meade; Ningbo Sunny provided Celestron and Synta with access to Meade's intellectual property rights, thereby ensuring that Celestron no longer needed to compete with Meade (previously an independent company); and Ningbo Sunny shared its customers' data—including pricing data—with Celestron and Synta, thus enabling them to coordinate their prices and strategies. This cooperation reinforced Synta and Ningbo Sunny's control in the United States for their telescopes, further enabling the price fixing in which they engaged.

144.    Synta and Ningbo Sunny's combination and conspiracy eliminated competitors and increased market concentration. Specifically, the effect of Ningbo Sunny's acquisition of Meade lessened competition, raised the already-high barriers to entry (*see infra*), and tended to allow Synta and Ningbo Sunny to obtain control over the telescope market in the United States. All of this conduct facilitated and made possible the circumstances for the price-fixing in which they

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                    30

engaged.

145.   After the Meade acquisition, Messrs. Shen and Huen continued to provide advice and assistance to horizontal competitors Ningbo Sunny and Meade, met with Mr. Ni about these issues, and toured Meade's facilities. Mr. Huen also instructed Ningbo Sunny to remove Meade's CEO and to replace him with Celestron's former CEO, Mr. Lupica. Again, these are not the actions in which true competitors would engage. These are, instead, the actions of two corporate families that have decided to collaborate instead of compete.

**H.   Defendants and Co-Conspirators Conspired to Interfere with Orion's Acquisition of the Hayneedle Assets**

146.   Synta and Ningbo Sunny also colluded to prevent a competitor, Orion, from acquiring various valuable assets. In 2014, Orion attempted to acquire certain assets, including web domains like telescopes.com, from online retailer, Hayneedle ("Hayneedle Assets"). Defendants and Co-Conspirators used their market power to fix credit terms to prevent Orion from acquiring the Hayneedle Assets. Specifically, they coordinated timing to cut off Orion's credit with the respective businesses when they learned that Orion sought to acquire these assets.

147.   On May 12, 2014, Orion sent a letter of intent to Hayneedle indicating that Orion sought to purchase the Hayneedle Assets. On June 14, 2014, Synta sent Orion's CEO, Peter Moreo, an email that threatened to terminate Orion's credit, stating, "if Orion really buys Hayneedle, this will be the beginning of hazard, we could not trust Orion's credit any more." Synta then forwarded this email to Ningbo Sunny and requested that Ningbo Sunny also withdraw Orion's line of credit. Ningbo Sunny then sent Orion an email nearly identical to Synta's email to Orion. With its supplier credit cut off, Orion could not move forward with the asset acquisition. Synta and Ningbo Sunny therefore sabotaged Orion's purchase of the Hayneedle Assets that would have allowed it to better compete with them in supplying telescopes.

**I.   Illustrative Examples of Defendants' Anticompetitive Conduct and Conspiracy to Fix Prices, Rig Bids, and Allocate the Market**

148.   In the *Orion* Action, evidence demonstrated defendants' anticompetitive conduct

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                     31

which includes, without limitation:

    a.    Fixing or stabilizing the prices of telescopes;

    b.    Rigging bids for telescopes;

    c.    Allocating the market for telescopes;

    d.    Jointly working together to aid and abet Ningbo Sunny's acquisition of Celestron's horizontal competitor, Meade;

    e.    Exchanging non-public, material information with each other, including Meade's intellectual property, business plans, and telescope pricing strategies;

    f.    Exchanging non-public, material information about competitors' businesses, including intellectual property, business plans, and telescope pricing strategies; and

    g.    Aiding and abetting each other's consolidation and maintenance of monopoly power.

149.    Through these activities, the Ningbo Sunny and Synta corporate families illegally combined and conspired with each other instead of competing against one another. Celestron has amassed at least 70 percent of the telescope market in the United States as a result of Defendants' and Co-Conspirators' anticompetitive conduct.

150.    Illustrative examples of Defendants' and Co-Conspirators' conspiratorial conduct in the telescope market that, among other things, facilitated and made possible the circumstances for the market allocation and price fixing in which they engaged, includes, but are not limited to:

151.    Regarding the horizontal competitors' conspiracy to acquire Meade for Ningbo Sunny, Ningbo Sunny's Mr. Ni confirmed to Celestron's then-CEO Mr. David Anderson and directors, Mr. Shen, Mr. Huen, Mr. Chen, and Ms. Sylvia Shen, that Ningbo Sunny would purchase Meade to prevent JOC (Jinghua) from doing so per the parties' discussion and indicated that Celestron and Synta should provide the financial support to Ningbo Sunny.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**    32

From: nbsunny <nbsunny@vip.sina.com>
Sent: Friday, December 13, 2013 12:43 AM
To: DAVE ANDERSON
Cc: david shen; Laurence Huen; Jack chen; shentakuo1
Subject: Fw: Fw: Celestron Payments星特朗付款

Dear Dave,

Thanks for your email and supports!

At the end of June or beginning of July, I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON / SYNTA should be provided the financial support to SUNNY.

At present, Sunny has already paid more than $10 millions to MEADE. According to your email, you said you will not provide the financial support to sunny in 2014. It will not maintain MEADE' s operation, if only support them by sunny. We had borrowed a lot of money from bank for MEADE. Moreover, Meade still needs to addition $3.5 millions working capital to support their normal operation work at the first of 2014.

As your mention, the $10 millions that you support us is included the payment of goods that the terms of payment is 100days. But so far, CELESTRON is total paid $4.5 millions  if we calculated based on the term of payment is 100 days.

In 2014, we hope the term of payment that CELESTRON pay to sunny will less than 50 days form shipping. And maybe you can pay the SYNTA later; I think Mr. Shen will agree it. At present, Meade has already started to borrow money from East West Bank by offering guarantees from sunny. I think it will help to cushion MEADE if Meade get this money from bank.

Best regards,

Ni Wen Jun

152.   In the *Orion* Action, the jury found that Ningbo Sunny and Synta conspired to acquire Meade. Synta made substantial payments and loans to Ningbo Sunny to facilitate the Meade acquisition. Celestron took equity in its competitor, Meade, as part of this unlawful arrangement between Ningbo Sunny and Synta.

153.   Additionally, a California law firm represented Ningbo Sunny in the acquisition of Meade. According to its engagement letter, however, the law firm was required to take instructions from Synta's Mr. Shen and his executives, including Celestron's Joe Lupica and Dave Anderson. Messrs. Lupica and Anderson helped Sheppard Mullin negotiate and structure the transaction and instructed it to keep Messrs. Shen and Ni updated. This is not the kind of arrangement that would occur amongst normal horizontal competitors.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;
Case No. 5:20-cv-03639-EJD                                                                                  33

> 1.   Scope of Representation. Except as we may agree otherwise in writing, we will be representing only the Client and will not be representing any parent, subsidiary or other affiliated entity nor any shareholder, partner, member, director, officer, employee, agent or insurer of the Client. Except as we may otherwise agree, the terms of this letter apply to other engagements for the Client that we may undertake. You have advised us that you will obtain tax advice regarding the Matter from a third party; accordingly, our firm will not be providing any tax advice in connection with the Matter, including, without limitation, tax structuring or tax consequences arising out of the Matter. You have instructed us to take direction from and communicate directly with your advisors, Dave Anderson (President of Celestron), Laurence Huen, David Shen (head of Synta) and Joe Lupica.

154.   Ningbo Sunny's Mr. Ni and Synta's Mr. Shen also agreed that Celestron's then-CEO, Joe Lupica, would be transferred to Ningbo Sunny, and after Ningbo Sunny's acquisition of Meade, Joe Lupica would become Meade's CEO. He and others acted as a conduit of information between Ningbo Sunny and Synta.

155.   When the FTC inquired into whether Synta's Mr. Shen was involved in any way in Ningbo Sunny's Meade acquisition, but the FTC was advised by the law firm that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade" on August 22, 2013. This statement was false given that Ningbo Sunny's Mr. Ni and Synta's Mr. Shen had agreed before this that Mr. Shen and his companies would provide financial support to Ningbo Sunny in connection with the Meade acquisition.

156.   The FTC was also concerned that Synta's Mr. Shen was previously a Ningbo Sunny shareholder. To allay the FTC's concerns, Ningbo Sunny's Mr. Ni formed Sunny Optics, Inc., the entity used to acquire Meade and became its sole shareholder. Ningbo Sunny represented to the FTC that it had nothing to do with the Meade acquisition. Then, after the acquisition closed, Mr. Ni transferred his interest in Sunny Optics to Ningbo Sunny for the nominal amount of $1.

157.   After Ningbo Sunny acquired Meade, Ningbo Sunny and Synta agreed not to compete with each other, which noncompetition was the entire purpose of this charade from the beginning. For example, a December 12, 2013 email thread between the entities reflects a request from Synta's Mr. Shen to Ningbo Sunny's Mr. Ni to reach an understanding with Celestron's then-CEO about not competing against Celestron for sales:

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                34

158.   In a June 13, 2014 email, Synta's Mr. Shen informed Ningbo Sunny's Mr. Ni and Celestron's David Anderson, "The best way in the future is to divide the products and sell them into different markets to reduce conflicts":

159.   Defendants and Co-Conspirators' conduct was in furtherance of their efforts to eliminate competition and fix prices. Ningbo Sunny (and, as a consequence, Meade) agreed not to compete against Celestron. As Meade's then-Vice President of Sales, Victor Aniceto, explained the strategy to Meade's then-CEO Joe Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business."

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 35

**5-ER-0956**

From: "Victor Aniceto" <victor.aniceto@meade.com>
Date: November 12, 2013 at 4:54:52 PM PST
To: "Joe Lupica" <joe.lupica@meade.com>
Subject: proposed promo

Joe,
We met earlier today to discuss promotional activities to generate revenue and kick start our holiday activities.

Attached is a P & L with background on YTD sales on products we currently have instock.

For the LX850, we discussed $1000 off on the mount only. This will result in a retail price of $4999. Comparably, CGE Pro mounts have a special price of $3999 ($1,000 off). We will still be higher by $1,000 but we have Starlock. This is designed to get interest going on this mount as well as take advantage of the great review in S & T.

For the PST, we will offer $100 off which will be competitive against the Lunt offers.
The SMT90-15 needs a boost as we have only sold 3 all year that is why we are aggressive but we will still have good margins.

Lastly, the XWA eyepieces are really under performing and we just need to move the inventory out.

Mr Ni discussed with me earlier that he wants us to remain profitable and he doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business.

We plan to launch this at ASAE and sent to the dealers by Saturday, 11/16/13.

Please provide your approval.

Thanks.

**Victor Aniceto**
Vice President of Sales
Meade Instruments Corp.
victor.aniceto@meade.com
Tel - 949.451.1450, ext. 6364
Fax - 949.451.1460   www.meade.com

160.   Moreover, Celestron's current CEO, Corey Lee, conspired with Synta and Ningbo Sunny to steal competitors' key business information. Ningbo Sunny sells telescopes to Celestron's competitors. Ningbo Sunny provides Celestron with material business information on such customers, including its pricing of telescopes, credit arrangements, and order forecasts. For instance, Ningbo Sunny's James Chiu provided detailed data for several recent years of Orion orders to Celestron's CEO, Corey Lee:

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                          36

From: nbsunny [mailto:nbsunny@vip.sina.com]
Sent: Friday, May 22, 2015 4:58 PM
To: COREY LEE
Subject: 回复: RE: orion 订单统计   Re: Order statistics

Dear Corey,

This is for 2014. I will send for 2013 on Monday.

Junwen

发件人：COREY LEE
发送时间：2015-05-23 06:31
收件人：nbsunny
主题：RE: Re: orion 订单统计   Subject: Re: Order statistics

Junwen,

Thank you. I assume this information is for Orion orders in 2015? Can you supply sales figures for both 2014 and 2013?

Thank you.

Corey

161. Ningbo Sunny and Synta also exchanged and fixed prices. They discussed and agreed on the amount to charge distributors. For example, Ningbo Sunny's James Chiu and Synta's Joyce Huang discussed Ningbo Sunny's prices and determined they should be higher. Similarly, Ms. Huang informed Mr. Chiu that Ningbo Sunny's "payment terms should be the same with Suzhou [Synta.]"

162. In addition to the foregoing, Defendants' internal records reveal their agreement to cooperate with horizontal competitors. In a November 2005 email to Peter Ni, Joe Lupica, Sylvia Shen, Anne Barton, and others, Joe Lupica wrote:

> I think Sunny, Synta and Celestron have a very good opportunity to increase our sales of telescopes, spotting scopes and binoculars over the next few years.
>
> We have very good distribution channels to sell Sunny and Synta products. The quality of the products manufactured at Sunny and Synta will enable Celestron to separate ourselves from all other competitors. I am very excited about our future and I look forward to working together for the benefit of all three companies.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

37

I believe it will be very important over the next two or three years for Sunny, Synta and Celestron to make sure we understand how we plan to distribute the products manufactured by Sunny and Synta to make sure we have the best opportunity to grow. …

Mr. Ni, I truly appreciate your consideration of this very important issue. I think it is important for the three of our companies to look to the world as one strong group of companies. This will better help us compete against all the other Chinese manufacturers.

163. Peter Ni of Ningbo responded:

Sunny will try its best to work with Celestron and Synta to turn these 3 companies into the best and strongest Telescope & sport optics manufacturing and marketing group in the world. I believe we will share the great success out of joint efforts. … Dear Joe, I appreciate your confidence about our future through cooperation. And I am expecting greater success to be made by our common efforts.

164. In December 2011, Celestron's Monthly Management Presentation similarly stated: "The relationship between Celestron, Synta and Sunny has never been stronger. … It is also well understood that each is dependent upon the other for continued growth."

165. Defendants and Co-Conspirators' emails further reveal their agreement to allocate the market and restrict supply. In May 2005, Sylvia Shen emailed Rob Shishino and Joe Lupica: "[T]he production for these models *will be transferred* to Sunny. … we don't want to order from Bosma any more, unless otherwise you have urgent demand in the near future before Sunny can catch up the production."

166. In November 2005, Peter Ni of Ningbo conveyed to Joe Lupica Sylvia Shen, Anne Barton, and others of Synta: "Please be sure that Sunny *will never directly work with or supply* to any of Celestron's dealers and distributors. … And we assure you that we will *never sell* any big diameter telescopes to any third parties."

167. In December 2005, Sylvia Shen emailed Joe Lupica, David Shen's interpreter Nancy Liu, and others: "I reminded him not to order from Bosma, Jinghua for the orders Synta/Sunny can build for you. That is for transition period, now you know clearly whom to buy products from."

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    38

168.   In January 2006, Lupica emailed Shen and Liu: "David, Mr. Ni and I discussed the Powerseekers and Firstscope lines since we intend to discontinue both lines this year[.]"

169.   In a February 2007 "Risk Assessment Memo," Lupica wrote:

> Take Sales from Suppliers that Compete with Synta and Sunny: The additional 40,000 to 50,000 telescopes purchased from Synta/Sunny will not only provide additional work for these two factories but it will also *take business away* from the competitors of Synta/Sunny such as Jinghua and others.

170.   As Ningbo Sunny's Vice Chairman, Mr. Chiu, wrote to Ms. Sylvia Shen to discuss "how to avoid conflict with Celestron products" and state that "[i]f the customer visits our factory and confirms their intention to cooperate with us, we will consider the strategy of separation from Celestron products or adopt different product prices to protect Celestron."

171.   Ningbo Sunny's Mr. Chiu also explained to Synta's Ms. Sylvia Shen that Ningbo Sunny "will take prompt action to avoid conflict in the astronomical market," including "abandoning the small OEM customers so as to protect big customers."

172.   In sum, as Synta's Mr. Shen explained in an email to Ningbo Sunny: "Director Ni will not be a competitor and is trustworthy when it comes to business."

173.   Defendants and Co-Conspirators were able to coordinate and raise telescopes prices as a result of their *per se* illegal agreements and understandings. They sought to avoid competition with each other's telescopes and developed strategies to protect each other from further competition. Mr. Lupica wrote, they did this to collectively "dominate the telescope industry."

174.   As Synta's Mr. Shen explained in an email to senior Celestron executives that he then forwarded to Ningbo Sunny, "we do not need to wage a price war with Orion head-on," because Synta and its co-conspirators could instead simply "replace them" in the marketplace.

**J.   The Structure and Characteristics of the Telescope Market Renders the Conspiracy More Plausible**

175.   The telescope market is conducive to a price-fixing agreement because of its structure and other characteristics, which have made collusion particularly attractive. Specifically, this market: (1) was the subject of market allocation; (2) has high barriers to entry; (3) is highly

concentrated; and (4) has inelastic demand.

176. Likewise, the telescope market is protected from outside competition because telescopes require heavy financial investments and intellectual property licensing. They also require scale to achieve cost efficiencies.

### 1. The Telescope Market Was Subject to Market Allocation

177. Through illegal allocation of the telescope market in the United States, Ningbo Sunny and Synta together have 80 percent of that market.

178. Although Ningbo Sunny and Synta are each capable of manufacturing all types of telescopes, Ningbo Sunny and Synta have an illegal agreement or understanding that Synta manufactures higher-end telescopes, while Ningbo Sunny manufactures lower-end telescopes. Pursuant to that unlawful agreement or understanding, Synta will not compete on telescopes offered by Ningbo Sunny, and *vice versa*.

179. This allocation of the market further enabled the price-fixing conduct described here.

### 2. The Telescope Market Has High Barriers to Entry

180. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

181. There are substantial barriers that preclude, reduce, or make more difficult entry into the telescope market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million-dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, intellectual property rights, and long-standing customer relationships.

182. The high barriers to entry allow Defendants and Co-Conspirators to control prices and output for several reasons. First, manufacturing telescopes requires high capital investments,

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                      40

**5-ER-0961**

and Ningbo Sunny and Synta are vertically integrated with the largest distributors. There is an insufficient number of independent distributors to render independent manufacturing profitable. Second, manufacturing telescopes requires key intellectual property rights, such as patents on software to automatically detect celestial objects demanded by amateur astronomers. Meade invented this software and initially owned the patents. Defendants and Co-Conspirators colluded, however, so that Ningbo Sunny could acquire Meade, thereby blocking independent manufacturers that might have been able to successfully compete with Ningbo Sunny or Synta with this game-changing intellectual property.

183.   As evidence of the high barriers to entry, no new, significant telescope manufacturers have entered the market in at least a decade. Furthermore, in light of Ningbo Sunny's acquisition of Meade, which also had manufacturing capabilities, in 2013, the number of suppliers has essentially dwindled to Ningbo Sunny and Synta.

184.   Furthermore, Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities, and the failure of any replacement suppliers to emerge, demonstrate that the barriers to entry into the telescope market, combined with Defendants' anticompetitive conduct, have effectively foreclosed competition.

### 3.   The Telescope Market Is Highly Concentrated

185.   A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

186.   Defendants and Co-Conspirators control the telescope market in the United States.

187.   Through increasing consolidation, the telescope market in the United States has become increasingly concentrated. In 2005, Synta acquired Celestron as a wholly-owned subsidiary. Celestron became the dominant higher-end telescope distributor in the United States through Defendants and Co-Conspirators' efforts. Subsequently, Ningbo Sunny acquired Meade with Synta's help and became the dominant lower-end telescope distributor in the United States.

188.   Synta and Ningbo Sunny manufacture, market, and/or sell their telescopes to distributors, including their respective wholly-owned subsidiaries Celestron and Meade, which

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 41

then sell the telescopes online, in stores, and through dealers to astronomy enthusiasts in the United States. Celestron and Meade collectively account for the vast majority of telescopes sold in the United States.

189. Synta and Ningbo Sunny have faced limited competition in the telescope market as a result of their acquisition of competitors and agreements with each other. Their anticompetitive conduct, including controlling the supply of telescopes in the United States, further facilitated and made possible the circumstances for the price fixing and market allocation in which they engaged.

190. The telescope market was not always highly concentrated. Ningbo Sunny and Synta transformed this market, however, by colluding to prevent competitors from entering the market and thereby making sure they are the only viable sources of telescopes.

191. As of 2012, Synta and Ningbo Sunny together controlled 80% of the global telescope manufacturing market. The associated Herfindahl-Hirschman Index ("HHI") for the industry—a key market concentration metric often considered by antitrust economists—registered at 3,200 points, well above the 2,500-point threshold generally regarded as evidencing high concentration. Moreover, industry HHI levels remained above 2,500 from 2012 through 2018, the most recent year for which Plaintiffs have collected information to date.

192. Additionally, when Ningbo Sunny acquired Meade with the help of Synta, Defendants and Co-Conspirators removed a competitor and independent supplier from the telescope market—Meade. Neither Celestron nor Meade have seriously competed since Ningbo Sunny's acquisition of Meade or exercised their manufacturing capabilities to diversify the supply of telescopes.

193. Furthermore, Ningbo Sunny and Synta consolidated control of the telescope market by fixing prices and engaging in anticompetitive conduct.

### 4. There Is Inelasticity of Demand for Telescopes

194. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 42

Inelasticity tends to exist when customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

195.   For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales.

196.   Demand for telescopes is highly inelastic because there are no close substitutes for these products.

## V.    CLASS ACTION ALLEGATIONS

197.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following classes ("Nationwide Injunctive Class") under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2):

> All persons and entities who indirectly purchased a telescope for their own use and not for resale during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

198.   Plaintiffs also bring this action on behalf of themselves and as a class of Indirect Purchaser States under Rule 23(a) and (b)(2), seeking damages pursuant to California state antitrust and consumer protection laws as well as common law unjust enrichment on behalf of the following class ("Damages Class"):

> All persons and entities who indirectly purchased a telescope for their own use and not for resale in one of the Indirect Purchaser States during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

199.   The "Indirect Purchaser States," for purposes of this complaint, are: Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada,

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                          43

New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

### A.   California Law Should Be Applied to the Indirect Purchaser States' Damages Class

200.   It is appropriate to apply California law to a class of indirect purchaser plaintiffs from the Indirect Purchaser States because many of Defendants and Co-Conspirators and their respective subsidiaries and affiliates can be found in California and have their principal place of business in California; many of the key witnesses reside in California; Defendants and Co-Conspirators carried out their conspiracy in California, *inter alia*, by coordinating it through the California offices of Ningbo Sunny's legal counsel; and much of Defendants and Co-Conspirators' sales occurred in California. California law should be applied to the Damages Class for the following reasons:

#### 1.   The Conspiracy's Contacts with California: Location of Defendants and Co-Conspirators

201.   Aside from the foreign entities, the most critical corporate entities furthering the conspiracy alleged herein were incorporated in or carried out their principal place of business in California.

202.   Defendant Celestron—a major participant in the conspiracy—is headquartered and has its principal place of business in Torrance, California. Acts in furtherance of the conspiracy by Celestron were carried out in California.

203.   Co-Conspirator Meade—a major participant in the conspiracy, which would have been named as a Defendant but for its bankruptcy petition—is headquartered in Irvine, California. Acts in furtherance of the conspiracy by Meade were carried out in California.

204.   According to an April 11, 2014 email from Mr. Lupica, when Ningbo Sunny acquired Meade in 2013, Meade had over 10 legal entities formed in California that were paying state taxes each year, including Meade Instruments Holding Corp., Meade Coronado Holding Corp., MTSC Holding Corp., MC Holding Corp., Meade Instruments Europe Corp., Meade.com,

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                          44

and Coronado Instruments Inc., among others.

**2.      The Conspiracy's Contacts with California: Location of Individuals**

205.   David Shen regularly comes to this District to meet with distributors of Synta telescopes. Acts in furtherance of the conspiracy by Mr. Shen were carried out in California.

206.   Joe Lupica, Celestron's former CEO and then Meade's former CEO, resides in California. Acts in furtherance of the conspiracy by Mr. Lupica were carried out in California.

207.   Corey Lee, Celestron's CEO, resides in California. Acts in furtherance of the conspiracy by Mr. Lee were carried out in California.

**3.      Specific Targets of the Conspiracy Were from California**

208.   A unanimous jury has already found that Orion, an American retail company that sells telescopes, was harmed by the conspiracy alleged herein.

209.   Orion, which competes with Synta and Ningbo Sunny both in the supply of telescopes and filed a complaint against them in the *Orion* Action, has corporate offices in Watsonville, California and a retail store in Cupertino, California.

**4.      The Conspiracy's Contacts with California: Facilitation of the Conspiracy in California**

210.   The law firm that assisted Ningbo Sunny in its acquisition of Meade helped facilitate the conspiracy in California. For example, a June 6, 2013 engagement letter with Ningbo Sunny in connection with Ningbo Sunny's acquisition of Meade specifies that "this agreement will be governed by the laws of California without regard to its conflict rules."

211.   The attorney who wrote the aforementioned engagement letter, is based in California. On information and belief, he accepted instruction from both Ningbo Sunny and Synta on structuring and negotiating Ningbo Sunny's acquisition of Meade and handled the acquisition from California

212.   Another attorney, who worked on the deal process, is also based in California. On information and belief, he accepted instruction from both Ningbo Sunny and Synta on structuring and negotiating Ningbo Sunny's acquisition of Meade and handled the acquisition from the San

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                            45

Francisco Bay Area. Indeed, a July 16, 2013 email from him to Celestron's then-CEO Mr. Lupica and Celestron's board member, Mr. Huen, regarding next steps in Ningbo Sunny's acquisition of Meade confirms as much.

### 5.     Defendants and Co-Conspirators Targeted California

213.   Defendants and Co-Conspirators directed their conduct at persons and activities within California. For example, Synta manufactures a large proportion of telescopes for California-based Orion under the Orion brand name.

214.   There are at least 73 amateur astronomy clubs in California that feature meetings, viewing nights, star parties, and stargazing programs which, on information and belief, is more than any other state.

215.   Defendants have violated California antitrust and consumer protection laws, and California has an interest in not only protecting its own consumers but in punishing businesses like Defendants that operate within its borders.

### B.     Alternatively, Plaintiffs Seek to Certify State Damages Classes

216.   As an alternative to the Damages Class, in the event California law is not applied to class members' claims residing in states that recognize a form of indirect purchaser cause of action, Plaintiffs seek certification of classes asserting claims for damages under the antitrust statutes and/or consumer protection statutes of the following Indirect Purchaser States (collectively, the "State Damages Classes"):

**Arizona:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Arizona during the period from and including January 1, 2005 through present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Arkansas:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Arkansas during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**California:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in California during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Connecticut:** All persons and entities who indirectly purchased a telescope for their

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;
Case No. 5:20-cv-03639-EJD                                                                        46

own use and not for resale in Connecticut during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**District of Columbia:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in the District of Columbia during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Florida:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Florida during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Hawaii:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Hawaii during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Illinois:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Illinois during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Iowa:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Iowa during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Kansas:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Kansas during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Maine:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Maine during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Massachusetts:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Massachusetts during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Michigan:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Michigan during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Minnesota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Minnesota during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

47

**Mississippi:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Mississippi during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Missouri:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Missouri during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Montana:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Montana during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Nebraska:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Nebraska during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Nevada:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Nevada during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New Hampshire:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New Hampshire during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New Mexico:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New Mexico during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New York:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New York during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**North Carolina:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in North Carolina during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**North Dakota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in North Dakota during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Oregon:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Oregon during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

48

**Rhode Island:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Rhode Island during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**South Carolina:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in South Carolina during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**South Dakota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in South Dakota during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Tennessee:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Tennessee during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Utah:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Utah during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Vermont:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Vermont during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**West Virginia:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in West Virginia during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Wisconsin:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Wisconsin during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

217. The Nationwide Injunctive Class, Damages Class, and the State Damages Classes are referred to herein as the "Classes" unless otherwise indicated. Excluded from the Classes are Defendants and Co-Conspirators, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased telescopes directly. Plaintiffs reserve the right to amend the aforementioned definitions if discovery and further investigation reveal that they should be expanded or otherwise modified.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                    49

**5-ER-0970**

218. Plaintiffs properly bring this action as a class action under Rule 23(a) for the following reasons:

a. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The Classes are so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable. While Plaintiffs does not know the exact number and identity of all Class Members, Plaintiffs are informed and believe that there are tens of thousands of members in each Class. The precise number of Class Members can be ascertained through discovery;

b. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):** There are questions of law and fact common to the Classes which predominate over any questions that may affect particular Class Members. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

i. Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of telescopes sold in the United States;

ii. The identity of the participants of the alleged conspiracy;

iii. The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

iv. Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Cause of Action;

v. Whether the market for telescopes in the United States is the relevant market;

vi. Whether the United States constitutes the relevant geographic

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

50

market;

vii. Whether Defendants possess market or monopoly power in the telescope market;

viii. Whether Defendants and their alleged horizontal competitors agreed or combined to restrain competition and exclude competitors from the telescope market;

ix. Whether Defendants entered into concerted refusals to deal to foreclose competition and exclude competitors from the telescope market;

x. Whether the alleged monopoly and/or attempt to monopolize violated the Sherman Act;

xi. Whether the alleged conspiracy, monopoly, and/or attempt to monopolize violated state antitrust and/or consumer protection laws;

xii. Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Damages Class, thereby entitling Plaintiffs and the members of the Damages Class to disgorgement of all benefits derived by Defendants;

xiii. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the property of Plaintiffs and the members of the Classes;

xiv. The effect of the alleged conspiracy on the prices of telescopes sold in the United States during the Class Period;

xv. Whether Plaintiffs and members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

xvi. Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                51

Classes;

xvii. The appropriate injunctive and related equitable relief for the Nationwide Class; and

xviii. The appropriate class-wide measure of damages for the Damages Class.

c. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of Class Members. Plaintiffs and the Classes have been injured by the same wrongful practices of Defendants. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of the Classes and are based on the same legal theories;

d. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of the Classes in that he has no interests antagonistic to those of the other Class Members, and Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation as counsel;

219. This action is properly brought as a class action under Rule 23(b) for the following reasons:

a. **Class Action Status (Fed. R. Civ. P. 23(b)(1)):** Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by Class Members would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by Class Members would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

b. **Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)):** Certification

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                    52

under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the  Classes as a whole.

    c.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because  questions of law or fact common to Class Members predominate over any questions affecting only individual members, and class action treatment is superior to the other available  methods for the fair and efficient adjudication of this controversy.

    d.    The Classes are ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member were infringed or violated in the same fashion;

220. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    a.    Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    b.    This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured;

    c.    Without a class action, Class Members will continue to suffer damages, and Defendant's violations of law will proceed without remedy while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

    d.    Plaintiffs know of no difficulty that will be encountered in the management

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**    53

of this litigation which would preclude its maintenance as a class action.

## VI.    PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

221.    Ningbo Sunny and Synta's anticompetitive practices have excluded competitors, suppressed innovation, and increased telescope prices.

222.    In the telescope market, price competition has been restrained or eliminated because Ningbo Sunny and Synta engaged in price-fixing, agreed to allocate the market among themselves, and limit supply, thereby raising telescope prices.

223.    By exercising their respective control in the telescope market, Synta and Ningbo Sunny have reduced competitors' sales and margins and diminished competitors' ability and incentive to invest and innovate. Several former competitors of Synta and Ningbo Sunny have sold off or shut down their telescope businesses, unable to achieve sales volumes and margins needed to sustain a viable business.

224.    Consumer choice has also been restrained due to Ningbo Sunny's acquisition of Meade. Since Ningbo Sunny acquired Meade, Meade has not significantly competed with Celestron. Moreover, the acquisition of Meade prevented companies that are trying to compete against Defendants, such as Jinghua, from obtaining a potential manufacturing facility and important intellectual property that would have increased competition.

225.    In the telescope market, price competition has also been restrained or eliminated because Ningbo Sunny and Synta allocated the market among themselves. Additionally, by fixing prices and credit terms so that unaffiliated distributors pay more than affiliated distributors, and by sharing independent distributors' confidential business information with each other, Ningbo Sunny and Synta have prevented independent distributors from fairly competing against their own affiliates and putting downward pressure on prices.

226.    Defendants' conspiracy had the following effects, among others:

    a.    The number of manufacturers and products for telescopes and accessories have been reduced as a result of Synta's acquisition of Celestron and Ningbo Sunny's acquisition of Meade;

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                         54

**5-ER-0975**

    b.    There have been no new entrants into the telescope market for a decade and many independent manufacturers and distributors have gone out of business as a result of Synta and Ningbo Sunny's collusion;

    c.    The concentration of vital intellectual property assets within the nucleus of companies controlled by Synta and Ningbo Sunny working together has reinforced their respective control and erected additional barriers to new entrants;

    d.    Price competition has been restrained or eliminated with respect to telescopes;

    e.    Celestron, empowered and emboldened by its supracompetitive overcharges, now exercises control in the telescope market, including supply to major retailers such as Wal-Mart, Menards, and Costco;

    f.    The prices of telescopes have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    g.    Indirect purchasers of telescopes have been deprived of free and open competition; and

    h.    Indirect purchasers of telescopes paid artificially inflated prices.

227.    These antitrust injuries are of the type that the antitrust laws were meant to punish and prevent.

228.    On information and belief, Ningbo Sunny and Synta have collectively controlled at least 65 percent of the global telescope market since 2012. This figure increased to over 90 percent at certain points during the Class Period.

229.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for telescopes. Telescope distributors and retailers passed on inflated prices to Plaintiffs and the members of the Classes. Those overcharges have unjustly enriched Defendants. Telescopes follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and any cost changes attributable to telescopes can be traced through the

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

chain of distribution to Plaintiffs and the members of the Classes.

230.   Just as telescopes can be physically traced through the supply chain, so can their prices be traced to show that changes in the prices paid by direct purchasers affect prices paid by indirect purchasers. Here, the inflated prices of telescopes resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by distributors and retailers.

231.   The economic and legal literature has recognized that unlawful overcharges in a multiple-level distribution chain normally result in higher prices for those at the bottom of the distribution chain. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[3]

232.   As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[4]

233.   The purpose of the conspiratorial conduct of Defendants and their co-conspirators

[3] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

[4] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 56

was to raise, fix, rig or stabilize the price of telescopes. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of telescopes to distributors and retailers on the price of telescopes to consumers while controlling for the impact of other price-determining factors.

234. The precise amount of the overcharge impacting the prices of telescopes can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

235. By reason of the violations of the antitrust, consumer protection, and unjust enrichment laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their property, having paid higher prices for telescopes than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS

### A.   The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

236. Plaintiffs repeat and re-allege the allegations set forth above. Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) September 2019, when evidence of Defendants' conspiracy was first made public in the *Orion*

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                          57

Action.

237.   Plaintiffs and members of the Classes are consumers that purchased telescopes not for resale. They had no direct contact or interaction with Defendants and had no means from which they could have discovered the telescopes combination and conspiracy described in this Complaint before September 2019.

238.   No information in the public domain was available to Plaintiffs and members of the Classes concerning the combination or conspiracy alleged herein prior to September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion* Action. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants or their co-conspirators' dealings with competitors or direct purchasers, much less the fact that Defendants and their co-conspirators had engaged in the combination and conspiracy alleged herein.

239.   For these reasons, the statute of limitations as to Plaintiff's and the Classes' claims did not begin to run until, at the earliest, September 2019.

**B.      Fraudulent Concealment Tolled the Statute of Limitations**

240.   In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion* Action.

241.   Before that time, Plaintiffs and the members of the Classes were unaware of Defendants' unlawful conduct and did not know before then that they were paying supra-competitive prices for telescopes throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

242.   The affirmative acts of Defendants alleged herein, including acts in furtherance of

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                          58

the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. The following are illustrative examples of Defendants' fraudulent concealment:

243. Beginning with the 2005 acquisition of Celestron, Synta and Ningbo Sunny attempted to conceal that Mr. Shen would remain in control of Ningbo Sunny after the acquisition. Among other things, as discussed above, Defendants represented that Mr. Shen had resigned from his position as Vice Chairman of Ningbo Sunny following the acquisition and held no other position in Ningbo Sunny since the acquisition. However, as Defendants' internal correspondence clearly demonstrate (*see infra*), Mr. Shen's remained firmly in control of Ningbo Sunny after the Celestron acquisition.

244. Following the Celestron acquisition, Defendants also attempted to conceal their broader agreement to cooperate as horizontal competitors. Among other misrepresentations, in an April 2005 press release about the acquisition, Joseph Lupica publicly stated: "This acquisition is in the best interest of Celestron dealers, employees, consumers and the telescope industry as a whole. Synta and Celestron will form a strong team to provide competitive products of the highest quality for consumers." The release also avoided making any explicit reference to Ningbo Sunny, stating instead that Synta had "related companies" and Synta's "related companies will continue to manufacture and supply other telescopes and related products for Celestron."

245. In the April 2005 press release, Defendants further stated: "Celestron will be in a position . . . to lead the product engineering, development and manufacturing processes from the Torrance, California headquarters. . . . Celestron's operations will remain in Torrance, the management team will stay intact[.]" ECF No. 117-5. This was another misrepresentation as Synta had already communicated to Celestron that members of the Shen family, including David Shen and Sylvia Shen, would oversee Celestron.

246. In August 2006, Joe Lupica was admonished for representing Synta and Ningbo Sunny as "sister companies" and instructed "not refer to Sunny as an affiliated company again." Accordingly, in subsequent communications with competitors and customers, Mr. Lupica concealed the fact that, Synta and Ningbo Sunny were "sister companies." However, those

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                     59

specific representations were false.  As a 2010 internal Celestron presentation acknowledged, Synta and Ningbo Sunny were and would remain "sister companies."

247.   Shortly after the Celestron acquisition, Defendants further concealed their intent to expand into the lower-end telescope market through their acquisition of Celestron. In an April 2005 email to Bushnell Telescopes, for example, David Shen stated:

> Thank you for your long term trust and support.  After Celestron acquisition I believe we have more areas that we can provide services to you. There are a lot of rumors spreaded around by competitors, saying Synta is going to build volume low end traditional products to compete Bushnell,.. etc.  It must cause your great concern.  It is not true, on the contrary, we are not interested in big volume chain store orders. …
>
> I have no interest to compete the volume low price products with Bushnell, Meade or others. Celestron has good reputation in high end high price products, I'll exert all my effort in this area to maintain and strengthen its reputation. Once again, I would like to address, I have no intention to compete with you. We are looking forward to exploring more opportunies to serve you."

248.   Synta and Ningbo Sunny also attempted to conceal the existence of their transactions in connection with Ningbo Sunny's acquisition of Meade. David Anderson revealed in an email recently disclosed in pending litigation that "Since July Celestron has made $10 million in anticipated payments to Ningbo Sunny. This represents a majority of the monies that will be paid to Ningbo Sunny this year. If Celestron continues with this payment pattern it will need to disclose this arrangement to its auditors and its bank. Though we see this as temporary an outside group (such as the bank or auditing firm) will interpret it as a significant change due to the fact that the majority of payments for the last 7 months were made in anticipation with no discernable benefit to Celestron."

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                           60

249. Additionally, as stated, *supra*, when the FTC inquired into whether Synta's Mr. Shen was involved in Ningbo Sunny's Meade acquisition, it represented to the FTC that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade[.]" This statement was false in light of the fact that Ningbo Sunny's Mr. Ni and Synta's Mr. Shen agreed before this that Mr. Shen and his companies would provide financial support to Ningbo Sunny in connection with the Meade acquisition.

250. Furthermore, as part of Synta and Ningbo Sunny's collusion regarding Meade, Celestron took equity in Meade, which is memorialized in Defendants and Co-Conspirators' shadow books.

251. Additionally, Defendants and Co-Conspirators also intentionally and fraudulently concealed their conspiracy from the public by filing disclosures with the SEC relating to the Meade transaction that failed to disclose Mr. Shen, Synta, and Celestron's involvement and role in the Meade acquisition.

252. In addition to the foregoing acts of fraudulent concealment, by their very nature, Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing. Telescopes are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the telescopes industry to be a competitive industry. On information and belief, Defendants met and communicated in secret and agreed to keep the facts about its collusive conduct from being discovered by any member of the public or by distributors, retailers, and other direct purchasers with whom they did business. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' telescope prices before September 2019, at the earliest.

253. Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                          61

254.   Because the alleged conspiracy was self-concealing and affirmatively concealed by Defendants and its co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until, at the earliest, September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion* Action.

255.   For these reasons, the statute of limitations applicable to Plaintiffs and the Classes' claims was tolled and did not begin to run until September 2019.

## VIII.  CAUSES OF ACTION

<u>First Cause of Action</u>
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Restraint of Trade**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

256.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

257.   Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

258.   The acts done by Defendants as part of, and in furtherance of, its and its co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

259.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, rig bids for, or control prices for telescopes, thereby creating anticompetitive effects.

260.   The anticompetitive acts were intentionally directed at the United States market for telescopes and had a substantial and foreseeable effect on interstate commerce by stabilizing, raising, or fixing prices for telescopes throughout the United States.

261.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for telescopes.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                      62

**5-ER-0983**

262.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Injunctive Class who purchased telescopes have been harmed by being forced to pay inflated, supra-competitive prices for telescopes.

263.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

264.   Defendants and their co-conspirators' conspiracy had the following effects, among others:

    a.   Price competition in the market for telescopes has been restrained, suppressed, and/or eliminated in the United States;

    b.   Prices for telescopes sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

    c.   Plaintiffs and members of the Nationwide Injunctive Class who purchased telescopes indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

265.   Plaintiffs and members of the Nationwide Injunctive Class have been injured and will continue to be injured in their business and property by paying more for telescopes purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

266.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

267.   Plaintiffs and members of the Nationwide Injunctive Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
    63

**Second Cause of Action**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Monopolization**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

268. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

269. The relevant market is the market for telescopes in the United States. Plaintiffs reserve the right to redefine the relevant market following further discovery.

270. Defendants and Co-Conspirators have monopoly power in the market for telescopes in the United States.

271. Defendants and Co-Conspirators have acquired and maintained their respective monopolies in the telescope market through:

a. Synta's acquisition of Celestron in 2005;

b. Synta facilitating Ningbo Sunny's acquisition of Meade in 2013, thereby eliminating Meade as a competitor manufacturer and distributor and increasing market concentration;

c. Synta and Ningbo Sunny agreeing to allocate the telescope market;

d. Synta and Ningbo Sunny agreeing not to bid on RFQs for each other's telescope offerings;

e. Synta and Ningbo Sunny exchanging their intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies; and

f. Synta and Ningbo Sunny exchanging their competitors' (*e.g.*, Orion's) intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies.

272. Defendants and Co-Conspirators have acquired and maintained their respective monopolies through the aforementioned conduct plus:

a. Colluding to prevent Jinghua from acquiring Meade;

b. Making false representations to the FTC regarding Synta's involvement in Ningbo Sunny's acquisition of Meade; and

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 64

      c.     Colluding to sabotage Orion's acquisition of the Hayneedle Assets.

273. Defendants' acquisition or maintenance of their monopolies is not a result of growth or development as a consequence of a superior product, business acumen, or historic accident, but is the result of the unlawful conduct alleged herein.

274. There is no procompetitive justification for Defendants' anticompetitive conduct that outweighs its anticompetitive effects; namely, the foreclosure of competition in the telescope market. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

275. Defendants' willful acquisition or maintenance of their respective monopolies in the telescope market injured, and continues to injure, Plaintiffs and members of the Nationwide Class in their property by:

      a.     Restricting output and limiting consumer choice in the telescope market; and

      b.     Forcing Plaintiffs and members of the Nationwide Class to pay artificially high, supracompetitive prices for telescopes.

276. The injury to Plaintiffs and members of the Nationwide Class was a foreseeable consequence of Defendants' willful acquisition or maintenance of its monopoly in the telescope market.

277. Plaintiffs and members of the Nationwide Class have suffered irreparable harm and do not have an adequate remedy at law. Accordingly, Plaintiffs and members of the Nationwide Class seek injunctive and equitable relief.

**Third Cause of Action**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Attempted Monopolization**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

278. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

279. The relevant market is the market for telescopes in the United States. Plaintiffs reserve the right to redefine the relevant market following further discovery.

280. Defendants and Co-Conspirators have monopoly power in the market for telescopes

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**           65

in the United States.

281.   Defendants and Co-Conspirators have acquired and maintained their respective monopolies in the market for telescopes in the United States through:

     a.    Synta's acquisition of Celestron in 2005;

     b.    Synta facilitating Ningbo Sunny's acquisition of Meade in 2013, thereby eliminating Meade as a competitor manufacturer and distributor and increasing market concentration;

     c.    Synta and Ningbo Sunny agreeing to allocating the telescope market such that Synta manufacturers higher-end telescopes and Ningbo Sunny manufacturers lower-end telescopes;

     d.    Synta and Ningbo Sunny agreeing to not to bid on RFQs for each other's telescope offerings;

     e.    Synta and Ningbo Sunny exchanging their intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies; and

     f.    Synta and Ningbo Sunny exchanging their competitors' (*e.g.*, Orion's) intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies.

282.   Defendants and Co-Conspirators have acquired and maintained their respective monopoly through the aforementioned conduct plus:

     a.    Colluding to prevent Jinghua from acquiring Meade;

     b.    Making false representations to the FTC regarding Synta's involvement in Ningbo Sunny's acquisition of Meade; and

     c.    Colluding to sabotage Orion's acquisition of the Hayneedle Assets.

283.   The anticompetitive conduct described herein undertaken by Defendants create a dangerous probability that Defendants will achieve monopoly power in the telescope market. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive

alternatives.

284. Defendants' predatory and anticompetitive conduct described herein, which was done with the intent of monopolizing the telescope market, injured, and continues to injure, Plaintiffs and members of the Class in their property by:

     a.    Restricting output and limiting consumer choice in the telescope market; and

     b.    Forcing Plaintiffs and members of the Class to pay artificially high, supracompetitive prices for telescopes.

285. The injury to Plaintiffs and members of the Class was a foreseeable consequence of Defendants' predatory and unlawful conduct, described herein, which was done with the intent of monopolizing the telescope market.

286. Plaintiffs and members of the Class have suffered irreparable harm and do not have an adequate remedy at law. Accordingly, Plaintiffs and members of the Class seek injunctive and equitable relief.

**Fourth Cause of Action**
**Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

287. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

288. As a result of Ningbo Sunny's acquisition of Meade and Synta's facilitation thereof, Synta and Ningbo Sunny has been able to exercise market power in the market for telescopes in the United States. The acquisition created the largest syndicates of telescope manufacturers and telescope distributors in the United States. This market is highly concentrated and the acquisition further significantly increased market concentration.

289. It is unlikely that entry into the market would remedy, in a timely manner, the anticompetitive effects from Ningbo Sunny's acquisition of Meade in 2013. Entry is difficult and likely to take years because of the intellectual property needed to manufacture telescopes, the time required to plan for and to complete manufacturing facilities, and the time required to plan for and establish the distribution channels.

290. The effect of the mergers substantially lessens competition in the provision of in

---

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
Case No. 5:20-cv-03639-EJD

violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, in the following ways:

     a.    Eliminating actual, direct, and substantial competition between Synta and Ningbo Sunny in the market for telescopes in the United States;

     b.    Increasing the ability of the merged entities to unilaterally raise prices of telescopes;

     c.    Eliminating Meade as a substantial and independent competitor in the market;

     d.    Eliminating the diversity of telescope offerings by Defendants;

     e.    Increasing the prices of telescopes to consumers; and

     f.    Reducing incentives to improve telescope quality in the relevant market.

291. Ningbo Sunny's acquisition of Meade has substantially lessened competition in the market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18 as well as decreased telescope options and increased telescope prices to consumers.

**Fifth Cause of Action**
**Violation of the State Antitrust Laws**
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)**

292. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

293. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the market for telescopes in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

294. The contract, combination, or conspiracy consisted of an agreement among Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for telescopes and to allocate products and customers in the United States.

295. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**        68

a.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price telescopes at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to telescopes sold in the United States;

b.    allocating products and customers in the United States in furtherance of their agreements; and

c.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

296.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products and customers.

297.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

298.    Defendants have entered into an unlawful agreement in restraint of or to monopolize trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Arizona; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

b.    In violation of Arizona Revised Statutes § 44-1403, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;
Case No. 5:20-cv-03639-EJD                                                                 69

5-ER-0990

occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

299.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

a.   During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, telescopes at supra-competitive levels; to prevent competition in the market for telescopes; and to pool, combine, and directly and indirectly unite their interests connected with the sale of telescopes to elevate the price at which telescopes are sold.

b.   The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, telescopes.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 70

**5-ER-0991**

c. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of telescopes; and (2) Allocating among themselves the production of telescopes.

d. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) Price competition in the market for telescopes has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for telescopes sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased telescopes directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

*e.* By virtue of the conduct alleged herein, Defendants have entered into contracts, in concerted action with others, where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in California in violation of Section 16720, *et seq.*

f. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for telescopes than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions

Code.

300.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut General Statutes §§ 35-26 *et seq.*

    a.    Connecticut's legislature conferred broad standing under the Connecticut Antitrust Act based on an important principle of protecting the public from anticompetitive behavior and of promoting competition in the marketplace.

    b.    Under the Connecticut Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. Conn. Gen. Stat. § 35-46a.

    c.    Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful. Conn. Gen. Stat. § 35-26.

    d.    Every contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful. Conn. Gen. Stat. § 35-27.

    e.    Every contract, combination, or conspiracy that has the purpose of effect of fixing, controlling, or maintaining prices in any part of trade or commerce; or of fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of any part of trade or commerce, is also unlawful. Conn. Gen. Stat. § 35-28.

    f.    Defendants made contracts or engaged in a combination or conspiracy with each other by maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of telescopes for the purpose of, and which had the desired effect of, fixing, controlling, or maintaining prices for telescopes within the intrastate commerce of Connecticut, and to monopolize and attempt to monopolize said commerce.

    g.    Plaintiffs purchased telescopes within the State of Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                          72

telescopes would have been lower, in an amount to be determined at trial.

h.   Plaintiffs and members of the Class were injured with respect to purchases of telescopes in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs, and injunctive relief.

i.   Sec. 35-44b. Judicial construction of Connecticut Antitrust Act. It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes.

301.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of District of Columbia Code Annotated § 28-4503, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                      73

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

302.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 ILCS10/1, *et seq.*

a.    The Illinois Antitrust Act, 740 ILCS10/1, *et seq.*, aims to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILCS 10/2.

b.    Plaintiffs purchased telescopes within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price for telescopes would have been lower, in an amount to be determined at trial.

c.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

d.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling, or maintaining prices for telescopes sold, and/or for allocating products and customers within the intrastate commerce of Illinois.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                           74

     e.     Defendants further unreasonably restrained trade or commerce and established, maintained, used, and attempted to acquire monopoly power over the market for telescopes in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/3 § 3(3).

303.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

     a.     Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Iowa; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

     b.     In violation of Iowa Code § 553.5, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Iowa, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

     c.     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

     d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
75

**5-ER-0996**

304. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

    a.    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Kansas Statutes Annotated, § 50-101. Defendants have acted in violation of § 50-101 to fix, raise, stabilize, and maintain prices of, and allocate markets for, telescopes at supra-competitive levels; to prevent competition in the market for telescopes; and to pool, combine, and directly unite their interests in connection with the sale of telescopes to elevate the price at which telescopes are sold.

    b.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Kansas; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    c.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

305. Defendants have entered into an unlawful agreement in restraint of trade in violation

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
76

of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

    a.    Defendants entered into a combination in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101.

    b.    Defendants further monopolized, attempted to monopolized, and combined and conspired together to monopolize trade in telescopes including with the State of Maine in violation of Maine Rev. Stat. Ann. 10, § 1102.

    c.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Maine; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    d.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

    e.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    f.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

306.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

    a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Michigan; (2) telescope prices were raised, fixed, maintained

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
77

and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b. In violation of Michigan Compiled Laws Annotated, § 445.773, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Michigan, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

307. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a. Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                              78

**5-ER-0999**

supracompetitive, artificially inflated prices for telescopes.

b.　In violation of Minnesota Statutes 325D.52, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Minnesota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.　During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.　As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.　By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

308.　Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

a.　Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

b.　In violation of Mississippi Code Annotated § 75-21-3, Defendants monopolized and attempted to monopolize the market for telescopes, a substantial part of which occurred within Mississippi, for the purpose of

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**　　　　　　　　　　　　　　　　　　　79

excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

309.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq*.

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of Nebraska Revised Statute § 59-802, Defendants monopolized, attempted to monopolize, and combined or conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Nebraska, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
80

Nebraska commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

310.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Nevada; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of Nevada Revised Statutes Annotated § 598.60(1)(e), Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                     81

property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

311.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of New Hampshire Revised Statutes § 356:3, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within New Hampshire, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 82

**5-ER-1003**

restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

312. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

 a. Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

 b. In violation of New Mexico Statutes § 57-1-2, Defendants monopolized, attempted to monopolize, and conspired and combined to monopolize trade or commerce in the telescope market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

 c. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

 d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

 e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

313. Defendants have entered into an unlawful agreement in restraint of trade in violation

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                     83

of the New York General Business Laws §§ 340, *et seq*.

    a. Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New York; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes when they purchased telescopes, or purchased telescopes that were otherwise of lower quality than they would have been absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase telescopes that they otherwise would have purchased absent the illegal conduct.

    b. Defendants entered into a contract, agreement, arrangement, or combination with at least one other person whereby:

        i. A monopoly in the telescope market, substantially affecting commerce in New York, was established or maintained; (b) Competition or the free exercise of conduct in the telescope market, substantially affecting commerce in New York, was restrained; or (c) Competition was restrained for the purpose of establishing or maintaining a monopoly or unlawfully interfering with the free exercise of conduct in the telescope market.

    c. During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

    d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e. By reason of the foregoing, Defendants have entered into agreements in

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

314. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

    a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    In violation of North Carolina General Statutes § 75-2.1, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within North Carolina, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

    c.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

315.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of North Dakota Code § 51-08.1-03, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within North Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

316.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Oregon; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of Oregon Revised Statutes § 646.730, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Oregon, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

317.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) telescope prices were raised, fixed, maintained

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
87

**5-ER-1008**

and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.  In violation of South Dakota Codified Laws § 37-1-3.2, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within South Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.  During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

318.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

a.  Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                      88

supra-competitive, artificially inflated prices for telescopes.

b.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Tennessee, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market, such that in place of a free, open and competitive market, a monopoly in the Tennessee market has been maintained.

c.  During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

319.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq*.

a.  Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Utah; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.  In violation of Utah Code Annotated § 76-10-3104, Defendants monopolized, attempted to monopolize, and combined and conspired

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                     89

together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants' have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

320. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*.

a. Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Vermont; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

321.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of West Virginia Code § 47-18-4, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                              91

322.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*.

       a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

       b.    In violation of Wisconsin Statutes § 133.03, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Wisconsin, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

       c.    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

       d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

       e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

323.  Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for telescopes than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**         92

This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

324. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from its anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

325. Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## Sixth Cause of Action
### Violation of State Consumer Protection Laws
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)**

326. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

327. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

328. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

    a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which telescopes were sold, distributed, or obtained in Arkansas and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

    b. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

    c. Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

93

Arkansas; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

329. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

a. During the Class Period, Defendants marketed, sold, or distributed telescopes in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

b. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                94

c.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

d.    Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

e.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

f.    Defendants' acts or practices are unfair to purchasers of telescopes in the State of California within the meaning of Section 17200, California Business and Professions Code;

g.    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

h.    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                95

**5-ER-1016**

business acts or practices.

    i.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

    j.    The unlawful and unfair business practices of Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for telescopes. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

    k.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

    l.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

330. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

    a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which telescopes were sold, distributed or obtained in the District of Columbia.

    b.    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
96

**5-ER-1017**

unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for telescopes. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing telescopes because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges. Defendants' conduct with regard to telescopes, including its illegal conspiracy to secretly fix the price of telescopes at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for telescopes.

c. Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially inflated prices for telescope.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                      97

Class seek all relief available under that statute.

331. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

    a.    Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Florida; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

    c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

    d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

332. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

    a.    Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4)

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 98

**5-ER-1019**

Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of Hawaii Revised Statutes § 480-9, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Hawaii, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

e.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Revised Statutes §§ 480-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

333.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

a.   Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

b.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Massachusetts and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

c.   Defendants' unlawful conduct had the following effects: (1) telescopes price competition was restrained, suppressed, and eliminated throughout

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                      99

Massachusetts; (2) telescopes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

    e.    Defendants have been or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to Defendants not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

    f.    By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

334. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

    a.    Plaintiffs and the Damages Class purchased telescopes for personal, family, or household purposes.

    b.    Defendants engaged in the conduct described herein in connection with telescopes in trade or commerce in a market that includes Missouri.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
100

c.    Defendants agreed to, and did in fact, affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

d.    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for telescopes. It concealed, suppressed, and omitted facts that would have been important to Plaintiffs and members of the Damages Class as they related to the cost of telescopes they purchased.

e.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in telescopes by making public statements that were not in accord with the facts.

f.    Defendants' statements and conduct concerning the price of telescopes were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing telescopes at prices established by a free and fair market.

g.    Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Missouri; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

h.    The foregoing acts and practices constituted unlawful practices in violation

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                           101

of the Missouri Merchandising Practices Act.

i.  As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

j.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

335.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq.*

a.  Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Montana; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.  During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
102

and members of the Damages Class have been injured and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

336. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which telescopes were sold, distributed or obtained in New Mexico and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for telescopes as set forth in N.M.S.A., § 57-12-2E. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for telescopes. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing telescopes because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs' could avoid the overcharges. Defendants' conduct with regard to

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                         103

**5-ER-1024**

telescopes, including its illegal conspiracy to secretly fix the price of telescopes at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for telescopes.

c.   Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d.   During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

337.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

a.   Defendants agreed to, and did in fact, act in restraint of trade or commerce

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                      104

by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed or obtained in New York and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b. Defendants and their co-conspirators made public statements about the prices of telescopes that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for telescopes; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

c. Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased telescopes were misled to believe that they were paying a fair price for telescopes or the price increases for telescopes were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

d. Defendants knew that its unlawful trade practices with respect to pricing telescopes would have an impact on New York consumers and not just Defendants' direct customers.

e. Defendants knew that their unlawful trade practices with respect to pricing telescopes would have a broad impact, causing consumer class members who indirectly purchased telescopes to be injured by paying more for telescopes than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349,

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g. Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New York; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

h. During the Class Period, Defendants marketed, sold, or distributed telescopes in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed telescopes in New York.

j. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

338. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed or obtained in North Carolina and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b. Defendants' price-fixing conspiracy could not have succeeded absent

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                106

deceptive conduct by Defendants to cover up its illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of telescopes created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed its unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

c.   The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d.   Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
107

**5-ER-1028**

e.   During the Class Period, Defendants marketed, sold, or distributed telescopes in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

f.   During the Class Period, Defendants, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed telescopes in North Carolina.

g.   Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

339.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

a.   Members of this Damages Class purchased telescopes for personal, family, or household purposes.

b.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Rhode Island.

c.   Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for telescopes. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, it breached that duty by its silence. Defendants misrepresented to all consumers during the Class Period that its telescope

prices were competitive and fair.

d. Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

e. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f. Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of telescopes, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing telescopes at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of telescopes they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

340. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

a. Defendants' combination or conspiracy had the following effects: (1)

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

109

**5-ER-1030**

telescopes price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) telescopes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

    c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

341. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

    a. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Vermont.

    b. By virtue of the conduct alleged herein, Defendants and those acting in concert with them entered into contracts where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in Vermont in violation of Section 2453, *et seq.*, of Vermont Title 9.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

110

c.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for telescopes. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by its silence. Defendants misrepresented to all consumers during the Class Period that its telescope prices were competitive and fair.

d.  Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Vermont; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

e.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f.  Defendants' deception, including its affirmative misrepresentations and omissions concerning the prices of telescopes, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing telescopes at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Seventh Cause of Action**
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)**

342. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

343. Plaintiffs bring this claim under the laws of each of the Indirect Purchaser States.

344. As a result of its unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on telescopes.

345. Defendants have benefited from its unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the members of the Damages Class for telescopes.

346. Plaintiffs and the members of the Damages Class are entitled to Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a *pro rata* basis.

347. Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased telescopes subject to Defendants' conspiracy would have been futile.

**IX. PRAYER FOR RELIEF**

348. Accordingly, Plaintiffs respectfully request that:

349. The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) and direct that reasonable notice of this action be given to each and every member of the Class as provided by Rule 23(c)(2).

350. That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

    a.    An unreasonable restraint of trade or commerce in violation of Section 1 of

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
112

the Sherman Act;

    b.    A *per se* violation of Section 1 of the Sherman Act;

    c.    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and consumer protection laws as set forth herein; and

    d.    Acts of unjust enrichment by Defendants as set forth herein.

351.   Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

352.   Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

353.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

354.   Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of its acts of unfair competition and acts of unjust enrichment;

355.   Plaintiffs and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

356.   Plaintiffs and the members of the Classes recover their costs of suit, including

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**    113

reasonable attorneys' fees, as provided by law; and

357.   Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## X.    JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                        114

**5-ER-1035**

Dated:  December 5, 2022

Respectfully Submitted,

/s/ Kalpana Srinivasan
Kalpana Srinivasan (Bar No. 237460)
Marc M. Seltzer (Bar No. 54534)
Steven Sklaver (Bar No.237612)
Michael Gervais (Bar No. 330731)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Phone: 310-789-3100
ksrinivasan@susmangodfrey.com
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com

Alejandra C. Salinas (*pro hac vice*)
Texas SBN 24102452
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
asalinas@susmangodfrey.com

/s/ *Lin Y. Chan*
Lin Y. Chan (SBN 255027)
Eric B. Fastiff (SBN 182260)
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
lchan@lchb.com
efastiff@lchb.com

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

115

**5-ER-1036**

/s/ Adam J. Zapala
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
James G. Dallal (SBN 277826)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**

116

**5-ER-1037**